# EXHIBIT B

JONES DAY
Jane Rue Wittstein
Thomas E. Lynch
Michael T. Ferruggia
250 Vesey Street
New York, NY 10281
Tel: (212) 326-3939
Fax: (212) 755-7306

*Attorneys for Reorganized Debtor*
*NIU HOLDINGS LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------- x | | |
| In the matter of: | : | **Chapter 11** |
| | : | |
| NIU Holdings LLC, | : | **Case No. 15-10155 (SCC)** |
| | : | |
| Reorganized Debtor. | : | |
| -------------------------------------------------------- :x | | |
| NIU Holdings LLC, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | **Adv. Proc. No. _____** |
| AT&T Mobility Holdings, B.V.; New Cingular | : | |
| Wireless Services, Inc.; Nextel International | : | |
| (Uruguay) LLC; and Communicaciones Nextel | : | |
| de México S.A. DE C.V., | : | |
| | : | |
| Defendants. | : | |
| -------------------------------------------------------- | : | |
| | :x | |

**[PROPOSED] ADVERSARY COMPLAINT FOR**
**DECLARATORY JUDGMENT AND BREACH OF CONTRACT**

**PROPOSED ADVERSARY COMPLAINT AS OF 2/11/2019**

**TABLE OF CONTENTS**

Page

I.     NATURE OF THE ACTION .................................................................................. 1

II.    JURISDICTION AND VENUE ............................................................................ 9

III.   THE PARTIES ....................................................................................................... 9

     A.    PLAINTIFF ................................................................................................ 9

          1.    NIU Holdings ................................................................................ 9

     B.    DEFENDANTS .......................................................................................... 9

          1.    AT&T Mobility .............................................................................. 9

          2.    New Cingular ................................................................................ 9

          3.    Nextel Uruguay ............................................................................ 9

          4.    Com Nextel ................................................................................... 9

IV.   FACTUAL BACKGROUND ................................................................................ 10

     A.    NII's Bankruptcy Case ............................................................................ 10

     B.    The Agreements ...................................................................................... 10

          1.    The Purchase and Sale Agreement .............................................. 10

          2.    The Escrow Agreement ................................................................ 11

     C.    AT&T's April 2017 Escrow Claim Notice ............................................. 13

          1.    AT&T's First Revision to Its Claimed Amounts ......................... 15

          2.    NIU's Objection ........................................................................... 16

          3.    AT&T's Second Revision to Its Claimed Amounts ..................... 16

          4.    AT&T's Claimed Amounts as of July 2017 ................................. 17

     D.    The Recent Resolution of Defendant Com Nextel's 2010 and 2011 Audits ........... 18

     E.    AT&T's Assertion of New Claims Against the Escrow Account After the Final Release Date ................................................................................. 20

V.    CLAIMS FOR RELIEF ....................................................................................... 21

     A.    Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a) ....................... 21

     B.    Breach of Contract .................................................................................. 23

VI.   PRAYER FOR RELIEF ....................................................................................... 24

**PROPOSED ADVERSARY COMPLAINT AS OF 2/11/2019**

Plaintiff NIU Holdings LLC[1]  ("NIU" or "Plaintiff"), by and through  its undersigned counsel,

brings this adversary proceeding against defendants AT&T Mobility Holdings B.V. ("AT&T"),

New Cingular Wireless Services, Inc. ("New Cingular"), Nextel International (Uruguay) LLC

("Nextel Uruguay"), and Communicaciones Nextel de México S.A. DE C.V. ("Defendant Com

Nextel," and collectively with AT&T Mobility, New Cingular and Nextel Uruguay, the

"Defendants"; together with Plaintiff, the "Parties"), and alleges as follows:

## I.     NATURE OF THE ACTION

1.      This adversary proceeding arises out of Defendants' efforts to frustrate Plaintiff's

receipt of funds from an Escrow Account (defined below) to which Plaintiff is entitled under the

agreements entered into by the Parties and approved by this Court.  Plaintiff seeks a judgment:

(1) declaring that Defendants are in breach of the relevant agreements and (2) directing

the disbursement to NIU of $68,325,951 from the Escrow Account in which the disputed funds are

currently held.

2.      This dispute arises from a Purchase and Sale Agreement (the "Purchase Agreement"),

dated January 26, 2015, that was approved by this Court as part of the chapter 11 bankruptcy

proceedings of NII Holdings and its affiliates, including NIU.  (*See In re: NII Holdings, Inc.*, Case

No. 14-12611 (the "NII Bankruptcy Proceedings"), ECF No. 575.)

3.      A significant event in the NII Bankruptcy Proceedings was the sale of the debtors'

Mexican business operations to Defendant New Cingular (an affiliate of AT&T) for $1.875 billion in

---

[1] NIU Holdings LLC filed its petition on January 25, 2015 in the above-captioned case (Dkt No. 1).
At the time, NIU's proceedings were jointly administered (*see* Dkt No. 9) as part of the chapter 11
cases of NII Holdings, Inc. ("NII Holdings") and its affiliated debtors under NII Holdings' case
number 14-12611.  Filings in the jointly administered proceedings will be cited as "ECF No. __".  On
October 18, 2016, the Court entered the *Final Decree Pursuant to Section 350(a) of the Bankruptcy
Code and Bankruptcy Rule 3022 Closing the Debtors' Jointly Administered Chapter 11 Cases,* Dkt
No. 10; ECF No. 988.  On February 11, 2019, NIU Holdings filed a motion to reopen its bankruptcy
case in order to commence this adversary proceeding (Dkt No. 11).

accordance with the terms of the agreed and approved Purchase Agreement and its ancillary documents. This sale was the cornerstone of the Debtors' First Amended Joint Plan of Reorganization,[2] and the sale proceeds were recognized as the key source for funding the Plan. (*See* Plan at II.E.)

4. The Purchase Agreement provided that $187.5 million—ten percent of the total purchase price—would be held in a designated escrow account (the "Escrow Account")[3] following the closing of the sale to satisfy indemnification claims AT&T was entitled to make within specified times based on pre-closing liabilities for which NII remained responsible. (Ex. 2, Purchase Agreement at 11.4(a), 11.5(a); Ex. 3, Escrow Agreement at 3(e)(i)(2).) Among expected indemnification claims were tax liabilities related to years before the sale closed and for which final liabilities had not been fixed.

---

[2] The *First Amended Joint Plan of Reorganization (Plan and Disclosure Statement Solicitation Version*, April 20, 2015, ECF No. 664) was approved by this Court on June 19, 2015 in the *Findings of Fact, Conclusions of Law and Order Confirming Pursuant to Section 1129(a) and (b) of the Bankruptcy Code The First Amended Joint Plan of Reorganization Proposed by the Debtors and Debtors in Possession and The Official Committee of Unsecured Creditors* (the "Confirmation Order") (ECF No. 831), which attached the First Amended Joint Plan of Reorganization as modified by certain ministerial and immaterial changes as Appendix I to the Confirmation Order (the "Plan") (ECF No. 831, Appx I). The Mexico Sale Order as defined in the Plan (hereinafter "Sale Order") refers to the *Order: (I) Approving Purchase and Sale Agreement; (II) Authorizing the Sale of All of the Membership Interests of Nextel International (Uruguay) LLC Free and Clear of Interests; (III) Approving the Transfer and Novation of the Liabilities of Nextel International (Uruguay) LLC, Enjoining the Enforcement of Such Liabilities and Dismissing Its Chapter 11 Case and (IV) Granting Certain Related Relief*, entered on March 23, 2015 (ECF No. 575) (attached hereto as Exhibit 1). The successful consummation of the Mexico sale was a condition precedent to the Effective Date of the Plan. (*See* Plan at VII.B.3.)

[3] Operation of the Escrow Account is governed by an Escrow Agreement (the "Escrow Agreement") which accompanied the Purchase Agreement and was one of the ancillary documents specifically governed by the Sale Order. (*See* Ex. 2, Purchase Agreement at Prelim. Stat. E; Ex. 3, Escrow Agreement; Sale Order at 2.)

5.      The sale of NII's Mexican business operations closed on April 30, 2015, and $187.5 million of the sale price was deposited into the Escrow Account in accordance with the Purchase Agreement and its accompanying Escrow Agreement.

6.      Under the terms of the Escrow Agreement, the "Final Release Date" for the Escrow Account was April 30, 2017.  (*See* Ex. 3, Escrow Agreement at 3(e)(iii)(1) (setting the date as "after the second anniversary of the Closing Date.")  Defendants were obligated to deliver "Claim Notices" identifying all "Claimed Amounts" subject to the Escrow Account on or before that Final Release Date.  (*Id.* at 3(e)(i)(2) (defining Claim Notice and Claimed Amount) and 3(e)(iii)(1)(setting Final Release Date).)  Specifically, with respect to any individual claims that the Purchaser might assert against the Escrow Account, Section 3(e)(i)(2) of the Escrow Agreement required a specific "Claim Notice" describing the claim in reasonable detail and providing the estimated amount to be held in reserve, all to be prepared in good faith:

> If the Purchaser intends to assert a claim against the Escrow Fund for Damages pursuant to Article 9 or Article 11 of the Purchase and Sale Agreement (each a "Claim"), then Purchaser shall deliver a written notice to Escrow Agent (with a copy to Seller) (each a "Claim Notice") describing such claim in reasonable detail and stating the estimate of the amount of the Escrow Fund to be reserved with respect to such Claim prepared in good faith based on information then available (the amount set forth in the applicable Claim Notice, the "Claimed Amount") (emphasis added).

7.      After the April 30, 2017 Final Release Date, the Parties were obligated to execute a "Joint Release Notice" directing the release of remaining funds in the Escrow Account to NIU, except to the extent Claimed Amounts subject to Claim Notices remained in dispute or the "Objection Period" had not yet run as to a noticed "Claim."  (*Id.* at 2(e)(i) (defining Joint Release Notice), 3(e)(i)(3) (defining Objection Period), 3(e)(i)(2) (defining Claim), and 3(e)(iii)(1) (providing for execution of Joint Release Notice).)

8.      On April 27, 2017, Defendant AT&T delivered to the Escrow Agent an Escrow Claim Notice (the "April 2017 Escrow Claim Notice") pursuant to the Escrow Agreement purporting to assert a right to disbursement of $117.9 million relating to certain "Taxes and Damages" (as defined in the Purchase Agreement) for fiscal years 2010-2014 and for which AT&T purported to claim a right to immediate payment from the escrowed funds.  (Ex. 4, AT&T's April 2017 Escrow Claim Notice.)  AT&T's April 2017 Escrow Claim Notice declared that the $117.9 million was an "aggregate amount of such Taxes and Damages" to which AT&T claimed a right to payment from Escrow Account funds.  AT&T's April 2017 Escrow Claim Notice divided the $117.9 million into two categories of estimated Taxes and Damages, with $80,600,000 relating to alleged liabilities for Defendant Com Nextel and $37,300,000 relating to alleged liabilities for certain affiliated Other Entities.[4]

9.      AT&T's delivery of the April 2017 Escrow Claim Notice served to immediately encumber $117.9 million in funds in the Escrow Account on the eve of the Final Release Date, effectively blocking NIU's timely access to funds to which it was otherwise entitled simply by providing what has now proven to be this grossly inflated April 2017 Escrow Claim Notice, as discussed below (and which may well have been unsupported by the "good faith" required under section 3(e)(i)(2) of the Escrow Agreement).

10.     On April 28, 2017 and in response to a demand from NIU, AT&T supplied NIU with detail regarding the $117.9 million in estimated Taxes and Damages that were the subject of its April 2017 Escrow Claim Notice.  (Ex. 5, 4/28/2017 Email from David Welsch to Shana Smith.)

---

[4] The affiliated "Other Entities" are Inversiones Nextel de Mexico, S. de R.L. de C.V. ("Inv. Mexico"), NII Telecom S. de R.L. de C.V. ("NII Telecom") and NII Digital, S. de R.L. de C.V. ("NII Digital").

AT&T described its specific, individual estimates for Taxes and Damages claimed for each entity, for each year, and for each type of Mexican regulatory audit, as shown in Table 1:

| Audit | Entity | Estimated Taxes and Damages (USD) |
|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $38,600,000 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $37,100,000 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("**IEPS**") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | $9,900,000 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | $3,000,000 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $3,800,000 |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $1,100,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $12,900,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | $7,700,000 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $3,800,000 |

TABLE 1

11.     The Claim Amounts provided by AT&T, while ascribed to specific entities and specific tax years, were not all predicated on issues that had actually been raised in audits associated with those entities for the tax year being "estimated"; rather, AT&T appeared to take tax issues raised for one year and extrapolate potential liability to other years, creating inflated estimates as the basis for asserting the $117.9 million demand on the eve of the Final Release Date.  *See, e.g.*, ¶ 45 *infra* (revising downward the aggregate amount of the Disputed Claim Amounts because AT&T had not actually received written notice of a 2012 income tax audit for Com Nextel).

12.     Under the terms of the Escrow Agreement, NIU had thirty (30) days to object to the April 2017 Escrow Claim Notice, as clarified by AT&T's April 28 correspondence.  (Ex. 3, Escrow Agreement at 3(e)(i)(3).)  NIU timely disputed AT&T's April 2017 Escrow Claim Notice by delivering an Objection Notice to the Escrow Agent on May 25, 2017.  While NIU's Objection Notice effectively preserved the status quo by preventing disbursement of the $117.9 million AT&T demanded from the Escrow Account based on its inflated estimates of potential future claims, all funds that were subject to AT&T's Claim Amounts were required to be frozen pending an agreement between the Parties or a court order.  (*See* Ex. 6, 5/25/2017 Objection Letter; Ex. 7, 5/25/2017 Letter from Shana Smith to AT&T.)

13.     Specifically, under the Escrow Agreement, the funds that are the subject of AT&T's April 2017 Escrow Claim Notice and NIU's Objection Notice are "Disputed Claim Amounts" and thus are required by the terms of the Escrow Agreement to remain in the Escrow Account until the Escrow Agent receives the earlier of a Joint Release Notice from the Parties or a Final Judgment authorizing disbursement.  (Ex. 3, Escrow Agreement at 3(e)(ii).)

14.     The Parties need not resolve each and every disputed tax claim that is the subject of AT&T's April 2017 Escrow Claim Notice before any funds in the Escrow Account are to be released.  Instead, the Escrow Agreement provides that "upon resolution of <u>any</u> dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser <u>shall deliver a Joint Release Notice</u> . . . to release . . . to Purchaser, the applicable amount . . . that is payable . . . and . . . to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts <u>still pending or disputed</u> . . . ."  (Ex. 3, Escrow Agreement at 3(e)(iii)(2) (emphasis added).)  Accordingly, as timely asserted individual claims are resolved, NIU is entitled to funds in the Escrow Account that are no longer Disputed

Claim Amounts, and the Parties are obligated to deliver a Joint Release Notice to the Escrow Agent

to release the excess funds to Purchaser.  (*Id.*)

       15. In fact, following NIU's identification of two errors in the April 2017 Escrow

Claim Notice, AT&T agreed to correct the total aggregate amount of its estimated claims, resulting in

a reduction in its total claims to $109,941,971 from its original total of $117.9 million, and the release

of the related amounts from escrow to NIU.  (*See* Ex. 8, 5/18/2017 Adjustment to Claimed Amount

and Joint Release Notice; Ex. 9, 7/18/2017 Joint Release Notice.)  One of these errors resulted from

AT&T's inclusion of a specific individual claim that did not qualify for indemnification, while the

other resulted from the incorrect calculation of interest payments.  (*See infra* ¶¶ 43, 45-49.)  This

demonstrates that, as required by the Escrow Agreement, as specific individual claims are resolved,

the related amounts are to be disbursed to NIU and AT&T respectively, according to the Parties'

resolution of that specific claim.

       16.    The dispute giving rise to this action arises from AT&T's unwillingness to deliver

a Joint Release Notice releasing funds from the Escrow Account to which NIU is entitled as a result

of Defendant Com Nextel's 2010 and 2011 audits being resolved with the Mexican tax authorities.

In its April 2017 Escrow Claim Notice, AT&T estimated that those Mexican tax audit matters

justified its demand for *more than $70 million* from the Escrow Account, and that inflated estimate

was the basis for holding up these funds when amounts not subject to a Claim Notice were released in

2017.  The final liability for those 2010 and 2011 audits of Defendant Com Nextel has now been

finally resolved:  the amended tax returns were filed, the amounts determined to be owed have been

satisfied, and the relevant government authorities have provided confirmation that the audits are

completed.  For 2011, there is an additional administrative document that is pending signature and is

expected to be completed in mid-February. But given the filing of the amended return and payment of

the agreed additional amount due, the audit is closed and the liability for 2011 is fixed. The approximately $3.9 million—*less than 5.6% of the amount originally demanded in the April 2017 Escrow Claim Notice*—required to indemnify AT&T for those matters has been disbursed to AT&T from the Escrow Account with NIU's consent in a Joint Release Notice. AT&T, however, refuses to execute a Joint Release Notice authorizing disbursement to NIU of $68,325,951, the excess funds originally estimated by AT&T but never needed for those potential claims.

17.     Rather than release excess funds in compliance with the Parties' agreements, AT&T is withholding its consent to an appropriate Joint Release Notice and demanding that the Escrow Account funds be applied to entirely new demands for potential indemnity never included in its April 2017 Escrow Claim Notice or otherwise identified before the Final Release Date. (*See, e.g.*, Ex. 10, 4/5/2018 Letter from David Welsch to Shana Smith (suggesting an increase of $70 million to AT&T's original claim).) To the extent AT&T may ultimately be entitled to demand indemnification from NIU for additional rights under the Purchase Agreement, its ability to assert those as "Claims" against funds in the Escrow Account expired on the Final Release Date, April 30, 2017. (Ex. 3, Escrow Agreement at 3(e)(iii)(1).) In other words, AT&T may have continuing indemnification rights against NIU under the Purchase Agreement, but it has no right to encumber Escrow Account funds based on either newly asserted demands or upwardly revised Claims for which estimates were provided prior to the Final Release Date.

18.     Accordingly, NIU seeks an order and judgment finding and determining that (1) AT&T is in breach of the Purchase Agreement and the Escrow Agreement; and (2) there is no longer any dispute with respect to Defendant Com Nextel's 2010 and 2011 audits and the excess $68,325,951 should be released from the Escrow Account to NIU.

## II.      JURISDICTION AND VENUE

19.      This Court has jurisdiction to consider this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. 157(b).

20.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.     THE PARTIES

### A.      PLAINTIFF

#### 1.      NIU Holdings

21.      NIU Holdings is a Delaware limited liability company based in Reston, Virginia.

### B.      DEFENDANTS

#### 1.      AT&T Mobility

22.      Upon information and belief, Defendant AT&T Mobility is a Netherlands company based in Dallas, Texas.  As noted below, AT&T Mobility is a permitted assignee of New Cingular's rights and interests in the agreements in issue in this adversary proceeding.

#### 2.      New Cingular

23.      Upon information and belief, Defendant New Cingular is a Delaware corporation based in Redmond, Washington.

#### 3.      Nextel Uruguay

24.      Upon information and belief, Defendant Nextel Uruguay is a Delaware limited liability company based in Reston, Virginia.

#### 4.      Com Nextel

25.      Upon information and belief, Defendant Com Nextel is a Mexican corporation based in Mexico City, Mexico.

## IV.    FACTUAL BACKGROUND

### A.    NII's Bankruptcy Case

26.    On September 15, 2014, NII Holdings and several of its affiliates filed for bankruptcy under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, in proceedings jointly administered by this Court under Case No. 14-12611.  In connection with the bankruptcy, the debtors sought to sell off, among other assets, the entirety of the debtors' Mexican business operations.

27.    To that end, on January 24, 2015, NIHD Telecom Holdings, B.V. ("NIHD")— formerly the legal and beneficial owner of NIU Holdings—engaged in a transaction pursuant to which it transferred 100% of the outstanding membership interests of Nextel Uruguay to NIU Holdings.  At the time, Nextel Uruguay owned 7,575,738,489 shares, the vast majority, of the capital stock of Defendant Com Nextel.  The 3,595 remaining outstanding shares of Defendant Com Nextel were already owned by a wholly owned subsidiary of Defendant Com Nextel.  Thus, this transaction involved the transfer of all of NII Holdings' interests in Defendant Com Nextel to NIU Holdings.

28.    Thereafter, on January 26, 2015, NIU Holdings entered into the Purchase Agreement pursuant to which, as explained in greater detail below, it agreed to sell all of its interests in Nextel Uruguay, and therefore also all of its interests in Defendant Com Nextel, to New Cingular.  On March 23, 2015, this Court approved the proposed sale transaction and Purchase Agreement, pursuant to Sections 105 and 363 of the Bankruptcy Code.  (ECF No. 575.)  As is explained below, that sale transaction ultimately closed on April 30, 2015, and ownership of Defendant Com Nextel thereby transferred to New Cingular.

### B.    The Agreements

#### 1.    The Purchase and Sale Agreement

29.    The sale of the debtors' Mexican business was memorialized in the Purchase Agreement pursuant to which NIU (the "Seller") agreed to sell all of its "right, title and interest in

10

and to [Nextel Uruguay's] Interests, free and clear of all 363 Interests [as defined in the Purchase Agreement]." (Ex. 2, Purchase Agreement at 23(2.2).) The Final Purchase Price for this sale was approximately $1.875 billion, minus certain adjustments. The Purchase Agreement was executed on January 26, 2015 and the closing took place on April 30, 2015.

30.    The Purchase Agreement includes a provision for tax indemnification,[5] which states that NIU is "responsible for, and will indemnify and hold harmless [AT&T] . . . for all Taxes and Damages relating to . . . any taxes imposed on the Entities that are attributable to any PreClosing Period . . . ." (Ex. 2, Purchase Agreement at 83(11.4(a)).) Payments for such indemnification obligations may be made from the Escrow Account, in accordance with its terms, or from NIU directly. (Ex. 2, Purchase Agreement at 83(11.4(b)).)

31.    AT&T may seek indemnification for tax matters "[i]f a <u>written notice</u> of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a 'Tax Claim') is delivered or sent to or commenced or initiated against any of the Entities by any Government Authority with respect to Taxes or Tax Returns . . . ." (Ex. 2, Purchase Agreement at 84(11.5(a)) (emphasis added).) In the event that AT&T receives such written notice, it must "promptly notify [NIU] in writing of the Tax Claim . . . ." (Ex. 2, Purchase Agreement at 84(11.5(a)) (emphasis added).)

## 2.    The Escrow Agreement

32.    In conjunction with the Purchase Agreement (*see* Ex. 2, Purchase Agreement at Prelim Stat. E), NIU, New Cingular and Citibank N.A. executed the Escrow Agreement, dated as of January 26, 2015 to establish a fund that could be available, among other purposes, to satisfy claims arising after the closing of the Purchase Agreement. Under that agreement, upon closing of the Purchase

---

[5] Notably, tax indemnification is separate from other forms of indemnification under the agreement. (Ex. 2, Purchase Agreement at 86(11.7(a)).)

Agreement, NIU deposited the "Escrow Amount" of $187.5 million into the Escrow Account. (Ex. 2, Purchase Agreement at 7.) Citibank was appointed as the Escrow Agent charged with administering this Escrow Account. (Ex. 2, Purchase Agreement at 7.)

33.     Among other things, the Escrow Agreement sets forth the requirements for any distribution funds from the Escrow Account. For example, if there is no dispute as to the distribution of money, the Purchaser and Seller may jointly execute and deliver to the Escrow Agent a Joint Release Notice instructing the Escrow Agent how and to whom to distribute the funds.

34.     The procedure for disbursements is different when, as is relevant to this action, there is a dispute between the Parties as to entitlement to funds in the Escrow Account. With respect to demands that the Purchaser might assert against the Escrow Account for alleged "Damages" it claims to have suffered under the Purchase Agreement, Section 3(e)(i)(2) of the Escrow Agreement provides:

> If the Purchaser intends to assert a claim against the Escrow Fund for Damages pursuant to Article 9 or Article 11 of the Purchase and Sale Agreement (each a "Claim"), then Purchaser shall deliver a written notice to Escrow Agent (with a copy to Seller) (each a "Claim Notice") describing such claim in reasonable detail and stating the estimate of the amount of the Escrow Fund to be reserved with respect to such Claim prepared in good faith based on information then available (the amount set forth in the applicable Claim Notice, the "Claimed Amount") (emphasis added).

35.     After the Purchaser files a Claim Notice, describing the claim in "reasonable detail" and providing an "estimate of the amount . . . to be reserved with respect to such Claim" which is to be "prepared in good faith based on information then available" pursuant to Section 3(e)(i)(2) of the Escrow Agreement, the Seller has thirty (30) days to file an "Objection Notice" setting forth any objection it may have to the Purchaser's Claim Notice. (*See* Ex. 3, Escrow Agreement at 3(e)(i)(3).) Upon the Seller's objection, the distribution procedures set forth in section 3(e)(ii) of the Escrow Agreement apply.

36.     Section 3(e)(ii) of the Escrow Agreement requires the Escrow Agent to distribute only undisputed amounts and to "continue to hold in the Escrow Account the amount in dispute (each such amount, a "Disputed Claim Amount") . . . ."  The Escrow Agent is then required to hold the Disputed Claim Amount until either (i) it receives from the Parties a Joint Release Notice directing the disposition of "all or part of" the Disputed Claim Amount, or (ii) a written notice by either the Purchaser or Seller (with copy to the other party) of a legally binding settlement agreement or a final and nonappealable order or judgment of a court or arbitral tribunal.  (Ex. 3, Escrow Agreement at 3(e)(ii).)

37.     The "Final Release Date" for the Escrow Account is defined in the Escrow Agreement as "after the second anniversary of the Closing Date."  (*See* Ex. 3, Escrow Agreement at 3(e)(iii)(1).) In this case, the Final Release Date was April 30, 2017.

38.     After that Final Release Date, the Escrow Agreement provides that all funds remaining in the Escrow Account are to be returned to NIU, except to the extent there are still disputes as to Claimed Amounts or the Objection Period has not yet run as to a noticed Claim.  (*See* Ex. 3, Escrow Agreement at 3(e)(iii).)  The Escrow Agreement further provides that "upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser shall deliver a Joint Release Notice . . . to release . . . to Purchaser, the applicable amount . . . that is payable . . . and . . . to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate disputed Claim Amounts still pending or disputed . . . ." (Ex. 3, Escrow Agreement at 3(e)(iii)(2).)

C.     **AT&T's April 2017 Escrow Claim Notice**

39. On April 27, 2017, three days before the Escrow Agreement's Final Release Date, AT&T delivered to the Escrow Agent the April 2017 Escrow Claim Notice seeking disbursement of

an "aggregate amount of such Taxes and Damages" totaling $117.9 million for fiscal years 2010–

2014.  (Ex. 4, April 2017 Escrow Claim Notice.)[6]

40. While AT&T's April 2017 Escrow Claim Notice indicated aggregate estimated

taxes and damages of $80,600,000 related to Defendant Com Nextel and $37,300,000 related to the

affiliated Other Entities, more specificity was required under the Parties' agreements.[7]  (*See, e.g.*, Ex.

2, Purchase Agreement at 11.5(a) (defining each Tax Claim singularly as written notice of, among

other things, an audit); Ex. 3, Escrow Agreement at 3(e)(i)(2) (requiring that each Claim Notice must

state "a reasonable estimate of the amount of the Escrow Fund to be reserved with respect to such

[Tax] Claim").)

---

[6] The April 2017 Escrow Claim Notice of $117.9 million represented more than 70% of the $163.5 million remaining in the Escrow Account as of the Final Release Date.

[7] The April 2017 Escrow Claim Notice, even as clarified by the April 28, 2017 correspondence, arguably failed to provide the "reasonable estimate(s) … prepared in good faith" for each asserted claim, since certain amounts were "Damages" that bore no reasonable relationship to the actual anticipated liability and thus arguably violated Section 3(e)(i)(2) of the Escrow Agreement.  NIU does not waive any of the bases on which it has objected to the April 2017 Escrow Claim, but is focused here on Defendants' refusal to adhere to the requirement that excess funds reserved for a Disputed Claim be released once the claim for a specific tax year that was the subject of a Disputed Claim Amount has been resolved.  (Ex. 3, Escrow Agreement at 3(e)(iii)(2) ("upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser *shall* deliver a Joint Release Notice . . . to release . . . to Purchaser an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed . . . .")(emphasis added).)

41.     On April 28, 2017, in response to NIU's initial requests for a breakdown of the claims included in the April 2017 Escrow Claim Notice, AT&T provided the following table:

TABLE 1 (as of April 2017)

| Audit | Entity | Estimated Taxes and Damages (USD) |
|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $38,600,000 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $37,100,000 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("IEPS") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | $9,900,000 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | $3,000,000 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $3,800,000 |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $1,100,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $12,900,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | $7,700,000 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $3,800,000 |

42.     Except for the claims in Table 1, AT&T made no other claims against the Escrow Account for tax indemnities under Article 11 of the Purchase Agreement (or otherwise) prior to the Final Release Date.  Accordingly, on May 4, 2017, the Parties delivered to the Escrow Agent a Joint Release Notice releasing to NIU $45,562,279.58 – the entire balance remaining in the Escrow Account less the Disputed Claim Amounts set forth in Table 1.  (Ex. 11, 5/4/2017 Joint Release Notice.)

**1.     AT&T's First Revision to Its Claimed Amounts**

43.     On May 18, 2017, following correspondence with NIU regarding the April 2017 Escrow Claim Notice, AT&T revised the estimated aggregate amount of its claims from $117.9 million downward to $113.8 million "based on calculations of certain interest payments."  (Ex. 8,

5/18/2017 Adjustment to Claimed Amount and Joint Release Notice.)  The Parties therefore delivered

to the Escrow Agent a Joint Release Notice directing the release of the $4.1 million back to NIU.

(*Id.*)

### 2.    NIU's Objection

44.    On May 25, 2017, NIU timely objected to the April 2017 Escrow Claim Notice.  (Ex.

6, 5/25/2017 Objection Letter; Ex. 7, 5/25/2017 Letter from Shana Smith to AT&T.)  NIU set forth in

that objection specific responses to each of AT&T's individual claims based on AT&T's April 28,

2017 breakdown.  (*Id.*)  As is described above, the Escrow Agreement provides that the Disputed

Claim Amount remains in escrow "until the earlier to occur of the Escrow Agent's receipt of (1) a

Joint Release Notice executed and delivered by Purchase and Seller directing the disposition of all or

part of such Disputed Claim Amount in respect of which a dispute between Purchaser and Seller has

been resolved or (2) written notice executed and delivered by Purchaser and Seller (with a copy to the

other party) accompanied by a copy of (i) a legally binding agreement entered into by the Parties with

respect to the dispute, (ii) a final and nonappealable order or judgment of a court of competent

jurisdiction with respect to the dispute, or (iii) a final and nonappealable determination of an

arbitration or like panel to which the Parties have agreed to submit with respect to the dispute."  (Ex.

3, Escrow Agreement at 3(e)(ii).)

### 3.    AT&T's Second Revision to Its Claimed Amounts

45.    On July 18, 2017, AT&T conceded that its claims in relation to 2012 income taxes

for Defendant Com Nextel were not based on any "written notice" as is required by the Purchase

Agreement.  (Ex. 2, Purchase Agreement at 11.5(a).)  Accordingly, the Parties delivered to the

Escrow Agent a Joint Release Notice calling for the release of $3,816,390 to NIU.  (Ex. 9, 7/18/2017

Joint Release Notice.)

46. The Parties' July 18, 2017 joint release of $3,816,390 to NIU from the Escrow Account to NIU reduced the aggregate amount of the Disputed Claim Amounts from $113.8 million to $109,941,971.

### 4. AT&T's Claimed Amounts as of July 2017

47. Based on the information AT&T has provided to NIU, the $109,941,971 aggregate amount of AT&T's remaining claims on the Escrow Account following the Parties' July 2017 joint release was comprised of $73,373,864 in claims related to Defendant Com Nextel and $36,568,107 in claims related to affiliated Other Entities.

48. The changes to AT&T's claimed amounts from the April 2017 Escrow Claim Notice through its May 2017 revision and the July 2017 joint release are set forth in the table below:

TABLE 2 (as of July 2017)

| Audit | Entity | Estimated Taxes and Damages (USD) | Adjustments | Updated Amount |
|---|---|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 38,600,000 | (3,137,035) | 35,462,965 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 37,100,000 | (242,294) | 36,857,706 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 3,800,000 | (3,800,000) | - |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 1,100,000 | (46,807) | 1,053,193 |
| | Total Comunicaciones Nextel | 80,600,000 | (7,226,136) | 73,373,864 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("IEPS") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | 9,900,000 | (739,929) | 9,160,071 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | 3,000,000 | 5,111 | 3,005,111 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | 12,900,000 | (40,164) | 12,859,836 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | 7,700,000 | 6,870 | 7,706,870 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | 3,800,000 | 36,219 | 3,836,219 |
| | Total Other Entities | 37,300,000 | (731,893) | 36,568,107 |
| | Total Claims | 117,900,000 | | 109,941,971 |

49. The original April 2017 Escrow Claim Notice amounts are listed in the column titled "Estimated Taxes and Damages (USD)." The reductions to claims from May 2017 and July 2017

are shown in the "Adjustments" column. The new aggregate amount of AT&T's claims subject to its April 2017 Escrow Claim Notice is shown in the column titled "Updated Amount."

**D.      The Recent Resolution of Defendant Com Nextel's 2010 and 2011 Audits**

50.      Upon information and belief, AT&T satisfied 100% of its obligations with respect to Defendant Com Nextel's 2010 tax audit without any outlay of cash, and accordingly, no escrow funds were disbursed to AT&T.

51.      On July 9, 2018, the Parties executed a Joint Release Notice that provided for the disbursement of $3,994,720.20 to AT&T from the Escrow Account related to resolution of Defendant Com Nextel's 2011 tax audit. (Ex. 12, 7/9/2018 Letter Agreement and Joint Release Notice.)

52.      Following the July 9, 2018 disbursement of funds from the Escrow Agreement related to Defendant Com Nextel's 2011 tax audit, the funds in the Escrow Account subject to Disputed Claims was reduced from $109,941,971 to $105,947,250.80.

53.      As demonstrated in Table 2, above, AT&T estimated claims of $35,462,965 and $36,857,706, respectively, for Defendant Com Nextel's 2010 and 2011 audits within AT&T's aggregate claim amounts.

54.      Defendant Com Nextel's 2010 and 2011 audits have now been resolved. The amended returns have been filed, all amounts determined to be due have been satisfied, and the relevant governmental authorities have provided confirmation that the audits at issue are resolved and closed. As a result, there is no longer any basis for AT&T to maintain its claims to funds in the Escrow Account related to those formerly potential liabilities.

55.      Notwithstanding resolution of Defendant Com Nextel's 2010 audit, AT&T has not agreed to jointly release to NIU $35,462,965 in accordance with the Escrow Agreement, as that amount is the remaining Disputed Claim Amount related to Defendant Com Nextel's 2010 audit, which is no longer a potential liability and should not be disputed.

56.     Similarly, notwithstanding resolution of Defendant Com Nextel's 2011 audit, AT&T

has not agreed to jointly release to NIU $32,862,986 in accordance with the Escrow Agreement, as

that amount is the remaining Disputed Claim Amount related to Defendant Com Nextel's 2011 audit,

which is no longer a potential liability and should not be disputed.

57.     The adjustments to reflect the actual liability that has now been resolved for Defendant

Com Nextel's 2010 and 2011 audits versus the estimated amounts on Table 2 for the tax years that

were the subject of the April 2017 Escrow Claim Notice (through its May 2017 revision and the July

2017 Joint Release Notice) are set forth in the table below:

TABLE 3 (reflecting resolved 2010 and 2011 audits)

| Audit | Entity | As of July 2017 (Table 2) | Adjustments for Closed Audits | Updated Amount After Closed Audits |
|---|---|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 35,462,965 | (0) to AT&T | 35,462,965 owed to NIU |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 36,857,706 | (3,994,720.20) to AT&T | 32,862,986 owed to NIU |
| | | | **Total Due NIU** | **$68,325,951** |

| | | |
|---|---|---|
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | - |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | 1,053,193 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("**IEPS**") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | 9,160,071 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | 3,005,111 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | 12,859,836 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | 7,706,870 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | 3,836,219 |
| | Total Remaining Claims | **37,621,300** |

**Total Funds still in escrow**          $105,947,250.80

58.     In total, AT&T has not agreed to jointly release to NIU the total sum of $68,325,951,

which is the excess of amounts AT&T originally estimated in April 2017 for Defendant Com

Nextel's 2010 and 2011 audits. Those potential tax liabilities have now been resolved, and AT&T

has no basis to maintain those claims against the escrow funds.

> **E.    AT&T's Assertion of New Claims Against the Escrow Account After the Final
> Release Date**

59.    On April 5, 2018, AT&T responded to an initial request from NIU that a Joint Release

Notice be executed to disburse excess funds related to Defendant Com Nextel's 2010 and 2011

audits. AT&T declined, arguing that (1) the April 2017 Escrow Claim Notice comprised one

Disputed Claim that need not be disbursed until every element was resolved, and (2) even if the 2010

and 2011 audits were resolved, AT&T's estimates for tax liability had purportedly "increased by

almost $70,000,000." (Ex. 10, 4/5/2018 Letter from David Welsch to Shana Smith.)

60.    Effectively, despite previously executing a Joint Release Notice for Disputed Claim

Amounts that were resolved (*see* ¶¶ 45-46 *supra*), AT&T has now taken the position that, even as

individual claims that were the subject of its April 2017 Escrow Claim Notice have been resolved,

excess escrow funds that were the subject of those claims are somehow transferrable to new demands

that AT&T contends arose after the Final Release Date or to demands which were detailed in the

April 2017 Escrow Claim Notice for which AT&T contends its timely submitted estimates were too

low. Not coincidentally, the amount of these newly asserted demands is slightly higher than the

amount of excess funds reserved for previously Disputed Claim Amounts which have now been

resolved. Therefore, Defendants are refusing to execute a Joint Release Notice in order to withhold

funds in the Escrow Account due to NIU, even though these amounts admittedly are no longer

needed to satisfy Defendants' previous inflated indemnification demands for the 2010 and 2011 tax

years.

61.    NIU responded promptly to AT&T's refusal to execute a Joint Release Notice related

to excess Escrow Account funds related to Defendant Com Nextel's 2010 and 2011 audits, pointing

out that (1) AT&T's April 2017 Escrow Claim Notice was comprised of multiple individual claims, and (2) nothing in the operative agreements gives AT&T rights to assert new demands against the Escrow Account after the Final Release Date or to revise upward estimates for claims timely made prior to the Final Release Date. (Ex. 13, 4/24/2018 Letter from John Kane to David Welsch.)

62.     On July 18, 2018, NIU sent to AT&T a draft Joint Release Notice requesting disbursement to NIU of $68,325,951—an amount equal to the funds in the Escrow Account exceeding the actual claims related to Defendant Com Nextel's 2010 and 2011 audits.

63.     On August 3, 2018, counsel for AT&T responded to NIU's draft Joint Release Notice and reiterated AT&T's position that the April 2017 Escrow Claim Notice constituted a single claim, that AT&T is entitled to revise claim amounts after the Final Release Date, and that NIU is not entitled to any disbursements of Escrow Account funds. (Ex. 14, 8/3/2018 Letter from Werner F. Ahlers to John Kane.) As such, Defendants have made clear their refusal to execute a Joint Release Notice authorizing the release of the excess funds admittedly no longer needed to satisfy the claims related to Defendant Com Nextel's 2010 and 2011 audits, leaving NIU with no choice but to commence this Adversary Proceeding to obtain a judgment authorizing the Escrow Agent to release the funds which should be returned to NIU under the plain terms of the Purchase Agreement and Escrow Agreement.

## V.     CLAIMS FOR RELIEF

### A.     Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a) (Against All Defendants)

64.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 63 inclusive, as though fully set forth herein.

65.     Pursuant to 28 U.S.C. § 2201, made applicable in Bankruptcy Court by Fed. R. Bankr. Proc. 7001, NIU seeks a declaratory judgment that: (1) AT&T is in breach of the Purchase Agreement and the Escrow Agreement; (2) there is no longer any dispute with respect to Defendant

Com Nextel's 2010 and 2011 audits, and $68,325,951 in Escrow Account funds previously related to those audits should be disbursed to NIU.

66.     There is an actual controversy between interested parties related to the April 2017 Escrow Claim Notice delivered by AT&T related to Defendant Com Nextel and affiliated Other Entities and seeking disbursement of an "aggregate amount of such Taxes and Damages" originally totaling $117.9 million and now totaling $105,947,250.80 for fiscal years 2010-2014 (*see* Tables 2 and 3).  These funds remain in the Escrow Account (under the custody of Citibank) pending resolution of these claims either through a Joint Release Notice or a final judgment.

67.     Under the Purchase Agreement, any claims for indemnity made against the Escrow Account were to be delivered prior to the Final Release Date.  AT&T was to provide "a reasonable estimate of the amount of the Escrow Fund to be reserved with respect to such [Tax] Claim prepared in good faith based on information then available."  The Claims could not be based on theoretical tax liability; rather, they must be based on "written notice" of, among other things, an audit.  As each claim is resolved, the Parties may execute a Joint Release Notice for release of "all or part of" the Disputed Claim Amount.

68.     Nowhere in the Parties' agreements is AT&T authorized to encumber funds other than those identified in an Claim Notice delivered before the Final Release Date, based on estimated liabilities identified before the Final Release Date.

69.     AT&T provided to NIU the basis for its April 2017 Escrow Claim Notice on April 28, 2017.  The individual claims constituting AT&T's claims against the Escrow Account and the estimated amounts for those individual claims were all identified before the Final Release Date (*see* Table 1, *supra*).  AT&T has no right under the Parties' agreements to assert new individual demands against funds in the Escrow Account, or to revise estimates it provided in April 2017 to

increase existing claims for other tax years or other entities against funds in the Escrow Account.

Any new or revised demands must be asserted separately against NIU under the Purchase Agreement.

70.     Accordingly, Plaintiff seeks a declaratory judgment from the Court setting forth the

Parties' rights and obligations as to the Disputed Claim Amounts currently held in escrow, NIU's

entitlement to the return of excess funds being held in the Escrow Account given the resolution of

Defendant Com Nextel's 2010 and 2011 audits, and AT&T's revised and/or newly-asserted claims

post-Final Release Date.

**B.     Breach of Contract (Against All Defendants)**

71.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 70

inclusive, as though fully set forth herein.

72.     The Purchase Agreement and the Escrow Agreement are valid and enforceable

contracts, freely entered into by the parties thereto all of whom are sophisticated business entities

represented at all times by experienced and well-respected legal counsel and other professionals.

73.     Pursuant to those agreements, Defendants purchased the entirety of the business,

including all of the associated assets and liabilities, of Defendant Com Nextel.  The agreements

contemplated indemnification of AT&T for certain tax claims via an Escrow Account, provided that

AT&T received written notice of the tax claim and, in turn, requested disbursement of an estimated

amount based on then-available information.

74.     Plaintiff has duly performed its obligations under these contracts.  Plaintiff provided

the consideration called for under the Purchase Agreement, and all associated agreements, including

transferring the entirety of Defendant Com Nextel's business to Defendants.  Even when the present

dispute under the agreements arose, Plaintiff has acted in good faith to release undisputed amounts

from the Escrow Account and to try to reach a consensual and fair resolution of AT&T's claims.

75.     As explained herein, Defendants have breached the Purchase Agreement and the Escrow Agreement by (1) failing to provide a reasonable estimate of the amount of the Escrow Fund to be reserved with respect to its tax claims "in good faith based on information then available;" and (2) failing to execute and deliver a Joint Release Notice calling for the disbursement of part of the Disputed Claim Amount following the resolution of certain claims included in AT&T's April 2017 Escrow Claim Notice.

76.     Defendants seek to withhold in the Escrow Account funds to which NIU is rightfully entitled.  Following resolution of AT&T's claims for indemnification for certain tax liability, the funds in the Escrow Account should have been released to NIU promptly.  Defendants' failure to comply with the plain language of the Escrow Agreement constitutes a breach of the "good faith" provision of section 3(e)(i)(2) of the Escrow Agreement, which states that AT&T must only assert claims against the Escrow Account that can be stated in "good faith."  AT&T's refusal to authorize disbursement to NIU of the excess claim amounts predicated on AT&T's purportedly new or revised claims of $70 million—asserted almost one year after the Final Release Date—is not proceeding in good faith.

77.     Plaintiff will incur substantial harm as a result of Defendants' breaches of contract and bad faith assertion of its entitlement to the entire Disputed Claim Amount currently held in escrow. If Defendants' tactics go uncorrected Plaintiff will suffer financial harm in an amount to be determined at trial.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

1.   Declaring that:

   a.   AT&T is in breach of the Purchase Agreement and the Escrow Agreement;

b.  there is no longer any dispute with respect to Defendant Com Nextel's 2010 and 2011 audits and the excess $68,325,951 should be released from the Escrow Account back to NIU; and

c.  any claims asserted against the escrow account by AT&T after the Final Release Date are invalid and must be separately claimed under the Purchase Agreement.

2.  Awarding damages to Plaintiff in an amount to be determined at trial;

3.  Awarding interest, costs, expenses and attorneys' fees to Plaintiff, in an amount to be determined at trial; and

4.  Awarding such further relief as the Court deems just and proper.

Dated: _____, 2019
      New York, New York

Respectfully submitted,

 [DRAFT]_____

Jane Rue Wittstein
Thomas E. Lynch
Michael T. Ferruggia
JONES DAY
250 Vesey St.
New York, NY 10281-1047
Tel:    212-326-3939
Fax:    212-755-7306
Email: jruewittstein@jonesday.com
       telynch@jonesday.com
       mferruggia@jonesday.com

*Attorneys for Reorganized Debtor*
*NIU HOLDINGS LLC*

# EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
In re:                                              :    Chapter 11
                                                    :
NII Holdings, Inc., et al.,[1]                      :    Case No. 14-12611 (SCC)
                                                    :
            Debtors.                                :    (Jointly Administered)
                                                    :
                                                    :
-------------------------------------------------------------x


### ORDER: (I) APPROVING PURCHASE AND SALE AGREEMENT; (II) AUTHORIZING THE SALE OF ALL OF THE MEMBERSHIP INTERESTS OF NEXTEL INTERNATIONAL (URUGUAY) LLC FREE AND CLEAR OF INTERESTS; (III) APPROVING THE TRANSFER AND NOVATION OF THE LIABILITIES OF NEXTEL INTERNATIONAL (URUGUAY) LLC, ENJOINING THE ENFORCEMENT OF SUCH LIABILITIES AND DISMISSING ITS CHAPTER 11 CASE AND (IV) GRANTING CERTAIN RELATED RELIEF

Upon consideration of the motion [Docket No. 406] (the "Sale Motion")[2] of the above-

captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections

105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002,

6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the

Southern District of New York (the "Local Rules"), seeking the entry of an order (the "Sale

Order") (i) approving that certain Purchase and Sale Agreement (collectively with all exhibits

---

[1]    The Debtors in the jointly administered bankruptcy cases are comprised of the following fourteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); NII Mercosur, LLC (4079); and NIU Holdings LLC (5902).  The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

[2]    Unless otherwise stated, all capitalized terms not defined herein shall have the same meanings ascribed to such terms in the Sale Motion or the Purchase Agreement, as applicable.

and schedules thereto and all ancillary documents and agreements (including the Transition

Services Agreement and Escrow Agreement), and as any may be further amended, modified or

supplemented in accordance with the terms hereof and thereof, the "Purchase Agreement"),

dated as of January 26, 2015, by and among NIHD Telecom Holdings B.V. ("Seller Parent"),

NIU Holdings LLC ("Seller"), Nextel International (Uruguay) LLC ("Company Parent"),

Comunicaciones Nextel de México, S.A. de C.V., NII International Telecom S.C.A., NII

International Holdings S.à.r.l., NII Global Holdings, Inc., NII Capital Corp. and NII Holdings,

Inc. (collectively, "Seller Guarantor") and New Cingular Wireless Services, Inc. (together with

all successors and assigns permitted under section 12.9 of the Purchase Agreement,

the "Purchaser"), a copy of which is attached hereto as **Exhibit 1;** (ii) authorizing all of the

transactions contemplated by the Purchase Agreement, including the sale by Seller of the

membership interests in Company Parent (the "Company Parent Membership Interests") free and

clear of all 363 Interests[3] (the "Sale") pursuant to and in accordance with the Purchase

Agreement; (iii) approving the assumption by Seller and novation by Company Parent of all

Company Parent 363 Interests[4] and enjoining the enforcement of Company Parent 363 Interests

against Company Parent; (iv) subject to the occurrence of the Closing, authorizing and directing

the dismissal of the Chapter 11 Case of Company Parent pursuant to section 1112(b) of the

Bankruptcy Code; and (v) granting certain related relief; and the Court having entered the *Order*

---

[3]    The term "363 Interests" means interests, as such term is used in section 363(f) of the Bankruptcy Code, and which includes all Encumbrances and Liabilities (each as defined in the Purchase Agreement), whether direct or indirect, absolute, contingent, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, material or non-material, disputed or undisputed, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute, or otherwise, and whether arising prior to, on or after the commencement of any Chapter 11 Cases, which 363 Interests include, without limitations, any claims arising from or in connection with the Funded Debt.

[4]    The term "Company Parent 363 Interests" means all 363 Interests that have been or at any time could be asserted against Company Parent or its assets, including the Company Shares.

*(a) Authorizing and Approving the Bidding Procedures, Break-Up Fee and Expense*

*Reimbursement, (b) Authorizing and Approving the Debtors Entry Into the Stalking Horse*

*Purchase Agreement, (c) Approving the Notice Procedures, and (d) Scheduling a Sale Hearing*

on February 17, 2015 [Docket No. 472] (the "Bid Procedures Order"); and no Qualified Bids

having been received and, accordingly, pursuant to the Bid Procedures, the Debtors having

canceled the Auction, and having determined, after an extensive marketing process and upon

consultation with the Official Committee of Unsecured Creditors (the "Committee"), that

Purchaser submitted the highest or otherwise best offer for the Company Parent Membership

Interests; and upon adequate and sufficient notice of the Auction, Sale Motion, the hearing

before the Court on March 23, 2015 (the "Sale Hearing"), and all related transactions having

been given in the manner directed by the Court pursuant to the Bid Procedures Order; and the

Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the

objections thereto, if any, and (z) the statements of counsel and evidence presented in support of

the relief requested by the Debtors at the Sale Hearing; and the Court having considered the

Supplemental Declaration of J. Nicholas Melton, dated March 19, 2015 [Docket No. 557], the

Declaration of J. Nicholas Melton, dated January 27, 2015 [Docket No. 407] and the Declaration

of Daniel E. Freiman, dated January 27, 2015 [Docket No. 408]; and it appearing that the Court

has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth

in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it

appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their

estates, creditors, and other parties in interest; and upon the record of the Sale Hearing and all

other pleadings and proceedings in these Chapter 11 Cases, including the Sale Motion; and after

due deliberation thereon and good and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[5]

**Jurisdiction and Venue**

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District and this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Statutory Bases**

B.      The statutory and other bases for the relief requested in the Sale Motion and entry of this Sale Order are sections 105, 305, 350, 363, 365, and 1112 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 , 6006 and 9007 and Local Rules 4001-1, 6004-1 and 6006-1.

**Final Order**

C.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

**Compliance with Bid Procedures Order**

D.      As demonstrated by (i) the testimony and other evidence proffered or introduced at the Sale Hearing and (ii) the representations of counsel on the record at the Sale Hearing, the

---

[5]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion and the Sale are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Debtors have thoroughly and fairly marketed the Company and conducted the related sale

process in good faith and in compliance in all respects with the Bid Procedures Order.

E.      The Bid Procedures set forth in the Bid Procedures Order were non-collusive and

substantively and procedurally fair to all parties.  Moreover, the Bid Procedures enabled the

Debtors to obtain the highest or otherwise best offer for the Company Parent Membership

Interests and, indirectly, the Company.  All interested persons and entities have been afforded a

full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) prior to the

entry of the Bid Procedures Order, submit higher or otherwise better bids to purchase the

Company, (iii) following the entry of the Bid Procedures Order, submit higher or otherwise

better bids to purchase the Company Parent Membership Interests, and (iv) object and be heard

in connection with the Sale Motion and the relief granted by this Sale Order.

F.      Purchaser is the Successful Bidder (as defined in the Bid Procedures) for the

Company Parent Membership Interests.  The consideration provided by Purchaser under the

Purchase Agreement constitutes the highest or otherwise best offer for the Company Parent

Membership Interests and, indirectly, the Company, and provides fair and reasonable

consideration to the Debtors for the sale of the Company Parent Membership Interests and,

indirectly, the Company.  Purchaser has complied in all respects with the Bid Procedures Order

and any other applicable order of this Court in negotiating and entering into the Purchase

Agreement.  The Sale and Purchase Agreement likewise comply with the Bid Procedures Order

and all other applicable orders of this Court.

### Notices

G.      As evidenced by the affidavits of service and publication previously filed with the

Court [Docket Nos. 490, 494, 496], proper, timely, adequate and sufficient notice of the Auction,

Sale Motion, Sale Hearing, Sale, Injunction, Seller Liability Assumption and Company Parent Novation (as defined below) and the Company Parent Dismissal was provided in accordance with the Bid Procedures Order, sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006 and 9007 and Local Rules 4001-1, 6004-1, 6006-1 and 9006-1(b). Such notice was good, sufficient and appropriate under the circumstances, and no other or further notice of any of the foregoing is or shall be required.

H.    Actual written notice of the Auction, Sale Motion, Sale Hearing, Sale, Injunction, Seller Liability Assumption and Company Parent Novation and the Company Parent Dismissal, and a fair and reasonable opportunity to object or otherwise be heard with respect thereto, has been afforded to all known interested individuals and entities, including the following parties:

(a)    the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee");

(b)    Kramer Levin Naftalis & Frankel, LLP, as counsel to the Committee;

(c)    Paul, Weiss, Rifkind, Wharton & Garrison, on behalf of certain noteholders;

(d)    Akin, Gump, Strauss, Hauer & Feld LLP, on behalf of certain noteholders;

(e)    Kirkland & Ellis LLP, on behalf of certain noteholders;

(f)    U.S. Bank National Association, solely in its capacity as the trustee under the indenture governing those certain 8.875% senior unsecured notes due in 2019;

(g)    Wilmington Savings Fund Society, FSB, solely in its capacity as the trustee under the indenture governing those certain 10% senior unsecured notes due in 2016;

(h)    Wilmington Trust, National Association, solely in its capacities as the trustee under the indentures governing those certain 11.375% senior unsecured notes due in 2019 and those certain 7.875% senior unsecured notes due in 2019

(i)      all other parties known to hold, or have asserted, any Company Parent 363

Interest;

(j)      all other parties known to hold, or have asserted, any 363 Interest in Company

Parent Members Interests;

(k)      all non-Debtor counter-parties to the Debtors' contracts and leases;

(l)      all entities reasonably known to have expressed, since January 1, 2014, an interest

in the acquisition, directly or indirectly, of Company Parent, the Shares, the Company or a

material portion of the Company's assets;

(m)      federal, state, and local regulatory or taxing authorities or recording offices or any

other governmental authorities that (i) as a result of the Sale, may have claims, contingent or

otherwise, in connection with the Seller's ownership of the Company Parent Membership

Interests or (ii) may have any claim against Company Parent or other reasonably known interest

in the relief requested by the Sale Motion; and

(n)      all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the

date hereof.

I.      The Debtors also published a notice of the Auction, the deadline to submit bids

for the Company Parent Membership Interests, the time and place of the Auction, the time and

place of the Sale Hearing and the time for filing an objection to the relief requested in the Sale

Motion (x) in the global edition of *The Wall Street Journal* on February 23, 2015 [Docket

No. 494], (y) in *Reforma* on February 23, 2015 [Docket No. 494] and (z) on the Debtors' website

hosted by Prime Clerk at https://cases.primeclerk.com/nii [Docket No. 494].  Such publication

notice was good, sufficient and proper notice to any interested parties whose identities are

unknown to the Debtors, and reasonably calculated under the circumstances to reach such

parties.

J.    On March 17, 2015, the Debtors caused the *Notice of Cancellation of Auction*

[Docket No. 539] to be filed with the Court identifying Purchaser as the Successful Bidder in

accordance with the Bid Procedures.

## Highest or Otherwise Best Offer

K.    The Debtors conducted a sale process in accordance with, and have otherwise

complied in all respects with, the Bid Procedures Order.  The Bid Procedures afforded a full, fair

and reasonable opportunity for any person or entity to make a higher or otherwise better offer to

purchase the Company Parent Membership Interests.

L.    The Debtors have concluded, upon consultation with the Committee, that the offer

of Purchaser, upon the terms and conditions set forth in the Purchase Agreement, constitutes the

highest or otherwise best offer for the Company Parent Membership Interests and, indirectly, the

Company, and provides a greater certainty of recovery than would be provided by any other

available alternative.  The Debtors' determination that (i) the Purchase Agreement constitutes the

highest or otherwise best offer for the Company Parent Membership Interests and, indirectly, the

Company and (ii) the structure of the Sale, including the terms of the Injunction (defined below),

Company Parent Dismissal and Bid Procedures, maximizes the total consideration to be realized

by the Debtors in connection with a direct or indirect sale of the Company, in each case,

constitutes a reasonable exercise of the Debtors' sound business judgment.

M.    The Purchase Agreement represents a fair and reasonable offer to purchase the

Company Parent Membership Interests under the circumstances of these Chapter 11 Cases.  Prior

to the entry of the Bid Procedures Order, no other entity or group of entities has offered to

directly or indirectly purchase the Company for greater overall value to the Debtors' estates than Purchaser, and following the entry of the Bid Procedures Order, no other entity or group of entities has offered to purchase the Company Parent Membership Interests for greater overall value to the Debtors' estates than Purchaser.

N.    Approval of the Sale, Sale Motion, Injunction, Company Parent Dismissal, Seller Liability Assumption and Company Parent Novation and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors' estates, creditors and other parties in interest.

## Arm's Length Sale

O.    The Purchase Agreement was negotiated, proposed by the Debtors and Purchaser and entered into by the Seller, Seller Parent, Seller Guarantor, Company Parent and Purchaser without collusion, in good faith and from arm's length bargaining positions.  Neither the Debtors nor Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, Purchaser has not acted in a collusive manner with any person and the Final Purchase Price was not controlled by any agreement among the bidders.  In addition, Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

P.    The disclosures made by the Debtors concerning the Purchase Agreement, Auction, Sale, Sale Hearing, Injunction, Seller Liability Assumption and Company Parent Novation and the Company Parent Dismissal were good, complete and adequate, and no further disclosures are warranted or required.

## **Good Faith of Purchaser**

Q.      Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law.  Purchaser has at all times proceeded in good faith in all respects in connection with the Debtors' Chapter 11 Cases in that, among other things: (i) Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring, directly or indirectly, the Company, including by acquiring the Company Parent Membership Interests subject to the requirements of the Bid Procedures; (ii) Purchaser in no way induced or caused the chapter 11 filings by the Debtors; and (iii) all payments to be made by Purchaser in connection with the Sale have been disclosed.  Purchaser will continue to act in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Purchase Agreement.

## **No Fraudulent Transfer or Merger**

R.      The consideration provided by Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and otherwise best offer for the Company Parent Membership Interests, (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practical available alternatives, and (iv) constitutes reasonably equivalent value, fair consideration and fair value (as those terms are defined in each of the Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession or the District of Columbia.  No other person, entity or group of entities has offered to purchase the Company, directly or indirectly, for greater overall value to the Debtors' estates than Purchaser.

S.       The Purchase Agreement was not entered into for the purpose of hindering,

delaying, preferring or defrauding creditors under the Bankruptcy Code or under the laws of the

United States, any state, territory, possession and the District of Columbia.  Neither the Seller,

Seller Parent, Seller Guarantor nor Purchaser entered into the transactions contemplated by the

Purchase Agreement fraudulently, thereby negating the possibility of any liability of Purchaser

for any statutory or common law fraudulent conveyance or fraudulent transfer claims.

## Validity of Transfer

T.       The consummation of the Purchase Agreement and the Sale is legal, valid and

properly authorized under all applicable provisions of the Bankruptcy Code, and all of the

applicable requirements of such sections have been complied with in respect of the transactions

contemplated under the Purchase Agreement.

U.       Each Party to the Purchase Agreement has (i) full corporate power and authority

to execute and deliver the Purchase Agreement and all other documents contemplated thereby,

(ii) all corporate authority necessary to consummate the transactions contemplated by the

Purchase Agreement, and (iii) taken all corporate action necessary to authorize and approve the

Purchase Agreement and the consummation of the transactions contemplated thereby.  Each

other Debtor has, to the extent necessary and applicable, (i) all corporate authority necessary to

consummate the transactions contemplated by the Purchase Agreement, and (ii) taken all

corporate action necessary to authorize and approve the consummation of the transactions

contemplated by the Purchase Agreement.

V.       The Service Provider has (i) full corporate power and authority to execute and

deliver the Transition Services Agreement and all other documents contemplated thereby, (ii) all

corporate authority necessary to consummate the transactions contemplated by the Transition

Services Agreement, and (iii) taken all corporate action necessary to authorize and approve the

Transition Services Agreement and the consummation of the transactions contemplated thereby.

No consents or approvals, other than those expressly provided for in the Purchase Agreement,

are required for the Debtors to consummate the Sale, the Purchase Agreement and the other

transactions contemplated thereby.

W.    The transfer of the Company Parent Membership Interests to Purchaser under the

Purchase Agreement will (a) vest Purchaser with good and marketable title in and to the

Company Parent Membership Interests and (b) be a legal, valid and effective transfer of all of the

legal, equitable and beneficial right, title and interest in and to the Company Parent Membership

Interests, in each case, free and clear of all 363 Interests.

X.    The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1)

or section 332 of the Bankruptcy Code is not required with respect to the Sale.

**Seller Liability Assumption and Company Parent Novation**

Y.    The Shares comprise 100% of the equity interests of the Company, and no other

equity interests are outstanding or issuable by the Company. The Company is not obligated,

contractually or otherwise, to issue, directly or indirectly, any other equity interests or rights to

acquire equity interests in the Company.  The Company Shares are the property of Company

Parent's estate and legal and beneficial title thereto is vested in Company Parent's estate within

the meaning of section 541(a) of the Bankruptcy Code, which Company Shares are encumbered

by the CDB 363 Interests (as defined below).  Following the Seller Liability Assumption and

Company Parent Novation, (a) Company Parent's estate will have no other assets other than the

Company Shares and will be free and clear of all 363 Interests other than in respect of its

obligations under the Purchase Agreement and (b) the Company Shares will be free and clear of all 363 Interests.

Z.      The Seller Liability Assumption and Company Parent Novation will not result in any undue burden or prejudice to any holders of any Company Parent 363 Interests because all such Company Parent 363 Interests shall attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have against Company Parent and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Company Parent 363 Interests; *provided* that the Company Parent 363 Interests shall rank senior in right of payment to the Seller 363 Interests (as defined below).

AA.     All holders of Company Parent 363 Interests who did not object or who withdrew their objections to the Sale, the Seller Liability Assumption and Company Parent Novation or the Sale Motion are deemed to have consented to the Sale, the Seller Liability Assumption and Company Parent Novation and the other relief requested in the Sale Motion.  All other holders of Company Parent 363 Interests, including those who maintained and did not withdraw objections to the Sale, Seller Liability Assumption and Company Parent Novation or Sale Motion, if any, are adequately protected by having their Company Parent 363 Interests, if any, attach to the net proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such holders had prior to the Sale, subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Company Parent 363 Interests; *provided* that the Company Parent 363 Interests shall rank senior in right of payment to any Seller 363 Interests.

BB.     Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their

estates, creditors and other parties in interest, if (a) the Seller Liability Assumption and Company

Parent Novation were not approved in all respects or (b) Company Parent and the Company

Parent Shares were not free and clear of all 363 Interests.

CC.    Without the Seller Liability Assumption and Company Parent Novation, it would

be impossible for the Debtors to maximize the value of their estates given the unique

circumstances of these Chapter 11 Cases.

DD.    The Seller Liability Assumption and Company Parent Novation are essential to

the successful reorganization of the Debtors and necessary to permit the Sale of the Company for

fair and reasonable consideration.

EE.    The Seller Liability Assumption and Company Parent Novation are necessary and

appropriate to carry out the provisions of the Bankruptcy Code and preserve the value of the

Debtors' estates and the rights of the Debtors and their creditors and other parties in interest, and

such relief does not conflict with the provisions of the Bankruptcy Code.

**Transfer of Company Parent Membership Interests**

FF.    The Company Parent Membership Interests comprise 100% of the equity interests

of Company Parent, and no other equity interests are outstanding or issuable by Company Parent.

Neither Seller nor Company Parent is obligated, contractually or otherwise, to issue, directly or

indirectly, any other equity interests or rights to acquire equity interests in Company Parent.  The

Company Parent Membership Interests are the property of Seller's estate and legal and beneficial

title thereto is vested in the Seller's estate within the meaning of section 541(a) of the Bankruptcy

Code.  Subject to the receipt of the consideration for the Sale, Seller's estate has no assets other

than the Company Parent Membership Interests.

GG.    The transfer of the Company Parent Membership Interests to Purchaser free and clear of all 363 Interests will not result in any undue burden or prejudice to any holders of any Seller 363 Interests, if any, because all Seller 363 Interests,[6] if any, shall attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have against the Company Parent Membership Interests and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Seller 363 Interests; *provided* that the Seller 363 Interests, if any, shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

HH.    All holders of Seller 363 Interests who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented to the Sale and the relief requested in the Sale Motion.  All other holders of Seller 363 Interests, including those who maintained and did not withdraw objections to the Sale or the Sale Motion, if any, are adequately protected by having their Seller 363 Interests, if any, attach to the net proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such holders had prior to the Sale, subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Seller 363 Interests; *provided* that the Seller 363 Interests shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

II.    Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, creditors and other parties in interest, if the Company Parent Membership Interests were not free and clear of all 363 Interests.

---

[6]    The term "Seller 363 Interests" means all 363 Interests that have been or at any time could be asserted against Seller or its assets, including the Company Parent Membership Interests.

JJ.      Not selling the Company Parent Membership Interests free and clear of all 363

Interests would make it impossible for the Debtors to maximize the value of their estates, and the

sale of the Company Parent Membership Interests other than required by the Purchase

Agreement would be of substantially less benefit to the Debtors' estates.

**Injunction**

KK.      The Injunction will not result in any undue burden or prejudice to any holders of

any Company Parent 363 Interest or Seller 363 Interest (collectively, a "Specified 363 Interest")

as all holders of such Specified 363 Interests are adequately protected by having their Specified

363 Interests attach to the net proceeds of the Sale when received by the Seller, in the order of

their priority, with the same validity, force and effect which they now have against the Company

Parent or the Company Parent Membership Interests, as applicable, and subject to any claims and

defenses the Debtors, their estates or other parties may possess with respect to such Interests;

*provided* that the Seller 363 Interests shall be subject to and rank junior in right of payment to the

Company Parent 363 Interests.

LL.      Purchaser would not have entered into the Purchase Agreement and will not

consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their

estates, their creditors and other parties in interest, if the Injunction was not approved in all

respects or if Purchaser, its affiliates, or their respective officers, directors, managers, members

or shareholders would, or in the future could, be liable for any Specified 363 Interests, or would

have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at

law or equity, or by payment, setoff or otherwise, directly or indirectly, any Specified 363

Interests.

MM.    Without the Injunction, it would be impossible for the Debtors to maximize the value of their estates given the unique circumstances of these Chapter 11 Cases.

NN.    The Injunction is essential to the successful reorganization of the Debtors and necessary to permit the Sale of the Company for fair and reasonable consideration.

OO.    The Injunction is necessary and appropriate to carry out the provisions of the Bankruptcy Code and preserve the value of the Debtors' estates and the rights of the Debtors and their creditors and other parties in interest, and such relief does not conflict with the provisions of the Bankruptcy Code.

## **Compelling Circumstances**

PP.    The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for (i) the Sale other than in the ordinary course of business, before, and outside of a plan of reorganization, (ii) the Injunction, (iii) the Seller Liability Assumption and Company Parent Novation and (iv) the Company Parent Dismissal in that, among other things, the immediate implementation of this Sale Order, the consummation of the Sale and the Seller Liability Assumption and Company Parent Novation, the implementation of the Injunction and the Company Parent Dismissal are each necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors and all other parties in interest, and to provide the means for the Debtors to maximize creditor recoveries.

QQ.    The transactions contemplated by the Purchase Agreement and this Sale Order neither impermissibly restructure the rights of any Debtor's creditors or equity holders nor impermissibly dictate the terms of a chapter 11 plan for any Debtor, and therefore, do not constitute a *sub rosa* chapter 11 plan.

RR.    To maximize the value of the Company Parent Membership Interests, preserve the viability of the Company and avoid deterioration, erosion of value and uncertainty with respect to the future operations of the Company, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement.

SS.    Nothing in the Purchase Agreement creates any third party beneficiary rights in any person or entity not a party to the Purchase Agreement.

## Dismissal of Company Parent's Bankruptcy Case

TT.    Cause exists under section 1112(b) of the Bankruptcy Code to dismiss the Chapter 11 Case of Company Parent.

UU.    Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, creditors and other parties in interest, if the Chapter 11 Case of Company Parent were not dismissed.


## NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1.    The relief requested in the Sale Motion with respect to this Sale Order is GRANTED to the extent set forth herein.

2.    The Sale is authorized as set forth herein and in the Purchase Agreement.

3.    All objections and responses, if any, to the Sale, Injunction, Seller Liability Assumption and Company Parent Novation, Company Parent Dismissal or Sale Motion that have not been withdrawn, waived or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are overruled on the merits and denied with prejudice.  All persons and

entities given notice of the Sale Motion that failed to timely object thereto are deemed to have consented to the relief sought therein.

4.      The Court's findings of fact and conclusions of law set forth in the Bid Procedures Order are incorporated herein by reference.

5.      All of the provisions of this Sale Order are non-severable and mutually dependent.

## Approval of the Purchase Agreement

6.      The Purchase Agreement and all of the terms and conditions thereof are hereby authorized and approved in all respects.  The Debtors are authorized and directed to perform all of their respective obligations under the Purchase Agreement, and such obligations shall be enforceable by Purchaser in accordance with the terms hereof and thereof.

7.      The Debtors are authorized and directed (i) to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement and effectuate the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement), together with any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Sale Order, the Sale, the Seller Liability Assumption and Company Parent Novation,  the Company Parent Dismissal and the Injunction, and to take all further actions as may be reasonably requested by Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to Purchaser, or reducing to possession, the Company Parent Membership Interests, free and clear of all 363 Interests; (ii) to pay to Purchaser, from time to time, amounts (if any) owing to Purchaser pursuant to the Purchase Agreement; and (iii) to take any and all actions as may be necessary or appropriate to the performance of the Debtors'

obligations as contemplated by the Purchase Agreement and this Sale Order, without any further

corporate action or order of this Court.  The Debtors and their officers, employees and agents are

hereby authorized to execute and deliver the Purchase Agreement and any and all documents

necessary, required or contemplated by the Purchase Agreement.  The Debtors' obligations to

pay to Purchaser, from time to time, amounts (if any) owing to Purchaser pursuant to the

Purchase Agreement (including, for the avoidance of doubt, the Break-Up Fee and Expense

Reimbursement) constitute administrative expense claims under sections 503(b) and 507(a)(2) of

the Bankruptcy Code, and the Break-Up Fee and Expense Reimbursement shall be senior to all

other administrative expense claims that may be approved in the Chapter 11 Cases.

8.    The Purchase Agreement and any related agreements, documents or other

instruments may be modified, amended or supplemented by the parties thereto strictly in

accordance with, and subject to all limitations on amendments that are set forth in, the terms of

the Purchase Agreement without further order of the Court, *provided* that any such modification,

amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.    Purchaser has no obligation to proceed with the Closing unless and until all

conditions precedent to its obligations to do so, as set forth in the Purchase Agreement, have

been met, satisfied or waived in accordance with the terms of the Purchase Agreement.

10.    The failure specifically to include any particular provision of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Purchase Agreement be authorized and approved in its

entirety.

11.    The Debtors are hereby authorized and directed, after consultation with the

Committee, to (i) instruct the Escrow Agent to hold the Deposit Amount, and, upon the

consummation of the transactions contemplated by the Purchase Agreement, the Indemnification

Escrow Amount and the Tax Withholding Amount, in each case, in accordance with the Escrow

Agreement and (ii) release and deliver the Deposit Amount, the Indemnification Escrow Amount

and the Tax Withholding Amount, in each case, pursuant to the terms of the Purchase Agreement

and Escrow Agreement.

12.     If the Seller determines to reject the release of the Deposit Amount, in accordance

with section 4.6(c) of the Purchase Agreement, the Seller must obtain the consent (not to be

unreasonably withheld) of the Committee  or further order of the Court prior to taking such

action.

### Seller Liability Assumption and Company Parent Novation

13.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, upon the

consummation of the transactions set forth in the Purchase Agreement, Seller shall assume from

Company Parent, and Company Parent shall have been deemed to novate, all Company Parent

363 Interests to Seller, and following such assumption and novation, Company Parent shall have

no liability therefor (the "Seller Liability Assumption and Company Parent Novation").

14.     The Seller Liability Assumption and Company Parent Novation shall constitute a

legal, valid, binding and effective assumption and novation of all Company Parent 363 Interests.

15.     All Company Parent 363 Interests shall attach to the net proceeds of the Sale

when received by the Seller, in the order of their priority, with the same validity, force and effect

which they now have as against Company Parent and subject to any claims or defenses the

Debtors, their estates or other parties may possess with respect to such Interests; *provided* that

the Company Parent 363 Interests shall rank senior in right of payment to the Seller 363

Interests.

16.     Following the Seller Liability Assumption and Company Parent Novation, Company Parent will be free and clear of all Company Parent 363 Interests and the Company Shares shall be free and clear of all 363 Interests, other than in respect of Company Parent's pre-closing obligations under the Purchase Agreement.

### **Transfer of the Company Parent Membership Interests**

17.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Seller is authorized to transfer the Company Parent Membership Interests to Purchaser on the Closing Date pursuant to the terms and conditions of the Purchase Agreement, free and clear of all Seller 363 Interests, with all Seller 363 Interests to attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have as against the Company Parent Membership Interests and subject to any claims or defenses the Debtors, their estates or other parties may possess with respect to such Interests; *provided* that the Seller 363 Interests shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

18.     The transfer of the Company Parent Membership Interests to Purchaser shall constitute a legal, valid, binding and effective transfer of all such Company Parent Membership Interests and shall vest Purchaser with all right, title and interest of the Seller in the Company Parent Membership Interests free and clear of all Seller 363 Interests.

### **Injunction**

19.     Following the Closing Date, all persons and entities (as defined in section 101(15) of the Bankruptcy Code) and their respective successors and assigns holding or asserting Specified 363 Interests (i) arising prior to or on the Closing Date or, directly or indirectly, from the transfer of the Company Parent Membership Interests to Purchaser or (ii) relating in any way

to the Debtors are hereby forever barred, estopped and permanently enjoined from (x) asserting

such Specified 363 Interests against Purchaser and Purchaser's Affiliates, its and their successors

and assigns, and its and their property, including the Company Parent Membership Interests and

the Shares and (y) commencing or continuing in any matter any action or other proceeding, in

any jurisdiction, whether in law or equity, in any judicial, administrative, arbitral or other

proceeding against Purchaser, Purchaser's Affiliates, its and their successors and assigns, or its

and their respective assets (including the Company Parent Membership Interests and the Shares)

in connection with such Specified 363 Interests, including the following actions: (i) any action or

other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any

manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing such

Interests; (iv) asserting any setoff, right of subrogation or recoupment of any kind in respect of

such Interests; (v) commencing or continuing any action, in any manner, place or jurisdiction,

that does not comply with, or is inconsistent with, the provisions of this Sale Order or other

orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or

(vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to

operate any of the assets of the Company ((x) and (y), collectively, the "Enjoined Actions").

20.    Following the Closing Date, no holder of any Specified 363 Interest shall interfere

with Purchaser's title to or use and enjoyment of the Company Parent Membership Interests,

Company Parent, the Shares and/or the Company based on or related to such Specified 363

Interests, or based on any action the Debtors may take in their Chapter 11 Cases.

21.    All persons and entities are hereby forever prohibited and enjoined from taking

any action that would adversely affect or interfere with the ability of the (i) Seller to sell and

transfer the Company Parent Membership Interests to Purchaser in accordance with the terms of

the Purchase Agreement and this Sale Order and (ii) other Debtors to take any and all actions

necessary or appropriate to execute and deliver, perform under, consummate, implement and

effectuate the Purchase Agreement (including, for the avoidance of doubt, the Transition

Services Agreement and Escrow Agreement) and this Sale Order.

22.      All persons and entities that are in possession of some or all of the Company

Parent Membership Interests on the Closing Date are directed to surrender possession of such

Company Parent Membership Interests to Purchaser on the Closing Date.

23.      Upon consummation of the transactions contemplated in the Purchase Agreement,

Purchaser shall be authorized to file termination statements or lien terminations in any required

jurisdiction to remove any record, notice filing or financing statement recorded to attach, perfect

or otherwise notice any Specified 363 Interest.

24.      A certified copy of this Sale Order may be filed with any appropriate clerk and/or

recorded with any appropriate recorder to act to cancel any of the Specified 363 Interests and to

resolve any title issue with respect to the Company Parent Membership Interests, Company

Parent or the Company Shares.

25.      If any person or entity which has filed statements or other documents or

agreements evidencing Specified 363 Interests shall not have delivered to the Debtors prior to the

Closing Date, in proper form for filing and executed by the appropriate parties, termination

statements, instruments of satisfaction, releases of liens and easements and any other documents

necessary or desirable to Purchaser for the purpose of documenting the release of all Specified

363 Interests that the person or entity has or may assert with respect to all or any portion of the

Company Parent Membership Interests, Company Parent or the Company Shares, the Debtors

and Purchaser are hereby authorized to execute and file such statements, instruments, releases

and other documents on behalf of such person or entity with respect to the Company Parent Membership Interests or Company Shares, as applicable.

26.    This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments (including departments of foreign governments), secretaries of state, federal, foreign and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing is hereby directed to accept for filing any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

27.    No foreign or domestic governmental unit may revoke or suspend any permit or licenses relating to the operation of the Company on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale.  To the extent available under applicable law, the Company shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other foreign or domestic governmental authorization or approval of the Debtors with respect to the Business, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred with the Company as of the Closing Date.

28.    Following the Closing Date, the Company and the Company's direct and indirect assets, including the Shares, will be free and clear of all 363 Interests (x) arising from, related to

or incurred in connection with (i) the 10% senior unsecured notes issued by NII Capital, due in 2016, (ii) 8.875% senior unsecured notes issued by NII Capital Corp. due in 2019, (iii) 7.625% senior unsecured notes issued by NII Capital Corp. due in 2021, (iv) 11.375% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019, and (v) 7.875% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019 ((i)-(v), collectively, the "<u>Funded Debt</u>") and (y) that have been, are or could be asserted by the Debtors or any of their Affiliates. Except as expressly permitted by the Purchase Agreement or this Sale Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code), are hereby forever barred, estopped and permanently enjoined from the Enjoined Actions with respect to such 363 Interests (paragraphs 19 through 28, collectively, the "<u>Injunction</u>").

### No Successor, Transferee or Other Liability

29.    Purchaser shall not assume any liability or other obligation of the Debtors arising under or related to the Company Parent Membership Interests, Company Parent or the Company or its subsidiaries. Without limiting the generality of the foregoing, Purchaser shall not be liable for any 363 Interests against the Debtors or any of their predecessors or affiliates, and Purchaser shall not have any successor, transferee or vicarious liabilities of any kind or character ("<u>Successor Liability</u>") in connection with, or in any way relating to, the Company Parent Membership Interests, Company Parent or the Company or its subsidiaries prior to and including the Closing Date.

30.    Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of any 363 Interest. The consideration given by Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of Successor

Liability of Purchaser, which releases shall be deemed to have been given in favor of Purchaser by all holders of any 363 Interests.

31.    Upon the Closing Date, all persons and entities are hereby forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Purchaser, its successors and assigns, or Company Parent, the Company or its subsidiaries, with respect to any Successor Liability, including the Enjoined Actions.

## Good Faith of Purchaser

32.    The transactions contemplated by the Purchase Agreement are undertaken by the Debtors and Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Sale Order to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly stayed pending such appeal.

33.    Neither the Debtors nor Purchaser has engaged in any action or inaction that would cause or permit the Sale to be avoided or costs, damages or other remedy to be imposed under section 363(n) of the Bankruptcy Code.  The consideration provided by Purchaser for the Company Parent Membership Interests under the Purchase Agreement is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

## Dismissal of the Chapter 11 Case of Company Parent

34.    Immediately prior to the Closing, the Debtors are authorized and directed to file a notice (the "Dismissal Notice") of dismissal of the Chapter 11 Case of Company Parent (the "Company Parent Case") with this Court, in form and substance reasonably acceptable to

the Committee and Purchaser.  Upon the filing of the Dismissal Notice, the Company Parent

Case shall be dismissed.

35.     Upon the dismissal of the Bankruptcy Case, the Clerk of the Court is authorized

and directed to promptly take all actions to close the Company Parent Case.

36.     Notwithstanding section 349 of the Bankruptcy Code or otherwise, all orders

entered in the Company Parent Case shall survive the dismissal and closing of the Company

Parent Case.

37.     The dismissal of the Company Parent Case shall have no effect on the other

Chapter 11 Cases with which it is jointly administered.

38.     In respect of the Company Parent Case, all fees of the U.S. Trustee shall be paid

in full and no amounts shall be due and owing to the U.S. Trustee following the Closing, and all

required reports shall be filed with this Court.

39.     Professional fee administrative claims related to the Company Parent Case may

continue to be sought through the filing of appropriate applications in the Debtors' jointly

administered cases; *provided* such claims shall be asserted only against Seller or its other

affiliated debtors, and not Company Parent.

### Relief from Automatic Stay

40.     Purchaser shall not be required to seek or obtain relief from the automatic stay

under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase

Agreement or any other Sale-related document or deliver any notice provided for in this Sale

Order or the Purchase Agreement.  The automatic stay imposed by section 362 of the Bankruptcy

Code is modified to the extent necessary to implement the preceding sentence or any other

provisions of this Sale Order.  The requirements of Local Rule 4001-1 have been satisfied with

respect to this Sale Order.

### Other Provisions

41.    Upon the Closing, all Intercompany Obligations shall be netted against each other

and the balance (if any) will be, as applicable, contributed to the capital of the Company (if the

net balance is an amount payable to Seller or its Affiliates) or deemed to have been distributed to

Seller (if net balance is an amount payable to the Entities), in each case, without any cash

payment being made.  Notwithstanding the netting of Intercompany Obligations as set forth

herein and in the Purchase Agreement, which shall be enforceable by the Purchaser, Company

Parent, the Company and their respective Affiliates, the netting of such Intercompany

Obligations shall be disregarded solely for purposes of allocating the net proceeds of the Sale

following the Closing among the Debtors which shall be allocated pursuant to a chapter 11 plan

in the Debtors' Chapter 11 Cases.  For the avoidance of doubt, such allocation shall not have any

impact on the Purchaser, Company Parent, the Company or their respective Affiliates.

42.    Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062,

9014 or otherwise, this Sale Order shall be immediately effective and enforceable upon entry,

and the Debtors and Purchaser are authorized to close the Sale immediately upon entry of this

Sale Order.  Time is of the essence in closing the Sale, and the Debtors and Purchaser intend to

close the Sale as soon as practicable.  This Sale Order constitutes a final and appealable order

within the meaning of 28 U.S.C. § 158(a).  Any party objecting to this Sale Order must exercise

due diligence in filing an appeal and pursuing a stay, or risk its appeal being dismissed as moot.

43.    This Sale Order shall be binding in all respects upon (i) the Debtors and their non-

Debtor Affiliates (including, for the avoidance of doubt, Seller, Seller Parent, Seller Guarantor,

Company Parent and Service Provider) and their estates, (ii) all creditors of, and holders of

equity interests in, any Debtor (including all creditors, whether known or unknown, of Company

Parent), (iii) any holders of 363 Interests (whether known or unknown) in or against or on all or

any portion of the Company Parent Membership Interests, Company Parent or the Company

Shares, (iv) Purchaser and its successors and assigns, (v) other parties in interest, (vi) trustees,

examiners and other representatives or fiduciaries, if any, subsequently appointed in any of the

Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any

of the Debtors' Chapter 11 Cases or upon the dismissal of any of the Debtors' Chapter 11 Cases,

(vii) any successors or assigns of any Debtor, (viii) any reorganized Debtor and (ix) any Person

succeeding directly or indirectly to all or substantially all of the Debtors' business in Brazil (as

existing on the date hereof) (the "Brazil Business") in connection with (A) any restructuring

transaction under or prior to the consummation of any chapter 11 plan in these Chapter 11 Cases

with respect to the Debtors, or (B) a sale of all or substantially all of the Brazil Business, which

sale is consummated under or prior to the consummation of a chapter 11 plan in these Chapter 11

Cases with respect to the Debtors ((vi) through (ix), collectively, "Debtor Successors").  For the

avoidance of doubt, CDB, HSBC México, S.A., NII International Mobile S.á.r.l. and its direct or

indirect subsidiaries that currently own the Brazil Business shall not be Debtor Successors;

provided in the cases of NII International Mobile S.á.r.l. and its direct or indirect subsidiaries

that currently own the Brazil Business, that the reorganized Debtors continue to indirectly own

(and they or their Affiliates have not executed a definitive agreement to sell) the Brazil Business

upon consummation of any chapter 11 plan in the Chapter 11 Cases (the "Controlled Brazil

Owners").

44.     Notwithstanding any other provision herein, until Repayment (defined below) occurs, nothing in this Order shall release any Specified 363 Interests arising from or related to the CDB Credit Facilities (as defined in the Purchase Agreement) (the "CDB 363 Interests"). Upon Repayment, (x) Company Parent and its respective assets (including the Company Shares) shall be free and clear of such CDB 363 Interests and (y) the Injunction shall apply. "Repayment" means the satisfaction in full and in cash of all obligations (other than contingent obligations not yet due and payable) under the CDB Credit Facilities in accordance with the Pay-Off Letters (as defined in the Purchase Agreement).

45.     The Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and all ancillary documents shall be binding upon (x) the Debtors and their non-Debtor Affiliates (including, for the avoidance of doubt, Seller, Seller Parent, Seller Guarantor, Company Parent and Service Provider, but excluding the Controlled Brazil Owners) and their estates, (y) any Debtor Successor and (z) Purchaser and its successors and assigns.

46.     In addition, any Debtor Successor specified in clause (x) of paragraph 43 shall have to provide to Purchaser adequate assurance of future performance as if the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and all ancillary documents were being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code.  Any such assumption shall not relieve the Debtors of their respective obligations under the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and all ancillary documents.  This Sale Order and the Purchase Agreement shall inure to the benefit of

the Debtors, their estates, creditors, Purchaser, and the respective successors and assigns of each of the foregoing.

47.     Notwithstanding anything to the contrary in this Order, any other order of this Court or any plan of reorganization or liquidation of any Debtor, Purchaser shall not be required to file or serve a proof of claim with respect to claims arising under or in connection with the Stalking Horse Purchase Agreement, and no bar date shall be imposed with respect to such claims.

48.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind in these Chapter 11 Cases, any subsequent chapter 7 cases in which these Chapter 11 Cases may be converted or any related proceedings subsequent to the entry of this Sale Order, shall alter or affect the terms and conditions of the Sale, the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and the Escrow Agreement) or the terms or implementation of this Sale Order.

49.     Notwithstanding the dismissal of the Company Parent Case, this Court shall retain jurisdiction and power to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including retaining jurisdiction to (i) compel delivery of the Company Parent Membership Interests to Purchaser in accordance with the Purchase Agreement, (ii) interpret, implement and enforce the provisions of this Sale Order, (iii) protect Purchaser against any 363 Interests in or against the Debtors, Company Parent, the Company Parent Membership Interests or the Company Shares of any kind or nature whatsoever, (iv) compel Debtor Successors, as applicable, to perform under the Purchase Agreement (including, for the

avoidance of the doubt, the Transition Services Agreement and Escrow Agreement) and (v) enter

any orders under sections 363 or 365 of the Bankruptcy Code with respect to the Company

Parent Membership Interests, the Seller Liability Assumption and Company Parent Novation and

(vi) notwithstanding the possible applicability of section 530(b) of the Bankruptcy Code or

Bankruptcy Rule 5010, reopen the Chapter 11 Case of any Debtor in order to effect each of

subsections (i) – (vi) in this paragraph.

50.    Purchaser has standing to seek to enforce the terms of this Order.

51.    The Debtors are authorized to take all actions necessary or appropriate to

effectuate the relief granted pursuant to this Sale Order.

52.    To the extent this Sale Order is inconsistent with the Purchase Agreement or any

prior order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of

this Sale Order shall govern.

53.    Upon receipt of or provision by any of the Debtors or any Seller Successor of a

document destruction notice in accordance with section 7.9 of the Purchase Agreement, such

Debtor or Seller Successor shall (i) within five (5) business days of the receipt of such notice,

notify in writing the lead plaintiffs ("Lead Plaintiff") in the class-action securities litigation in the

United States District Court for the Eastern District of Virginia styled In re NII Holdings, Inc.

Securities Litigation, No. 14-CV-227 (the "Securities Litigation") of such request and (ii) request

delivery of such materials from the Purchaser or, if such materials are in the possession of the

Debtors or any Seller Successor, set aside such materials subject to the terms of section 7.9 of the

Purchase Agreement, for preservation and/or production in accordance with applicable protocols

in the Securities Litigation.

54.     In connection with the Closing, and as a closing deliverable to Purchaser from Seller under the Purchase Agreement, the Debtors shall provide to Purchaser evidence that the DIP Facility (as defined in the Order, Pursuant to 11 U.S.C. §§ 105, 362, 363 and 364, Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York:  (a) Authorizing Debtors to Obtain Postpetition Financing and (b) Granting Related Relief (the "DIP Order")) has been indefeasibly repaid in full in accordance with Paragraph 17A(b) of the DIP Order.

Dated:    March 23, 2015
          New York, New York

/S/ Shelley C. Chapman
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**<u>Purchase Agreement</u>**

NYI-524646567v3

**EXECUTION VERSION**

**PURCHASE AND SALE AGREEMENT**

**AMONG**

**NEW CINGULAR WIRELESS SERVICES, INC.,**

**NEXTEL INTERNATIONAL (URUGUAY) LLC,**

**NIHD TELECOM HOLDINGS B.V.,**

**NIU HOLDINGS LLC,**

**AND**

**COMUNICACIONES NEXTEL DE MÉXICO S.A. DE C.V.,**

**NII INTERNATIONAL TELECOM S.C.A.**

**NII INTERNATIONAL HOLDINGS S.Á R.L.**

**NII GLOBAL HOLDINGS, INC.**

**NII CAPITAL CORP.,**

**AND**

**NII HOLDINGS, INC.,**

**Dated January 26, 2015**

# TABLE OF CONTENTS

1. DEFINITIONS ............................................................................................. 2

    1.1.    Definitions ................................................................................. 2

    1.2.    Construction Rules and Interpretative Matters ............................ 22

2. PURCHASE AND SALE ............................................................................. 23

    2.1.    Implementation Transactions ...................................................... 23

    2.2.    Purchase and Sale of Company Parent Interests and Company Shares .......................................................................... 23

3. CONSIDERATION ...................................................................................... 23

    3.1.    Consideration ............................................................................. 23

    3.2.    Purchase Price Deposit .............................................................. 23

    3.3.    Payment of Consideration at Closing .......................................... 24

    3.4.    Closing Date Purchase Price Adjustment ................................... 24

    3.5.    Intercompany Obligations ........................................................... 26

4. CLOSING AND TERMINATION .................................................................. 27

    4.1.    Closing Date ............................................................................... 27

    4.2.    Closing Deliveries by Seller ....................................................... 27

    4.3.    Closing Deliveries by Purchaser ................................................ 29

    4.4.    Termination of Agreement .......................................................... 29

    4.5.    Procedure for Termination .......................................................... 31

    4.6.    Effect of Termination .................................................................. 31

5. REPRESENTATIONS AND WARRANTIES OF SELLER ............................. 33

    5.1.    Organization of Seller ................................................................. 33

    5.2.    Authorization of Agreement ........................................................ 34

    5.3.    Conflicts; Consents of Third Parties ........................................... 34

    5.4.    Organization of the Entities ........................................................ 35

    5.5.    Capitalization of the Entities ....................................................... 35

    5.6.    Subsidiaries ............................................................................... 36

    5.7.    Title to Shares ........................................................................... 36

    5.8.    Financial Statements .................................................................. 36

    5.9.    Undisclosed Liabilities ................................................................ 37

    5.10.    Taxes ....................................................................................... 37

    5.11.    Real Property ............................................................................ 39

# TABLE OF CONTENTS
(continued)

5.12.   Intellectual Property ........................................................................ 40

5.13.   Material Contracts ........................................................................... 41

5.14.   Labor ................................................................................................ 43

5.15.   Litigation .......................................................................................... 44

5.16.   Compliance with Laws; Permits...................................................... 45

5.17.   Environmental Matters .................................................................... 47

5.18.   Broker's or Finder's Fee ................................................................. 48

5.19.   Insurance ......................................................................................... 48

5.20.   Sufficiency of Assets ....................................................................... 48

5.21.   Subscribers; Transmission Towers; Network Assets.................... 48

5.22.   Certain Conduct; Sanctions ........................................................... 49

5.23.   Absence of Certain Changes.......................................................... 50

5.24.   Related Party Contracts ................................................................. 50

5.25.   Employee Benefits .......................................................................... 50

5.26.   Company Parent............................................................................... 52

5.27.   No Other Representations or Warranties ....................................... 52

6. REPRESENTATIONS AND WARRANTIES OF PURCHASER .................... 53

6.1.    Organization .................................................................................... 53

6.2.    Authorization of Agreement ........................................................... 53

6.3.    Conflicts; Consents of Third Parties .............................................. 53

6.4.    Litigation .......................................................................................... 54

6.5.    Broker's or Finder's Fee ................................................................. 54

6.6.    Financial Capability ........................................................................ 54

6.7.    Investigation .................................................................................... 54

6.8.    No Other Representations or Warranties ....................................... 54

7. COVENANTS................................................................................................. 55

7.1.    Access to Information ...................................................................... 55

7.2.    Conduct of the Business Pending the Closing............................... 56

7.3.    Third Party Consents....................................................................... 60

7.4.    Governmental Approvals ................................................................ 60

# TABLE OF CONTENTS
(continued)

| | | |
|---|---|---|
| 7.5. | Regulatory Compliance | 62 |
| 7.6. | Further Assurances | 62 |
| 7.7. | Publicity | 63 |
| 7.8. | Certain Agreements | 63 |
| 7.9. | Preservation of Records | 64 |
| 7.10. | Confidentiality | 64 |
| 7.11. | Trademark License Agreement | 65 |
| 7.12. | Certain Employees | 65 |
| 7.13. | Financing Cooperation | 66 |
| 7.14. | Seller Disclosure Schedule | 66 |
| 7.15. | Extension Financing | 66 |
| 7.16. | Transition Services | 67 |
| 8. CONDITIONS TO CLOSING | | 67 |
| 8.1. | Conditions Precedent to Obligations of Purchaser | 67 |
| 8.2. | Conditions Precedent to Obligations of Seller | 70 |
| 8.3. | Conditions Precedent to Obligations of Purchaser and Seller | 71 |
| 8.4. | Frustration of Closing Conditions | 71 |
| 9. INDEMNIFICATION | | 71 |
| 9.1. | Survival | 71 |
| 9.2. | Indemnification by Seller | 72 |
| 9.3. | Indemnification by Purchaser | 73 |
| 9.4. | Indemnification Procedures | 73 |
| 9.5. | Limitations on Indemnification | 75 |
| 9.6. | Indemnity Payments | 76 |
| 9.7. | Exclusivity of Indemnity | 78 |
| 9.8. | Tax Indemnification | 78 |
| 9.9. | Successors | 78 |
| 10. BANKRUPTCY COURT MATTERS | | 78 |
| 10.1. | Competing Transaction | 78 |
| 10.2. | Break-Up Fee and Expense Reimbursement | 79 |

# TABLE OF CONTENTS
(continued)

10.3.   Bankruptcy Court Filings ...........................................................79

11. TAX MATTERS ...........................................................................81

11.1.   Tax Return Preparation .................................................81

11.2.   Assistance and Cooperation.........................................82

11.3.   Certain Tax Agreements................................................83

11.4.   Tax Indemnification ........................................................83

11.5.   Indemnification Procedures and Contest Provisions ...................84

11.6.   Allocation of Straddle Period Taxes.............................85

11.7.   Other Tax Matters..........................................................86

11.8.   Tax Refunds ....................................................................86

11.9.   Amendment of Tax Returns...........................................86

11.10. Certain Tax Elections .....................................................86

11.11. Transfer Taxes ...............................................................87

11.12. Company Parent .............................................................87

12. MISCELLANEOUS ....................................................................87

12.1.   Expenses ........................................................................87

12.2.   Injunctive Relief .............................................................87

12.3.   Submission to Jurisdiction ............................................87

12.4.   Waiver of Jury Trial........................................................88

12.5.   Entire Agreement; Amendments and Waivers.............................88

12.6.   Governing Law ...............................................................89

12.7.   Notices ...........................................................................89

12.8.   Severability.....................................................................90

12.9.   Binding Effect; Assignment...........................................90

12.10. Non-Recourse ................................................................91

12.11. Legal Representation .....................................................91

12.12. Counterparts...................................................................92

12.13. Seller Guarantors ..........................................................92

# TABLE OF CONTENTS
(continued)

Exhibits

Exhibit A: Form of Bidding Procedures
Exhibit B: Form of Bidding Procedures Order
Exhibit C: Form of Sale Order
Exhibit D: Form of Transition Services Agreement
Exhibit E: Form of Amendment to Trademark Sublicense Agreement
Exhibit F: Form of Instrument of Assignment
Exhibit G: Special Power of Attorney


Schedules

Schedule 1.1(a): 2015 Budget
Schedule 1.1(b): Certain Letters of Credit
Schedule 1.1(c): License Payment Amounts
Schedule 1.1(d): List of Persons of Purchaser
Schedule 1.1(e): List of Persons of Seller
Schedule 1.1(f): Third Party Consents
Schedule 1.1(g): Excluded Acquirers
Schedule 7.2(b)(F): Related Party Contracts
Schedule 7.8: Certain Contracts Terminated or Amended
Schedule 7.12(b): Terminated Plan
Schedule 8.1(k): Required Consents

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "Agreement"), dated January 26, 2015, is among New Cingular Wireless Services, Inc., a corporation existing under the Laws of Delaware ("Purchaser"), NIHD TELECOM HOLDINGS B.V., a private company with limited liability existing under the Laws of the Netherlands ("Seller Parent"), NIU HOLDINGS LLC, a limited liability company existing under the Laws of Delaware ("Seller"), Nextel International (Uruguay) LLC, a limited liability company existing under the Laws of Delaware ("Company Parent") and the Seller Guarantors identified as such on the signature page (the "Seller Guarantors").

## PRELIMINARY STATEMENTS

A.     Seller Parent is the legal and beneficial owner of all of the issued and outstanding limited liability company membership interests of Seller, an entity formed on January 22, 2015 for the purpose of consummating the transactions contemplated hereby and Seller Parent transferred 100% of the outstanding membership interests of Company Parent (the "Company Parent Interests") to Seller on January 24, 2015 (the "Company Parent Transfer").

B.     Company Parent is a debtor and debtor-in-possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (collectively with the Seller Proceeding (as defined below) and the cases of Company Parent's other affiliated debtors and debtors-in-possession, the "Bankruptcy Cases").

C.     Company Parent owns 7,575,738,489 shares (acciones) (the "Company Shares") of the capital stock of Comunicaciones Nextel de México, S.A. de C.V. (the "Company").

D.     The remaining 3,595 shares (acciones) of the capital stock of the Company (the "Minority Company Shares" and together with the Company Shares, the "Shares") of the Company are owned by Servicios NII, S. de R.L. de C.V., a wholly owned Subsidiary of the Company (the "Minority Shareholder").

E.     Concurrently with the Parties' entry into this Agreement, the Parties and the Escrow Agent are entering into the Escrow Agreement pursuant to which the Escrow Agent will hold the Deposit Amount and, upon consummation of the transactions contemplated by this Agreement, the Escrow Amount.

F.     Purchaser desires to purchase, and Seller desires to sell, the Company Parent Interests free and clear of all 363 Interests in accordance with Sections 105 and 363 of the Bankruptcy Code on the terms set forth in this

Agreement, and Company Parent will be, and will own the Company Shares, free and clear of all 363 Interests.

G.    Upon consummation of the transactions contemplated by this Agreement, Purchaser will be vested with Seller's entire right, title and interest in and to the Company Parent Interests and, indirectly, all of the Shares, in each case, free and clear of all 363 Interests.

## AGREEMENT

The Parties agree as follows:

## 1. DEFINITIONS

1.1.    Definitions.  For purposes of this Agreement, the following terms and variations on them have the meanings specified below:

"363 Interests" means interests, as such term is used in Section 363(f) of the Bankruptcy Code, and which includes all Encumbrances and Liabilities, whether direct or indirect, absolute, contingent, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, material or non-material, disputed or undisputed, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise, and whether arising prior to, on or after the commencement of the Bankruptcy Cases.

"2015 Budget" means the Dollar-denominated budget approved by Seller or its Affiliates for the year 2015 set forth on Schedule 1.1(a).

"2015 Budget Month" means (i) any calendar month (other than January) during the calendar year 2015 ending prior to the Closing Date and (ii) the part of a calendar month in which the Closing Date occurs that is prior to the Closing Date.

"2015 Budget Period" means (i) the calendar quarters during the calendar year 2015 ending prior to the Closing Date plus (ii) if applicable, the part of the calendar quarter in which the Closing Date occurs that is prior to the Closing Date.

"Adjustment Time" means 11:59 p.m. (local time in Mexico City, Mexico) on the Closing Date.

"Adverse Regulatory Condition" is defined in Section 7.4(b).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control"

(including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise, provided that, solely for purposes of clause (a) of the definition of Excluded Acquirer, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of (a) (x) ownership, control or power to vote 50 percent or more of the outstanding shares or other equity securities of such Person or (y) beneficial ownership of 50 percent or more of the outstanding economic interests of such Person (b) control, in any manner (including by Contract together with other Persons), over the election of a majority of the directors, trustees or general partners (or individuals exercising similar functions) of such Person.

"Aggregate Expenditure Adjustment Amount" means the Dollar equivalent, as of the Adjustment Time, of the sum of (i) the amount, if any, by which (x) the amount the Entities are projected to spend in the aggregate during the 2015 Budget Period in the 2015 Budget on Qualifying Capital Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Capital Expenditures during the 2015 Budget Period and (ii) the amount, if any, by which (x) the amount the Entities are projected to spend in the aggregate during the 2015 Budget Period in the 2015 Budget on Qualifying Sales and Marketing Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Sales and Marketing Expenditures during the 2015 Budget Period. For purposes of determining the Aggregate Expenditure Adjustment Amount, amounts budgeted in the 2015 Budget to be spent in a calendar quarter that straddles the Closing Date will be prorated based on the number of days in that quarter preceding the Closing Date relative to the total number of days in that quarter.

"Agreement" means this Agreement, as it may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"Amendment to Trademark Sublicense Agreement" means an Amendment to Trademark Sublicense Agreement in the form attached as Exhibit E.

"Ancillary Agreements" is defined in Section 5.2.

"Auction" is defined in the Bidding Procedures.

"Audited Financial Statements" is defined in Section 5.8(a).

"Back-Up Plan" means confirmation of a chapter 11 plan resulting in (x) the reorganized debtors or their successors retaining the Business and their business in Brazil, in each case, substantially as existing as of the date hereof and (y) no Excluded Acquirer (A) becoming the "beneficial owners" (as defined in Rules 13(d)-3 and 13(d)-5 of the Exchange Act) of more than 25% of

(1) the capital stock or other economic interests of any Entity or reorganized debtor (other than any entity whose sole assets are the Debtors' businesses in Argentina substantially as existing as of the date hereof) or (2) all or substantially all of the Company's consolidated assets or (B) having the right, directly or indirectly, to acquire more than a 25% economic interest in any Entity or reorganized debtor (other than any entity whose sole assets are the Debtors' businesses in Argentina substantially as existing as of the date hereof)  within 12 months of confirmation of such chapter 11 plan, in each case of (A) or (B) prior to or in connection with the consummation of any such chapter 11 plan.

"Balance Sheet Date" is defined in Section 5.8(a).

"Bankruptcy Cases" is defined in Preliminary Statement B.

"Bankruptcy Code" is defined in Preliminary Statement B.

"Bankruptcy Court" is defined in Preliminary Statement B.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Basket Amount" is defined in Section 9.5(a).

"Bidding Procedures" means the bidding procedures in the form of Exhibit A, subject only to such modifications that in Purchaser's reasonable good faith judgment are immaterial or ministerial in nature, but in no event (i) adverse to Purchaser without Purchaser's prior consent or (ii) inconsistent with the Bidding Procedures Order, the Sale Order or this Agreement.

"Bidding Procedures Motion" means a motion, in form and substance reasonably satisfactory to Purchaser, seeking approval of the Bidding Procedures Order and the Sale Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court in the form of Exhibit B, subject only to such modifications that in Purchaser's reasonable good faith judgment are immaterial or ministerial in nature, but in no event (i) adverse to Purchaser without Purchaser's prior consent or (ii) inconsistent with this Agreement.

"Break-Up Fee" means an amount of cash in Dollars equal to $32 million.

"Business" means the business of marketing, selling and providing wireless telecommunication services (including voice and data services), and all services ancillary thereto, in Mexico, in each case as currently conducted by the Entities.

"Business Day" means any day of the year that is not a Saturday, a Sunday or any other day on which commercial banks are authorized or required by law to be closed in New York City or Mexico City.

"Cap" is defined in Section 9.5(b).

"CDB" means the China Development Bank Corporation.

"CDB Credit Facilities" means the two $187,500,000 credit agreements, each dated as of July 12, 2011, as amended from time to time, among the Company, the guarantors thereunder and CDB as administrative agent and lender.

"Cell Site Standards" is defined in Section 5.16(e).

"CFC" means the Mexican Federal Antitrust Commission (*Comisión Federal de Competencia Económica*).

"Closing" is defined in Section 4.1.

"Closing Date" means the date on which the Closing occurs.

"Closing Statement" is defined in Section 3.4(b).

"Closing Statement Dispute Notice" is defined in Section 3.4(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"COFETEL" means the former Mexican Federal Telecommunications Commission (*Comisión Federal de Telecomunicaciones*).

"Company" is defined in Preliminary Statement C.

"Company Approvals" means the Regulatory Approval and the notice to the National Foreign Investment Commission (*Comisión Nacional de Inversiones Extranjeras*) pursuant to article 9 of the Mexican Foreign Investment Law (*Ley de Inversión Extranjera*).

"Company Parent" is defined in the Preamble.

"Company Parent Interests" is defined in Preliminary Statement A.

"Company Parent Transfer" is defined in Preliminary Statement A.

"Company Shares" is defined in Preliminary Statement C.

"Company Telecommunication Licenses" is defined in Section 5.16(c).

"Competing Transaction" means (i) a sale, joint venture or any other direct or indirect transfer of any Debtor, Seller Parent, Seller or the Company which contemplates, or would result in, any direct or indirect transfer of the Company Parent Interests or any of the Shares, or any transaction with such effect, (ii) any acquisition or purchase of all or any material portion of the Business or all or any portion of the capital stock of any Entity, or (iii) any plan of reorganization or liquidation that does not contemplate, or that would be reasonably expected to impede or delay the implementation or consummation of, the transactions provided for in this Agreement; provided, however, if this Agreement is validly terminated for any reason, except as expressly set forth herein, the following shall not constitute a Competing Transaction (x) consummation of a Back-Up Plan or (y) following consummation of a Back-Up Plan, the acquisition by any Person of the reorganized debtors' public equity securities in one or more public market securities transactions to which the reorganized debtors are not a party that do not result in any Excluded Acquirer becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 of the Exchange Act) of more than 49% of any class of public equity securities of such reorganized debtors.

"Contract" means any legally binding contract, indenture, note, bond, lease, commitment or other agreement or arrangement.

"Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, and (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code.

"Corporate Records" means the original corporate books of each of the Entities and Company Parent, including the shareholders' (or equivalent) meetings minutes book (*libro de actas de asambleas*), stock (or equivalent) registry book (*libro de registro de acciones/partes sociales*), capital variations registry book (*libro de registro de variaciones de capital*) and the board of directors' (or equivalent) meetings minutes book (*libro de actas de sesiones del consejo de administración/gerentes*).

"Damages" is defined in Section 9.2.

"De Minimis Claim" is defined in Section 9.5(a).

"Debtors" means Seller, Company Parent, and each Seller Guarantor (other than the Company).

"Deposit Amount" is defined in Section 3.2.

"Direct Claim" is defined in Section 9.4(f).

"Direct Claim Notice" is defined in Section 9.4(f).

"Disputed Item" is defined in Section 3.4(c).

"Employee" means an employee of the Entities (whether retained as such or deemed as such under applicable Law).

"Employee Plan" means any employment arrangement, consulting or deferred compensation Contract, executive compensation, bonus, employee pension, profit-sharing, savings, retirement, stock option, stock purchase, severance pay, life, health, disability or accident insurance plan or other compensation or benefit plan, program, policy or commitment, that is sponsored or maintained by, or required to be contributed to by an Entity or with respect to which an Entity has any Liability.

"Encumbrances" means any charge, lien, encumbrance, security interest, claim (as defined in Section 101(5) of the Bankruptcy Code), mortgage, lease, sublease, hypothecation, deed of trust, pledge, option, right of use or possession, right of first offer or first refusal, contractual restriction, easement, right of way, servitude, restrictive covenant, encroachment, transfer restriction, conditional sale or installment Contract, finance lease involving substantially the same effect or any other encumbrance, limitation or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property).

"End Date" is defined in Section 9.1.

"Entities" means the Company and its Subsidiaries.

"Environmental Law" means any Law or Order relating to the protection of health, safety, the environment or any Hazardous Substance.

"ERISA" is defined in Section 5.25(a).

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with the Company or any of its Subsidiaries as a "single employer" within the meaning of Section 414 of the Code.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means the escrow agreement entered into on the date hereof among the Parties and the Escrow Agent.

"Escrow Account" means the deposit account of the Escrow Agent that is governed by the Escrow Agreement and into which the Escrow Amount or the Deposit Amount, as applicable, is deposited.

"Escrow Amount" means an amount in Dollars equal to $187.5 million.

"Estimated Expenditure Adjustment Amount" is defined in Section 3.4(a).

"Estimated Closing Statement" is defined in Section 3.4(a).

"Estimated Net Indebtedness Amount" is defined in Section 3.4(a).

"Estimated Purchase Price" means an amount in Dollars equal to (i) $1.875 billion *minus* (ii) the Estimated Net Indebtedness Amount *minus* (iii) the Estimated Expenditure Adjustment Amount.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Acquirer" means any "Person or Group" (as such terms are defined in the Exchange Act) that includes one or more Persons that (a) is principally engaged, or has an Affiliate that is principally engaged, in the cable, satellite or wireless telecommunications business or (b) is, is an Affiliate of, or is acting in concert with (x) any Person listed in Schedule 1.1(g) or any Affiliate thereof or (y) any other Person controlled by any officer or director of any Person listed on Schedule 1.1(g) or in which any officer or director of any Person listed on Schedule 1.1(g) or any Affiliate thereof holds, directly or indirectly, an equity interest (other than an equity interest of less than 1%).

"Existing Plan" means the Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors [Docket No. 322].

"Existing Plan Documents" means, collectively, the Plan Support Agreement filed as an exhibit to Docket No. 320, the Existing Plan and the *Disclosure Statement for Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors* [Docket No. 323].

"Expense Reimbursement" means an amount of cash in Dollars equal to the reasonable and documented out-of-pocket third-party costs, fees and expenses incurred by Purchaser and its Affiliates (including reasonable fees and expenses of legal, accounting and financial advisors) in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $10,000,000.

"Extended Termination Date" is defined in Section 4.4(a).

"FCPA" means the Foreign Corrupt Practices Act of 1977.

"File", "Filed" or "Filing" means filed with the Bankruptcy Court.

"Final Closing Statement" means the Closing Statement, as (i) mutually agreed in writing by Purchaser and Seller (whether during the

Resolution Period or otherwise), (ii) made final, binding and conclusive due to the failure of Seller to timely deliver a Closing Statement Dispute Notice pursuant to <u>Section 3.4(c)</u>, or (iii) made final by the Independent Accountant pursuant to <u>Section 3.4(e)</u>.

"<u>Final Company Cash Balance</u>" means the Dollar equivalent, as of the Adjustment Time, of the aggregate amount of all cash and cash equivalents that are required to be reflected as such on a consolidated balance sheet of the Company in accordance with Mexican NIF as of the Adjustment Time, other than any such cash or cash equivalents the use of which by the Entities is restricted for a particular use or event by Law or Contract (other than pursuant to the CDB Credit Facilities or posted as collateral to secure obligations under the letters of credit set forth on <u>Schedule 1.1(b)</u>), in any such case as set forth in the Final Closing Statement.

"<u>Final Company Debt Balance</u>" means the Dollar equivalent, as of the Adjustment Time, of the aggregate amount of all Indebtedness of the Entities determined on a consolidated basis in accordance with Mexican NIF as of the Adjustment Time, as set forth in the Final Closing Statement.

"<u>Final Expenditure Adjustment Amount</u>" means the sum of (i) the Aggregate Expenditure Adjustment Amount and (ii) the Incremental Expenditure Adjustment Amount.

"<u>Final License Value Adjustment Amount</u>" means (i) if the Closing Date occurs before payment in full by the Entities of each of the annual fees that are due for use in 2015 of the Telecommunication Licenses set forth on <u>Schedule 1.1(c)</u> (the "<u>2015 License Fees</u>") to each applicable Governmental Authority, the Dollar equivalent, as of the Adjustment Time, of an amount equal to the negative value of the aggregate Peso amount of all 2015 License Fees *multiplied by* a fraction, the numerator of which is the number of days from and including January 1, 2015 to and excluding the Closing Date and the denominator of which is 365 and (ii) if the Closing Date occurs after payment in full by the Entities of each of the 2015 License Fees to each applicable Governmental Authority, the Dollar equivalent, as of the Adjustment Time, of an amount equal to the aggregate Peso amount of all the 2015 License Fees paid in full *multiplied by* a fraction, the numerator of which is the number of days in 2015 from and including the Closing Date to and including December 31, 2015 and the denominator of which is 365.

"<u>Final Net Indebtedness Amount</u>" means an amount of Dollars equal to (i) the Final Company Debt Balance *minus* (ii) the Final Company Cash Balance *minus* (iii) the Final License Value Adjustment Amount.

"<u>Final Order</u>" means an Order which has not been stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil

Procedure) or a petition for writ of certiorari has expired and no appeal, motion, stay or petition is pending, or in the event that such an appeal or petition thereof has been sought, such Order shall have been affirmed by the highest court to which such Order was appealed or certiorari shall have been denied, and the time to take any further appeal or petition for certiorari shall have expired.

"Final Purchase Price" means an amount equal to (i) $1.875 billion *minus* (ii) the Final Net Indebtedness Amount *minus* (iii) the Final Expenditure Adjustment Amount, if any.

"Financial Statements" is defined in Section 5.8(a).

"First Day Order" means an Order of the Bankruptcy Court substantially in the form of, *mutatis mutandis*, the *Order Making Certain Orders Entered in Chapter 11 Cases of Affiliated Debtors Applicable to Recently Filed Cases* [Docket No. 140], approving, among other things, the joint administration of the Seller Proceeding as part of the Bankruptcy Cases.

"Funded Debt" means (i) the 10% senior unsecured notes issued by NII Capital Corp., due in 2016, (ii) 8.875% senior unsecured notes issued by NII Capital Corp. due in 2019, (iii) 7.625% senior unsecured notes issued by NII Capital Corp. due in 2021, (iv) 11.375% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019, and (v) 7.875% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019.

"General Enforceability Exceptions" means any bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar Law of general applicability relating to or affecting creditors' rights or general equity principles.

"Governmental Approvals" means the Company Approvals and any other consent, approval (or deemed approval after the expiry of all appropriate waiting periods), authorization, notice, permission or waiver of, or notice to or report or other filing with, a Governmental Authority required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereunder, excluding any of the foregoing required under the Bankruptcy Code.

"Governmental Authority" means any U.S., Mexican or other government or governmental political subdivision or regulatory body thereof, whether federal, state or local, or any agency, instrumentality or other governmental authority.

"Guarantor Successor" is defined in Section 12.13(c).

"Hazardous Substance" means any substance that is listed, classified or regulated pursuant to any Environmental Law.

"IFETEL" means the Mexican Telecommunications Institute (*Instituto Federal de Telecomunicaciones*).

"IMSS" means the Mexican Institute of Social Security (*Instituto Mexicano del Seguro Social*).

"Incremental Expenditure Adjustment Amount" means the Dollar equivalent, as of the Adjustment Time, of the sum of (i) the sum of all amounts, if any, by which (x) 65% of the amount the Entities are projected to spend during any 2015 Budget Month in the 2015 Budget on Qualifying Capital Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Capital Expenditures during such 2015 Budget Month and (ii) the sum of all amounts, if any, by which (x) 80% of the amount the Entities are projected to spend during any 2015 Budget Month in the 2015 Budget on Qualifying Sales and Marketing Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Sales and Marketing Expenditures during such 2015 Budget Month. For purposes of determining the Incremental Expenditure Adjustment Amount, amounts budgeted in the 2015 Budget to be spent in a 2015 Budget Month that straddles the Closing Date will be prorated based on the number of days in that 2015 Budget Month preceding the Closing Date relative to the total number of days in that 2015 Budget Month.

"Indebtedness" means as of any time with respect to any Person, without duplication, (i) all liabilities for borrowed money, whether current or funded, secured or unsecured, all obligations evidenced by bonds, debentures, notes or similar instruments, including the Pay-Off Amount, and all liabilities in respect of mandatorily redeemable or purchasable capital stock or securities convertible into capital stock; (ii) all liabilities for the deferred purchase price of property; (iii) all liabilities in respect of any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, to the extent that such liabilities are required to be classified and accounted for under Mexican NIF as capital leases; (iv) all liabilities for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction securing obligations of a type described in clauses (i), (ii) or (iii) above to the extent of the obligation secured, and all liabilities as obligor, guarantor, or otherwise, to the extent securing an obligation of a type described in clauses (i), (ii) or (iii) above to the extent of the obligation secured; (v) any transactions accounted for under Mexican NIF as debt; (vi) any supplier account payables above 90 days past due (other than accounts payable being disputed in good faith); (vii) all liabilities in respect of any unfunded or underfunded pension obligations (calculated on a projected net benefit obligation basis) (other than in respect of the Terminated Plan); (viii) to the extent negative, the net position of such Person under all Contracts to which it is a party documenting derivative and/or hedging transactions, and (ix) all guarantees of obligations of any other Person with respect to any of the foregoing, provided, however, that there will be no duplication of the amount of any liabilities, net positions or guarantees and no liabilities or obligations under clause (iv), (vii) or (viii) hereof will constitute

Indebtedness to the extent it secures any other liabilities or obligations that constitute Indebtedness.  For the avoidance of doubt, Intercompany Obligations settled hereunder and the obligations set forth on <u>Schedule 1.1(c)</u>, to the extent they are taken into account in the calculation of the Final License Value Adjustment Amount, will not constitute Indebtedness.

"<u>Indemnified Parties</u>" is defined in <u>Section 9.3</u>.

"<u>Indemnifying Party</u>" is defined in <u>Section 9.4(a)</u>.

"<u>Independent Accountant</u>" means Deloitte LLP or such other certified public accountant reasonably satisfactory to Purchaser and Seller.

"<u>INFONAVIT</u>" means the Mexican Institute for Workers' Housing National Fund (*Instituto del Fondo Nacional de la Vivienda para los Trabajadores*).

"<u>Initial Termination Date</u>" is defined in <u>Section 4.4(a)</u>.

"<u>Instrument of Assignment</u>" means an instrument of assignment effecting the transfer and assignment of the Company Parent Interests to Purchaser at the Closing in substantially the form attached hereto as <u>Exhibit F</u>.

"<u>Insurance Policies</u>" is defined in <u>Section 5.19</u>.

"<u>Intellectual Property</u>" means all intellectual property rights anywhere in the world arising from or in respect of the following (i) patents and patent applications, including continuations, divisionals, revisions, renewals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, internet domain names and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals of the foregoing (collectively, "<u>Trademarks</u>"), (iii) works of authorship and copyrights, and all applications, registrations and renewals of the foregoing, (iv) Software, and (v) trade secrets and proprietary know-how or other proprietary information.

"<u>Intercompany Obligations</u>" means, as of any specified time, any Liabilities owed by any Entity or Company Parent to Seller or any of its Affiliates (other than the Entities and Company Parent) or by Seller or any of its Affiliates (other than the Entities and Company Parent) to any Entity or Company Parent, in each case at such specified time.

"<u>Interested Party</u>" has the meaning ascribed thereto in the Bidding Procedures.

"<u>Knowledge of Purchaser</u>" means the actual knowledge of the Persons listed on <u>Schedule 1.1(d)</u>, or such knowledge as the foregoing

individuals would reasonably be expected to have after inquiry they believe in good faith to be reasonable in respect of the applicable matter.

"Knowledge of Seller" means the actual knowledge of the Persons listed on Schedule 1.1(e), or such knowledge as the foregoing individuals would reasonably be expected to have after inquiry they believe in good faith to be reasonable in respect of the applicable matter.

"Labor Agreements" is defined in Section 5.14(a).

"Law" means any U.S. or non-U.S., federal, state or local law, statute, code, ordinance, common law or any constitutional mandate, treaty, rule, executive order, regulation (including any Mexican Official Norms (*Norma Oficial Mexicana*), agency or official requirement, license or permit of any Governmental Authority.

"Leased Property" means all real property leased or subleased by the Company and its Subsidiaries, other than Transmission Towers.

"Legal Proceeding" means any judicial, administrative or arbitral action, suit, demand, claim, hearing or proceeding by or before a Governmental Authority or arbitrator.

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, whether or not required to be reflected as such in a balance sheet of a Person prepared in accordance with Mexican NIF, known or unknown, determined or determinable, whenever or however arising.

"Licenses" is defined in Section 5.12(a).

"Local Rules" means the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

"Material Contracts" is defined in Section 5.13(a).

"Mexican Income Tax Law" means the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta).*

"Mexican NIF" means the Mexican Financial Information Norms (*Normas de Información Financiera*), as in effect from time to time, issued by the Mexican Board of Financial Information (*Consejo Mexicano de Normas de Información Financiera, A.C.*) and the Accounting Principles Commission of the *Instituto Mexicano de Contadores Públicos, A.C.*

"Mexico" means the United Mexican States.

"Mifel Trust" is defined in Section 4.2(n).

"Minority Company Shares" is defined in Preliminary Statement D.

"Minority Shareholder" is defined in Preliminary Statement D.

"NII Holdings" means NII Holdings, Inc.

"Non-Disclosure Agreement" means the non-disclosure agreement, dated as of October 15, 2014, executed between AT&T Services, Inc. and NII Holdings.

"Notice of Dismissal" is defined in Section 8.1(d).

"OFAC" means the United States Department of Treasury's Office of Foreign Assets Control.

"OFAC Lists" means the List of Specially Designated Nationals and Blocked Persons, the Foreign Sanctions Evaders List and the Sectoral Sanctions Identifications List, each administered by OFAC and as amended from time to time.

"Order" means any temporary, preliminary or permanent order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Authority or arbitrator.

"Ordinary Course of Business" means the ordinary course of business of the applicable Entity, consistent in all material respects with past practice.

"Owned Property" means all real property owned by the Entities, other than Transmission Towers.

"Participation Materials" is defined in Section 10.1(a).

"Parties" means Seller Parent, Seller, Company Parent, each Seller Guarantor and Purchaser.

"Pay-Off Amount" means the aggregate amount specified in the Pay-Off Letters as required to pay in full all principal and interest outstanding and all other amounts owing under the CDB Credit Facilities (including any penalties, fees or other amounts due upon a prepayment at the Closing of all principal and interest outstanding), calculated as of the Adjustment Time.

"Pay-Off Letters" is defined in Section 4.2(h).

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates issued by a Governmental Authority, excluding Telecommunication Licenses.

"Permitted Encumbrances" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance which have been made available to Purchaser, (ii) statutory liens for any Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established, (iii) mechanics', carriers', workers', repairmen's and similar Encumbrances arising or incurred in the Ordinary Course of Business and not material in amount or effect on the Business, (iv) zoning, entitlement and other land use and environmental Laws, (v) liens securing debt as disclosed in the Financial Statements, (vi) title of a lessor under a capital or operating lease, (vii) such other imperfections in title, charges, easements, restrictions and encumbrances that are not material in amount or effect on the Business, and (viii) Encumbrances that will be released by the Sale Order or at Closing as a consequence of the consummation of the transactions contemplated hereunder.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Plan Support Agreement" means the Plan Support Agreement dated November 24, 2014 attached as Exhibit A to Docket No. 249.

"Post-Closing Period" means a Taxable period (or portion thereof) that, to the extent it relates to any of the Entities, begins the day after the Closing Date.

"Postpay Subscribers" means the aggregate number of Subscribers that are in active service and are without unpaid charges attributable to such number over 90 days past due, excluding Prepaid Subscribers.

"Pre-Closing NOLs" is defined in Section 11.4(d).

"Pre-Closing Period" means a Taxable period (or portion thereof) that, to the extent such period relates to any of the Entities, ends on or before the Closing Date.

"Pre-Closing VAT Favorable Balances" is defined in Section 11.4(d).

"Prepaid Subscribers" means the aggregate number of Subscribers that are in active service with telephone numbers assigned pursuant to prepaid Contracts.

"Privileged Communications" is defined in Section 12.11(a).

"Process Agent" is defined in Section 12.3.

"PROFECO" means the Mexican Consumer Protection Agency (*Procuraduría Federal de Protección al Consumidor*).

"Purchaser" is defined in the Preamble.

"Purchaser Indemnitees" is defined in Section 9.2.

"Purchaser Material Adverse Effect" means an effect that would prevent, materially delay or materially impair the ability of Purchaser to consummate the transactions contemplated by this Agreement on a timely basis.

"Purchaser Returns" is defined in Section 11.1(b).

"Purchaser Tax Act" means (i) a change in method of accounting, (ii) not keeping, maintaining or making available to any applicable Taxing authority the information, documents and accounting records that the Entities are obligated to keep, maintain and make available to such Taxing authorities as required by applicable Mexican Tax Law relating to a Pre-Closing Period; provided such information, documents and records need not be kept, maintained or made available to the extent that such information, documents or records were not originally kept and maintained by the Entities, or (iii) an amendment to a Tax Return for a Pre-Closing Period by Purchaser or any of its Affiliates (including, after the Closing, the Entities), in each case that, following the Closing (including the portion of the Closing Date after the Closing), results in any gain or income to Seller or any of its non-Entity Affiliates for any taxable period or the Entities for a Pre-Closing Period (including the pre-Closing portion of any Straddle Period) in an amount that individually or in the aggregate equals or exceeds $35,000,000, other than an action (x) taken in the Ordinary Course of Business, (y) that is required in order to comply with applicable Laws, or (z) expressly permitted by this Agreement.

"Qualifying Capital Expenditures" means the capital expenditures by the Entities contemplated by the 2015 Budget for the 2015 Budget Period or the applicable 2015 Budget Month, as applicable, determined as of the Adjustment Time consistent with past practice.

"Qualifying Sales and Marketing Expenditures" means the expenditures by the Entities captured by the "Sales and Marketing Expenditures" line items set forth in the 2015 Budget and contemplated by the 2015 Budget for the 2015 Budget Period or the applicable 2015 Budget Month, as applicable, determined as of the Adjustment Time, consistent with past practice.

"Regulatory Approval" means the authorization pursuant to the Regulatory Statutes issued by the IFETEL or the CFC, as applicable, or any

Governmental Authority that may replace them in the future, in connection with the transactions contemplated by this Agreement.

"Regulatory Statutes" means, as applicable, the Mexican Antitrust Law (*Ley Federal de Competencia Económica*) and the Mexican Telecommunications and Broadcasting Law (*Ley Federal de Telecomunicaciones y Radiodifusión*).

"Related Party" is defined in Section 5.24.

"Related Party Contract" is defined in Section 5.24.

"Release Date" is defined in Section 9.1.

"Resigning Individuals" is defined in Section 4.2(e).

"Resolution Period" is defined in Section 3.4(d).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to consider entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court in the form included in Exhibit C, subject only to such modifications that in Purchaser's reasonable good faith judgment are immaterial or ministerial in nature, but in no event (i) adverse to Purchaser without Purchaser's prior consent or (ii) inconsistent with the Bidding Procedures Order or this Agreement.

"Sanctioned Countries" is defined in Section 5.22(c).

"Sanctions Laws" means (i) the economic sanctions Laws of the United States, including the International Emergency Economic Powers Act, 50 U.S.C. §§1701, et seq., the Trading with the Enemy Act, 50 App. U.S.C. §§1, et seq., the Iran Sanctions Act of 1996 (50 U.S.C. §1701 note), the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (PL 111-195), the National Defense Authorization Act for Fiscal Year 2012 (PL-112-81), the National Defense Authorization Act for Fiscal Year 2013 (including the Iran Freedom and Counter-Proliferation Act of 2012 (PL 112-239)), the Iran Threat Reduction and Syria Human Rights Act of 2012 (PL 112-158), the Cuban Liberty and Democratic Solidarity Act (Libertad Act), 22 U.S.C. §§6021, et seq., and all Laws administered by OFAC, codified at 31 C.F.R. Part 500, et seq., and (ii) any applicable economic sanctions Laws of any jurisdiction other than the United States, such as the United Nations Security Council, or other relevant sanctions authority applicable to Seller or any Entity.

"Sanctions Lists" mean (i) the OFAC Lists and (ii) any other sanctions lists of any jurisdiction (including the United States), such as the United Nations Security Council, or other relevant sanctions authority applicable to Seller or any Entity.

"SAR" means the Mexican Law of Systems of Savings for Retirement (*Ley de los Sistemas de Ahorro para el Retiro*).

"SCT" means the Mexican Ministry of Communication and Transportation (*Secretaría de Comunicaciones y Transportes*).

"Section 7.8 Instruments" is defined in Section 7.8.

"Section 7.8 Terminations" is defined in Section 7.8.

"Seller" is defined in the Preamble.

"Seller Disclosure Schedule" is defined in Article 5.

"Seller Indemnitees" is defined in Section 9.3.

"Seller Fundamental Representations" means the representations and warranties contained in Section 5.1 (Organization of Seller and Seller Parent), Section 5.2 (Authorization of Agreement), Section 5.4 (Organization of Entities), Section 5.5 (Capitalization of the Entities), Section 5.7 (Title to Shares), Section 5.16(d) (Telecommunication Licenses) and Section 5.26 (Company Parent).

"Seller Guarantor" is defined in the Preamble.

"Seller Material Adverse Effect" means (i) a material adverse effect on the business, financial condition, assets used in the business or results of operations of the Entities taken as a whole or (ii) an effect that would prevent, materially delay or materially impair the ability of Seller or Seller Parent to consummate the transactions contemplated by this Agreement, provided, however, that for purposes of clause (i) only, any adverse effect will not be taken into account in determining whether there has been, or would reasonably be expected to be, a Seller Material Adverse Effect to the extent resulting from: (a) general conditions in the industry in which the Entities operate, (b) compliance by Seller with its covenants in this Agreement (other than Section 7.2, excluding, however, actions prohibited by Section 7.2(b)(F) in respect of which Seller sought consent that Purchaser unreasonably withheld), (c) changes in Mexican NIF (or official interpretations thereof) or changes in the regulatory or accounting requirements applicable to the industry in which the Entities operate, (d) any failure by the Entities to meet any projections of revenues, earnings or other operational or financial measures for any period ending on or after the date of this Agreement and before the Closing, provided, however, that the exception in this subsection (d) will not prevent or otherwise affect a determination that any change or occurrence underlying such failure has resulted in, or contributed to, a Seller Material Adverse Effect, (e) changes in the financial or securities markets (including the cost or availability of debt or equity financing) or general economic, regulatory or political conditions, in each case, globally, in Mexico or in any other jurisdiction, (f) changes (including changes in applicable Law or official

interpretations thereof) or conditions generally affecting the industry, the country or the regions in which the Entities operate, including any foreign exchange controls, (g) acts of war (whether or not declared), armed hostilities, acts of terrorism or any natural disasters, (h) adverse changes in the relationships of the Entities with their Employees, customers or suppliers (including any Employee departures and any actions taken by customers or suppliers of the Entities to discontinue or not renew their Contracts with the Entities or to terminate them in accordance with their terms), in each case proximately caused by the announcement of entry into this Agreement, (i) any action taken (or omitted to be taken) at the written request of Purchaser after the date hereof, and (j) solely for purposes of <u>Section 8.1(h)</u>, any decline in the number of Subscribers to the Entities' iDEN network that occurs subsequent to December 31, 2014 and prior to the Closing Date that does not arise out of any breach by the Seller or Seller Parent of its covenants under this Agreement (or any actions or inactions occurring prior to the date hereof that would have been a breach of Seller or Seller Parent's covenants under this Agreement had this Agreement been in effect as of January 1, 2015) or applicable Law, provided, however, that the exception in this subsection (j) will not prevent or otherwise affect a determination that any change or occurrence underlying such decline has resulted in, or contributed to, a Seller Material Adverse Effect; provided, further, that with respect to subsections (a), (c), (e), (f) or (g), such matters will be considered to the extent that they disproportionately affect the Entities as compared to similarly situated businesses operating in the telecommunications industry in Mexico.

"<u>Seller Parent</u>" is defined in the <u>Preamble</u>.

"<u>Seller Petition Date</u>" is defined in <u>Section 2.1</u>.

"<u>Seller Proceeding</u>" means the bankruptcy case of Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, which, following entry of the First Day Order, is jointly administered with the Bankruptcy Cases.

"<u>Seller Returns</u>" is defined in <u>Section 11.1(a)</u>.

"<u>Shares</u>" is defined in <u>Preliminary Statement D</u>.

"<u>Software</u>" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"<u>Special Power of Attorney</u>" is defined in <u>Section 12.3</u>.

"Straddle Period" means a taxable period that, to the extent it relates to any of the Entities, includes, but does not end on, the Closing Date.

"Specified Representations" means the representations and warranties contained in Section 5.14 (Labor), Section 5.17 (Environmental Matters) and Section 5.25 (Employee Benefits).

"Subscriber" means a mobile telephone number maintained by any Entity and assigned to an end user of the Entities' mobile wireless voice or data services that is paying any Entity for such service (regardless of whether such end user is current or delinquent in the payment at any given date of calculation).

"Subsidiary" is defined in Section 5.6.

"Seller Successor" is defined in Section 9.9.

"Successor" is defined in Section 4.6(b).

"Successful Bidder" is defined in the Bidding Procedures.

"Tax Claim" is defined in Section 11.5(a).

"Tax Return" means all returns, declarations, reports, estimates, claims for refunds, information returns, elections and statements required to be filed with any Governmental Authority in respect of any Taxes, including any amendments thereto and requests for the extension of time in which to file any such return, declaration, report, estimate, information return, election or statement.

"Taxes" (including, with correlative meaning, the term "Taxable" or "Taxing") means (a) all federal, state or local taxes imposed by any Governmental Authority, including all such taxes based on gross or net income, gross receipts, flat tax, capital, sales, use, ad valorem, transfer, franchise, profits, inventory, environmental, capital stock, license, withholding, payroll, employment, disability, social security, unemployment, excise, production, value added, severance, stamp, occupation, duties (*derechos* and *aprovechamientos*) and other taxes (including any other contributions (*contribuciones*) and employee payments for profit sharing (*participación de los trabajadores en las utilidades*)), property and estimated taxes, including any payments due under any social security Laws and those related to IMSS, INFONAVIT and SAR, and (b) all interest, penalties, fines, inflationary adjustments, additions to tax or additional amounts imposed by any Taxing authority in connection with any item described in subsection (a).

"Telecommunication Licenses" means any concession, permit, authorization or registration granted by the IFETEL, SCT or COFETEL for the operation of any kind of telecommunications services, including the use of spectrum, network or band-width.

"Terminated Plan" is defined in Section 7.12(b).

"Termination Date" means the Initial Termination Date or, if such date has been extended pursuant to Section 4.4(a), the later Extended Termination Date to which such date has been so extended.

"Third Party Claim" is defined in Section 9.4(a).

"Third Party Claim Notice" is defined in Section 9.4(a).

"Third Party Consents" means the approvals, consents or waivers that are set forth in Schedule 1.1(f).

"Trademark License Agreement" means the Fourth Amended and Restated Trademark License Agreement, dated July 27, 2011, between the Trademark Licensor and NII Holdings, as amended on July 9, 2013.

"Trademark Licensor" means Nextel Communications, Inc.

"Trademark Sublicense Agreement" means the Trademark Sublicense Agreement, dated January 1, 2012, between NII Holdings and the Company.

"Trademarks" is defined within the definition of Intellectual Property.

"Transaction Agreements" means this Agreement, the Escrow Agreement and the Transition Services Agreement.

"Transition Services Agreement" means a transition services agreement in the form attached as Exhibit D.

"Transfer Taxes" means any and all transfer Taxes (excluding Taxes measured in whole or in part by net income) and similar Taxes, fees, duties, levies, customs, tariffs, imposts, assessments, obligations and charges payable to a Governmental Authority by reason of the purchase and sale of the Company Parent Interests.

"Transmission Tower Standards" is defined in Section 5.16(f).

"Transmission Towers" is defined in Section 5.21(b).

"Unaudited Balance Sheet" is defined in Section 5.8(a).

"Unaudited Financial Statements" is defined in Section 5.8(a).

"Unresolved Items" is defined in Section 3.4(e).

"Uruguay Divestiture" is defined in Section 7.2(c).

"Uruguay Subsidiary" means Nextel Uruguay S.A.

"U.S." means the United States of America.

"U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

"VAT" is defined in Section 11.4(a).

"Willful Breach" means a deliberate, volitional, non-coerced and non-accidental act or omission by a party in breach of its obligations hereunder.

1.2.    Construction Rules and Interpretative Matters.  The following rules of construction and interpretation will apply:

(a)    when calculating the period of time in which any act is to be performed pursuant to this Agreement, the date that is the reference date in calculating the beginning of such period will be excluded.  If the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(b)    any reference in this Agreement to "$" or "Dollars" will mean U.S. Dollars and to "Pesos" or "MXN$" means Mexican Pesos;

(c)    when sums of money expressed in Dollars or Pesos need to be converted into or expressed as the equivalent amounts in Pesos or Dollars, as the case may be, for purposes of this Agreement, such sums will be converted based on the exchange rate (*Tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana*) published by the Mexican Central Bank (*Banco de México*) on the Federal Official Gazette (*Diario Oficial de la Federación*) on the Business Day immediately preceding the date as of which such conversion is to be made or as of which such equivalent amount is to be expressed;

(d)    the Exhibits and Schedules (including the Seller Disclosure Schedule) to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement;

(e)    any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa;

(f)    the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement;

(g)    all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified;

(h)      words such as "herein", "hereinafter", "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires;

(i)      the word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it;

(j)      any reference to the "date hereof" means the date of this Agreement;

(k)      references to Laws mean a reference to (i) such Laws as the same may be amended, modified or supplemented from time to time and (ii) all rules and regulations promulgated thereunder, unless the context requires otherwise; and

(l)      the Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## 2. PURCHASE AND SALE

2.1.     <u>Implementation Transactions</u>.  On the Business Day immediately following the date hereof, each of the Debtors will File a motion seeking entry of the First Day Order and File the Bidding Procedures Motion and seek entry of the Bidding Procedures Order.

2.2.     <u>Purchase and Sale of Company Parent Interests and Company Shares</u>.  Subject to the terms and conditions contained herein, at the Closing, Seller will sell and transfer to Purchaser, and Purchaser will purchase and accept transfer from Seller of, all of Seller's right, title and interest in and to the Company Parent Interests, free and clear of all 363 Interests, and Company Parent (a) will be, and will own the Company Shares, free and clear of all 363 Interests and (b) will indirectly own the Minority Company Shares free and clear of all 363 Interests.

## 3. CONSIDERATION

3.1.     <u>Consideration</u>.  The aggregate consideration for the Company Parent Interests will be the Final Purchase Price.

3.2.     <u>Purchase Price Deposit</u>.  Within two Business Days following entry of the Bidding Procedures Order, Purchaser will deposit with the Escrow Agent $32 million in immediately available funds (together with all accrued investment

income thereon, the "Deposit Amount").  The Deposit Amount will be released by the Escrow Agent and delivered to either Purchaser or Seller as follows:

(a)    if the Closing occurs, the Deposit Amount will be delivered to Seller and applied towards the amount payable by Purchaser under Section 3.3;

(b)    if this Agreement is terminated by Seller pursuant to Section 4.4(f), the Deposit Amount will, upon receipt by the Escrow Agent of a joint notice of release executed by Purchaser and Seller or a final and non-appealable order or judgment of a court of competent jurisdiction, be delivered to and retained by Seller; and

(c)    if this Agreement is terminated for any reason other than by Seller pursuant to Section 4.4(f) (as set forth in Section 3.2(b)), Purchaser and Seller will deliver a joint notice of release to the Escrow Agent within two Business Days after such termination providing for the release of the Deposit Amount to Purchaser as promptly as practicable after the date of such joint notice.

3.3.    Payment of Consideration at Closing.  On the Closing Date, (a) Purchaser will pay to Seller an amount in Dollars equal to (i) the Estimated Purchase Price, minus (ii) the Deposit Amount, and *minus* (iii) the Escrow Amount, by wire transfer of immediately available funds to an account or accounts designated by Seller, (b) Purchaser will pay on behalf of the Entities the Pay-Off Amount to the recipients specified in the Pay-Off Letters by wire transfer of immediately available funds to the accounts specified in such Pay-Off Letters, (c) Purchaser and Seller will cause the Deposit Amount to be delivered to Seller in accordance with Section 3.2(a), and (d) Purchaser will pay the Escrow Amount by wire transfer of immediately available funds to be held in the Escrow Account in accordance with the Escrow Agreement.

3.4.    Closing Date Purchase Price Adjustment.  (a)  At least five Business Days prior to the Closing Date, Seller will prepare and deliver to Purchaser a certificate executed by an executive officer of Seller (the "Estimated Closing Statement") consisting of Seller's estimates of the Final Net Indebtedness Amount (such estimate, the "Estimated Net Indebtedness Amount") and the Final Expenditure Adjustment Amount (such estimate, the "Estimated Expenditure Adjustment Amount").  The Estimated Closing Statement will be prepared in good faith and in accordance with Mexican NIF.  Purchaser will have the right to object to the amounts contained in the Estimated Closing Statement no later than the second Business Day immediately prior to the Closing Date if it in good faith determines that any such amount is materially inaccurate.  Seller will in good faith consider the objections, if any, of Purchaser to the Estimated Closing Statement and, if Purchaser has made any objections, will reissue an Estimated Closing Statement no later than 5:00 p.m. local time in Mexico City, Mexico on the last Business Day immediately prior to the Closing

Date with such revisions, if any, that Seller has determined in good faith are appropriate.

(b)    As promptly as practicable following the Closing Date (but in any event within 60 days thereafter), Purchaser will prepare, or cause to be prepared, and deliver to Seller a certificate executed by a duly authorized representative of Purchaser (the "<u>Closing Statement</u>") consisting of Purchaser's calculation of the Final Net Indebtedness Amount and the Final Expenditure Adjustment Amount.  The Closing Statement will be prepared in good faith and in accordance with Mexican NIF.

(c)    The Closing Statement will become final, binding and conclusive upon Seller and Purchaser on the 45th day following Purchaser's delivery of the Closing Statement unless prior to such 45th day Seller delivers to Purchaser a written notice (a "<u>Closing Statement Dispute Notice</u>") stating that Seller disputes one or more items contained in the Closing Statement (a "<u>Disputed Item</u>") and describing in reasonable detail each Disputed Item based on information then available to Seller.

(d)    If Seller delivers a Closing Statement Dispute Notice, then Purchaser and Seller will seek in good faith to resolve the Disputed Items during the 30-day period beginning on the date Purchaser receives the Closing Statement Dispute Notice (the "<u>Resolution Period</u>").  If Purchaser and Seller reach agreement with respect to any Disputed Items, Purchaser will revise the Closing Statement to reflect such agreement.

(e)    If Purchaser and Seller are unable to resolve all Disputed Items during the Resolution Period, then, at the request of either Party, Purchaser and Seller will jointly engage and submit the unresolved Disputed Items (the "<u>Unresolved Items</u>") to the Independent Accountant; provided that if Purchaser and Seller do not appoint an Independent Accountant within ten days after either Purchaser or Seller gives notice to the other of such request, either of them may request the American Arbitration Association to appoint as the Independent Accountant a partner in the Mexico City office of an internationally recognized independent registered public Independent Accountant based on its determination that the partner has had no material relationships with the Parties or their respective Affiliates within the preceding two years and taking into account such firm's material relationships during the preceding two years with the Parties and their respective Affiliates, and such appointment will be final, binding and conclusive on Purchaser and Seller.  Purchaser and Seller will use their respective reasonable best efforts to cause the Independent Accountant to issue its written determination regarding the Unresolved Items within 30 days after such items are submitted for review.  The scope of the disputes to be resolved by the Independent Accountant will be to make a determination with respect to the Unresolved Items in accordance with Mexican NIF and this <u>Section 3.4(e)</u> and the Independent Accountant is not to make any other determination.  The Independent Accountant's decision will be based solely on written submissions

by Purchaser and Seller.  Each written submission to the Independent Accountant will also be provided to the other Party.  The Independent Accountant may not assign a value greater than the greatest value for such item claimed by either Party or smaller than the smallest value for such item claimed by either Party.  Each Party will be afforded the opportunity to present to the Independent Accountant any material such Party deems relevant to the Independent Accountant's determination.  Each Party will use its commercially reasonable efforts to furnish to the Independent Accountant such work papers and other documents and information pertaining to the Unresolved Items as the Independent Accountant may request.  The determination of the Independent Accountant will be final, binding and conclusive on Purchaser and Seller absent manifest error.  The fees, expenses and costs of the American Arbitration Association and the Independent Accountant will be borne in the same proportion as the aggregate amount of the Unresolved Items that is unsuccessfully disputed by each (as finally determined by the Independent Accountant) bears to the total amount of the Unresolved Items submitted to the Independent Accountant.

(f)      Prior to Closing, Seller will provide Purchaser and its representatives such access to Employees, books and records of the Entities as Purchaser reasonably requests in connection with Purchaser's review of the Estimated Closing Statement.  From and after Closing, Purchaser will provide Seller and its representatives such access to Employees, books and records of the Entities as Seller reasonably requests in connection with Seller's review of the Closing Statement.

(g)      Following the determination of the Final Closing Statement, if (i) the Final Purchase Price exceeds the Estimated Purchase Price, then Purchaser will pay Seller the amount of such excess and (ii) the Estimated Purchase Price exceeds the Final Purchase Price, then Seller will pay Purchaser the amount of such excess.  The party that is required to make a payment pursuant to this Section 3.4(g) will make such payment within two Business Days after the determination of the Final Closing Statement.  Any payment under this Section 3.4(g) will be made in cash in accordance with Section 3.4(h).

(h)      Any amount paid pursuant to Section 3.4(g) will be (i) increased by interest on such amount, compounded daily, at an annual interest rate equal to 3%, from the Closing Date to and including the date of payment based on a 360-day year, and increased such that after all applicable withholding taxes, the payee receives a net after-tax amount equal to the full amount of accrued interest, (ii) made by wire transfer of immediately available cash funds in Dollars to an account designated by the receiving party, and (iii) treated as an adjustment to the Final Purchase Price for Tax reporting purposes.

3.5.    Intercompany Obligations.  If the Closing occurs, upon the Closing and effective without further action, as between Seller and its Affiliates (other than the Entities and Company Parent) and the Entities and Company Parent, all Intercompany Obligations will be netted against each other and the balance (if

any) will be, as applicable, contributed to the capital of the Company (if the net balance is an amount payable to Seller or its Affiliates) or deemed to have been distributed to Seller (if the net balance is an amount payable to the Entities or Company Parent), in each case, without any cash payment being made, and, except for the Transition Services Agreement, all Contracts between Seller and any of its Affiliates (excluding the Entities and Company Parent), on the one hand, and any Entity or Company Parent, on the other hand, will be terminated without any surviving Liabilities or other obligations of any of the parties thereto. If requested by Purchaser, Seller will cause the parties to such Contracts being so terminated to execute and deliver at Closing customary mutual releases with respect thereto in form and substance reasonably acceptable to Purchaser.

## 4. CLOSING AND TERMINATION

4.1.    <u>Closing Date</u>.  Subject to the satisfaction of the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u>, and <u>Section 8.3</u>, or the waiver thereof by the Party entitled to waive that condition, the closing of the purchase and sale of the Company Parent Interests (the "<u>Closing</u>") will take place at the offices of Jones Day located at 222 East 41st Street, New York, New York, or at such other place as the Parties may agree in writing, at 10:00 a.m. New York City time, on the date that is three Business Days following the satisfaction or waiver of the conditions set forth in <u>Article 8</u>, other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions, unless another time or date, or both, are agreed to in writing by the Parties.

4.2.    <u>Closing Deliveries by Seller</u>.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following:

(a)    the officer's certificate required to be delivered pursuant <u>Section 8.1(a)</u> and <u>Section 8.1(b)</u>;

(b)    the Instrument of Assignment, duly executed by Seller;

(c)    original executed counterparts of the unanimous shareholder or other applicable equity holder resolutions of each Entity (which will at the Closing also be executed by the Purchaser), approving:

(i)    the resignations, effective as of the Closing Date, of the directors (or equivalent) of each Entity, expressly releasing, effective as of the Closing Date, the respective Entity, the Seller and the Purchaser from any and all claims and actions arising out of their services as a director (other than claims for indemnity or insurance), and themselves obtaining a full release from the Entities and the Purchaser from any and all claims and actions (except for those resulting from fraud, bad faith and/or willful misconduct) resulting from the due performance of their respective duties as directors;

(ii)      the appointment of new directors (or equivalent) of the respective Entity as determined by Purchaser; and

(iii)      the revocation of all powers of attorney in existence as of the Closing (except for those identified by Purchaser in writing no later than five Business Days prior to the Closing Date) and the granting of powers of attorney to the Persons determined by Purchaser.

(d)      executed resignations of the directors (or equivalent) and officers, solely in their capacity as directors (or equivalent) or officers, as applicable, of each Entity other than those directors (or equivalent) and officers specified by Purchaser to Seller no later than the second Business Day prior to the Closing as exempt from this requirement (the "Resigning Individuals");

(e)      the Transition Services Agreement, duly executed by the Company and the other parties thereto;

(f)      the Amendment to Trademark Sublicense Agreement, duly executed by NII Holdings and the Company;

(g)      the amendments and releases, duly executed by each applicable party, referred to in Section 3.5 or Section 7.8;

(h)      customary pay-off letters duly executed by CDB and reasonably satisfactory to Purchaser (the "Pay-Off Letters") confirming that, upon receipt by the party or parties identified therein of the Pay-Off Amount, the CDB Credit Facilities shall have been paid in full and all Encumbrances provided thereunder shall have been released;

(i)      originals of the Corporate Records (which may be delivered at the Company's principal executive offices) together with a certificate issued by each Entity's and Company Parent's secretary certifying that the Corporate Records of the applicable Entity or Company Parent comply in all material respects with applicable Laws;

(j)      the original share certificates or evidence of other equity interests, as applicable (where required by applicable Law) of each applicable Entity reflecting the capital structure set forth in Section 5.5(a) of the Seller Disclosure Schedule;

(k)      a certified copy of the Sale Order, as entered by the Bankruptcy Court;

(l)      an executed agreement between Company Parent and Seller, in form and substance reasonably satisfactory to Purchaser, effecting the Seller Liability Assumption and Company Parent Novation (as defined in the Sale Order);

(m)    evidence reasonably satisfactory to Purchaser that (i) the Uruguay Divestiture has been consummated and (ii) the requirements of Section 8.1(d) and Section 8.1(e) have been satisfied;

(n)    an executed original termination letter of trust agreement number F115/2000 (the "Mifel Trust") duly executed by Banca Mifel, S.A., in its capacity as trustee thereunder and by all the settlors/beneficiaries thereunder certifying that the Mifel Trust has been duly terminated releasing all parties thereunder from any and all liability in connection therewith;

(o)    any releases reasonably requested by Purchaser pursuant to, and copies of customary corporate documents effecting the netting, contribution or distribution contemplated by, Section 3.5; and

(p)    each of the Section 7.8 Terminations and, to the extent obtained as of the Closing Date, each of the Section 7.8 Instruments and Third Party Consents, in each case, executed and delivered by each party thereto.

4.3.    Closing Deliveries by Purchaser.  At the Closing, Purchaser will deliver, or cause to be delivered, to Seller (or, where applicable in the case of the Closing deliveries set forth in Section 4.3(c), the other Persons specified in Section 3.3) the following:

(a)    the officer's certificate required to be delivered pursuant Section 8.2(a) and Section 8.2(b);

(b)    the Instrument of Assignment, duly executed by Purchaser; and

(c)    the consideration specified in Section 3.3 delivered in accordance therewith.

4.4.    Termination of Agreement.  This Agreement may be terminated before the Closing as follows:

(a)    by Purchaser or Seller, if the Closing has not occurred by 5:00 p.m. local time in Mexico City, Mexico on June 30, 2015 (the "Initial Termination Date"), provided, however, that if (i) the Closing has not occurred because any of the conditions to Closing set forth in Section 8.1(i) or Section 8.3(b) remains unsatisfied and not waived and (ii) all other conditions to the respective obligations of the Parties to close hereunder that are capable of being fulfilled by the Initial Termination Date have been so fulfilled or waived (except for any closing conditions which by their terms are to be fulfilled at Closing, which closing conditions remain capable of being fulfilled), then such date shall be extended to September 30, 2015 (the "Extended Termination Date");

(b)    by mutual written consent of Seller and Purchaser;

(c)    by Purchaser, if any condition to the obligations of Purchaser set forth in <u>Section 8.1</u> or <u>Section 8.3</u> has become incapable of fulfillment other than as a result of a material breach by Purchaser of any covenant contained in this Agreement, and such condition is not waived by Purchaser;

(d)    by Seller, if any condition to the obligations of Seller set forth in <u>Section 8.2</u> or <u>Section 8.3</u> (other than <u>Section 8.2(c)</u> or <u>Section 8.3(a)</u>) has become incapable of fulfillment other than as a result of a material breach by Seller of any covenant contained in this Agreement, and such condition is not waived by Seller;

(e)    by Purchaser, if Seller or Seller Parent breaches any representation or warranty or any covenant contained in this Agreement or any representation or warranty of Seller is inaccurate, such breach or inaccuracy would result in a failure of a condition set forth in <u>Section 8.1</u> or <u>Section 8.3</u> and such breach or inaccuracy has not been cured by the earlier of (i) ten Business Days after the giving of notice by Purchaser to Seller of such breach or inaccuracy and (ii) the Termination Date;

(f)    by Seller, if Purchaser breaches any representation or warranty or any covenant contained in this Agreement or any representation or warranty of Purchaser is inaccurate, such breach or inaccuracy would result in a failure of a condition set forth in <u>Section 8.2</u> or <u>Section 8.3</u> and such breach or inaccuracy has not been cured by the earlier of (i) ten Business Days after the giving of notice by Seller to Purchaser of such breach or inaccuracy and (ii) the Termination Date;

(g)    by Seller or Purchaser if there is in effect a Law or final non-appealable Order of a Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(h)    by Purchaser if (i) within one Business Day of the date hereof, the Debtors do not File a motion seeking the entry of the First Day Order or the Bidding Procedures Motion in the Bankruptcy Cases or (ii) the Bidding Procedures Order has not been entered by the Bankruptcy Court on or before February 17, 2015.

(i)    by Purchaser if the Bidding Procedures Order is entered by the Bankruptcy Court and (i) the Auction is not held on or before March 20, 2015, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures, (ii) the Sale Hearing is not held on or before March 23, 2015, or (iii) the Sale Order has not become a Final Order or is not capable of becoming a Final Order on or before April 6, 2015;

(j)    by Purchaser if either (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, the Bidding Procedures Order is (A)

amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay or (ii) following entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(k)      following entry of the Bidding Procedures Order by the Bankruptcy Court and prior to the date that the Sale Order is entered by the Bankruptcy Court, by Seller at the conclusion of the Auction, if Seller enters into a Contract with respect to a Competing Transaction (without regard to the proviso in such definition related to a Back-Up Plan) pursuant to the Bidding Procedures; or

(l)      by Purchaser, if (i) Purchaser is not selected as the Successful Bidder at the conclusion of the Auction or (ii) any Debtor or any Affiliate of the Debtors seeks, or does not use its reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason, provided that the foregoing will not apply to the dismissal of Company Parent's bankruptcy case as contemplated by this Agreement or (iii) any Debtor or any controlled Affiliate of the Debtors seeks, or does not use its reasonable best efforts to oppose any other Person in seeking, the Bankruptcy Court to enter an order appointing a trustee in the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' businesses under Bankruptcy Code Section 1106(b), or such an order is entered for any reason.

For the avoidance of doubt, notwithstanding the foregoing, from and after the date hereof until the earlier of the Closing Date and the termination of this Agreement, all the restrictions set forth in Section 10.1 will apply.

4.5.    Procedure for Termination.  If either Purchaser or Seller desires to terminate this Agreement pursuant to Section 4.4, it will provide notice to that effect to the other Party and this Agreement will terminate without further action by Purchaser or Seller upon delivery of such notice by such Party to the other Party.

4.6.    Effect of Termination.  (a)  If termination pursuant to Section 4.4 occurs, (i) except as set forth in this Section 4.6, each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination, (ii) the Deposit Amount will be returned to Purchaser in accordance with Section 3.2(c) unless Section 3.2(b) applies, (iii) if termination occurs (A) by Purchaser pursuant to Section 4.4(i), (j), (l)(ii) or (l)(iii), Seller Parent, Seller, Company Parent and the Company will pay to Purchaser (x) the Expense Reimbursement within two Business Days thereof, *plus* (y) a Break-Up

Fee on the date a Competing Transaction is consummated, if such transaction is consummated within 365 days of the date of such termination, or (B) by Seller pursuant to <u>Section 4.4(k)</u> or Purchaser pursuant to <u>Section 4.4(l)(i)</u>, Seller Parent, Seller, Company Parent and Company will pay to Purchaser (x) the Expense Reimbursement within five Business Days thereof *plus* (y) a Break-Up Fee within the earlier of (1) (a) a sale order becoming a Final Order or (b) a confirmation order becoming a Final Order, as applicable, approving a Competing Transaction (without regard to the proviso in such definition related to a Back-Up Plan) or (2) thirty days after a termination of this Agreement by Seller pursuant to <u>Section 4.4(k)</u> or Purchaser pursuant to <u>Section 4.4(l)(i)</u>, and (iv) except as set forth in this <u>Section 4.6</u>, such termination will be without liability to Purchaser or Seller, provided, however, that the provisions of <u>Section 3.2</u>, <u>Section 4.5</u>, this <u>Section 4.6</u>, <u>Section 10.2</u> and <u>Article 12</u> (other than <u>Section 12.2</u>) and, to the extent necessary to effectuate the foregoing enumerated provisions, <u>Section 1.1</u>, will survive any such termination and will be enforceable hereunder, provided, further, that, other than pursuant to <u>Section 4.6(c)</u>, nothing in this <u>Section 4.6</u> will be deemed to release any Party from liability for any Willful Breach of its obligations under this Agreement that occurred prior to such termination. The obligations of Seller Parent, Seller, Company Parent and the Company to pay the Expense Reimbursement and Break-Up Fee as set forth above will be joint and several.

    (b)    The obligations to return the Deposit Amount and pay the Break-Up Fee and Expense Reimbursement subject to and in accordance with <u>Section 3.2</u>, <u>Section 4.5</u>, this <u>Section 4.6</u> and <u>Section 10.2,</u> will (i) be binding upon and enforceable against each Debtor immediately upon the Bankruptcy Court's entering the Bidding Procedures Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion, dismissal or consolidation of the Bankruptcy Cases, any plan of reorganization or liquidation in the Bankruptcy Cases, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to return the Deposit Amount and pay Purchaser the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement, are intended to be, and upon entry of the Bidding Procedures Order specifically provide that they are, binding upon (i) each of Seller's and Company Parent's affiliated debtors and debtors-in-possession, (ii) any successors or assigns of the Debtors, (iii) any trustee, examiner or other representative of a Debtor's estate, (iv) the reorganized Debtors, and (v) any other entity vested or revested with any right, title or interest in or to the Company Parent Interests or any Shares, or any other Person claiming any rights in or control (direct or indirect) over any of the Company Parent Interests or any Shares (each of (i) through (v), a "<u>Successor</u>") as if such Successor were a Seller hereunder. The obligations of Seller to return the Deposit Amount and the obligations to pay Purchaser the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

(c)      Notwithstanding anything to the contrary in this Agreement, in the event this Agreement is terminated by Seller pursuant to Section 4.4(f), and Purchaser offers to agree to the release of the Deposit Amount to Seller and Seller does not, promptly (and in any event within three Business Days) after such offer, reject such release and forego its entitlement thereto, the Deposit Amount will be the sole and exclusive remedy of Seller and its Affiliates against Purchaser and its Affiliates for any loss suffered as a result of any breach of any covenant or agreement in this Agreement (including termination of this Agreement), or in respect of any representation made or alleged to have been made in connection with this Agreement, and upon release and acceptance of such Deposit Amount, Purchaser and its Affiliates will have no further liability or obligation relating to or arising out of this Agreement (including termination thereof) or in respect of representations made or alleged to be made in connection herewith, whether in equity or at law, in contract, in tort or otherwise.

## 5. REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in (a) the disclosure schedule delivered by Seller to Purchaser together with this Agreement (the "Seller Disclosure Schedule") or (b) reports filed by NII Holdings with the Securities and Exchange Commission after January 1, 2013 and prior to the date of this Agreement ((x) only to the extent of disclosure in such reports the relevance of which to the applicable representation or warranty is reasonably apparent on its face and (y) excluding, in each case, any disclosures set forth in any risk factor section or in any other section to the extent they are forward-looking statements or cautionary, predictive or forward-looking in nature), Seller hereby represents and warrants to Purchaser that:

5.1.    Organization of Seller and Seller Parent.  Each of Seller and Seller Parent and each Seller Guarantor is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted subject to the limitations on such power and authority that are imposed on Seller Parent and each Seller Guarantor and will be imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, and is in good standing (to the extent such concept is recognized under applicable Law) in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be in good standing would not, individually or in the aggregate, materially and adversely affect the ability of Seller or Seller Parent or any Seller Guarantor to carry out its obligations under this Agreement or to consummate the transactions contemplated hereby.  Seller has been formed for the sole purpose of consummating the transactions contemplated hereby, has not engaged previously, and does not engage, in any business activities except for holding the Company Parent Interests, and as of the Closing does not have any assets of any kind other than the Company Parent Interests and does not

have any Liabilities of any kind or nature other than those incurred pursuant to this Agreement.

5.2.    <u>Authorization of Agreement</u>.  Subject to entry of the Bidding Procedures Order and the Sale Order, each of Seller and Seller Parent and each Seller Guarantor has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party (the "<u>Ancillary Agreements</u>") and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby has been duly authorized by all requisite corporate action on the part of Seller and Seller Parent and each Seller Guarantor.  This Agreement and each Ancillary Agreement has been duly and validly executed and delivered by Seller and Seller Parent  and each Seller Guarantor and (assuming the due authorization, execution and delivery by the other Parties hereto, and the entry of the Bidding Procedures Order and the Sale Order) this Agreement and each Ancillary Agreement constitute legal, valid and binding obligations of Seller and Seller Parent and each Seller Guarantor, enforceable against Seller and Seller Parent and each Seller Guarantor in accordance with its respective terms, subject to General Enforceability Exceptions.

5.3.    <u>Conflicts; Consents of Third Parties</u>.  (a)  The execution and delivery by Seller and Seller Parent and each Seller Guarantor of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby and compliance by Seller and Seller Parent and each Seller Guarantor with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation, the creation or acceleration of any obligation or change of any rights or the incurrence of any Encumbrance, under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity, or (ii) subject to entry of the Bidding Procedures Order and the Sale Order, (A) other than in respect of the Third Party Consents, any Contract, Permit or Telecommunications License to which Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity is a party or by which any of the properties or assets of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity are bound, (B) any Order of any Governmental Authority applicable to Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity or any of the properties or assets of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity, or (C) any applicable Law, other than, in the case of subsection (ii), such conflicts, violations, defaults, terminations, cancellations or other changes that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  The approval of an independent manager for NII International Telecom S.C.A. has been obtained to

the extent required to be obtained in connection with execution and delivery of this Agreement or the transactions contemplated hereby.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority is required on the part of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity in connection with the execution and delivery of this Agreement or any Ancillary Agreement, the compliance by Seller or Seller Parent or any Seller Guarantor with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity of any other action contemplated hereby or thereby, except for (i) the Company Approvals, (ii) the entry of the Bidding Procedures Order and the Sale Order, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications the failure of which to obtain or make would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.4.    <u>Organization of the Entities</u>.  Each Entity is duly organized, validly existing and in good standing (to the extent such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, duly qualified or authorized to do business under the Laws of its jurisdiction and has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now conducted and is in good standing (to the extent such concept is recognized under applicable Law) in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.5.    <u>Capitalization of the Entities</u>.  (a)  The Shares and the shares of the Subsidiaries of the Company are duly authorized and are validly issued, fully subscribed and paid, non-assessable and qualify as *acciones liberadas*.  The Shares comprise all the outstanding capital stock of the Company.  The number and type of issued and outstanding capital stock of each Entity, the record owners thereof and the jurisdiction of organization or formation of each Entity are listed in Section 5.5(a) of the Seller Disclosure Schedule.  All of the equity interests of each Subsidiary of the Company are owned by the Company or another Subsidiary of the Company free and clear of all 363 Interests.  There are no bonds, debentures, notes or other Indebtedness of any Entity that entitle holders thereof to vote (or to a veto or any similar type of negative control) on any matters on which holders of the Shares (or equity interests of the Subsidiaries) may vote.

(b)    There are no preemptive or, other than pursuant to this Agreement, other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights or repurchase rights of any character to which Seller, Seller Parent, Company Parent or any Entity is a party requiring,

and there are no securities of any Entity outstanding which upon conversion or exchange would require, the issuance, sale or disposition of any shares or other securities or obligations convertible into, exchangeable for or evidencing the right to subscribe for or purchase shares of any Entity.

(c)    NII Mexico, LLC (i) has not engaged previously, and does not engage, in any business or operations and (ii) as of the Closing does not have any assets of any kind and does not have any Liabilities of any kind.

5.6.    Subsidiaries.  The Company does not own any equity interest in any other Person except for the subsidiaries identified in Section 5.6 of the Seller Disclosure Schedule (the "Subsidiaries").

5.7.    Title to Shares.  Company Parent has legal title to the Company Shares and the Minority Shareholder has legal title to the Minority Company Shares, in each case free and clear of all 363 Interests other than this Agreement.  Subject to the entry of the Sale Order and the conditions set forth herein, at the Closing, Purchaser will be vested with indirect legal ownership of the Shares free and clear of all 363 Interests.  Except for this Agreement, none of Seller or any of its Affiliates is a party to any stockholder agreement, voting trust, proxy or other similar Contract with respect to the voting, purchase, repurchase or transfer of the Shares or any other equity interests of any of the other Subsidiaries.

5.8.    Financial Statements.  (a)  Prior to the date of this Agreement, Seller has delivered to Purchaser complete and correct copies of (i) the audited consolidated balance sheets of the Company as at December 31, 2012 and December 31, 2013 and the related consolidated statements of income and of cash flows of the Company for the years then ended, together with the notes thereto (the "Audited Financial Statements") and (ii) the unaudited consolidated balance sheet (the "Unaudited Balance Sheet") of the Company as at September 30, 2014 (the "Balance Sheet Date") and the related consolidated unaudited statements of income and of cash flows of the Company for the period ending on the Balance Sheet Date (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements").  Each of the Financial Statements has been derived from the books of account and other financial records of the Entities and has been prepared in accordance with Mexican NIF and presents fairly, in all material respects, the consolidated financial position, results of operations and cash flows of the Company, as at the dates and for the periods indicated therein, except that the Unaudited Financial Statements described in subsection (ii) are subject to normal year-end adjustments (which will not be material in nature or amount).

(b)    The books and records of the Entities have been maintained in conformity with applicable Law and Mexican NIF.  Except as set forth in Section 5.8(b) of the Seller Disclosure Schedule, the corporate books of the Entities contain records of all meetings, and actions taken by written consent of,

the shareholders (or equivalent), the board of directors (or equivalent) and any committees of the board of directors (or equivalent) of the Entities that are complete and accurate in all material respects, and no material meeting, or material action taken by written consent has been held for which minutes have not been prepared and are not contained in such corporate books.

5.9.    Undisclosed Liabilities.  The Entities do not have any Liabilities except for (a) Liabilities reflected or reserved against on the balance sheet included in the Audited Financial Statements or the Unaudited Balance Sheet and not heretofore paid or discharged, (b) Liabilities incurred since the date of the Audited Financial Statements in the Ordinary Course of Business, or (c) Liabilities that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.10.    Taxes.  (a)  (i) All income and other material Tax Returns required to be filed by or on behalf of or with respect to each Entity have been timely filed (taking into account any applicable extension periods) with the appropriate Governmental Authority and all such Tax Returns are true, correct and complete in all material respects, (ii) the Company has, or has caused each of its Subsidiaries to have, duly and timely paid all amounts of Taxes and other charges shown to be due on such Tax Returns, except for those which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established and which are set forth on Section 5.10(a) of the Seller Disclosure Schedule, and (iii) none of the Entities has waived any statute of limitations in respect of a material amount of Taxes, which waiver is currently in effect.

(b)    Each of the Entities has timely collected or withheld all material amounts of Taxes required to be collected or withheld with respect to its Employees, independent contractors, creditors, stockholders or other third parties and have paid over to the appropriate Governmental Authority all amounts required to be so collected or withheld.

(c)    All written deficiencies or assessments made as a result of any audit, examination or investigation by any Governmental Authority of the Tax Returns of any of the Entities have been fully paid, and none of the Entities has received any notice in writing of any other audits, examinations or investigations in progress by any Governmental Authority relating to any Tax Returns of any of the Entities.  Except as set forth on Section 5.10(c) of the Seller Disclosure Schedule, none of the Entities has received any written notice from any Governmental Authority of the commencement of any audit, examination or investigation not yet in progress.

(d)    None of the Entities is a party to any Tax indemnification, Tax allocation or Tax sharing agreements pursuant to which such Entity will have any obligation to make any payments after the Closing Date, except for any agreement the primary purpose of which is not Tax.  None of the Entities is or

was subject to the Mexican tax consolidation regime which was in effect until December 31, 2013.

(e)    There are no Tax rulings, requests for rulings or closing agreements relating to or with respect to the income and/or assets of any of the Entities that could affect the liability for Taxes of any of the Entities for any period (or portion thereof) ending on or after the Closing Date.

(f)    None of the Entities is or will be required to include a material item of income, or exclude a material item of deduction, for any period (or portion thereof) ending on or after the Closing Date, as a result of, on or before the Closing Date, any (i) transaction treated as an installment sale or open transaction for any Tax purpose, (ii) receipt of a prepaid amount or deposit, (iii) change in method of accounting or similar adjustment that any of the Entities has agreed to, requested, or was required to make or (iv) agreement entered into with any Governmental Authority.

(g)    There are no Encumbrances for Taxes upon any assets of any of the Entities other than Permitted Encumbrances.

(h)    No written claim has ever been made by a Governmental Authority in any jurisdiction where any of the Entities does not file Tax Returns that such Entity is or may be subject to taxation by such jurisdiction.

(i)    None of the Entities has granted any extension or comparable consent regarding the application of the statute of limitations with respect to any material Taxes or Tax Return that is outstanding, nor has any request for any such extension or consent been made.

(j)    None of the Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending on or after the Closing Date as a result of any intercompany transactions in accordance with the Mexican Income Tax Law.

(k)    There are no restrictions or limitations on the deductibility of interest payable by any of the Entities for Mexican income tax purposes, in accordance with the provisions set forth in Article 27, Section VII and Article 28, Section XXVII of the Mexican Income Tax Law in force as of January 1, 2015, and the applicable Articles and Sections of the Mexican Income Tax Law in effect in prior years.

(l)    All transactions between the Company or one of its Affiliates, on the one hand, and the Company or another one of its Affiliates, on the other hand, have been entered on the same terms as would have been entered by unrelated parties acting at arm's-length, including compliance in all material respects with the provisions set forth in Articles 179 and 180 of the Mexican

Income Tax Law and Article 76, Sections IX and XII, as well as the corresponding articles of the Mexican Income Tax Law in force prior to 2015.

(m)    None of the Entities has made any entity classification election for U.S. federal income tax purposes or any other U.S. federal income tax election.

(n)    For U.S. federal income tax purposes, Company Parent has always been disregarded as separate from its owner.

(o)    Except as set forth on Section 5.10(o) of the Seller Disclosure Schedule, none of the Entities has executed or entered into any transaction that is required to be reported in format 76 in accordance with Article 31-A of the Mexican Federal Tax Code (*Código Fiscal de la Federación*) with respect to fiscal years 2014 and 2015.

(p)    Less than 50% of the value of the Entities derives directly or indirectly from real estate located in Mexico.

(q)    Company Parent is not a tax resident of Mexico and does not have a permanent establishment in Mexico.

(r)    For purposes of this Section 5.10, "Entities" or "Entity" includes Company Parent.

5.11.    Real Property.  (a)  Section 5.11(a) of the Seller Disclosure Schedule lists the street address (or equivalent identifying information) of each Owned Property and the current owner of each Owned Property.  The Entities have legal title to all Owned Property, free and clear of Encumbrances except for (a) Encumbrances set forth in Section 5.11(a) of the Seller Disclosure Schedule and (b) Permitted Encumbrances.  Seller has made available to Purchaser true and complete copies of (i) each deed for each Owned Property and all title insurance policies and surveys, if any, relating to the Owned Property and (ii) all documents evidencing all Encumbrances upon the Owned Property, in each case to the extent in Seller's or its Affiliates' possession.

(b)    Section 5.11(b) of the Seller Disclosure Schedule lists the street address (or equivalent identifying information) of each Leased Property and the identity of the lessor, lessee and current occupant (if different from lessee) of each such Leased Property.  Seller has made available to Purchaser true and complete copies of all leases in effect at the date hereof relating to the Leased Property; and, to the Knowledge of Seller, there has not been any sublease or assignment entered into by the Company or any of its Subsidiaries in respect of the Leased Property.

(c)    As of the date of this Agreement, except for such of the following as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, to the Knowledge of Seller, (i)

there are no special assessments or any planned public improvements that may result in a special assessment with respect to any Owned Property and (ii) there is no special proceeding pending or threatened in writing in which any Governmental Authority having jurisdiction over any of the Owned Property is seeking to increase the assessed value thereof.  To the Knowledge of Seller, there is no pending or threatened in writing condemnation proceeding with respect to any of the Owned Property or Leased Property that would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(d)     Except for such of the following as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, the use, operation and maintenance of the Owned Property and Leased Property (including all structures and improvements thereon) is in material compliance with all applicable Laws (including those relating to zoning and permitting), does not violate any restrictive covenant or any provision of any such applicable Laws and is not subject to "permitted non-conforming" use classifications or conditional use permits or zoning variances.

5.12.  Intellectual Property.  (a)  Section 5.12 of the Seller Disclosure Schedule describes all Intellectual Property owned by the Entities as of the date of this Agreement for which a patent, trademark, copyright or registration exists or has been applied for by or on behalf of the Entities and all material licenses or other covenants or rights under Intellectual Property which the Entities have been granted from any Person or which the Entities have granted to any Person ("Licenses").

(b)     The Entities solely and exclusively own all material Intellectual Property owned or purported to be owned by the Entities, and all such material Intellectual Property is subsisting and, to the Knowledge of Seller, valid and enforceable.

(c)     The Intellectual Property owned by the Entities, together with the right to use the Intellectual Property licensed to the Entities, constitutes all material Intellectual Property used in the business of the Entities as presently conducted.

(d)     Seller or its Affiliates (other than the Entities) do not own any material Intellectual Property that is used in the business of the Entities.

(e)     To the Knowledge of Seller, (i) as of the date of this Agreement, the material Intellectual Property owned by the Entities is not the subject of any challenge received by the Entities in writing and (ii) the Entities have not received, since six years prior to the date of this Agreement, any written notice of any default or breach under any material License to which the Entities are a party or by which they are bound.

(f)     The conduct of the business of the Entities does not and has not materially infringed or otherwise violated any Intellectual Property of any Person.

(g)     (i) The Entities are in compliance with all privacy policies of the Entities and with all applicable Laws regarding privacy and personal information, except where the failure to comply would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, and (ii) the Entities have used commercially reasonable measures to ensure the confidentiality, privacy and security of customer, Employee and other confidential and trade secret information, and, to the Knowledge of Seller, as of the date of this Agreement, no Person has gained unauthorized access to, or misused, any such information, except where the access or misuse would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(h)     To the Knowledge of Seller, no material Software owned or distributed by the Entities is subject to any "open source" license or any other agreement that requires making available source code, prohibits or limits the ability to charge fees or other consideration, grants any right to any Person to decompile or otherwise reverse-engineer such Software, or requires the licensing of any Software for the purpose of making derivative works.

(i)     (i) The Entities own or have rights to use all material information technology systems sufficient to operate their businesses as it is currently conducted, except where the failure to do so would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, (ii) the Entities have a disaster recovery plan, procedures and facilities in place and have taken all reasonable steps to safeguard the information technology systems utilized in the operation of their businesses as it is currently conducted, and (iii) as of the date of this Agreement, to the Knowledge of Seller, there have been no unauthorized material intrusions or breaches of the security of the information technology systems.

5.13.   <u>Material Contracts</u>.  (a)  Section 5.13(a) of the Seller Disclosure Schedule sets forth a list of the following Contracts (other than any statement of work, purchase, project, change or similar orders issued pursuant to any such Contracts to the extent consistent with the terms and conditions, and not constituting an amendment, of the applicable Contract) to which, as of the date hereof, the Entities are party and under which the Entities have any remaining rights or obligations, or to which the Entities' Affiliates are a party and under which the Entities receive any material benefit, as of the date of this Agreement (collectively, the "<u>Material Contracts</u>"):

(i)     any Contract evidencing Indebtedness for borrowed money having an aggregate principal amount outstanding in excess of MXN$40,000,000, including the CDB Credit Facilities;

(ii)    any Contract that forms or purports to form a corporate partnership, joint venture or similar entity or any profit sharing, management services, strategic alliance, stockholder or similar Contract;

(iii)    each Contract for distribution, supply, inventory, purchase, franchise, license, agency, dealership, resale, advertising or similar contract that is reasonably expected to involve the payment or receipt by the Entities of consideration of more than MXN$15,000,000 in any 12-month period or MXN$40,000,000 in the aggregate over the term of such Contract;

(iv)    any stock purchase agreement, asset purchase agreement or other Contract relating to the acquisition, lease or disposition by any Entities of material assets and properties or any equity interest of any Entity or under which any Entity has any material indemnification obligations surviving on the date hereof;

(v)    any Contract that is reasonably expected to involve the payment or receipt by the Entities of more than MXN$40,000,000 in any 12-month period or MXN$75,000,000 in the aggregate over the term of such Contract;

(vi)    any Contract involving the payment of royalties or other amounts calculated based upon the revenues or income of the Entities and that are reasonably expected to involve the payment or receipt by the Entities of more than MXN$7,500,000 in any 12-month period or MXN$15,000,000 in the aggregate over the term of such Contract;

(vii)    any Contract that is an interconnection, bundling or similar Contract (excluding roaming Contracts) in connection with which the equipment, networks and services of any Entity are connected to those of another service provider in order to allow their respective customers access to each other's services and networks;

(viii)    any Contract (excluding roaming Contracts) that contains any commitment to (A) provide wireless services coverage in a particular geographic area, (B) build out tower sites in a particular geographic area, (C) pay for a specified number of minutes of voice service, or (D) acquire video content to be placed on or accessed over a mobile wireless device or otherwise;

(ix)    any roaming Contract that cannot be terminated on 30 days' prior notice or less;

(x)    any Contract relating to the settlement of any Legal Proceeding within the past three years with (A) any Governmental Authority or (B) any Person (other than a Governmental Authority) for an aggregate amount of more than MXN$15,000,000;

(xi)     any Contract that (A) purports to limit either the type of business in which any Entity may engage or the manner or locations in which any of them may so engage in any business or purport to create any exclusive relationship restricting the business or operations of any Entity (including by covenant not to compete), (B) could require the disposition of any material assets or line of business of any Entity, or (C) grants "most favored nation" status; and

(xii)    any material Licenses.

(b)     Prior to the date of this Agreement, Seller has made available to Purchaser true and correct copies of each of the Material Contracts and all amendments, exhibits, annexes and schedules thereto, and, other than Material Contracts that have terminated at their scheduled termination date in accordance with their terms, each of the Material Contracts, as amended, is in full force and effect and is a legal, valid and binding obligation of the Entity party thereto, enforceable against such Entity in accordance with its terms, subject to General Enforceability Exceptions.  None of the Entities is in breach or violation of, or default under, any Material Contract in any material respect.  To the Knowledge of Seller, as of the date of this Agreement, no event has occurred that is reasonably likely to result in a breach or default by any Person under, require any consent or other action by any Person under, or give rise to any penalty or right of termination, cancellation, acceleration or other change of any right or obligation of any Entity or a loss of any benefit that any Entity is entitled under (in each case, with or without notice or lapse of time, or both) any Material Contract, except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  As of the date of this Agreement, the Entities have not received any notice of any default or breach by such Entities under any Material Contract, except for defaults or breaches that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.14.  Labor.  (a) Section 5.14(a) of the Seller Disclosure Schedule lists each labor or collective bargaining agreement to which any Entity is a party or otherwise bound as of the date of this Agreement (collectively, the "Labor Agreements").  To the Knowledge of Seller, as of the date of this Agreement, no campaigns are being conducted with respect to any Entity to authorize representation by any labor union or labor organization.

(b)     Seller has made available to Purchaser accurate and complete copies of each material Labor Agreement.  The Company and its Subsidiaries are in compliance in all material respects with the Labor Agreements.  The consummation of the transactions contemplated by this Agreement will not require the consent of, or advance notification to, any works councils, unions or similar labor organizations with respect to any Employees or other service providers.

(c)     To the Knowledge of Seller, except as would not, individually or in the aggregate, be material:  (i) no Entity, as of the date of this Agreement, is the subject of any proceeding asserting that it has committed an unfair labor practice or seeking to compel it to bargain with any labor union or labor organization; and (ii) there is no pending or, to the Knowledge of Seller, threatened grievance, charge, complaint, audit or investigation by or, as of the date of this Agreement, before any Governmental Authority with respect to any current or former Employees or service providers.

(d)     There is no pending and has been no organized labor strike, slowdown, picketing or work stoppage, except in each case as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(e)     No Entity is liable for any material payment to any trust or other fund or to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for current or former Employees (other than routine payments to be made in the Ordinary Course of Business consistent with past practice), agents, distributors, independent contractors and other service providers.  No Entity has any direct or indirect material Liability with respect to any misclassification of any Person as an independent contractor or temporary employee rather than as an Employee, or with respect to any employee leased from another employer that would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(f)     Section 5.14(f) of the Seller Disclosure Schedule sets forth as of the date of this Agreement a complete and accurate list of all Employees and employees of Finatrade Servicios, S.A. de C.V. who render their services to the Entities by employer, name, title, date of hire and seniority or service credit if different, status (i.e., whether active or on leave of absence), and if on leave, the type of leave, such as disability, family, medical or military leave.

(g)     Section 5.14(g) of the Seller Disclosure Schedule sets forth a list of all Legal Proceedings pending with respect to current or former Employees or other service providers that, to the Knowledge of Seller, is complete and accurate in all material respects.

5.15.   Litigation.  There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened or, to the Knowledge of Seller, investigations pending or threatened against any Entity other than those that, if adversely determined, would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect and those that arise in the Ordinary Course of Business after the date hereof.  No Entity or any of their respective directors or officers in their capacities as such is a party to or subject to any order, decree, injunction or award with any Governmental Authority that

would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.16.  Compliance with Laws; Permits.  (a)  Since January 1, 2010, each Entity is and has been in compliance with all Laws applicable to its business or operations, except where the failure to be in compliance would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  No regulatory review out of the ordinary course or investigation by any Governmental Authority with respect to any Entity is, to the Knowledge of Seller, pending or threatened in writing, nor has any Governmental Authority indicated in writing an intention to conduct the same, except for such regulatory reviews out of the ordinary course or investigations that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  No Entity has received any written notice of any noncompliance with any such Laws that has not been cured, in each case, except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(b)    Each Entity currently has all Permits and Telecommunications Licenses that are required for it to own, lease or operate its properties and assets and to conduct the Business, except where the failure to have such Permits or Telecommunications Licenses would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  Since January 1, 2010, no Entity is or has been in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit or Telecommunications License to which it is a party, except where such default or violation would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(c)    Section 5.16(c) of the Seller Disclosure Schedule sets forth a true and complete list, of (i) all Telecommunication Licenses held by the Entities (the "Company Telecommunication Licenses"), (ii) all pending applications for Telecommunication Licenses that would be Company Telecommunication Licenses if issued or granted, and (iii) all pending applications by the Entities for modification, extension or renewal of any Company Telecommunication License.  The Company is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation), in any material respects, of any term, condition or provision of any Company Telecommunication License granted to any Entity.  There is not pending or, to the Knowledge of Seller, threatened before IFETEL, SCT or any other Governmental Authority any proceeding, notice of violation, order of forfeiture or complaint or investigation, requisition, confiscation, revocation, nullification, rescue and/or seizure against any Entity relating to any of the Permits or Company Telecommunication Licenses, that would, individually or in the aggregate, reasonably be expected to result in the suspension, revocation, cancellation, termination, forfeiture, or adverse modification of any material

Company Telecommunication License or any material Permit. The Governmental Authority's actions granting all Company Telecommunication Licenses, together with all underlying construction permits, have not been reversed, stayed, enjoined, annulled or suspended, and, as of the date hereof, there is not pending or, the Knowledge of Seller, threatened any application, petition, objection or other pleading with IFETEL, COFETEL or any other Governmental Authority that challenges or questions the validity of or any rights of the holder under any such Company Telecommunication License or Permit, in each case, except as would not, individually or in the aggregate, reasonably be expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(d)      The Entities have valid, binding and enforceable rights to the Company Telecommunication Licenses. The Company Telecommunication Licenses have not been sold, transferred, alienated, leased or encumbered or in any other manner has the right to use and enjoy ownership or possession of the Company Telecommunication Licenses been restricted, transferred or surrendered since the initial award thereof, and the Entities' title to all the Company Telecommunication Licenses is free and clear of any Encumbrances. The Entities have complied with all applicable Law in connection with obtaining each Company Telecommunication License and each Company Telecommunication License (i) has been legally and duly granted by the appropriate granting authority, (ii) is fully and unconditionally vested in an Entity, and (iii) is in full force and effect and paid for in full. None of the Entities owes any material fees or duties in connection with, or arising from, any Company Telecommunication Licenses, in each case, that are due and payable. The Entities do not own or use any license of the Federal Communications Commission of the U.S. No Entity holds any Telecommunications Licenses through a partnership, joint venture or other Person that is not an Entity.

(e)      All of the currently operating cell sites and microwave paths owned by the Entities in respect of which a filing with a Governmental Authority was required have been constructed and are currently operated as represented to such Governmental Authority in currently effective filings, and modifications to such cell sites and microwave paths have been preceded by the submission to such Governmental Authority of all required filings (the "Cell Site Standards"), in each case, except as would not, individually or in the aggregate, be reasonably expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(f)      All transmission towers owned by the Entities are obstruction-marked and lighted by an Entity to the extent required by, and in accordance with, the rules and regulations of any applicable Governmental Authority, in each case, except as would not, individually or in the aggregate, be reasonably expected to materially impair the ability of the Entities to conduct the Business as presently conducted. Appropriate notification to the applicable Governmental Authority has been made for each transmission tower owned or

leased by the Entities to the extent required to be made by an Entity by, and in accordance with, the rules and regulations of such Governmental Authority (the "Transmission Tower Standards"), in each case, except as would not, individually or in the aggregate, be reasonably expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(g)    All of the currently operating cell sites and microwave paths and transmission towers leased by the Entities (i) are subject to contractual arrangements with the lessor requiring compliance by such lessor with all aspects of the Cell Site Standards and the Transmission Tower Standards, (ii) if operated or maintained by the Entities, are so operated or maintained, as the case may be, in compliance with the Cell Site Standards and the Transmission Tower Standards, and (iii) to the Knowledge of Seller, each such lessor is in compliance with the Cell Site Standards and the Transmission Tower Standards, in each case, except as would not, individually or in the aggregate, reasonably be expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(h)    The Company does not hold any Permit or Telecommunications License to offer, and does not offer, any services or features other than wireless voice and data services and features, and any ancillary services or features thereto.  The Entities do not conduct any business other than the Business.

5.17.    Environmental Matters.  (a)  Except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, (i) each Entity has complied at all times with all applicable Environmental Laws, (ii) no property currently or formerly owned or operated by any Entity has been contaminated with any Hazardous Substance that could reasonably be expected to require remediation pursuant to any Environmental Law, (iii) no Entity is subject to any liability for Hazardous Substance disposal or contamination on any third party property, (iv) as of the date of this Agreement, no Entity has received any notice, demand, letter, claim or request for information indicating that it may be in violation of or subject to liability under any Environmental Law, and (v) no Entity is subject to any order, decree, injunction or agreement with any Governmental Authority or any indemnity with any third party relating to liability under any Environmental Law.

(b)    Seller has made available to Purchaser copies of all environmental reports, studies and assessments prepared since January 1, 2012 in its possession relating to the Entities or the Business.

(c)    The representations and warranties in this Section 5.17 are Seller's only representations and warranties with respect to environmental matters and no other representations or warranties will be deemed breached or inaccurate by reason of any environmental matter.

5.18.   <u>Broker's or Finder's Fee</u>.   None of Seller, Seller Parent, Company Parent or any of the Entities has any liability or obligation to pay any fees or commissions to any broker, finder or other agent with respect to the transactions contemplated by this Agreement for which Purchaser or any of its Affiliates (including, after Closing, the Entities) could become liable or obligated.

5.19.   <u>Insurance</u>.   To the Knowledge of Seller, the properties and assets of the Entities are adequately insured against accident, damage, injury, third party loss (including product liability claims), loss of profits and any other risk normally insured against by a prudent person operating the types of business operated by the Entities and effect such insurances as required by Law and any Contracts that are binding upon the Entities.   Section 5.19 of the Seller Disclosure Schedule sets forth all insurance policies owned or held as of the date hereof by any Entity on the date of this Agreement and that currently cover the corresponding Entity, its business, assets, properties or personnel with respect to risks arising in connection with the operation or conduct of its business (collectively, the "<u>Insurance Policies</u>").   As of the date of this Agreement, none of the Entities has received any notice in writing, nor, to the Knowledge of Seller, orally, from any insurer or agent of any intent to cancel or not to renew any Insurance Policy, and there are no pending or, to the Knowledge of Seller, threatened, material claims related to the business, assets, properties or personnel of the Entities against any Insurance Policy as to which the insurer has denied coverage or asserted a reservation of rights.   None of the Entities is in default, in any material respect, under any Insurance Policy.

5.20.   <u>Sufficiency of Assets</u>.   The Owned Property and other assets owned by the Entities together with their respective rights under Contracts that survive the Closing (including pursuant to the Transition Services Agreement), constitute all the assets, properties and rights (a) necessary to conduct the Business in all material respects as presently conducted by the Entities and (b) used to generate the results of the Entities set forth in the Financial Statements. All of the wireless telecommunication services business of Seller and its Affiliates in Mexico is operated by the Entities and is included in the Business.

5.21.   <u>Subscribers; Transmission Towers; Network Assets</u>.   (a)  Section 5.21(a) of the Seller Disclosure Schedule sets forth as of December 31, 2014 (i) the total number of Subscribers, (ii) the total number of Postpay Subscribers, and (iii) the total number of Prepaid Subscribers, in each of clauses (i), (ii) and (iii), such number of Subscribers to be broken down by plan and type of device.

(b)      Section 5.21(b) of the Seller Disclosure Schedule lists, as of the date of this Agreement, each transmission tower and tower structure on which transmitters used in the network of the Business are located ("<u>Transmission Towers</u>"), whether owned or leased by the Entities and its location by street address and global positioning service coordinates.

5.22.  Certain Conduct; Sanctions.  (a)  None of the Entities or any of their Affiliates, nor any director, officer or employee of the Entities or any of their Affiliates, nor any agent, representative or other Person acting or purporting to act for the benefit of or on behalf of the Entities or any of their Affiliates, to the Knowledge of Seller, (i) has violated any provision of the FCPA, the Mexican Federal Anticorruption Law (*Ley Federal Anticorrupción en Contrataciones Públicas*), the Mexican Federal Criminal Code (*Código Penal Federal*), the Criminal Codes of the several states of Mexico or any other applicable Law that prohibits corruption, bribery or any of the foregoing actions, (ii) has been investigated by a Governmental Authority, or been the subject of any allegation, with respect to conduct within the scope of clause (i) above, (iii) will use all or any portion of the amounts paid by Purchaser hereunder in a manner that may violate any provision of the FCPA, the Mexican Federal Anticorruption Law (*Ley Federal Anticorrupción en Contrataciones Públicas*), the Mexican Federal Criminal Code (*Código Penal Federal*), the Criminal Codes of the several states of Mexico or any other applicable Law that prohibits corruption, bribery or any of the foregoing actions or (iv) is a "foreign official" within the meaning of the FCPA.

(b)    The accounting books and records of the Entities and their Affiliates accurately and fairly reflect in all material respects the transactions and the dispositions of assets of each of those entities in reasonable detail and the Entities and their Affiliates maintain systems of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences, and (v) the Entities comply with the Laws referenced in Section 5.22(a).  The Entities and their Affiliates have instituted and maintain policies and procedures in relation to business conduct and ethics that are, to the Knowledge of Seller, reasonably designed to prevent or detect any conduct of business of the Entities involving the actions described in clause (i) of Section 5.22(a).

(c)    None of Seller, Seller Parent, Company Parent or the Entities is, nor to the Knowledge of Seller are any of their respective officers, directors or employees, an individual or entity that is a Person that is, or is acting under the direction of, on behalf of or for the benefit of a Person that is, or is owned or controlled by a Person that is, (i) the target of any Sanctions Laws or identified on any Sanctions Lists or (ii) located, organized or resident in a country or territory that is, or whose government is, the target of comprehensive trade sanctions under Sanctions Laws, including, as of the date of this Agreement, Cuba, Iran, North Korea, Sudan and Syria (collectively, the "Sanctioned Countries").

(d)    None of Seller, Seller Parent, Company Parent or the Company (or any of its Subsidiaries or Affiliates) does business with or, to the Knowledge of Seller, sponsors or provides assistance or support to, the government of, or, to the Knowledge of Seller, any other Person located in, any country, or with any other Person, targeted by any of the Sanctions Laws, including the Sanctioned Countries.

(e)    For purposes of this Section 5.22 only, "Affiliates" means only those Affiliates that act (and only to the extent they so act) in connection with the properties, assets or business of the Entities.

5.23.    Absence of Certain Changes.  Between December 31, 2013 and the date of this Agreement, the Entities have conducted their respective businesses only in, and have not engaged in any material transaction other than in accordance with, the Ordinary Course of Business and there has not been any:

(a)    circumstance, occurrence or development (including any adverse change with respect to any circumstance, occurrence or development existing on or prior to December 31, 2013) that constitutes or would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect; or

(b)    action taken by any Entity that would require Purchaser's consent pursuant to Section 7.2(b)(D), (F)(1), (G), (H), (K)(1), (M), (O) or, solely with respect to the foregoing, Section 7.2(b)(U), if such action had been taken after the date hereof.

5.24.    Related Party Contracts.  Section 5.24 of the Seller Disclosure Schedule contains a list of loans, leases and other Contracts between Seller and its Affiliates (other than the Entities), or the directors, Employees or officers of the Entities (each of the foregoing, a "Related Party"), on the one hand, and any Entity, on the other hand (each of the foregoing, a "Related Party Contract"), except for Employee Plans.  As of the Adjustment Time, none of the Entities will have any Intercompany Obligations outstanding other than those remaining in place in accordance with Section 3.5 or Section 7.8.

5.25.    Employee Benefits.  (a)  Section 5.25(a) of the Seller Disclosure Schedule sets forth an accurate and complete list of each Employee Plan.  With respect to each material Employee Plan, Seller has made available to Purchaser, to the extent applicable, accurate and complete copies of (i) the Employee Plan document, including any amendments thereto, and all related trust documents, insurance contracts or other funding vehicles, (ii) a written description of such Employee Plan if such plan is not set forth in a written document, and (iii) the most recently prepared actuarial report, if any.  To the Knowledge of Seller, no United States residents or taxpayers are employed by any Entity or participate in any Employee Plan. No Employee Plans are, or in the past six years have been,

subject to the Employee Retirement Income Security Act of 1974 ("ERISA") or other United States Law.

(b)    No Controlled Group Liability has been incurred by the Company or its ERISA Affiliates that has not been satisfied in full, and no condition exists that presents a risk to the Company or its ERISA Affiliates of incurring any such liability, except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  No purpose of the transactions contemplated by this Agreement is for any of Seller or its Affiliates to avoid Liability arising out of Title IV of ERISA.

(c)    Except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, each Employee Plan (including any related trusts) has been established, operated and administered in compliance with its terms, all applicable Laws and all applicable funding requirements.  All material contributions required to be made under the terms of any Employee Plan (including all employer contributions and employee salary reduction contributions) and all material obligations as of the date hereof have been timely made or are reflected in the Financial Statements.  Any Employee Plan that is required to be funded is fully funded as of the date hereof as required by applicable Law or, if not required to be fully funded, the book reserves (determined in accordance with Mexican NIF) are sufficient to provide for the payment of the relevant benefits.  Except as required by applicable Law, no Employee Plan provides material retiree or post-employment medical, disability, life insurance or other welfare benefits to any current or former Employee, and no Entity has any obligation to provide such benefits.

(d)    Excluding routine or ordinary course claims for benefits, there is no Legal Proceeding pending or, to the Knowledge of Seller, threatened, or, to the Knowledge of Seller, investigation by any Governmental Authority pending or threatened against or involving any Employee Plan that would, individually or in the aggregate, reasonably be likely to subject any Entity to a material Liability.

(e)    Neither the execution of this Agreement, nor the consummation of the transactions contemplated by this Agreement, (whether alone or in connection with another event) (i) entitles any current or former Employee, director, officer, independent contractor or other service provider of any Entity to severance pay (or other compensation or benefits) or any increase in severance pay (or other compensation or benefits), (ii) accelerates the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of any compensation or benefits under, or increase the amount payable or result in any other material obligation pursuant to, any of the Employee Plans, (iii) limits or restricts the right of the Company or any of its Subsidiaries or their successors to merge, amend or terminate any of the Employee Plans, or (iv) entitles the recipient of any payment or benefit to receive

a "gross up" payment or indemnity for any income or other taxes that might be owed with respect to such payment or benefit.

5.26.  <u>Company Parent</u>.  (a) Company Parent is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now conducted and is in good standing (to the extent such concept is recognized under applicable Law) in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(b)    Company Parent (i) has not engaged previously, and does not engage, in any business or operations except for holding the Company Shares and (ii) as of the Closing does not have any employees or assets of any kind other than the Company Shares and does not have any Liabilities of any kind.

(c)    The Company Parent Interests (i) constitute all of the authorized and issued limited liability interests of Company Parent and there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Company Parent Interests and (ii) are owned by Seller free and clear of all 363 Interests.

(d)    Seller has made available to Purchaser true and complete copies of each of the constituent documents and operating agreements of Seller, Seller Parent and Company Parent and none of Seller, Seller Parent or Company Parent is in default or in violation in any material respect of any provision set forth therein.

(e)    On January 23, 2015, Seller and Seller Parent consummated the Company Parent Transfer in accordance with their respective constituent documents and applicable Law pursuant to the transfer documentation provided to Purchaser prior to the date hereof.

5.27.  <u>No Other Representations or Warranties</u>.  Except for the representations and warranties contained in this <u>Article 5</u>, Seller makes no other express or implied representation or warranty with respect to the Business, the Entities, the Company Parent Interests or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller or its Affiliates' respective officers, directors, employees, agents or representatives.  Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Entities.  The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would

reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

## 6. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1.    <u>Organization</u>.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its incorporation, has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted and is in good standing (to the extent such concept is recognized under applicable Law), in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be in good standing would not, individually or in the aggregate, reasonably be expected to result in a Purchaser Material Adverse Effect.

6.2.    <u>Authorization of Agreement</u>.  Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser.  This Agreement and each Ancillary Agreement has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties hereto) this Agreement and each Ancillary Agreement constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to General Enforceability Exceptions.

6.3.    <u>Conflicts; Consents of Third Parties</u>.  (a)  The execution and delivery by Purchaser of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation, the creation or acceleration of any obligation or change of any rights or the incurrence of any Encumbrances, under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, (iii) any Order of any Governmental Authority applicable to Purchaser or any of the properties or assets of Purchaser, or (iv) any applicable Law, other than, in the case of subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement and any Ancillary Agreement, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Company Approvals and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.

6.4.    <u>Litigation</u>.  There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.  Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.

6.5.    <u>Broker's or Finder's Fee</u>.  Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder or other agent with respect to the transactions contemplated by this Agreement for which Seller or any of its Affiliates could become liable or obligated.

6.6.    <u>Financial Capability</u>.  Purchaser has and will have at the Closing sufficient funds available to pay the Estimated Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.  Purchaser's obligations to complete the transactions contemplated hereby are not dependent upon or conditioned on receipt of financing.

6.7.    <u>Investigation</u>.  Purchaser acknowledges and agrees that it has made its own inquiry and investigation into the Entities, the Company Parent Interests, the business and the assets and liabilities of the Entities, the transactions contemplated by this Agreement and any other rights or obligations to be transferred, directly or indirectly, pursuant to this Agreement.  Purchaser further acknowledges and agrees that the only representations and warranties made by Seller or any of its Affiliates are the representations and warranties expressly set forth in <u>Article 5</u>.  Purchaser acknowledges that, except for the representations and warranties expressly set forth in <u>Article 5</u>, the assets and businesses of the Entities, as a result of the purchase and sale of the Company Parent Interests, are being transferred on a "where is" and, as to condition, "as is" basis.

6.8.    <u>No Other Representations or Warranties</u>.  Except for the representations and warranties contained in this <u>Article 6</u>, Purchaser makes no

other express or implied representation or warranty in connection with this Agreement or any Ancillary Agreement or the transactions contemplated by this Agreement, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser, or any of Purchaser or its Affiliates' respective officers, directors, employees, agents or representatives.

## 7. COVENANTS

7.1.   <u>Access to Information</u>.  Before the Closing Date, Purchaser will be entitled, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of, and have access to, the employees, properties, businesses and operations of the Entities and their Affiliates and such examination of the books and records of the Entities and their Affiliates as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation, access or examination, and all communications with any Entity or Affiliate of an Entity and their respective representatives, will be coordinated through representatives designated by Seller.  Any such investigation, access and examination will be conducted upon reasonable notice and under reasonable circumstances during regular business hours and will be subject to restrictions under applicable Law.  Seller will cause the officers, Employees, consultants, agents, accountants, attorneys and other representatives of the Entities and their Affiliates to cooperate with the reasonable requests of Purchaser and its representatives in connection with such investigation, access and examination, and Purchaser and its representatives will cooperate with the Entities and their Affiliates and their respective representatives and will use its reasonable efforts to minimize any disruption to the Entities' and their Affiliates' business.  No such investigation, access or examination will be permitted to the extent that it would require any Entity or Affiliate of an Entity to (a) disclose information subject to attorney-client privilege, (b) violate any confidentiality obligations to which any Entity or Affiliate of an Entity is bound if Seller or the applicable Entity or Affiliate of such Entity, as applicable, will have used commercially reasonable efforts to obtain the consent of such third party to such investigation, access or examinations, or (c) in the event there is an Auction, disclose information regarding any bids, the identity of any bidder, confidentiality or non-disclosure agreements, letters of intent, expressions of interest or other proposals received in connection with transactions comparable to those contemplated by this Agreement or any information or analysis relating to any such communications. No later than 15 days following the date of this Agreement, Seller will deliver to Purchaser a schedule listing all Leased Property and setting forth the amount of rent due and payable under each Leased Property. Before the Closing Date, without the prior written consent of Seller (not to be unreasonably withheld, conditioned or delayed), Purchaser will not contact any suppliers to, or customers of, any Entity regarding the transactions contemplated by this Agreement.  Nothing contained herein is intended to modify or terminate the Non-Disclosure Agreement, which, until the Closing, will remain in full force and effect and applicable to Protected Information (as defined in the Non-Disclosure Agreement) provided to Purchaser

and its representatives hereunder or in connection herewith. Notwithstanding anything in this Section 7.1 to the contrary, with respect to Purchaser's rights to access and information from Affiliates of the Entities (other than Company Parent and the Entities) pursuant to this Section 7.1, Purchaser will have such rights only to the extent its request for access or information is related to the Employees, properties, businesses or operations of the Entities. For the avoidance of doubt, the term "Affiliates," as used in this Section 7.1, does not include the shareholders of NII Holdings, Inc. or any creditors of the Debtors.

7.2.    Conduct of the Business Pending the Closing.  (a)  From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, except (i) as set forth on Section 7.2(a) of the Seller Disclosure Schedule, (ii) as required by applicable Law (in which case, Seller will promptly notify Purchaser of any such condition), (iii) as otherwise expressly provided by this Agreement, or (iv) with the prior written consent of Purchaser (which may not be unreasonably withheld, conditioned or delayed), Seller will cause each Entity to:

(A)    conduct its business in the Ordinary Course of Business (as conducted since January 1, 2014); and

(B)    use its commercially reasonable efforts to preserve its present business operations, organization and goodwill and maintain existing relations with Governmental Authorities, customers, suppliers and other persons with whom they have material commercial relationships and keep available the services of their present Employees and agents, in each case, in all material respects.

(b)    From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, except (i) as set forth on Section 7.2(b) of the Seller Disclosure Schedule, (ii) as required by applicable Law (in which case, Seller will promptly notify Purchaser of any such condition), (iii) as otherwise expressly provided by this Agreement, or (iv) with the prior written consent of Purchaser (which may not be unreasonably withheld, conditioned or delayed with respect to the matters in clauses (F), (I), (Q), (R) or, to the extent related thereto, (U) of this Section 7.2(b)), Seller will not permit any of the Entities (which will include for purposes of clause (S) of this Section 7.2(b) Company Parent) to:

(A)    declare, set aside, make or pay any dividend or other distribution payable in cash, stock or property (or any combination thereof) in respect of its shares or other securities (including repayment of future capital contribution rights (*aportaciones para futuros aumentos de capital*)) or repurchase, redeem or otherwise acquire any outstanding shares or other securities of, or other ownership interests in, any Entity;

(B)    (1) split, combine, subdivide or reclassify its shares or other securities, (2) transfer, issue, sell, pledge, grant, encumber or dispose of any shares or other securities of any Entity or grant options, warrants, calls or other rights to purchase or otherwise acquire shares or other securities of any Entity, or (3) enter into any agreement with respect to the voting of its shares or other securities;

(C)    effect any recapitalization, reclassification or like change in its capitalization or voluntarily adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of any Entity;

(D)    amend its certificate of incorporation or by-laws or other organizational documents;

(E)    enter into a Contract imposing non-competition, "most-favored nation" status, exclusivity or similar restrictions on the Business or requiring any Entity to effect material changes on the Business or, other than in the Ordinary Course of Business (as conducted since January 1, 2014), or enter into, terminate or modify (1) any Contract with Seller or any of its Affiliates or (2) any Contract that would have been a Material Contract if entered into prior to the date hereof;

(F)    (1) increase the compensation or benefits of any directors or Employees, other than promotions, changes in positions, annual increases in salary or wages for non-officer Employees by no more than two percent in the aggregate in the Ordinary Course of Business (as conducted since January 1, 2014), (2) grant or pay any bonus, severance or new benefit or other compensation to any of its directors or Employees, provided that the Company and its Subsidiaries may pay annual cash bonuses with respect to the year 2014 or 2015 in the Ordinary Course of Business (as conducted since January 1, 2014) based on actual performance, (3) materially increase the coverage or benefits available under any (or create any new) Employee Plan or otherwise modify or amend or terminate any Employee Plan (or communicate in writing any intention to take such action), except, in each case, as required by applicable Law from time to time in effect or by the terms of any Employee Plan as of the date hereof, (4) take any action to accelerate the vesting or payment, or fund or secure the payment, of any amounts under any Employee Plan, (5) transfer the employment or service location of any individual to, or hire any individual to work at, a location in the United States, or (6) incur any charge, expense or other obligation under the Related Party Contract set forth on Schedule 7.2(b)(F);

(G)    subject any of its properties or assets (whether tangible or intangible and including any of the Shares) to an Encumbrance, except for the incurrence of Permitted Encumbrances in the Ordinary Course of Business (as conducted since January 1, 2014);

(H)      make any loans, advances, guarantees or capital contributions to or investments in any Person (other than (1) to the Entities or (2) advances to Employees, agents, consultants, accountants, service providers or representatives of any Entity in the Ordinary Course of Business (as conducted since January 1, 2014) and not in excess of MXN$75,000 for each advance and MXN$100,000 in the aggregate to any single such Person;

(I)      incur any Indebtedness for borrowed money other than (1) Indebtedness in an aggregate amount less than MXN$150,000,000, (2) Indebtedness associated with the conversion into debt of above 90 days past due supplier account payables, or (3) Indebtedness that is refinancing existing Indebtedness with Indebtedness maturing between the date of this Agreement and the Closing Date, in the case of clauses (1) and (3), only to the extent of Indebtedness (x) repayable at the option of the borrower without penalty or premium, (y) on terms reasonably acceptable to Purchaser and (z) in respect of which Seller has provided Purchaser with prior notice specifying the intended use of proceeds;

(J)      make or authorize any accrual or commitment for capital expenditures (excluding accruals or commitments that are fully used or spent before the Closing Date), in each case, in excess of 120% of the budgeted quarterly amounts under the 2015 Budget;

(K)      (1) purchase, lease or otherwise acquire any material properties, rights, spectrum or other assets, in each case, other than in the Ordinary Course of Business (as conducted since January 1, 2014), or (2) sell, assign, license, transfer, lease, mortgage, pledge, surrender, encumber, divest, cancel, abandon or fail to exercise any available rights to avoid the lapse or expiration of, or otherwise dispose of any of its material operations, properties, rights (including any rights in respect of transmission towers owned or leased by the Entities), product lines, spectrum, businesses, Intellectual Property, Company Telecommunication Licenses or assets (except sales of inventory to customers in the Ordinary Course of Business (as conducted since January 1, 2014) or sales of obsolete or worthless assets or inventory);

(L)      other than in the Ordinary Course of Business (as conducted since January 1, 2014), cancel or compromise any material debt or claim or waive or release any material right of any Entity;

(M)      enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(N)      other than short-term financial investments made in the Ordinary Course of Business (as conducted since January 1, 2014), acquire the securities of any other Person;

(O)    change the accounting methods, practices or procedures applicable to the Entities, except as required by Mexican NIF or applicable Law;

(P)    (1) enter into any line of business in any geographic area other than the current lines of business of the Entities and products and services reasonably ancillary thereto, (2) except as currently conducted, engage in the conduct of any business in any state that would require the receipt of a new or transfer of an existing Company Telecommunication License (other than renewals or replacements of any existing Company Telecommunication License), or (3) conduct any business operations outside of Mexico (excluding pursuant to customary roaming arrangements);

(Q)    assign, transfer, sell, lease, voluntarily forfeit, cancel, surrender, abandon or fail to undertake reasonable best efforts to defend any Permit or Telecommunications License;

(R)    settle any action before or threatened to be brought before a Governmental Authority for an amount in excess of MXN$15,000,000 individually and MXN$75,000,000 in the aggregate;

(S)    make or change any material Tax election, change any method of Tax accounting, settle or otherwise finally resolve any dispute with respect to a material amount of Tax or file a claim for any refund of Tax outside the Ordinary Course of Business for claiming such refunds;

(T)    use infrastructure network technologies or billing systems other than their existing network technologies and billing systems or other network technologies and billing systems disclosed to Purchaser prior to the date hereof; or

(U)    commit or agree to do anything prohibited by this Section 7.2.

(c)    From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, except as expressly contemplated by this Agreement, Seller Parent and Seller will (i) not transfer, sell, pledge, grant, encumber or dispose of, and cause Company Parent and the Uruguay Subsidiary not to issue, any Company Parent Interests or other equity interests in Company Parent or the Uruguay Subsidiary or grant options, warrants, calls or other rights to purchase or otherwise acquire any such Company Parent Interests or other equity interests or enter into any agreement with respect thereto and (ii) cause Company Parent and the Uruguay Subsidiary not to (A) split, combine or subdivide its Company Parent Interests or other equity interests, (B) effect any recapitalization, reclassification or like change in its capitalization or voluntarily adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization, (C) amend its organizational documents

or operating agreement, (D) engage in any business or operations other than, in the case of Company Parent, holding the Company Shares, or (E) acquire any assets, hire employees or incur any Liabilities. Seller will cause Company Parent to transfer all equity interests in the Uruguay Subsidiary to Seller (the "Uruguay Divestiture") prior to Closing.

(d)      From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, (i) Seller and Seller Parent will contribute cash to the Entities in amounts sufficient for the Entities to conduct their business in the Ordinary Course of Business and in accordance with this Agreement and (ii) no later than the tenth Business Day after the end of each 2015 Budget Month and each calendar quarter that ends during the 2015 Budget Period, Seller will deliver a certificate signed on behalf of Seller by an authorized officer of Seller to Purchaser setting forth the amounts of Qualifying Capital Expenditures and Qualifying Sales and Marketing Expenditures made by the Entities and the amount of cash contributions made by Seller and Seller Parent to the Entities, in each case during such 2015 Budget Month or calendar quarter, as applicable, and, at the request of Purchaser, furnish or provide Purchaser access to, supporting documentation sufficient to support Purchaser's review of such certificate.

7.3.    Third Party Consents.  Seller will use (and Seller will cause each of the Entities to use) reasonable best efforts, and Purchaser will use commercially reasonable efforts to cooperate with Seller and each of the Entities, to obtain at the earliest practicable date all Third Party Consents and any other approvals, consents, acknowledgments or waivers required or advisable to be obtained from any third party that is not a Governmental Authority in order to consummate the transactions contemplated hereby; provided, however, that, subject to Section 7.8, in no event will Seller grant, or permit any of its Affiliates to grant, any concession by any Entity in connection with obtaining any such consents, acknowledgments or waivers.

7.4.    Governmental Approvals.  (a)  On the terms and subject to the conditions set forth in this Agreement (including Section 7.4(b)), each of Purchaser and Seller will (and Seller will cause each of the Entities to) cooperate with each other and use its reasonable best efforts to take such action as may be required to obtain the Company Approvals and any other Governmental Approvals as promptly as practicable after the execution of this Agreement and to avoid the entry of any Law or Order that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement (it being understood that nothing contained in this Agreement will require Purchaser or any of its Subsidiaries to reach any agreements or understandings in connection with obtaining any Governmental Approval prior to the Termination Date).  In furtherance of the foregoing, following the date hereof, on the terms and subject to the conditions set forth in this Agreement (including Section 7.4(b)), each of the Parties will (and Seller will cause each of the Entities to) use its reasonable best efforts to (i) make or cause

to be made all filings or applications required of each of them or their respective Affiliates to obtain the Company Approvals as promptly as practicable, and in any event within 20 calendar days after the date hereof, (ii) comply at the earliest practicable date with any request under any Regulatory Statutes for additional information, documents or other materials received by either of them or any of their respective subsidiaries from the IFETEL, the CFC or any other Governmental Authority in respect of such filings or applications, and (iii) cooperate with each other in connection with any such filings or applications (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing or non-applying Parties before filing or submitting an application and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any relevant Governmental Authority with respect to any such filing or application.  Each Party will promptly inform the other Party of any material oral communication with, and provide copies of material written communications with, any Governmental Authority regarding any such filings or applications.  Neither Party will participate, or permit any of its Affiliates or advisors to participate, in any formal meeting with any Governmental Authority in respect of any filings, applications, investigation (including any proposed investigation), litigation or other inquiry related to the transactions contemplated by this Agreement (other than any such meetings (or the portions thereof) not exclusively related to the transactions contemplated by this Agreement), unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives such other Party the opportunity to attend and participate in such meeting.  Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 7.4</u> as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials. Subject to applicable Laws, Purchaser will have the right to direct all matters with any Governmental Authority consistent with its obligations hereunder.

(b)     Nothing in this Agreement will require, or be construed to require, Purchaser or any of its Affiliates to take or refrain from taking any action (including any divestiture, holding separate any business or assets or other similar action) or to agree to any restriction or condition relating to any assets, operations, business or the conduct of business of (i) Purchaser or any of its current or future Affiliates or (ii) any Entity, except, in the case of clause (ii) only, for any such restriction or condition that would not, individually or in the aggregate, reasonably be expected to result in a Seller Material Adverse Effect (disregarding the provisos set forth in the definition thereof) (the occurrence of any matter specified in clause (i) or clause (ii) above will constitute an "<u>Adverse Regulatory Condition</u>").

(c)       Nothing in this Agreement will require, or be construed to require,  Purchaser or any of its Affiliates to alter, abandon or not pursue any business initiatives or transactions with any other Person, including any acquisition of other Telecommunication Licenses or spectrum rights (or businesses or Persons that own such Telecommunication Licenses or rights) and participation in any auction of additional spectrum and Seller will not, and will cause each of its Affiliates not to, (i) take any actions in respect of any approvals of which Seller or any of its Affiliates has Knowledge that Purchaser or any of its Affiliates may have pending during the pendency of this Agreement with Mexican Governmental Authorities with respect to any such business initiatives or transactions that would reasonably be expected to delay or impair Purchaser's or its Affiliates' ability to obtain such approvals or result in the imposition of any adverse term, condition, restriction or consequence in respect thereof or (ii) file petitions, pleadings or claims, or take any positions with respect to any investigation, proceeding, bid or auction or similar process before any Governmental Authority (including, without limitation, with respect to any Telecommunication Licenses or spectrum rights) that would be inconsistent with the terms of this Agreement and the transactions contemplated by this Agreement or with the positions taken by Purchaser and its Affiliates before Governmental Authorities of which Seller or any of its Affiliates has Knowledge.

7.5.    Regulatory Compliance.  (a)  During the period from the date of this Agreement to the Closing, Seller will, and will cause each of the Entities to, undertake reasonable best efforts to (i) take all actions reasonably necessary to maintain and preserve the Company Telecommunication Licenses and (ii) refrain from taking any action that would reasonably be expected to give any Governmental Authority with jurisdiction over Seller or any of the Entities reasonable grounds to suspend, revoke or modify any Company Telecommunication License in any adverse manner (other than in any *de minimis* respect).

(b)       Prior to the Closing, Seller will, and will cause each of the Entities to, use reasonable best efforts to renew material Permits and the Company Telecommunications Licenses, including preparing and filing with the applicable Governmental Authority all necessary applications in connection therewith as soon as reasonably practicable after the commencement of the period during which such applications may be made; provided that none of the Entities will apply for any Permit or Telecommunications License (other than renewals or replacements of the Company Telecommunication Licenses) the receipt of which would, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay consummation of the transactions contemplated in this Agreement.

7.6.    Further Assurances.  Subject to the other provisions of this Agreement (including Sections 7.3 and 7.4(b)), each Party will, and Seller will cause each Entity to, use its reasonable best efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this

Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to its respective obligations to consummate the transactions contemplated by this Agreement.

7.7.   <u>Publicity</u>.  (a)  The initial press releases concerning this Agreement and the transactions contemplated hereby will be in substantially the forms previously agreed by the Parties.  Neither of the Parties will issue any press release or otherwise make any similar public announcement concerning this Agreement or the transactions contemplated hereby that in any material respect is inconsistent with or contains disclosures concerning this Agreement or the transactions contemplated hereby in addition to its initial press release without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless disclosure is otherwise required by applicable Law, stock exchange rules or by the Bankruptcy Court, provided, however, that the Party intending to make such release or announcement uses its reasonable best efforts consistent with such applicable Law, stock exchange rules or Bankruptcy Court requirement to consult in advance with the other Party with respect to the text thereof and to give the other Party a reasonable opportunity to comment thereon.

(b)   Seller and Purchaser will cooperate in developing language for a program of communications or notices relating to the transfer of ownership to be sent to customers of the Entities and Employees on or after the date of this Agreement and prior to the Closing.  Neither Purchaser nor Seller will, and will cause its respective Affiliates to not, send any communications or notices (other than bills and materials reasonably ancillary thereto, advertisements or other promotional materials, administrative notices or other correspondence in the Ordinary Course of Business and not making reference to the transactions contemplated by this Agreement, Purchaser, or its Affiliates) to customers of the Entities or Employees on or after the date of this Agreement and prior to the Closing without the prior approval of the other party (not to be unreasonably withheld, conditioned or delayed).

7.8.   <u>Certain Agreements</u>.  Prior to Closing, Seller will obtain each of the amendments or terminations set forth on Schedule 7.8(iii) (the "<u>Section 7.8 Terminations</u>"). From and after the date hereof, Seller will use (and until the Closing Seller will cause each of the Entities to use) reasonable best efforts, and, to the extent reasonably requested by Seller, Purchaser will use commercially reasonable efforts to cooperate with Seller and each of the Entities, to obtain at the earliest practicable date each of the assignments, terminations or consents set forth on Schedule 7.8(i) and (ii) (the "<u>Section 7.8 Instruments</u>"). If any Section 7.8 Instrument set forth on Schedule 7.8(i) or (ii) is not executed and delivered to Purchaser at or prior to Closing, then, from and after the Closing until such time as such Section 7.8 Instrument is executed by each party thereto and delivered to Purchaser, (a) Seller will provide and will cause its Affiliates to provide the Entities with the services and other benefits under each Contract to which such Section 7.8 Instrument relates, to the extent the applicable Entities received such

benefits in the ordinary course prior the date hereof, without any additional costs or expenses to the Entities, except for any such costs or expenses the Entities would have incurred pursuant to such Contract if such Section 7.8 Instrument had been obtained prior to Closing, and (b) the Entities receiving such services and other benefits will comply with and otherwise perform under such Contracts in the same manner as they did in the ordinary course prior the date hereof.  Until such time that the applicable Section 7.8 Instrument or Section 7.8 Termination related to any Contract set forth on Schedule 7.8 is obtained, Seller will not, and will cause its Affiliates not to, terminate or modify any of such Contracts.

7.9.    <u>Preservation of Records</u>.  Seller and Purchaser agree that each of them will preserve and keep the records held by it or their Affiliates relating to the Entities and their business for a period of at least seven years from the Closing Date (except as provided below) and will make, upon reasonable notice and during regular business hours, such records and personnel available to the other to the extent reasonably required by such party in connection with any insurance claims by, Legal Proceedings or tax audits against or governmental or internal investigations of Seller or Purchaser or any of their Affiliates, provided, however, that (i) the access to such records will not unreasonably interfere with the business or operations of Purchaser or Seller, as applicable, or any of their Affiliates, (ii) the access to such records will not be permitted to the extent that it would require Purchaser or Seller, as applicable, or any of their Affiliates, to (A) disclose information subject to attorney-client privilege or (B) violate any confidentiality obligations to which Purchaser or Seller, as applicable, or any of their Affiliates, is bound if the applicable Person shall have used commercially reasonable efforts to obtain the consent of the applicable third party to grant access to such records, and (iii) Seller or Purchaser, as applicable, will reimburse the other Party and its Affiliates for any reasonable and documented out-of-pocket expenses incurred in connection with such access.  If Seller or Purchaser wishes to destroy such records before the end of such seven-year period, such Party will first give 60 days prior notice to the other and such other Party will have the right at its option and expense, upon prior notice given to such Party within such 60-day period, to take possession of the records within 90 days after the date of such notice.

7.10.    <u>Confidentiality</u>.  (a)  For a period of two years from and after the later of (i) the Closing Date and (ii) the provision of information, knowledge or data by Purchaser or its Affiliates to Seller or its Affiliates pursuant to <u>Section 7.9</u>, Seller and each of its Affiliates will treat as confidential and will safeguard any and all information, knowledge and data about the Entities and the Business by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information, knowledge and data as Seller or its Affiliates used with respect thereto prior to the execution of this Agreement.  Effective upon the Closing, the confidentiality obligations under the Non-Disclosure Agreement will terminate.

(b)     For a period of two years from and after the date hereof, each of Seller and Purchaser will, and will cause (or, with respect to third-party representatives, use commercially reasonable efforts to cause) each of its Affiliates and representatives to, treat as confidential and safeguard each Transaction Agreements and the terms and conditions thereof using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized dissemination or disclosure of such confidential information. Notwithstanding the foregoing, either party hereto or its Affiliates or representatives may disseminate or disclose such confidential information and will not be liable with respect to such dissemination or disclosure (i) to such party's officers directors, employees, agents, Affiliates, attorneys or advisors or other representatives; (ii) to the extent such dissemination or disclosure is requested or required by Law, by legal process (including pursuant to the assertion of such party's or any of its Affiliates' legal rights under any Transaction Agreements), or by regulatory process or request; or (iii) to the extent such dissemination or disclosure is reasonably necessary for purposes of compliance by such party or any of its Affiliates with Tax or regulatory reporting requirements; provided, however, that in the case of any disclosure to the Persons in clause (i) above, the parties hereto or their Affiliates or representatives (as applicable) will exercise their commercially reasonable efforts to preserve the confidentiality of such information disclosed.

(c)     Notwithstanding clauses (a) and (b) of this Section 7.10, nothing contained in the Transaction Agreements will be deemed to prohibit Purchaser or Seller, or any of their respective Affiliates, from disclosing any information as may be required, based on the advice of legal counsel, under the Bankruptcy Code or the Bankruptcy Rules or any legal process before, or any order of, any Governmental Authority.

7.11.   Trademark License Agreement.  During the term of the Trademark Sublicense Agreement and any period provided pursuant to Section 2.4 thereof (in each case, as amended by the Amendment to the Trademark Sublicense Agreement), Seller will, and will cause NII Holdings, Inc. to, (i) maintain the Trademark License Agreement in full force and effect and (ii) not amend, modify or otherwise waive any provision of the Trademark License Agreement in any manner that would adversely affect the rights of the Company or any of its Subsidiaries under the Trademark Sublicense Agreement.  Except as prohibited by applicable Law, from and after the date hereof until the Closing Date, to the extent reasonably requested by Purchaser, Seller will cause the Entities to cooperate with Purchaser in connection with winding down use of the Trademarks that are sublicensed to the Company pursuant to the Trademark Sublicense Agreement; provided that, for the avoidance of doubt, this Section will not obligate Seller or the Entities to take any steps to begin winding down such Trademarks.

7.12.   Certain Employees and Plans.  (a)  With respect to any Employee who is employed by any Entity but whose job is not primarily related to the

Business, prior to the Closing, Seller will, or will cause its Affiliates to, take all necessary actions to transfer such Employee's employment to Seller or one of its Affiliates other than any Entity or Company Parent (or terminate their employment).  Seller will be responsible for any severance obligations that arise as a result of such transfer (or termination).

(b)    At least 30 days prior to the Closing, Seller will, or will cause its Affiliates to, take all actions necessary to terminate the Employee Plan set forth on Schedule 7.12(b) (the "Terminated Plan") and provide notice of such termination to the Employees and appropriate Governmental Authorities to the extent required by Law.

(c)    For the avoidance of doubt, the provisions of this Agreement are intended to be for the sole benefit of, and will be enforceable by, the Parties hereto, and nothing in this Section 7.12 or elsewhere in this Agreement, whether express or implied, will create any third-party beneficiary or other rights in any other Person, including any current or former employee or any dependent or beneficiary thereof.  Nothing contained herein, express or implied (i) will be construed to establish, amend or modify any benefit plan, program, agreement or arrangement of Purchaser or any of its Subsidiaries or (ii) will alter or limit the ability of Purchaser or any of its Subsidiaries to amend, modify or terminate any Employee Plan, or other benefit plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by Purchaser or any of its Subsidiaries.  The Parties acknowledge and agree that the terms set forth in this Section 7.12 will not create any right for any employee to any continued employment or engagement with Seller or any of its Subsidiaries or with Purchaser or any of its Subsidiaries.

7.13.    Financing Cooperation.  If requested by Purchaser in writing, Seller will, and will cause each of the Entities to, use its respective commercially reasonable efforts to take any actions and provide any cooperation reasonably requested by Purchaser in connection with the payment of the Pay-Off Amount or obtaining the Pay-Off Letters.

7.14.    Seller Disclosure Schedule.  Seller may, at its option, include in the Seller Disclosure Schedule items that are not required to be included in order to avoid any misunderstanding, and such inclusion, or any references to Dollar amounts, will not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information provided in one Section of the Seller Disclosure Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Section of the Seller Disclosure Schedule to which its relevance is reasonably apparent on its face.

7.15.    Extension Financing.  If, as of August 31, 2015, the Closing has not occurred and this Agreement has not been terminated, Seller and Purchaser will

discuss in good faith Seller's financing needs with respect to the Entities, if any, and consider possible financing alternatives, provided, however, that neither Seller nor Purchaser will have any obligations to provide or accept any financing to or from the other, provided that this Section 7.15 will not obligate Seller or its Affiliates to enter into any financing arrangement with Purchaser or any other third party.

7.16.   Transition Services.  The Parties agree that the applicable schedules to the Transition Services Agreement will include at least all services that were provided by Seller or any of its Affiliates (other than the Entities and Company Parent) or its or their third party service providers to the Entities or Company Parent, or by the Entities or Company Parent or their third party service providers  to Seller or any of its Affiliates (other than the Entities and Company Parent), in each case, during the three-month period prior to the date hereof and that are reasonably required for the operation of the respective businesses of the applicable service recipients under the Transition Services Agreement after the Closing, provided, however, that, to the extent a third party service provider is obligated at the time of the Closing to provide the services contemplated by this Section directly to the applicable service recipients (whether as a result of an assignment of an agreement to the applicable service recipient or pursuant to an agreement entered into between such third party service provider and the applicable service recipient after the date hereof and before the Closing), such services will be provided pursuant to such agreement and not pursuant to the Transition Services Agreement.  From and after the date hereof and prior to the Closing Date, each of Purchaser and Seller will (i) diligently and in good faith negotiate to identify all such services and develop and agree to full service descriptions for such services, and, once agreed, such descriptions will be set forth on the schedules to the Transition Services Agreement and (ii)  begin the process of negotiating in good faith the service fees for such services in accordance with the Agreed Methodology (as such term is defined in Exhibit D). If for any reason, the Transition Services Agreement is not executed and delivered by the Closing, Seller, its Affiliates (other than the Entities and Company Parent) and Seller Successors and its and their third party service providers, to the extent permitted by applicable third party contracts (and to the extent not so permitted, pursuant to Section 2.2 of Exhibit D), and the Entities and their third party service providers, to the extent permitted by applicable third party contracts (and to the extent not so permitted, pursuant to Section 2.2 of Exhibit D), will provide such services to the applicable service recipient on the terms set forth in Exhibit D until such time as the Transition Services Agreement has been executed and delivered, and Purchaser and Seller will continue to use their respective commercially reasonable efforts to negotiate and finalize the Transition Services Agreement until it is executed and delivered.

## 8. CONDITIONS TO CLOSING

8.1.   Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is

subject to the fulfillment, on or before to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    (i) the representations and warranties of Seller set forth in Section 5.23 (Absence of Certain Changes) shall be true and correct in all respects on the date of this Agreement, (ii) the representations and warranties of Seller set forth in Section 5.7 (Title to Shares) and Section 5.26(b)(ii) and (c) (Company Parent) shall be true and correct in all respects (A) on the date of this Agreement and (B) as of the Closing Date as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct in all respects as of such date), (iii) the Seller Fundamental Representations (other than the representations and warranties set forth in Section 5.7 (Title to Shares) and Section 5.26(b)(ii) and (c) (Company Parent)) and the representations and warranties of Seller set forth in Section 5.22 (Certain Conduct; Sanctions) (read for purposes of this Section 8.1(a) without any materiality or Seller Material Adverse Effect qualification or any similar qualification) shall be true and correct in all material respects (A) on the date of this Agreement and (B) at the Closing as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct in all respects as of such date), (iv) all other representations and warranties of Seller set forth in this Agreement shall be true and correct (A) on the date of this Agreement and (B) at the Closing as if given as of such date (except to the extent that any such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct as of such date), provided, however, that notwithstanding anything herein to the contrary, the condition set forth in this Section 8.1(a)(iv) shall be deemed to have been satisfied even if any representations and warranties of Seller are not so true and correct unless the failure of such representations and warranties of Seller to be so true and correct (read, for purposes of this Section 8.1(a)(iv) without any materiality or Seller Material Adverse Effect qualification or any similar qualification), individually or in the aggregate, has had or would reasonably be expected to result in a Seller Material Adverse Effect, and (v) Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect;

(b)    Seller and Seller Parent shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Seller or Seller Parent on or before the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect;

(c)    the Bankruptcy Court shall have entered the Sale Order and the Bidding Procedures Order, and once entered, neither order shall have been

(i) amended, modified or supplemented in any way without the Purchaser's prior written consent or (ii) voided, reversed or vacated or subject to a stay, and each of the Bidding Procedures Order and the Sale Order shall be a Final Order;

(d)    Company Parent shall have Filed a notice of dismissal of its chapter 11 case in form and substance reasonably satisfactory to Purchaser (a "Notice of Dismissal");

(e)    with respect to the chapter 11 case of Company Parent, (i) all fees of the U.S. Trustee shall have been paid in full and no amounts shall be due and owing to the U.S. Trustee following the Closing and (ii) all required reports shall have been Filed with the Bankruptcy Court;

(f)    the closing deliveries set forth in Section 4.2(a) – (o) shall have been delivered to Purchaser;

(g)    (i) all Governmental Approvals, the failure of which to obtain, individually or in the aggregate, would have or be reasonably expected to result in a Seller Material Adverse Effect, shall have been obtained and (ii) at Closing, no such Governmental Approvals or any Company Approvals (A) are subject to a written request for a stay or any similar written request that is pending, (B) are subject to a stay that is in effect or have been vacated, reversed, set aside, annulled or suspended, (C) are subject to any written petition for rehearing or reconsideration or written application for review that is pending, (D) are being reconsidered following applicable procedures by any Governmental Authority of competent jurisdiction that has undertaken in writing to reconsider the action on its own motion, or (E) are subject to any appeal that is pending (including other administrative or judicial review) or in effect, unless, in the case of the circumstances described in clause (A), (C) or (E), such circumstance would not reasonably be expected to result in (1) vacating, reversing, setting aside, annulling or suspending such Governmental Approval or (2) modifying such Governmental Approval in any manner that would impose any term, condition or consequence that would, individually or in the aggregate, reasonably be likely to have or result in an Adverse Regulatory Condition.  All Governmental Approvals that have been obtained shall have been obtained without the imposition of any term, condition, restriction or consequence that would, individually or in the aggregate with all other terms, conditions, restrictions or consequences imposed in connection with obtaining other Governmental Approvals, have, or reasonably be expected to result in, an Adverse Regulatory Condition;

(h)    since the date of this Agreement, there shall not have occurred any change, event, circumstance or development that, individually or in the aggregate, has had, or is reasonably expected to result in, a Seller Material Adverse Effect;

(i)        there shall not be instituted or pending any suit, action or proceeding commenced by a Governmental Authority of competent jurisdiction which is seeking to (i) prohibit, limit, restrain or impair Purchaser's ability to own operations, rights, product lines, businesses or interest therein of any Entity from and after the Closing or any of the assets, licenses, operations, rights, product lines, businesses or interest therein of any Entity (including by requiring any sale, divestiture, transfer, license, lease, disposition of or encumbrance or hold separate arrangement with respect to any such assets, licenses, operations, rights, product lines, businesses or interest therein), in each case, in a manner that would reasonably be expected to result in an Adverse Regulatory Condition, or (ii) prohibit or limit in any material respect Purchaser's ability to vote, transfer, receive dividends or distributions or otherwise exercise full ownership rights with respect to the Company Parent Interests or any Shares;

(j)        the Corporate Records of the Company and its Subsidiaries delivered under Section 4.2(j) shall be complete in all material respects and updated as of the Closing Date to accurately reflect the capital structure set forth in Section 5.5(a) of the Seller Disclosure Schedule; and

(k)        each of the Third Party Consents, Section 7.8 Terminations and Section 7.8 Instruments listed on Schedule 8.1(k) shall have been executed by each party thereto and delivered to Purchaser and shall be in full force and effect.

8.2.    Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or before the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)        the representations and warranties of Purchaser contained in Article 6 shall be true and correct (i) on the date of this Agreement and (ii) at the Closing as if given as of such date (except to the extent that any such representation and warranty expressly speaks as of a particular date, in which case such representation and warranty shall be true and correct as of such date); provided, however, that notwithstanding anything herein to the contrary, the condition set forth in this Section 8.2(a) shall be deemed to have been satisfied even if any representations and warranties of Purchaser are not so true and correct unless the failure of such representations and warranties of Purchaser to be so true and correct (read for purposes of this Section 8.2(a) without any materiality or Purchaser Material Adverse Effect qualification or any similar qualification), individually or in the aggregate, has had or would reasonably be expected to result in a Purchaser Material Adverse Effect and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect;

(c)     the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been voided, reversed or vacated or made subject to a stay; and

(d)     the Closing deliveries set forth in Section 4.3 shall have been delivered to Seller or, where applicable in the case of the Closing deliveries set forth in Section 4.3(c), the other Persons specified therein.

8.3.    Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or before the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     the Company Approvals shall have been obtained.

8.4.    Frustration of Closing Conditions.  Neither Purchaser nor Seller may rely on the failure of any condition set forth in Section 8.1 or Section 8.2 if such failure was the direct result of such Party's material breach of this Agreement.

## 9. INDEMNIFICATION

9.1.    Survival.  The representations and warranties contained in this Agreement will survive the Closing and will remain in full force and effect until 5:00 p.m. local time in Mexico City, Mexico on the date that is the 12-month anniversary of the Closing Date (the "Release Date"), at which time they will terminate, except that (a) the Seller Fundamental Representations will survive the Closing and will remain in full force and effect indefinitely and (b) the Specified Representations will survive the Closing and will remain in full force and effect until 5:00 p.m. local time in Mexico City, Mexico, on the 24-month anniversary of the Closing Date.  The covenants and agreements contained in this Agreement that are to be performed in full prior to the Closing will survive the execution and delivery of this Agreement and the Closing and will thereafter terminate at 5:00 p.m. local time in Mexico City, Mexico, on the Release Date. The covenants and agreements that are to be performed after the Closing will

survive the Closing until performed in accordance with their terms.  The last day on which a representation and warranty or covenant or agreement survives pursuant to this Section 9.1 is referred to herein as the "End Date" with respect to such representation and warranty or covenant or agreement, provided that, the indemnification in Section 9.2(e) will survive until 60 days after the expiration of the relevant statute of limitations.  No claim for indemnification pursuant to this Article 9 may be brought following the applicable End Date.  Notwithstanding the foregoing, if on or prior to the applicable End Date, a Third Party Claim Notice or a Direct Claim Notice has been given to an Indemnifying Party, the applicable claim as set forth in such notice will survive until satisfaction or other resolution thereof and may be amended to allow for adjusted Damages based on substantially the same facts and circumstances giving rise to such claim.

9.2.   Indemnification by Seller.  From and after the Closing, Seller will indemnify and save and hold harmless Purchaser and its Affiliates and their respective officers and directors (collectively, the "Purchaser Indemnitees") from and against any and all demands, claims, actions or causes of action, assessments, losses, damages (including diminution of value to the extent recoverable under the laws of the State of New York applicable to Contracts and consequential damages, to the extent reasonably foreseeable), liabilities, costs and expenses, including interest, penalties and reasonable and documented attorneys' fees and expenses ("Damages") resulting from, arising out of or incurred in connection with:  (a) any failure of any representation or warranty made by Seller to be true and correct as of the date of this Agreement or as of the Closing Date as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case, as of such date), (b) any nonfulfillment, violation or breach of any covenant or agreement made by Seller or Seller Parent in this Agreement, (c) Purchaser's acquisition of the Company Parent Interests to the extent such Damages would not have resulted, arisen or been incurred had Purchaser acquired the Company Shares directly (instead of through the acquisition of the Company Parent Interests), (d) the Uruguay Subsidiary or the Uruguay Divestiture, and (e) the Terminated Plan (including the termination of the Terminated Plan in accordance with Section 7.12(b) and regardless of whether Damages arose prior to, at or after the Closing).  For the purposes of Section 9.2(a), with respect to any representation or warranty that is limited or qualified by any materiality or Seller Material Adverse Effect qualification or any similar qualification, the occurrence of any failure of such representation or warranty to be true and correct, and the amount of Damages subject to indemnification hereunder, will be determined as if any such qualifications were not contained therein; provided, however, that this sentence will not apply to (i) any such qualifications contained in the definition of any defined term used herein, (ii) the representations and warranties set forth in any of Section 5.8 (Financial Statements), Section 5.9 (Undisclosed Liabilities) or Section 5.13 (Material Contracts) and (iii) any such qualifications used for the purposes of defining the scope of items or matters required to be set forth on a list.

9.3.    <u>Indemnification by Purchaser</u>.  From and after the Closing, Purchaser will indemnify and save and hold harmless Seller and its Affiliates and their respective officers and directors (collectively, the "<u>Seller Indemnitees</u>" and, together with the Purchaser Indemnitees, the "<u>Indemnified Parties</u>") from and against any Damages resulting from, arising out of or incurred in connection with: (a) any failure of any representation or warranty made by Purchaser to be true and correct as of the date of this Agreement or as of the Closing Date as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case, as of such date), and (b) any nonfulfillment, violation or breach of any covenant or agreement made by Purchaser in this Agreement.

9.4.    <u>Indemnification Procedures</u>.  (a)  If an Indemnified Party desires to assert any claim for indemnification provided for under this <u>Article 9</u> in respect of, arising out of or involving a claim or demand made by any Person (other than a Party or Affiliate thereof) against the Indemnified Party (a "<u>Third Party Claim</u>"), such Indemnified Party will notify Purchaser or Seller, as the case may be (the "<u>Indemnifying Party</u>"), in writing of such Third Party Claim, including the amount or the estimated amount of Damages sought thereunder to the extent then ascertainable (which estimate will not be conclusive of the final amount of such Third Party Claim), any relevant time constraints relating thereto and, to the extent practicable, any other material details pertaining thereto (a "<u>Third Party Claim Notice</u>") promptly after receipt by such Indemnified Party of written notice of the Third Party Claim; provided, however, that the failure to timely give such notice will not reduce the Damages for which the Indemnifying Party is obligated to indemnify the Indemnified Party under this <u>Article 9</u> except to the extent of any Damages resulting from the Indemnifying Party being prejudiced by such failure. The Indemnified Party will deliver to the Indemnifying Party, promptly after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim; provided, however, that failure to provide any such copies will not affect the indemnification obligations provided hereunder except to the extent of any Damages resulting from the prejudice of any claim or defense available to the Indemnifying Party as a result of such failure.

(b)    If a Third Party Claim is made against an Indemnified Party, the Indemnifying Party will be entitled to participate in the defense thereof and, within 30 days of receiving a Third Party Claim Notice with respect to such Third Party Claim, may assume the defense thereof and select counsel to act in such defense (which counsel will be reasonably satisfactory to the Indemnified Party). Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party will not be liable to the Indemnified Party for legal expenses subsequently incurred by the Indemnified Party in connection with the defense thereof, unless, in the reasonable opinion of counsel (including in-house counsel) to the Indemnified Party, counsel for the Indemnifying Party could not adequately represent the interests of the Indemnified Party because the interests of the Indemnifying Party are in conflict with those of the Indemnified Party.  If the

Indemnifying Party assumes such defense, the Indemnified Party will have the right to participate in the defense thereof and to employ counsel, at its own expense (except as provided in the immediately preceding sentence), separate from the counsel employed by the Indemnifying Party.  The Indemnifying Party will be liable for reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof and as otherwise contemplated by the two immediately preceding sentences.  If the Indemnifying Party chooses to defend any Third Party Claim, the Indemnified Party will cooperate in the defense or prosecution thereof.

(c)     If the Indemnifying Party, within 30 days after written notice of any such Third Party Claim (or sooner if the nature of the Third Party Claim so requires) (i) does not assume control of the defense or (ii) after assuming control of the defense, fails or ceases to diligently defend such Third Party Claim, which failure or cessation is not cured within 15 days after written notice thereof from the Indemnified Party, then the Indemnified Party will have the right to undertake the defense of such Third Party Claim, and (iii) the reasonable and documented fees and expenses of counsel to the Indemnified Party in connection therewith will be considered "Damages" for purposes of this Agreement; provided, however, that in no event will the fees and expenses of more than one counsel (in addition to one local counsel in each jurisdiction that is reasonably necessary) for the Indemnified Party with respect to a single Third Party Claim or a series of related Third Party Claims be considered "Damages" for purposes of this Agreement.

(d)     The Indemnified Party will not settle, compromise or discharge a Third Party Claim without the Indemnifying Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed.  The Indemnifying Party may pay, settle or compromise a Third Party Claim without the Indemnified Party's prior written consent, so long as such payment, settlement or compromise (i) includes an unconditional release of the Indemnified Party from all Liability in respect of such Third Party Claim, (ii) does not subject the Indemnified Party to any injunctive relief or other equitable remedy, (iii) does not include a statement or admission of fault, culpability or failure to act by or on behalf of any Indemnified Party, and (iv) simultaneously with the effectiveness of such settlement, payment or compromise, the Indemnifying Party pays in full any obligation imposed on the Indemnified Party by such settlement, compromise or consent or such obligation is paid in full from the Escrow Account.

(e)     The Parties will act in good faith in responding to, defending against, settling or otherwise dealing with any Third Party Claims, and cooperate in any such defense and give each other reasonable access during normal business hours and upon reasonable advance notice to all information relevant thereto.  Without limiting the generality of this Section 9.4(e), the Party controlling the defense of any Third Party Claim will deliver, or cause to be delivered, to the

other party copies of all correspondence, pleadings, motions, briefs, appeals or other written statements relating to or submitted in connection with the defense of the Third Party Claim, and timely notices of, and the right to participate in any hearing or other court proceeding, meeting or negotiation relating to the Third Party Claim.

        (f)      If an Indemnified Party desires to assert any claim for indemnification provided for under this Article 9 other than a claim in respect of, arising out of or involving a Third Party Claim (a "Direct Claim"), such Indemnified Party will notify the Indemnifying Party in writing of such Direct Claim, including the amount or the estimated amount of Damages sought thereunder to the extent then ascertainable (which estimate will not be conclusive of the final amount of such Direct Claim), and, to the extent practicable, any other material details pertaining thereto (a "Direct Claim Notice"); provided, however, that the failure to timely give such notice will not reduce the Damages for which the Indemnifying Party is obligated to indemnify the Indemnified Party under this Article 9 except to the extent of such Damages resulting from the Indemnifying Party being prejudiced by such failure.

        9.5.    Limitations on Indemnification.

        (a)      Seller will have no liability for any claim for indemnification pursuant to Section 9.2(a) if (i) in case of a claim (other than a Third Party Claim) arising out of an action Purchaser, the Entities or their respective Affiliates take after the Closing Date to obtain any Permit required for, or to comply with Transmission Tower Standards applicable to, an individual Transmission Tower in relation to facts or circumstances that would constitute a breach of the representations made in respect of Permits or Transmission Tower Standards in Section 5.16(a), Section 5.16(d) or Section 5.16(f), the Damages for which it would be responsible for such claim on a per-Transmission Tower basis are less than $5,000 and (ii) in the case of all other claims, the Damages for which it would be responsible for such claim and all related claims arising from substantially the same facts or circumstances are less than $50,000 (each such claim and, in the case of clause (ii), related claims, a "De Minimis Claim").  Seller will have no liability for indemnification pursuant to Section 9.2(a) unless and until the aggregate amount of Damages (excluding De Minimis Claims) for which it would be responsible for claims hereunder exceeds an amount equal to $10,000,000 (the "Basket Amount"), in which case Seller will, subject to the other limitations hereunder, be liable for all such Damages (excluding Damages associated with De Minimis Claims) in excess of the Basket Amount.  The limitations set forth in this Section 9.5(a) will not apply to any claim for indemnification in respect of a breach or inaccuracy of the Seller Fundamental Representations.

        (b)      The maximum aggregate amount of indemnifiable Damages payable by Seller in respect of claims pursuant to Section 9.2(a) (other than in

respect of a breach or inaccuracy of the Seller Fundamental Representations) will not exceed the Escrow Amount (the "Cap").

(c)    Purchaser will have no liability for any claim for indemnification pursuant to Section 9.3(a) that is a De Minimis Claim or until the aggregate amount of Damages (excluding all Damages associated with De Minimis Claims) for which it would be responsible for claims hereunder exceeds the Basket Amount, in which case Purchaser will, subject to the other limitations hereunder, be liable for all such Damages (excluding De Minimis Claims) in excess of the Basket Amount. The maximum aggregate amount of indemnifiable Damages payable by Purchaser in respect of claims pursuant to Section 9.3(a), taken together, will not in any event exceed the Cap.

(d)    No party hereto will be obligated to indemnify any other Person with respect to any Damages with respect to any matter that was included in the calculation of the adjustments reflected in the Final Purchase Price pursuant to Section 3.4 (to the extent so included).

(e)    Notwithstanding anything to the contrary in this Agreement, the Parties agree and acknowledge that, for any amounts finally determined to be payable by Seller (i) in respect of claims pursuant to Section 9.2(a) (other than in respect of a breach or inaccuracy of any of the Seller Fundamental Representations), such amounts will solely be paid from funds then available in the Escrow Account and Seller will not be obligated to pay any such amounts remaining unpaid after the funds in the Escrow Account have been exhausted, provided that, subject to the Cap, Seller will be obligated to pay in full any such amounts remaining unpaid after the funds in the Escrow Account have been exhausted up to the amount of funds from the Escrow Account that were released to a Purchaser Indemnitee in respect of claims pursuant to (A) Section 9.2(a) in respect of a breach or inaccuracy of any of the Seller Fundamental Representations, (B) Section 9.2(b), Section 9.2(c), Section 9.2(d) or Section 9.2(e), or (C) Article 11 and (ii) in respect of claims pursuant to (A) Section 9.2(a) in respect of a breach or inaccuracy of any of the Seller Fundamental Representations or (B) Section 9.2(b), Section 9.2(c), Section 9.2(d) or Section 9.2(e), such amounts will be paid from funds then available in the Escrow Account only to the extent Purchaser elects at any time, by written notice to Seller, to have such amounts paid from the Escrow Account and Seller will be obligated to pay any such amounts not so paid from the Escrow Account.

(f)    Notwithstanding anything to the contrary in this Agreement, in no event will an Indemnifying Party have liability to any Indemnified Party for any exemplary or punitive damages, except to the extent paid to a third party in connection with a Third Party Claim.

9.6.    Indemnity Payments.  (a)  In calculating the amount of any Damages, (i) the proceeds actually received by the Indemnified Party or any of its Affiliates under any insurance policy or pursuant to any claim, recovery,

settlement or payment by or against any other Person, in each case, net of any actual costs, expenses or premiums incurred in connection with securing or obtaining such proceeds will be deducted, except to the extent that the adjustment itself would excuse, exclude or limit the coverage of all or part of such Damages, (ii) all such Damages will be reduced by the net present value of any net Tax benefits attributable to such Damages reasonably expected by the Indemnified Party in its good faith discretion, after consultation with the Indemnifying Party, to be actually utilized by the Indemnified Party or its Affiliates within the taxable year in which such damages are incurred and the following two taxable years, and (iii) any payment made pursuant to this Article 9 will be treated as an adjustment to the price for which the Company Parent Interests are purchased by the Purchaser for all Tax purposes unless otherwise required by applicable Law.  In determining the taxable year in which, and the extent to which, any such tax benefit is reasonably expected to be utilized, such tax benefit shall be deemed to have been utilized only after all other available tax attributes and benefits, including net operating losses and any other deductions, are utilized.

(b)    If an Indemnified Party recovers an amount from a third party in respect of Damages that is the subject of indemnification hereunder after all or a portion of such Damages has been paid by an Indemnifying Party pursuant to this Article 9, the Indemnified Party will promptly remit to the Indemnifying Party the excess (if any) of (i) the amount paid by the Indemnifying Party in respect of such Damages, plus the amount received from the third party in respect thereof, less (ii) the full amount of Damages; provided that if the Indemnified Party is Purchaser and the amount paid by the Indemnifying Party was paid from the Escrow Account and the Escrow Agreement will not yet have been terminated, Purchaser will promptly remit such recovered amount to the Escrow Account instead of the Indemnifying Party.

(c)    Subject to Section 9.5(e), (i) The Indemnifying Party will pay all amounts payable pursuant to this Article 9, by wire transfer of immediately available cash funds in Dollars, promptly following receipt from an Indemnified Party of a bill for Damages that are the subject of indemnification hereunder, unless the Indemnifying Party in good faith reasonably disputes the Damages, in which event it will promptly notify the Indemnified Party, and (ii) in any event, the Indemnifying Party will pay to the Indemnified Party, by wire transfer in immediately available cash funds in Dollars, the amount of any Damages for which it is liable hereunder no later than three days following any determination of such Damages and the Indemnifying Party's liability therefor.  A "determination" will exist when (A) the parties to the dispute have entered into a legally binding agreement with respect to the dispute, (B) a court of competent jurisdiction will have entered a final and non-appealable order or judgment, or (C) an arbitration or like panel will have rendered a final and non-appealable determination with respect to disputes the parties have agreed to submit thereto.

9.7.    <u>Exclusivity of Indemnity</u>.  Except in the case of actual fraud (as to which none of the limitations set forth in this <u>Article 9</u> will apply), from and after the Closing, the rights of any Indemnified Party under this <u>Article 9</u> will be the sole and exclusive remedy of such Indemnified Party for monetary damages with respect to claims for breach or inaccuracy of any of the representations, or warranties, or breach of any of the covenants and agreements, in each case, that are indemnifiable under this <u>Article 9</u>.

9.8.    <u>Tax Indemnification</u>.  The foregoing provisions of this <u>Article 9</u> will not apply with respect to indemnification for Taxes (including for any breach of any representation or warranty contained in <u>Section 5.10</u> or any covenant contained in <u>Section 7.2(b)(S)</u> or <u>Article 11</u>), which will be governed solely by <u>Article 11</u>.

9.9.    <u>Successors</u>.  The obligations of Seller under this <u>Article 9</u> are intended to be, and the Sale Order will specifically provide that they will be, binding upon (a) any successors or assigns of Seller, (b) any trustee, examiner, or other representative of Seller's estate, (c) any reorganized Seller, and (d) any other entity vested or revested with any right, title or interest in or to a material portion of Seller's assets or any other Person claiming any rights in or control over a material portion of Seller's assets (each of (a) through (d), a "<u>Seller Successor</u>") as if such Seller Successor were Seller hereunder.

## 10. BANKRUPTCY COURT MATTERS

10.1.    <u>Competing Transaction</u>.  (a)  Each Debtor and each of Seller Parent and Seller agrees that (i) between the date hereof and the date the Bidding Procedures Order is entered by the Bankruptcy Court and (ii) from and after the date that the Auction is declared closed by Seller, Seller will not, and will not permit its Affiliates or its or their respective officers, directors, agents or representatives to, directly or indirectly, (A) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction (including a Back-Up Plan) or otherwise facilitate any effort or attempt to make a proposal or offer with respect to a Competing Transaction (including a Back-Up Plan), (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data to any Person relating to, any Competing Transaction (including a Back-Up Plan), (C) enter into or seek to enter into any agreement with respect to, make any Filings in furtherance of, or negotiate in any respect, a Competing Transaction (including a Back-Up Plan), and (D) request to amend or waive this <u>Section 10.1(a)</u>; provided that Seller and its Affiliates or its or their respective officers, directors, representatives and agents may provide materials and information ("<u>Participation Materials</u>") to, and enter into discussions and negotiations with, Interested Parties or Potential Bidders (as defined in the Bidding Procedures) to the extent expressly permitted by and in accordance with the Bidding Procedures. Until the entry of the Bidding Procedures Order, Seller agrees that it will promptly (and, in any event, within 24 hours) notify Purchaser if

any inquiries, proposals or offers with respect to a Competing Transaction are received by, any such information is requested from, or any such discussions or negotiation are sought to be initiated or continued with, it or any of its Affiliates or its or their respective officers, directors, agents or representatives indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposals or offers (including, if applicable, copies of any written requests, proposals or offers, including proposed agreements) and thereafter shall keep Purchaser informed, on a current basis, of the status and terms of any such proposals or offers (including any amendments thereto) and the status of any such discussions or negotiations, if any, including any change in the Debtors' or Seller Parent's intentions as previously notified.

(b)    Other than to the extent expressly permitted by and in accordance with the Bidding Procedures, each Debtor and each of Seller Parent and Seller agrees that from and after the date the Bidding Procedures Order is entered by the Bankruptcy Court until the date that the Auction is declared closed by Seller, Seller will not, and will not permit its Affiliates or its or their respective officers, directors, agents or representatives to, directly or indirectly, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction (including a Back-Up Plan) or (ii) enter into or seek to enter into any agreement with respect to, make any Filings in furtherance of, or negotiate in any respect, a Competing Transaction. For the avoidance of doubt, the Debtors will not pursue or agree to any Competing Transaction or Back-Up Plan other than as expressly permitted by and in accordance with the Bidding Procedures.

10.2.    <u>Break-Up Fee and Expense Reimbursement</u>.

(a)    The obligations to pay (i) the Break-Up Fee and the Expense Reimbursement as provided herein and (ii) any amounts payable pursuant to <u>Article 9</u>, in each case, will be entitled to superpriority administrative expense status pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, senior to all other administrative expense claims in the Bankruptcy Cases.

(b)    Each Party agrees and acknowledges that Purchaser's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal and other resources by Purchaser and its Affiliates, and that such due diligence, efforts, negotiation and execution have provided value to the Debtors and their respective Affiliates.  The provision of the Break-Up Fee and Expense Reimbursement is an integral part of this Agreement, without which Purchaser would not have entered into this Agreement.

10.3.    <u>Bankruptcy Court Filings</u>.  (a)  Within one Business Day of the date hereof, the Debtors will File a motion seeking the entry of the First Day Order and the Bidding Procedures Motion in the Bankruptcy Cases. In addition to the

foregoing, the Debtors will File prior to 6:45 a.m. local time in New York City, New York on the date hereof, a copy of the Support Stipulation executed by the Debtors, the Purchaser, the official committee of unsecured creditors, Aurelius Capital Management, LP and Capital Research and Management Company.

(b)    Each of the Debtors and Seller Parent will use its best efforts to seek to obtain entry of (i) the First Day Order within 15 days of the date hereof, (ii) Bidding Procedures Order within 22 days of the date hereof, and (iii) the Sale Order within 56 days of the date hereof, and to cause such order to become a Final Order not later than 70 days from the date hereof.

(c)    Purchaser agrees that it will use commercially reasonable efforts to take such actions as are reasonably requested by the Debtors to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for Filing for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order is appealed, Purchaser will use its reasonable best efforts to defend such appeal.

(d)    The Debtors will give timely notice of all motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby (i) as ordered by the Bankruptcy Court, (ii) to all Persons entitled to such notice, including all Persons that have asserted or, to the Knowledge of Seller, may hold Encumbrances or Liabilities in Company Parent, the Company Parent Interests or the Shares and all Governmental Authorities in jurisdictions applicable to Seller, in each case as required by the Bankruptcy Rules, or (iii) as Purchaser may reasonably request.

(e)    After entry of the Sale Order, to the extent Purchaser is the Successful Bidder at the Auction or if, in accordance with the Bidding Procedures Order, no Auction is held, none of the Debtors or Company Parent will take, and each will ensure that none of their respective Affiliates take, any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, vacation, modification in any manner or staying of the Sale Order.

(f)    The Debtors and their affiliated debtors and debtors-in-possession will be responsible for making all appropriate Filings relating to the transactions contemplated hereby, which Filings will be submitted to Purchaser prior to their Filing for Purchaser's prior review and comment, which comments will be considered in good faith by the Debtors to the extent consistent with the transactions contemplated hereby.

(g)    The Debtors will and will cause their affiliated debtors and debtors-in-possession to timely consult in good faith with Purchaser regarding pleadings it or its Affiliates intend to File in connection with, or which might

reasonably affect (i) the consummation of the transactions contemplated hereby, including the timing of consummation or (ii) the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order.

(h)    After the entry of the Sale Order and in connection with the Closing, the Debtors will cause Company Parent to pay in full all fees of the U.S. Trustee and File the Notice of Dismissal and all required reports with the Bankruptcy Court in order to effectuate the consummation of the transactions contemplated hereby.

(i)    The Debtors will not pursue approval of the Existing Plan Documents in the form currently on file with the Bankruptcy Court, and will announce to the Bankruptcy Court no later than the hearing on approval of the Bidding Procedures Order whether the Debtors intend to promptly withdraw, or to amend, replace or supersede the Existing Plan Documents to account for the transactions contemplated by this Agreement.

## 11. TAX MATTERS

11.1.    <u>Tax Return Preparation</u>.  (a)  <u>Pre-Closing Tax Returns</u>.  Seller will prepare and file, or cause to be prepared and filed, all Tax Returns in respect of any of the Entities relating to Pre-Closing Periods that are due after the Closing Date (including Tax Returns required to be filed by or with respect to any of the Entities on a combined or unitary basis with Seller or any Affiliate thereof) ("<u>Seller Returns</u>").  Seller will furnish Purchaser any Seller Return due after the Closing for Purchaser's review and comment at least 30 Business Days prior to the due date any such Seller Return is filed (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return), and Purchaser will provide Seller with Purchaser's written comments no later than 15 Business Days (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return) before the due date of any such Seller Return.  Seller will consider in good faith any revisions to the Seller Returns that are timely and reasonably requested by Purchaser in respect of any such Tax Return.  Seller and Purchaser agree to consult and promptly resolve in good faith any issue arising as a result of Purchaser's review of such Seller Returns.  Seller will pay or cause to be paid to the relevant Governmental Authority all amounts required to be paid in respect of such Tax Returns as determined pursuant to this <u>Section 11.1(a)</u>, to the extent not already taken into account in determining the Final Purchase Price or attributable to a Purchaser Tax Act.

(b)    <u>All Other Tax Returns</u>.  Purchaser will prepare and file, or cause to be prepared and filed, all Tax Returns other than those described in <u>Section 11.1(a)</u> above required to be filed by or on behalf of or in respect of any of the Entities, including Tax Returns for a Straddle Period ("<u>Purchaser Returns</u>").  Purchaser will furnish Seller any Purchaser Return for which Seller could be

liable under this Article 11 for Seller's review and comment at least 30 Business Days prior to the due date of any such Purchaser Return (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return), and Seller will provide Purchaser with Seller's written comments no later than 15 Business Days (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return) before the due date of any such Purchaser Return. Purchaser will consider in good faith any revisions to the Purchaser Returns that are timely and reasonably requested by Seller.  Seller and Purchaser agree to consult and resolve promptly in good faith any issue arising as a result of Seller's review of such Purchaser Returns.  Purchaser will pay or cause to be paid to the relevant Governmental Authority all amounts required to be paid in respect of such Purchaser Returns, as determined pursuant to this Section 11.1(b).  Within 10 Business Days after determining the amount of Tax for which Seller is responsible pursuant to this Agreement in respect of any Pre-Closing Period (including the pre-Closing portion of any Straddle Period), Seller will pay such amount to Purchaser (or, at the direction of Purchaser, the Company or another Affiliate of Purchaser), to the extent not already taken into account in determining the Final Purchase Price or attributable to a Purchaser Tax Act.

  11.2. <u>Assistance and Cooperation</u>.  After the Closing, each of Purchaser and Seller will (and cause their respective Affiliates to):

    (a) assist the other party in preparing and filing any Tax Returns which such other party is responsible for preparing and filing in accordance with this <u>Article 11</u>;

    (b) reasonably cooperate with the other party in preparing for any audits of, or disputes with Governmental Authorities regarding, any Tax Returns which such other party is responsible for preparing and filing in accordance with this <u>Article 11</u>;

    (c) make available to the other party and to any Governmental Authority as reasonably requested all information, records and documents relating to Taxes of the Entities;

    (d) provide timely notice to the other Party in writing of any pending or threatened Tax audits or assessments of the Entities for taxable periods for which the other Party may have a Liability under this <u>Article 11</u>;

    (e) furnish the other Party with copies of all correspondence received from any Governmental Authority in connection with any Tax audit or information request with respect to any taxable period for which the other Party may have a Liability under this <u>Article 11</u>; and

    (f) timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce),

or file Tax Returns or other reports with respect to, Taxes resulting from the transactions contemplated by this Agreement, and timely provide the other party with powers of attorney or similar authorizations necessary to carry out the purposes of this Article 11.

11.3.    Certain Tax Agreements.  Effective as of the Closing, all Tax indemnification, Tax allocation and Tax sharing agreements to which any of the Entities is a party will be terminated and, after the Closing, none of the Entities will have any further obligations under any such Tax indemnification, Tax allocation or Tax sharing agreement, other than any such Agreement solely between or among the Entities.

11.4.    Tax Indemnification.

(a)    Except to the extent attributable to a Purchaser Tax Act, Seller will be responsible for, and will indemnify and hold harmless Purchaser and its Affiliates for, without duplication, all Taxes and Damages relating to (i) any Taxes imposed on the Entities that are attributable to any Pre-Closing Period and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date; (ii) any breach of any representation or warranty contained in Section 5.10, or of any covenant contained in Section 7.2(b)(S) or this Article 11; (iii) Seller's share of any Transfer Taxes pursuant to Section 11.11; (iv) Taxes of Purchaser and its Affiliates that would not have arisen had Purchaser acquired the Company Shares directly (instead of through the acquisition of the Company Parent Interests);(v) the Uruguay Subsidiary or the Uruguay Divestiture; and (vi) any *impuesto al valor agregado* ("VAT") liability that arises as a result of the netting of Intercompany Obligations under Section 3.5 and is not offset or credited against VAT favorable balances attributable to such netting.

(b)    Notwithstanding anything to the contrary in this Agreement, the Parties agree and acknowledge that, for any amounts finally determined to be payable by Seller under this Article 11, such amounts will be paid solely from funds then available in the Escrow Account only to the extent Purchaser elects at any time, by written notice to Seller, to have such amounts paid from the Escrow Account and Seller will be obligated to pay any such amounts not so paid from the Escrow Account.

(c)    Any payment made pursuant to this Section 11.4 will be treated as an adjustment to the price for which the Company Parent Interests are purchased by the Purchaser for all Tax purposes unless otherwise required by applicable Law.

(d)    Seller will not have any liability to indemnify Purchaser in respect of any Tax under this Article 11 to the extent that (i) such Tax is reduced or eliminated through the utilization of net operating losses of one or more of the Entities attributable to a Pre-Closing Period (including the pre-Closing portion of

a Straddle Period) (such net operating losses, the "Pre-Closing NOLs"); (ii) such Tax is offset or credited against VAT favorable balances of one or more of the Entities attributable to a Pre-Closing Period (including the pre-Closing portion of a Straddle Period) (such balances, the "Pre-Closing VAT Favorable Balances"); provided, however, that any reduction in Seller's indemnification obligation pursuant to this clause (ii) will not exceed the net Pre-Closing VAT Favorable Balances of the Entities, taken as a whole.  After the Closing Date, Purchaser will use and will cause its Affiliates to use commercially reasonable efforts to utilize first any Pre-Closing NOLs or Pre-Closing VAT Favorable Balances to reduce Taxes otherwise indemnifiable under this Article 11 before utilizing any other available tax attributes and benefits, including other net operating losses and any other deductions; provided, however, for the avoidance of doubt, a restructuring of the Entities, Purchaser or its Mexican Affiliates will not be commercially reasonable for this purpose.

        11.5.   Indemnification Procedures and Contest Provisions.  (a)  If a written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a "Tax Claim") is delivered or sent to or commenced or initiated against any of the Entities by any Governmental Authority with respect to Taxes or Tax Returns of any of the Entities for which Purchaser or its Affiliates may reasonably be entitled to indemnification pursuant to Section 11.4 above, Purchaser or its Affiliates will promptly notify Seller in writing of the Tax Claim; provided, however, that the failure to timely give such notice will not limit and reduce Purchaser's right to indemnification hereunder except to the extent that the Indemnifying Party is prejudiced thereby.

        (b)     With respect to Tax Claims of or relating solely to Taxes of the Entities for any Pre-Closing Period for which Seller may be liable under Section 11.4, Seller may, upon written notice to Purchaser, assume and control the defense of such Tax Claim at its own cost and expense and with its own counsel.  Purchaser may retain separate co-counsel at its sole cost and expense and participate in the defense of the Tax Claim (including participation in any relevant meetings and conference calls).  Seller will not enter into any settlement with respect to any such Tax Claim without Purchaser's prior written consent, which will not be unreasonably delayed, conditioned or withheld, and Seller will keep Purchaser informed of all developments and events relating to all Tax Claims the defense of which is controlled by Seller (including promptly forwarding copies to Purchaser of any related correspondence).

        (c)     With respect to Tax Claims of or relating to Taxes of the Entities for any Straddle Period, Purchaser will control the contest of any such claims at its own cost and expense.  To the extent any such contest relates to Taxes for which Seller might be liable under this Article 11, Seller may retain separate co-counsel at its sole cost and expense and participate in the defense of the Tax Claim (including participation in any relevant meetings and conference calls).  Purchaser will not enter into any settlement with respect to any such Tax

Claim without Seller's prior written consent, which will not be unreasonably delayed, conditioned or withheld, and Purchaser will keep Seller informed of all developments and events relating to such Tax Claim (including promptly forwarding copies to Purchaser of any related correspondence).

(d)     With respect to Tax Claims of or relating solely to Taxes of the Entities for any Post-Closing Period, Purchaser will control the defense of such Tax Claim at its own cost and expense and with its own counsel.

(e)     Any payment required to be made pursuant to this Section 11.5 will be made by wire transfer of immediately available cash funds in Pesos within 30 Business Days after the indemnified party makes written demand upon the indemnifying party, but in no case earlier than ten Business Days prior to the date on which the relevant Taxes are required to be paid to the relevant Governmental Authority.  Any payment not timely made will accrue interest at the rate of 6.0% per annum, compounded quarterly.  Such interest will be increased such that after all applicable withholding taxes, Purchaser receives a net after-tax amount equal to the full amount of accrued interest.

11.6.   Allocation of Straddle Period Taxes.  For purposes of this Article 11, in order to apportion appropriately any Taxes relating to a Straddle Period, the parties will, to the extent permitted or required under any applicable Law, treat the Closing Date as the last day of the taxable year or period of the Company or relevant Subsidiary for all Tax purposes.  In any case where the applicable Law does not permit the Company or relevant Subsidiary to treat the Closing Date as the last day of the taxable year or period, the portion of any Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be:

(a)     in the case of Taxes that are imposed on a periodic basis, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period;

(b)     in the case of Taxes not described in clause (a) (such as Taxes that are either (i) based upon or related to income or receipts or (ii) imposed in connection with any sale or other transfer or assignment of property), deemed equal to the amount that would be payable if the taxable year or period ended on the Closing Date; and

(c)     for purposes of this Section 11.6, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated to the portion of the Straddle Period in the same manner as that set forth in Section 11.6(a).

11.7.  <u>Other Tax Matters</u>.  (a)  The indemnification provided for in this <u>Article 11</u> will be the sole remedy for any claim in respect of Taxes for which an indemnity is provided under this Agreement (including the representations with respect to Taxes set forth in <u>Section 5.10</u>), and the provisions of <u>Article 9</u> will not apply to such claims.

(b)    The covenants and indemnity in this Article 11 will survive until 60 days after the expiration of the relevant statute of limitations.

11.8.  <u>Tax Refunds</u>.  Purchaser will pay to Seller any refunds of Taxes (or reductions in Tax liability), including interest paid therewith, of the Entities that result from the receipt of such refund that relate to any Pre-Closing Period (including the pre-Closing portion of any Straddle Period), other than any refunds that are attributable to any carryback of net operating losses, capital losses or other similar Tax items relating solely to a Post-Closing Period.  For purposes of this Section 11.8, the term "refunds of Taxes" means the Entity's actual receipt of any refund, reimbursement or similar Tax item from any Person after the Closing to the extent such refund, reimbursement or similar Tax item is attributable to any Pre-Closing Period (including the pre-Closing portion of any Straddle Period), other than any refund taken into account in determining the Final Purchase Price and excludes any net tax profit account (cuenta de utilidad fiscal neta or "CUFIN"), capital contribution account (cuenta de capital de aportación or "CUCA"), recoverable asset tax and foreign tax credit and income tax credit from dividends distributed in excess of CUFIN.  Purchaser will make payment of any such refund described in this Section 11.8, net of any reasonable costs incurred by or on behalf of Purchaser in obtaining such refund, to Seller within ten Business Days of the actual receipt of such refund.  Any refunds of Taxes paid to Seller pursuant to this Section 11.8 will be treated as an adjustment to the Final Purchase Price.

11.9.  <u>Amendment of Tax Returns</u>.  Except as required in order to comply with applicable Law or pursuant to the resolution of a Tax-related Legal Proceeding, neither Purchaser nor any of its Affiliates may amend, file, refile, revoke or otherwise modify any Tax Return or Tax election of any Entity with respect to a Pre-Closing Period (including the pre-Closing portion of any Straddle Period), without the prior written consent of Seller, which consent will not be unreasonably withheld, conditioned or delayed.

11.10. <u>Certain Tax Elections</u>.  In connection with the transactions contemplated by this Agreement, Purchaser may timely make or cause to be timely made elections pursuant to Section 338(g) of the Code with respect to each Entity that, as of the Closing Date, is treated as a corporation for U.S. federal income tax purposes; provided, however, that Purchaser will provide to Seller written notice of Purchaser's decision to make or not make such elections  no later than the earlier of (i) 30 calendar days prior to Purchaser's making such election or elections, as the case may be, and (ii) 30 calendar days

prior to the last date upon which such election or elections, as the case may be, may be timely made.

11.11. <u>Transfer Taxes</u>.  Any Transfer Taxes imposed as a result of the transactions contemplated by this Agreement will be borne 50% by Purchaser and 50% by Seller.  The Party so required by applicable Law will file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by the applicable Law, the other Party will, and will cause its Affiliates to join in the execution of any such Tax Returns and other documentation.  If a Party is required under <u>Section 11.4</u> to indemnify the other Party in respect of any Transfer Taxes, the amount of the indemnification will be an amount equal to the amount by which the other Party has paid or is obligated to pay exceeds 50% of the total amount of such Transfer Taxes.

11.12. <u>Company Parent</u>.  For purposes of this <u>Article 11</u>, "Entities" or "Entity" includes Company Parent.

## 12. MISCELLANEOUS

12.1.    <u>Expenses</u>.  Except as otherwise provided in this Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses (including any finder's or investment banker's fees and attorneys' and accountants' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring the expense.  All such costs and expenses payable by any Entity will be paid and satisfied in full by Seller prior to the Closing.

12.2.    <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party will be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants contained in this Agreement. Subject to <u>Section 4.6(c)</u>, the rights set forth in this <u>Section 12.2</u> will be in addition to any other rights that a Party may have at law or in equity.

12.3.    <u>Submission to Jurisdiction</u>.  Without limiting a Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as indicated in <u>Section 12.7</u> hereof, provided, however, that

following entry of a final decree pursuant to Section 350 of the Bankruptcy Code, if the Bankruptcy Court is unwilling to hear such proceedings, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court thereof, for the resolution of any such claim or dispute and each Party hereby waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same or any other jurisdiction that could apply by virtue of their present or future domiciles or for any other reason.  Each Party irrevocably designates CT Corporation as its agent and attorney-in-fact for the acceptance of service of process and making an appearance on its behalf in any such claim or proceeding and for the taking of all such acts as may be necessary or appropriate in order to confer jurisdiction over it before the courts specified in this <u>Section 12.3</u> and each Party stipulates that such consent and appointment is irrevocable and coupled with an interest. The Parties irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. On the date hereof, Seller will cause the Company to deliver to Purchaser an irrevocable special power of attorney in favor of the Process Agent in the form of <u>Exhibit G</u> for lawsuits and collections duly executed and delivered by the Company in the presence of a Mexican Notary Public (the "<u>Special Power of Attorney</u>").

12.4.   <u>Waiver of Jury Trial</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 12.4</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.5.   <u>Entire Agreement; Amendments and Waivers</u>.  (a)  This Agreement (including the Schedules and Exhibits to this Agreement), the Escrow Agreement, the Non-Disclosure Agreement and the Transition Services Agreement represent the entire understanding and agreement between the Parties with respect to the subject matter of this Agreement.

(b)    This Agreement may be amended, supplemented or changed, and any provision of this Agreement may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(c)    No action taken pursuant to this Agreement, including any investigation by or on behalf of a Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.6.    <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the Laws of the State of New York.

12.7.    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given or delivered (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or email, or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, Seller Parent or any Seller Guarantor, to:

NIU Holdings LLC
c/o NII Holdings, Inc.
1875 Explorer Street,
Reston, VA 20191
Attention:  Gary D. Begeman, General Counsel
Fax:        703-390-5191
Email:      Gary.Begeman@nii.com

With a copy (which will not constitute notice) to:

Jones Day
222 East 41st Street
New York, New York 10017
Attention:  Robert A. Profusek
Fax:          212-755-7306
Email:        raprofusek@jonesday.com


If to Purchaser, to:

AT&T Inc.
One AT&T Plaza
208 South Akard Street, Suite 3702
Dallas, Texas 75202
Attention:  D. Wayne Watts
Fax.:         (214) 746-2103
Email:        wayne.watts@att.com


With a copy (which will not constitute notice) to:

Sullivan & Cromwell LLP
125 Broad Street
New York, New York  10004
Attention:  Sergio J. Galvis
               Werner F. Ahlers
Fax.:         (212) 558-3588
Email:        galviss@sullcrom.com
               ahlersw@sullcrom.com

12.8.   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.9.   <u>Binding Effect; Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations

hereunder may be made by any Party, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Party and any attempted assignment without the required consents will be void, provided, however, that (a) the Debtors may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including one or more reorganized Debtors) pursuant to a plan of reorganization confirmed by the Bankruptcy Court, provided that any such entity must provide to Purchaser evidence of adequate assurance of future performance as if this Agreement was being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code and (b) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its Affiliates. No assignment will relieve the assigning Party of any obligation. Upon any permitted assignment, the references in this Agreement to the assigning Party will also apply to any such assignee unless the context otherwise requires. In addition to the foregoing, any entity that constitutes a Debtor Successor (as defined in clause (x) of paragraph 49 of the Sale Order attached hereto), must (x) assume all of the Debtors' obligations hereunder (and the other Transaction Documents) and (y) prior to the consummation of such transactions and assumption, provide to Purchaser evidence of adequate assurance of future performance as if this Agreement was being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code. Any such assumption will not relieve the Debtors of their respective obligations under this Agreement or the other Transaction Documents.

12.10. <u>Non-Recourse</u>.  Except pursuant to an assignment contemplated by <u>Section 12.9</u> or pursuant to <u>Section 12.13</u>, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of a Party will have any liability for any obligations or liabilities of such Party under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

12.11. <u>Legal Representation</u>.  (a)  Purchaser agrees that, as to all communications prior to the Closing between Jones Day, on the one hand, and Seller, NII Holdings, the Entities or any of their respective Affiliates, on the other hand, to the extent that they are in respect of to the transactions contemplated by this Agreement (collectively, the "<u>Privileged Communications</u>"), the attorney-client privilege and the expectation of client confidence with respect to the Privileged Communications belongs to Seller and/or NII Holdings and may be controlled by Seller and/or NII Holdings and will not pass to or be claimed by Purchaser or any of its Affiliates (including, after the Closing, the Entities).  The Privileged Communications are the property of Seller and/or NII Holdings, and, from and after the Closing, none of Purchaser or its Affiliates (including the Entities), or any Person purporting to act on behalf of or through Purchaser or its Affiliates (including the Entities) will have the right to obtain such communications, whether by waiver of the attorney-client privilege or through other means.  The Privileged Communications may be used by Seller, NII Holdings or any of their respective Affiliates in connection with any dispute that

relates to the transactions contemplated by this Agreement, including in any claim brought by Purchaser.  Notwithstanding the foregoing, in the event that a dispute arises after the Closing between Purchaser or its Affiliates (including the Entities) and a third party (other than a Party to this Agreement or any of their respective Affiliates), Purchaser or its Affiliates (including the Entities) may assert the attorney-client privilege to prevent disclosure of confidential communications by counsel to such third party, provided, however, that none of Purchaser or its Affiliates (including the Entities) may waive such privilege without the prior written consent of Seller (not to be unreasonably withheld, conditioned or delayed).

(b)    The Parties agree that Purchaser will not, and will cause any Affiliates (including, after Closing, the Entities) not to, seek to have Jones Day disqualified from representing Seller or its Affiliates in connection with any dispute that may arise between Seller or its Affiliates and any of Purchaser or any of its Affiliates (including, after Closing, the Entities) in connection with this Agreement or the transactions contemplated by this Agreement.

12.12. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

12.13. <u>Seller Guarantors</u>.  (a)  The Seller Guarantors hereby absolutely, unconditionally and irrevocably guarantee, jointly and severally, on behalf of themselves and on behalf of all of their Affiliates that are direct or indirect legal, record or beneficial owners of any equity interests in Seller, to Purchaser the full, complete and timely payment and performance, subject to the terms and conditions hereof, by Seller and Seller Parent of each and every payment and performance obligation of Seller or Seller Parent in this Agreement, without any set off, restriction, condition or deduction for or on account of any counterclaim. If Seller or Seller Parent defaults for any reason whatsoever on any such payment obligation or fails to perform such performance obligation when and to the extent that any of the same will become due and payable, then the Seller Guarantors will unconditionally pay or cause to be paid such payment obligation or perform or cause to be performed such performance obligation immediately upon notice from Purchaser specifying the default so that the same benefits will be conferred on Purchaser as would have been received if such payment or performance obligations had been duly performed and satisfied by Seller or Seller Parent.  Purchaser will not be required to demand payment or performance from, or initiate Legal Proceedings against, Seller, Seller Parent or any other Person prior to or contemporaneously with proceeding against the Seller Guarantors or demand payment therefrom or performance thereby more than once.  Subject to the terms and conditions hereof, the Seller Guarantors waive (i) any and all legal and equitable defenses available to a guarantor (other than payment in full by Seller or Seller Parent) and (ii) promptness, diligence, presentment, protest, order and any notices hereunder, including any notice of any amendment of this Agreement or waiver or other similar action granted

pursuant to this Agreement and any notice of acceptance.  The guarantee set forth in this Section 12.13(a) will be deemed a continuing guarantee and will remain in full force and effect until the satisfaction in full of all payment and performance obligations of Seller and Seller Parent under this Agreement, notwithstanding the winding-up, liquidation, dissolution, merger or other incapacity or other restructuring of Seller or Seller Parent or any change in the status, control or ownership of Seller or Seller Parent.  The guarantee set forth in this Section 12.13(a) is a primary guarantee of payment and not just of collection.

(b)     Each Seller Guarantor agrees, on behalf of itself and on behalf of all of its Affiliates that are direct or indirect legal, record or beneficial owners of any equity interests in Seller, that any performance or payment obligations expressed to be undertaken by Seller or Seller Parent that may not be enforceable against or recoverable from Seller or Seller Parent by reason of any legal disability or incapacity on or of Seller or Seller Parent or any fact or circumstance (other than any limitation imposed hereunder) will nevertheless be enforceable against and recoverable from such Seller Guarantor as though the same had been incurred by such Seller Guarantor and such Seller Guarantor were the sole or principal obligor in respect thereof and will be performed or paid or caused to be performed or paid by such Seller Guarantor on demand.

(c)     The obligations of the Seller Guarantors under this Section 12.13 are intended to be, and the Sale Order will specifically provide that they will be, binding upon (i) any successors or assigns of a Seller Guarantor, (ii) any trustee, examiner, or other representative of a Seller Guarantor's estate, (iii) any reorganized Seller Guarantor, and (iv) any entity that constitutes a Debtor Successor (as defined in clause (x) of paragraph 49 of the Sale Order attached hereto) (each of (i) through (iv), a "Guarantor Successor") as if such Guarantor Successor were a Seller Guarantor hereunder.

(d)     The obligations of the Seller Guarantors under this Section 12.13, will be entitled to superpriority administrative expense status pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, senior to all other administrative expense claims, in the Bankruptcy Cases, including any superpriority administrative expense claims that may be sought in the Bankruptcy Cases.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its officers thereunto duly authorized, as of the date first written above.

**NEW CINGULAR WIRELESS SERVICES, INC.**

By: _____

    Name:  Rick L. Moore
    Title:Senior Vice President-Corporate
          Development

*[Signature Page to SPA]*

**NIU HOLDINGS LLC**

By: *Shana C. Smith*
        Name: Shana C. Smith
        Title: Manager


**NIHD TELECOM HOLDINGS B.V.**

By: *Shana C. Smith*
        Name: Shana C. Smith
        Title: Managing Director


**NEXTEL INTERNATIONAL
(URUGUAY) LLC**

By: *Shana C. Smith*
        Name: Shana C. Smith
        Title: Manager


**COMUNICACIONES NEXTEL DE
MÉXICO SA. DE C.V., as Seller
Guarantor**

By: _____
        Name: Antonio Garza Canovas
        Title: Vice President and General
        Counsel


*[Signature Page to Purchase and Sale Agreement]*

**NIU HOLDINGS LLC**

By: ______________________________
Name: Shana C. Smith
Title: Manager

**NIHD TELECOM HOLDINGS B.V.**

By: ______________________________
Name: Shana C. Smith
Title: Managing Director

**NEXTEL INTERNATIONAL (URUGUAY) LLC**

By: ______________________________
Name: Shana C. Smith
Title: Manager

**COMUNICACIONES NEXTEL DE MÉXICO SA. DE C.V., as Seller Guarantor**

By: ______________________________
Name: Antonio Garza Canovas
Title: Vice President and General Counsel

**NII INTERNATIONAL TELECOM
S.C.A., as Seller Guarantor**

**Represented by its Sole Manager
NII International Holdings S.á. r.l.**

By: *Shana C. Smith*
　　Name: Shana C. Smith
　　Title: Class B Manager

**NII INTERNATIONAL HOLDINGS
S.À.R.L., as Seller Guarantor**

By: *Shana C. Smith*
　　Name: Shana C. Smith
　　Title: Class B Manager

**NII GLOBAL HOLDINGS, INC., as
Seller Guarantor**

By: *Gary D. Begeman*
　　Name: Gary D. Begeman
　　Title: Vice President and Secretary

**NII CAPITAL CORP., as Seller
Guarantor**

By: *Gary D. Begeman*
　　Name: Gary D. Begeman
　　Title: Vice President and Secretary

*[Signature Page to Purchase and Sale Agreement]*

**NII HOLDINGS, INC., as Seller
Guarantor**

By: _____
     Name: Gary D. Begeman
     Title: Executive Vice President and
     General Counsel

# EXHIBIT 2

**PURCHASE AND SALE AGREEMENT**

**AMONG**

**NEW CINGULAR WIRELESS SERVICES, INC.,**

**NEXTEL INTERNATIONAL (URUGUAY) LLC,**

**NIHD TELECOM HOLDINGS B.V.,**

**NIU HOLDINGS LLC,**

**AND**

**COMUNICACIONES NEXTEL DE MÉXICO S.A. DE C.V.,**

**NII INTERNATIONAL TELECOM S.C.A.**

**NII INTERNATIONAL HOLDINGS S.Á R.L.**

**NII GLOBAL HOLDINGS, INC.**

**NII CAPITAL CORP.,**

**AND**

**NII HOLDINGS, INC.,**


**Dated January 26, 2015**

# TABLE OF CONTENTS

1. DEFINITIONS ...................................................................................2

    1.1.    Definitions........................................................................2

    1.2.    Construction Rules and Interpretative Matters ..............22

2. PURCHASE AND SALE ...................................................................23

    2.1.    Implementation Transactions ........................................23

    2.2.    Purchase and Sale of Company Parent Interests and Company Shares........................................................23

3. CONSIDERATION ...........................................................................23

    3.1.    Consideration .................................................................23

    3.2.    Purchase Price Deposit ..................................................23

    3.3.    Payment of Consideration at Closing ...........................24

    3.4.    Closing Date Purchase Price Adjustment.....................24

    3.5.    Intercompany Obligations ..............................................26

4. CLOSING AND TERMINATION........................................................27

    4.1.    Closing Date ...................................................................27

    4.2.    Closing Deliveries by Seller ...........................................27

    4.3.    Closing Deliveries by Purchaser ...................................29

    4.4.    Termination of Agreement ..............................................29

    4.5.    Procedure for Termination ..............................................31

    4.6.    Effect of Termination ......................................................31

5. REPRESENTATIONS AND WARRANTIES OF SELLER..................33

    5.1.    Organization of Seller ....................................................33

    5.2.    Authorization of Agreement ...........................................34

    5.3.    Conflicts; Consents of Third Parties ..............................34

    5.4.    Organization of the Entities ...........................................35

    5.5.    Capitalization of the Entities ..........................................35

    5.6.    Subsidiaries ....................................................................36

    5.7.    Title to Shares ................................................................36

    5.8.    Financial Statements ......................................................36

    5.9.    Undisclosed Liabilities ....................................................37

    5.10.    Taxes..............................................................................37

    5.11.    Real Property .................................................................39

**TABLE OF CONTENTS**
(continued)

5.12. Intellectual Property ........................................................................ 40

5.13. Material Contracts ........................................................................... 41

5.14. Labor .............................................................................................. 43

5.15. Litigation ......................................................................................... 44

5.16. Compliance with Laws; Permits ..................................................... 45

5.17. Environmental Matters .................................................................... 47

5.18. Broker's or Finder's Fee ................................................................. 48

5.19. Insurance ........................................................................................ 48

5.20. Sufficiency of Assets ...................................................................... 48

5.21. Subscribers; Transmission Towers; Network Assets ..................... 48

5.22. Certain Conduct; Sanctions ........................................................... 49

5.23. Absence of Certain Changes .......................................................... 50

5.24. Related Party Contracts .................................................................. 50

5.25. Employee Benefits .......................................................................... 50

5.26. Company Parent .............................................................................. 52

5.27. No Other Representations or Warranties ........................................ 52

6. REPRESENTATIONS AND WARRANTIES OF PURCHASER ..................... 53

6.1. Organization .................................................................................... 53

6.2. Authorization of Agreement ............................................................ 53

6.3. Conflicts; Consents of Third Parties ............................................... 53

6.4. Litigation ......................................................................................... 54

6.5. Broker's or Finder's Fee ................................................................. 54

6.6. Financial Capability ........................................................................ 54

6.7. Investigation ................................................................................... 54

6.8. No Other Representations or Warranties ........................................ 54

7. COVENANTS ............................................................................................... 55

7.1. Access to Information ...................................................................... 55

7.2. Conduct of the Business Pending the Closing ............................... 56

7.3. Third Party Consents ...................................................................... 60

7.4. Governmental Approvals ................................................................ 60

7.5. Regulatory Compliance ................................................................. 62

7.6. Further Assurances ..................................................................... 62

7.7. Publicity ...................................................................................... 63

7.8. Certain Agreements ..................................................................... 63

7.9. Preservation of Records .............................................................. 64

7.10. Confidentiality ............................................................................. 64

7.11. Trademark License Agreement .................................................... 65

7.12. Certain Employees ...................................................................... 65

7.13. Financing Cooperation ................................................................ 66

7.14. Seller Disclosure Schedule ......................................................... 66

7.15. Extension Financing .................................................................... 66

7.16. Transition Services ...................................................................... 67

8. CONDITIONS TO CLOSING ................................................................. 67

8.1. Conditions Precedent to Obligations of Purchaser ...................... 67

8.2. Conditions Precedent to Obligations of Seller ............................. 70

8.3. Conditions Precedent to Obligations of Purchaser and Seller ...... 71

8.4. Frustration of Closing Conditions ................................................. 71

9. INDEMNIFICATION ............................................................................... 71

9.1. Survival ........................................................................................ 71

9.2. Indemnification by Seller .............................................................. 72

9.3. Indemnification by Purchaser ....................................................... 73

9.4. Indemnification Procedures .......................................................... 73

9.5. Limitations on Indemnification ...................................................... 75

9.6. Indemnity Payments .................................................................... 76

9.7. Exclusivity of Indemnity ............................................................... 78

9.8. Tax Indemnification ...................................................................... 78

9.9. Successors ................................................................................... 78

10. BANKRUPTCY COURT MATTERS........................................................ 78

10.1. Competing Transaction ................................................................ 78

10.2. Break-Up Fee and Expense Reimbursement ............................... 79

10.3. Bankruptcy Court Filings ...................................................................... 79

11. TAX MATTERS .................................................................................... 81

11.1. Tax Return Preparation .................................................................. 81

11.2. Assistance and Cooperation ........................................................... 82

11.3. Certain Tax Agreements ................................................................ 83

11.4. Tax Indemnification ...................................................................... 83

11.5. Indemnification Procedures and Contest Provisions .................... 84

11.6. Allocation of Straddle Period Taxes ............................................. 85

11.7. Other Tax Matters ........................................................................ 86

11.8. Tax Refunds ................................................................................. 86

11.9. Amendment of Tax Returns .......................................................... 86

11.10. Certain Tax Elections .................................................................. 86

11.11. Transfer Taxes ............................................................................ 87

11.12. Company Parent .......................................................................... 87

12. MISCELLANEOUS ............................................................................. 87

12.1. Expenses ...................................................................................... 87

12.2. Injunctive Relief .......................................................................... 87

12.3. Submission to Jurisdiction ........................................................... 87

12.4. Waiver of Jury Trial ..................................................................... 88

12.5. Entire Agreement; Amendments and Waivers .............................. 88

12.6. Governing Law ............................................................................. 89

12.7. Notices ......................................................................................... 89

12.8. Severability .................................................................................. 90

12.9. Binding Effect; Assignment ......................................................... 90

12.10. Non-Recourse ............................................................................. 91

12.11. Legal Representation ................................................................... 91

12.12. Counterparts ............................................................................... 92

12.13. Seller Guarantors ........................................................................ 92

# TABLE OF CONTENTS
(continued)

Exhibits

Exhibit A: Form of Bidding Procedures
Exhibit B: Form of Bidding Procedures Order
Exhibit C: Form of Sale Order
Exhibit D: Form of Transition Services Agreement
Exhibit E: Form of Amendment to Trademark Sublicense Agreement
Exhibit F: Form of Instrument of Assignment
Exhibit G: Special Power of Attorney


Schedules

Schedule 1.1(a): 2015 Budget
Schedule 1.1(b): Certain Letters of Credit
Schedule 1.1(c): License Payment Amounts
Schedule 1.1(d): List of Persons of Purchaser
Schedule 1.1(e): List of Persons of Seller
Schedule 1.1(f): Third Party Consents
Schedule 1.1(g): Excluded Acquirers
Schedule 7.2(b)(F): Related Party Contracts
Schedule 7.8: Certain Contracts Terminated or Amended
Schedule 7.12(b): Terminated Plan
Schedule 8.1(k): Required Consents

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>"), dated January 26, 2015, is among New Cingular Wireless Services, Inc., a corporation existing under the Laws of Delaware ("<u>Purchaser</u>"), NIHD TELECOM HOLDINGS B.V., a private company with limited liability existing under the Laws of the Netherlands ("<u>Seller Parent</u>"), NIU HOLDINGS LLC, a limited liability company existing under the Laws of Delaware ("<u>Seller</u>"), Nextel International (Uruguay) LLC, a limited liability company existing under the Laws of Delaware ("<u>Company Parent</u>") and the Seller Guarantors identified as such on the signature page (the "<u>Seller Guarantors</u>").

## PRELIMINARY STATEMENTS

A.    Seller Parent is the legal and beneficial owner of all of the issued and outstanding limited liability company membership interests of Seller, an entity formed on January 22, 2015 for the purpose of consummating the transactions contemplated hereby and Seller Parent transferred 100% of the outstanding membership interests of Company Parent (the "<u>Company Parent Interests</u>") to Seller on January 24, 2015 (the "<u>Company Parent Transfer</u>").

B.    Company Parent is a debtor and debtor-in-possession under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") (collectively with the Seller Proceeding (as defined below) and the cases of Company Parent's other affiliated debtors and debtors-in-possession, the "<u>Bankruptcy Cases</u>").

C.    Company Parent owns 7,575,738,489 shares (*acciones*) (the "<u>Company Shares</u>") of the capital stock of Comunicaciones Nextel de México, S.A. de C.V. (the "<u>Company</u>").

D.    The remaining 3,595 shares (*acciones*) of the capital stock of the Company (the "<u>Minority Company Shares</u>" and together with the Company Shares, the "<u>Shares</u>") of the Company are owned by Servicios NII, S. de R.L. de C.V., a wholly owned Subsidiary of the Company (the "<u>Minority Shareholder</u>").

E.    Concurrently with the Parties' entry into this Agreement, the Parties and the Escrow Agent are entering into the Escrow Agreement pursuant to which the Escrow Agent will hold the Deposit Amount and, upon consummation of the transactions contemplated by this Agreement, the Escrow Amount.

F.    Purchaser desires to purchase, and Seller desires to sell, the Company Parent Interests free and clear of all 363 Interests in accordance with Sections 105 and 363 of the Bankruptcy Code on the terms set forth in this

Agreement, and Company Parent will be, and will own the Company Shares, free and clear of all 363 Interests.

G.     Upon consummation of the transactions contemplated by this Agreement, Purchaser will be vested with Seller's entire right, title and interest in and to the Company Parent Interests and, indirectly, all of the Shares, in each case, free and clear of all 363 Interests.

**AGREEMENT**

The Parties agree as follows:

**1. DEFINITIONS**

1.1.    Definitions.  For purposes of this Agreement, the following terms and variations on them have the meanings specified below:

"363 Interests" means interests, as such term is used in Section 363(f) of the Bankruptcy Code, and which includes all Encumbrances and Liabilities, whether direct or indirect, absolute, contingent, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, material or non-material, disputed or undisputed, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise, and whether arising prior to, on or after the commencement of the Bankruptcy Cases.

"2015 Budget" means the Dollar-denominated budget approved by Seller or its Affiliates for the year 2015 set forth on Schedule 1.1(a).

"2015 Budget Month" means (i) any calendar month (other than January) during the calendar year 2015 ending prior to the Closing Date and (ii) the part of a calendar month in which the Closing Date occurs that is prior to the Closing Date.

"2015 Budget Period" means (i) the calendar quarters during the calendar year 2015 ending prior to the Closing Date plus (ii) if applicable, the part of the calendar quarter in which the Closing Date occurs that is prior to the Closing Date.

"Adjustment Time" means 11:59 p.m. (local time in Mexico City, Mexico) on the Closing Date.

"Adverse Regulatory Condition" is defined in Section 7.4(b).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person, and the term "control"

(including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise, provided that, solely for purposes of clause (a) of the definition of Excluded Acquirer, the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of (a) (x) ownership, control or power to vote 50 percent or more of the outstanding shares or other equity securities of such Person or (y) beneficial ownership of 50 percent or more of the outstanding economic interests of such Person (b) control, in any manner (including by Contract together with other Persons), over the election of a majority of the directors, trustees or general partners (or individuals exercising similar functions) of such Person.

"<u>Aggregate Expenditure Adjustment Amount</u>" means the Dollar equivalent, as of the Adjustment Time, of the sum of (i) the amount, if any, by which (x) the amount the Entities are projected to spend in the aggregate during the 2015 Budget Period in the 2015 Budget on Qualifying Capital Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Capital Expenditures during the 2015 Budget Period and (ii) the amount, if any, by which (x) the amount the Entities are projected to spend in the aggregate during the 2015 Budget Period in the 2015 Budget on Qualifying Sales and Marketing Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Sales and Marketing Expenditures during the 2015 Budget Period. For purposes of determining the Aggregate Expenditure Adjustment Amount, amounts budgeted in the 2015 Budget to be spent in a calendar quarter that straddles the Closing Date will be prorated based on the number of days in that quarter preceding the Closing Date relative to the total number of days in that quarter.

"<u>Agreement</u>" means this Agreement, as it may be amended, modified or supplemented from time to time in accordance with the terms hereof.

"<u>Amendment to Trademark Sublicense Agreement</u>" means an Amendment to Trademark Sublicense Agreement in the form attached as <u>Exhibit E</u>.

"<u>Ancillary Agreements</u>" is defined in <u>Section 5.2</u>.

"<u>Auction</u>" is defined in the Bidding Procedures.

"<u>Audited Financial Statements</u>" is defined in <u>Section 5.8(a)</u>.

"<u>Back-Up Plan</u>" means confirmation of a chapter 11 plan resulting in (x) the reorganized debtors or their successors retaining the Business and their business in Brazil, in each case, substantially as existing as of the date hereof and (y) no Excluded Acquirer (A) becoming the "beneficial owners" (as defined in Rules 13(d)-3 and 13(d)-5 of the Exchange Act) of more than 25% of

(1) the capital stock or other economic interests of any Entity or reorganized debtor (other than any entity whose sole assets are the Debtors' businesses in Argentina substantially as existing as of the date hereof) or (2) all or substantially all of the Company's consolidated assets or (B) having the right, directly or indirectly, to acquire more than a 25% economic interest in any Entity or reorganized debtor (other than any entity whose sole assets are the Debtors' businesses in Argentina substantially as existing as of the date hereof) within 12 months of confirmation of such chapter 11 plan, in each case of (A) or (B) prior to or in connection with the consummation of any such chapter 11 plan.

"Balance Sheet Date" is defined in Section 5.8(a).

"Bankruptcy Cases" is defined in Preliminary Statement B.

"Bankruptcy Code" is defined in Preliminary Statement B.

"Bankruptcy Court" is defined in Preliminary Statement B.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Basket Amount" is defined in Section 9.5(a).

"Bidding Procedures" means the bidding procedures in the form of Exhibit A, subject only to such modifications that in Purchaser's reasonable good faith judgment are immaterial or ministerial in nature, but in no event (i) adverse to Purchaser without Purchaser's prior consent or (ii) inconsistent with the Bidding Procedures Order, the Sale Order or this Agreement.

"Bidding Procedures Motion" means a motion, in form and substance reasonably satisfactory to Purchaser, seeking approval of the Bidding Procedures Order and the Sale Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court in the form of Exhibit B, subject only to such modifications that in Purchaser's reasonable good faith judgment are immaterial or ministerial in nature, but in no event (i) adverse to Purchaser without Purchaser's prior consent or (ii) inconsistent with this Agreement.

"Break-Up Fee" means an amount of cash in Dollars equal to $32 million.

"Business" means the business of marketing, selling and providing wireless telecommunication services (including voice and data services), and all services ancillary thereto, in Mexico, in each case as currently conducted by the Entities.

"Business Day" means any day of the year that is not a Saturday, a Sunday or any other day on which commercial banks are authorized or required by law to be closed in New York City or Mexico City.

"Cap" is defined in Section 9.5(b).

"CDB" means the China Development Bank Corporation.

"CDB Credit Facilities" means the two $187,500,000 credit agreements, each dated as of July 12, 2011, as amended from time to time, among the Company, the guarantors thereunder and CDB as administrative agent and lender.

"Cell Site Standards" is defined in Section 5.16(e).

"CFC" means the Mexican Federal Antitrust Commission (*Comisión Federal de Competencia Económica*).

"Closing" is defined in Section 4.1.

"Closing Date" means the date on which the Closing occurs.

"Closing Statement" is defined in Section 3.4(b).

"Closing Statement Dispute Notice" is defined in Section 3.4(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"COFETEL" means the former Mexican Federal Telecommunications Commission (*Comisión Federal de Telecomunicaciones*).

"Company" is defined in Preliminary Statement C.

"Company Approvals" means the Regulatory Approval and the notice to the National Foreign Investment Commission (*Comisión Nacional de Inversiones Extranjeras*) pursuant to article 9 of the Mexican Foreign Investment Law (*Ley de Inversión Extranjera*).

"Company Parent" is defined in the Preamble.

"Company Parent Interests" is defined in Preliminary Statement A.

"Company Parent Transfer" is defined in Preliminary Statement A.

"Company Shares" is defined in Preliminary Statement C.

"Company Telecommunication Licenses" is defined in Section 5.16(c).

"Competing Transaction" means (i) a sale, joint venture or any other direct or indirect transfer of any Debtor, Seller Parent, Seller or the Company which contemplates, or would result in, any direct or indirect transfer of the Company Parent Interests or any of the Shares, or any transaction with such effect, (ii) any acquisition or purchase of all or any material portion of the Business or all or any portion of the capital stock of any Entity, or (iii) any plan of reorganization or liquidation that does not contemplate, or that would be reasonably expected to impede or delay the implementation or consummation of, the transactions provided for in this Agreement; provided, however, if this Agreement is validly terminated for any reason, except as expressly set forth herein, the following shall not constitute a Competing Transaction (x) consummation of a Back-Up Plan or (y) following consummation of a Back-Up Plan, the acquisition by any Person of the reorganized debtors' public equity securities in one or more public market securities transactions to which the reorganized debtors are not a party that do not result in any Excluded Acquirer becoming the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 of the Exchange Act) of more than 49% of any class of public equity securities of such reorganized debtors.

"Contract" means any legally binding contract, indenture, note, bond, lease, commitment or other agreement or arrangement.

"Controlled Group Liability" means any and all liabilities (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 and 4971 of the Code, and (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code.

"Corporate Records" means the original corporate books of each of the Entities and Company Parent, including the shareholders' (or equivalent) meetings minutes book (*libro de actas de asambleas*), stock (or equivalent) registry book (*libro de registro de acciones/partes sociales*), capital variations registry book (*libro de registro de variaciones de capital*) and the board of directors' (or equivalent) meetings minutes book (*libro de actas de sesiones del consejo de administración/gerentes*).

"Damages" is defined in Section 9.2.

"De Minimis Claim" is defined in Section 9.5(a).

"Debtors" means Seller, Company Parent, and each Seller Guarantor (other than the Company).

"Deposit Amount" is defined in Section 3.2.

"Direct Claim" is defined in Section 9.4(f).

"Direct Claim Notice" is defined in Section 9.4(f).

"Disputed Item" is defined in Section 3.4(c).

"Employee" means an employee of the Entities (whether retained as such or deemed as such under applicable Law).

"Employee Plan" means any employment arrangement, consulting or deferred compensation Contract, executive compensation, bonus, employee pension, profit-sharing, savings, retirement, stock option, stock purchase, severance pay, life, health, disability or accident insurance plan or other compensation or benefit plan, program, policy or commitment, that is sponsored or maintained by, or required to be contributed to by an Entity or with respect to which an Entity has any Liability.

"Encumbrances" means any charge, lien, encumbrance, security interest, claim (as defined in Section 101(5) of the Bankruptcy Code), mortgage, lease, sublease, hypothecation, deed of trust, pledge, option, right of use or possession, right of first offer or first refusal, contractual restriction, easement, right of way, servitude, restrictive covenant, encroachment, transfer restriction, conditional sale or installment Contract, finance lease involving substantially the same effect or any other encumbrance, limitation or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property).

"End Date" is defined in Section 9.1.

"Entities" means the Company and its Subsidiaries.

"Environmental Law" means any Law or Order relating to the protection of health, safety, the environment or any Hazardous Substance.

"ERISA" is defined in Section 5.25(a).

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with the Company or any of its Subsidiaries as a "single employer" within the meaning of Section 414 of the Code.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means the escrow agreement entered into on the date hereof among the Parties and the Escrow Agent.

"Escrow Account" means the deposit account of the Escrow Agent that is governed by the Escrow Agreement and into which the Escrow Amount or the Deposit Amount, as applicable, is deposited.

"Escrow Amount" means an amount in Dollars equal to $187.5 million.

"Estimated Expenditure Adjustment Amount" is defined in Section 3.4(a).

"Estimated Closing Statement" is defined in Section 3.4(a).

"Estimated Net Indebtedness Amount" is defined in Section 3.4(a).

"Estimated Purchase Price" means an amount in Dollars equal to (i) $1.875 billion *minus* (ii) the Estimated Net Indebtedness Amount *minus* (iii) the Estimated Expenditure Adjustment Amount.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Acquirer" means any "Person or Group" (as such terms are defined in the Exchange Act) that includes one or more Persons that (a) is principally engaged, or has an Affiliate that is principally engaged, in the cable, satellite or wireless telecommunications business or (b) is, is an Affiliate of, or is acting in concert with (x) any Person listed in Schedule 1.1(g) or any Affiliate thereof or (y) any other Person controlled by any officer or director of any Person listed on Schedule 1.1(g) or in which any officer or director of any Person listed on Schedule 1.1(g) or any Affiliate thereof holds, directly or indirectly, an equity interest (other than an equity interest of less than 1%).

"Existing Plan" means the Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors [Docket No. 322].

"Existing Plan Documents" means, collectively, the Plan Support Agreement filed as an exhibit to Docket No. 320, the Existing Plan and the *Disclosure Statement for Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors* [Docket No. 323].

"Expense Reimbursement" means an amount of cash in Dollars equal to the reasonable and documented out-of-pocket third-party costs, fees and expenses incurred by Purchaser and its Affiliates (including reasonable fees and expenses of legal, accounting and financial advisors) in connection with this Agreement and the transactions contemplated hereby in an amount not to exceed $10,000,000.

"Extended Termination Date" is defined in Section 4.4(a).

"FCPA" means the Foreign Corrupt Practices Act of 1977.

"File", "Filed" or "Filing" means filed with the Bankruptcy Court.

"Final Closing Statement" means the Closing Statement, as (i) mutually agreed in writing by Purchaser and Seller (whether during the

Resolution Period or otherwise), (ii) made final, binding and conclusive due to the failure of Seller to timely deliver a Closing Statement Dispute Notice pursuant to Section 3.4(c), or (iii) made final by the Independent Accountant pursuant to Section 3.4(e).

"Final Company Cash Balance" means the Dollar equivalent, as of the Adjustment Time, of the aggregate amount of all cash and cash equivalents that are required to be reflected as such on a consolidated balance sheet of the Company in accordance with Mexican NIF as of the Adjustment Time, other than any such cash or cash equivalents the use of which by the Entities is restricted for a particular use or event by Law or Contract (other than pursuant to the CDB Credit Facilities or posted as collateral to secure obligations under the letters of credit set forth on Schedule 1.1(b)), in any such case as set forth in the Final Closing Statement.

"Final Company Debt Balance" means the Dollar equivalent, as of the Adjustment Time, of the aggregate amount of all Indebtedness of the Entities determined on a consolidated basis in accordance with Mexican NIF as of the Adjustment Time, as set forth in the Final Closing Statement.

"Final Expenditure Adjustment Amount" means the sum of (i) the Aggregate Expenditure Adjustment Amount and (ii) the Incremental Expenditure Adjustment Amount.

"Final License Value Adjustment Amount" means (i) if the Closing Date occurs before payment in full by the Entities of each of the annual fees that are due for use in 2015 of the Telecommunication Licenses set forth on Schedule 1.1(c) (the "2015 License Fees") to each applicable Governmental Authority, the Dollar equivalent, as of the Adjustment Time, of an amount equal to the negative value of the aggregate Peso amount of all 2015 License Fees *multiplied by* a fraction, the numerator of which is the number of days from and including January 1, 2015 to and excluding the Closing Date and the denominator of which is 365 and (ii) if the Closing Date occurs after payment in full by the Entities of each of the 2015 License Fees to each applicable Governmental Authority, the Dollar equivalent, as of the Adjustment Time, of an amount equal to the aggregate Peso amount of all the 2015 License Fees paid in full *multiplied by* a fraction, the numerator of which is the number of days in 2015 from and including the Closing Date to and including December 31, 2015 and the denominator of which is 365.

"Final Net Indebtedness Amount" means an amount of Dollars equal to (i) the Final Company Debt Balance *minus* (ii) the Final Company Cash Balance *minus* (iii) the Final License Value Adjustment Amount.

"Final Order" means an Order which has not been stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under Section 60(b) of the Federal Rules of Civil

Procedure) or a petition for writ of certiorari has expired and no appeal, motion, stay or petition is pending, or in the event that such an appeal or petition thereof has been sought, such Order shall have been affirmed by the highest court to which such Order was appealed or certiorari shall have been denied, and the time to take any further appeal or petition for certiorari shall have expired.

"Final Purchase Price" means an amount equal to (i) $1.875 billion *minus* (ii) the Final Net Indebtedness Amount *minus* (iii) the Final Expenditure Adjustment Amount, if any.

"Financial Statements" is defined in Section 5.8(a).

"First Day Order" means an Order of the Bankruptcy Court substantially in the form of, *mutatis mutandis*, the *Order Making Certain Orders Entered in Chapter 11 Cases of Affiliated Debtors Applicable to Recently Filed Cases* [Docket No. 140], approving, among other things, the joint administration of the Seller Proceeding as part of the Bankruptcy Cases.

"Funded Debt" means (i) the 10% senior unsecured notes issued by NII Capital Corp., due in 2016, (ii) 8.875% senior unsecured notes issued by NII Capital Corp. due in 2019, (iii) 7.625% senior unsecured notes issued by NII Capital Corp. due in 2021, (iv) 11.375% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019, and (v) 7.875% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019.

"General Enforceability Exceptions" means any bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar Law of general applicability relating to or affecting creditors' rights or general equity principles.

"Governmental Approvals" means the Company Approvals and any other consent, approval (or deemed approval after the expiry of all appropriate waiting periods), authorization, notice, permission or waiver of, or notice to or report or other filing with, a Governmental Authority required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereunder, excluding any of the foregoing required under the Bankruptcy Code.

"Governmental Authority" means any U.S., Mexican or other government or governmental political subdivision or regulatory body thereof, whether federal, state or local, or any agency, instrumentality or other governmental authority.

"Guarantor Successor" is defined in Section 12.13(c).

"Hazardous Substance" means any substance that is listed, classified or regulated pursuant to any Environmental Law.

"IFETEL" means the Mexican Telecommunications Institute (*Instituto Federal de Telecomunicaciones*).

"IMSS" means the Mexican Institute of Social Security (*Instituto Mexicano del Seguro Social*).

"Incremental Expenditure Adjustment Amount" means the Dollar equivalent, as of the Adjustment Time, of the sum of (i) the sum of all amounts, if any, by which (x) 65% of the amount the Entities are projected to spend during any 2015 Budget Month in the 2015 Budget on Qualifying Capital Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Capital Expenditures during such 2015 Budget Month and (ii) the sum of all amounts, if any, by which (x) 80% of the amount the Entities are projected to spend during any 2015 Budget Month in the 2015 Budget on Qualifying Sales and Marketing Expenditures exceeds (y) the cash amount the Entities actually spend on Qualifying Sales and Marketing Expenditures during such 2015 Budget Month. For purposes of determining the Incremental Expenditure Adjustment Amount, amounts budgeted in the 2015 Budget to be spent in a 2015 Budget Month that straddles the Closing Date will be prorated based on the number of days in that 2015 Budget Month preceding the Closing Date relative to the total number of days in that 2015 Budget Month.

"Indebtedness" means as of any time with respect to any Person, without duplication, (i) all liabilities for borrowed money, whether current or funded, secured or unsecured, all obligations evidenced by bonds, debentures, notes or similar instruments, including the Pay-Off Amount, and all liabilities in respect of mandatorily redeemable or purchasable capital stock or securities convertible into capital stock; (ii) all liabilities for the deferred purchase price of property; (iii) all liabilities in respect of any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, to the extent that such liabilities are required to be classified and accounted for under Mexican NIF as capital leases; (iv) all liabilities for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction securing obligations of a type described in clauses (i), (ii) or (iii) above to the extent of the obligation secured, and all liabilities as obligor, guarantor, or otherwise, to the extent securing an obligation of a type described in clauses (i), (ii) or (iii) above to the extent of the obligation secured; (v) any transactions accounted for under Mexican NIF as debt; (vi) any supplier account payables above 90 days past due (other than accounts payable being disputed in good faith); (vii) all liabilities in respect of any unfunded or underfunded pension obligations (calculated on a projected net benefit obligation basis) (other than in respect of the Terminated Plan); (viii) to the extent negative, the net position of such Person under all Contracts to which it is a party documenting derivative and/or hedging transactions, and (ix) all guarantees of obligations of any other Person with respect to any of the foregoing, provided, however, that there will be no duplication of the amount of any liabilities, net positions or guarantees and no liabilities or obligations under clause (iv), (vii) or (viii) hereof will constitute

Indebtedness to the extent it secures any other liabilities or obligations that constitute Indebtedness. For the avoidance of doubt, Intercompany Obligations settled hereunder and the obligations set forth on Schedule 1.1(c), to the extent they are taken into account in the calculation of the Final License Value Adjustment Amount, will not constitute Indebtedness.

"Indemnified Parties" is defined in Section 9.3.

"Indemnifying Party" is defined in Section 9.4(a).

"Independent Accountant" means Deloitte LLP or such other certified public accountant reasonably satisfactory to Purchaser and Seller.

"INFONAVIT" means the Mexican Institute for Workers' Housing National Fund (*Instituto del Fondo Nacional de la Vivienda para los Trabajadores*).

"Initial Termination Date" is defined in Section 4.4(a).

"Instrument of Assignment" means an instrument of assignment effecting the transfer and assignment of the Company Parent Interests to Purchaser at the Closing in substantially the form attached hereto as Exhibit F.

"Insurance Policies" is defined in Section 5.19.

"Intellectual Property" means all intellectual property rights anywhere in the world arising from or in respect of the following (i) patents and patent applications, including continuations, divisionals, revisions, renewals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, internet domain names and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals of the foregoing (collectively, "Trademarks"), (iii) works of authorship and copyrights, and all applications, registrations and renewals of the foregoing, (iv) Software, and (v) trade secrets and proprietary know-how or other proprietary information.

"Intercompany Obligations" means, as of any specified time, any Liabilities owed by any Entity or Company Parent to Seller or any of its Affiliates (other than the Entities and Company Parent) or by Seller or any of its Affiliates (other than the Entities and Company Parent) to any Entity or Company Parent, in each case at such specified time.

"Interested Party" has the meaning ascribed thereto in the Bidding Procedures.

"Knowledge of Purchaser" means the actual knowledge of the Persons listed on Schedule 1.1(d), or such knowledge as the foregoing

individuals would reasonably be expected to have after inquiry they believe in good faith to be reasonable in respect of the applicable matter.

"Knowledge of Seller" means the actual knowledge of the Persons listed on Schedule 1.1(e), or such knowledge as the foregoing individuals would reasonably be expected to have after inquiry they believe in good faith to be reasonable in respect of the applicable matter.

"Labor Agreements" is defined in Section 5.14(a).

"Law" means any U.S. or non-U.S., federal, state or local law, statute, code, ordinance, common law or any constitutional mandate, treaty, rule, executive order, regulation (including any Mexican Official Norms (*Norma Oficial Mexicana*), agency or official requirement, license or permit of any Governmental Authority.

"Leased Property" means all real property leased or subleased by the Company and its Subsidiaries, other than Transmission Towers.

"Legal Proceeding" means any judicial, administrative or arbitral action, suit, demand, claim, hearing or proceeding by or before a Governmental Authority or arbitrator.

"Liabilities" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, whether or not required to be reflected as such in a balance sheet of a Person prepared in accordance with Mexican NIF, known or unknown, determined or determinable, whenever or however arising.

"Licenses" is defined in Section 5.12(a).

"Local Rules" means the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

"Material Contracts" is defined in Section 5.13(a).

"Mexican Income Tax Law" means the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta).*

"Mexican NIF" means the Mexican Financial Information Norms (*Normas de Información Financiera*), as in effect from time to time, issued by the Mexican Board of Financial Information (*Consejo Mexicano de Normas de Información Financiera, A.C.*) and the Accounting Principles Commission of the *Instituto Mexicano de Contadores Públicos, A.C.*

"Mexico" means the United Mexican States.

"Mifel Trust" is defined in Section 4.2(n).

"Minority Company Shares" is defined in Preliminary Statement D.

"Minority Shareholder" is defined in Preliminary Statement D.

"NII Holdings" means NII Holdings, Inc.

"Non-Disclosure Agreement" means the non-disclosure agreement, dated as of October 15, 2014, executed between AT&T Services, Inc. and NII Holdings.

"Notice of Dismissal" is defined in Section 8.1(d).

"OFAC" means the United States Department of Treasury's Office of Foreign Assets Control.

"OFAC Lists" means the List of Specially Designated Nationals and Blocked Persons, the Foreign Sanctions Evaders List and the Sectoral Sanctions Identifications List, each administered by OFAC and as amended from time to time.

"Order" means any temporary, preliminary or permanent order, injunction, judgment, decree, ruling, writ, assessment or award of a Governmental Authority or arbitrator.

"Ordinary Course of Business" means the ordinary course of business of the applicable Entity, consistent in all material respects with past practice.

"Owned Property" means all real property owned by the Entities, other than Transmission Towers.

"Participation Materials" is defined in Section 10.1(a).

"Parties" means Seller Parent, Seller, Company Parent, each Seller Guarantor and Purchaser.

"Pay-Off Amount" means the aggregate amount specified in the Pay-Off Letters as required to pay in full all principal and interest outstanding and all other amounts owing under the CDB Credit Facilities (including any penalties, fees or other amounts due upon a prepayment at the Closing of all principal and interest outstanding), calculated as of the Adjustment Time.

"Pay-Off Letters" is defined in Section 4.2(h).

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates issued by a Governmental Authority, excluding Telecommunication Licenses.

"Permitted Encumbrances" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance which have been made available to Purchaser, (ii) statutory liens for any Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been established, (iii) mechanics', carriers', workers', repairmen's and similar Encumbrances arising or incurred in the Ordinary Course of Business and not material in amount or effect on the Business, (iv) zoning, entitlement and other land use and environmental Laws, (v) liens securing debt as disclosed in the Financial Statements, (vi) title of a lessor under a capital or operating lease, (vii) such other imperfections in title, charges, easements, restrictions and encumbrances that are not material in amount or effect on the Business, and (viii) Encumbrances that will be released by the Sale Order or at Closing as a consequence of the consummation of the transactions contemplated hereunder.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Plan Support Agreement" means the Plan Support Agreement dated November 24, 2014 attached as Exhibit A to Docket No. 249.

"Post-Closing Period" means a Taxable period (or portion thereof) that, to the extent it relates to any of the Entities, begins the day after the Closing Date.

"Postpay Subscribers" means the aggregate number of Subscribers that are in active service and are without unpaid charges attributable to such number over 90 days past due, excluding Prepaid Subscribers.

"Pre-Closing NOLs" is defined in Section 11.4(d).

"Pre-Closing Period" means a Taxable period (or portion thereof) that, to the extent such period relates to any of the Entities, ends on or before the Closing Date.

"Pre-Closing VAT Favorable Balances" is defined in Section 11.4(d).

"Prepaid Subscribers" means the aggregate number of Subscribers that are in active service with telephone numbers assigned pursuant to prepaid Contracts.

"Privileged Communications" is defined in Section 12.11(a).

"Process Agent" is defined in Section 12.3.

"PROFECO" means the Mexican Consumer Protection Agency (*Procuraduría Federal de Protección al Consumidor*).

"Purchaser" is defined in the Preamble.

"Purchaser Indemnitees" is defined in Section 9.2.

"Purchaser Material Adverse Effect" means an effect that would prevent, materially delay or materially impair the ability of Purchaser to consummate the transactions contemplated by this Agreement on a timely basis.

"Purchaser Returns" is defined in Section 11.1(b).

"Purchaser Tax Act" means (i) a change in method of accounting, (ii) not keeping, maintaining or making available to any applicable Taxing authority the information, documents and accounting records that the Entities are obligated to keep, maintain and make available to such Taxing authorities as required by applicable Mexican Tax Law relating to a Pre-Closing Period; provided such information, documents and records need not be kept, maintained or made available only to the extent that such information, documents or records were not originally kept and maintained by the Entities, or (iii) an amendment to a Tax Return for a Pre-Closing Period by Purchaser or any of its Affiliates (including, after the Closing, the Entities), in each case that, following the Closing (including the portion of the Closing Date after the Closing), results in any gain or income to Seller or any of its non-Entity Affiliates for any taxable period or the Entities for a Pre-Closing Period (including the pre-Closing portion of any Straddle Period) in an amount that individually or in the aggregate equals or exceeds $35,000,000, other than an action (x) taken in the Ordinary Course of Business, (y) that is required in order to comply with applicable Laws, or (z) expressly permitted by this Agreement.

"Qualifying Capital Expenditures" means the capital expenditures by the Entities contemplated by the 2015 Budget for the 2015 Budget Period or the applicable 2015 Budget Month, as applicable, determined as of the Adjustment Time consistent with past practice.

"Qualifying Sales and Marketing Expenditures" means the expenditures by the Entities captured by the "Sales and Marketing Expenditures" line items set forth in the 2015 Budget and contemplated by the 2015 Budget for the 2015 Budget Period or the applicable 2015 Budget Month, as applicable, determined as of the Adjustment Time, consistent with past practice.

"Regulatory Approval" means the authorization pursuant to the Regulatory Statutes issued by the IFETEL or the CFC, as applicable, or any

Governmental Authority that may replace them in the future, in connection with the transactions contemplated by this Agreement.

"Regulatory Statutes" means, as applicable, the Mexican Antitrust Law (*Ley Federal de Competencia Económica*) and the Mexican Telecommunications and Broadcasting Law (*Ley Federal de Telecomunicaciones y Radiodifusión*).

"Related Party" is defined in Section 5.24.

"Related Party Contract" is defined in Section 5.24.

"Release Date" is defined in Section 9.1.

"Resigning Individuals" is defined in Section 4.2(e).

"Resolution Period" is defined in Section 3.4(d).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to consider entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court in the form included in Exhibit C, subject only to such modifications that in Purchaser's reasonable good faith judgment are immaterial or ministerial in nature, but in no event (i) adverse to Purchaser without Purchaser's prior consent or (ii) inconsistent with the Bidding Procedures Order or this Agreement.

"Sanctioned Countries" is defined in Section 5.22(c).

"Sanctions Laws" means (i) the economic sanctions Laws of the United States, including the International Emergency Economic Powers Act, 50 U.S.C. §§1701, et seq., the Trading with the Enemy Act, 50 App. U.S.C. §§1, et seq., the Iran Sanctions Act of 1996 (50 U.S.C. §1701 note), the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 (PL 111-195), the National Defense Authorization Act for Fiscal Year 2012 (PL-112-81), the National Defense Authorization Act for Fiscal Year 2013 (including the Iran Freedom and Counter-Proliferation Act of 2012 (PL 112-239)), the Iran Threat Reduction and Syria Human Rights Act of 2012 (PL 112-158), the Cuban Liberty and Democratic Solidarity Act (Libertad Act), 22 U.S.C. §§6021, et seq., and all Laws administered by OFAC, codified at 31 C.F.R. Part 500, et seq., and (ii) any applicable economic sanctions Laws of any jurisdiction other than the United States, such as the United Nations Security Council, or other relevant sanctions authority applicable to Seller or any Entity.

"Sanctions Lists" mean (i) the OFAC Lists and (ii) any other sanctions lists of any jurisdiction (including the United States), such as the United Nations Security Council, or other relevant sanctions authority applicable to Seller or any Entity.

"SAR" means the Mexican Law of Systems of Savings for Retirement (*Ley de los Sistemas de Ahorro para el Retiro*).

"SCT" means the Mexican Ministry of Communication and Transportation (*Secretaría de Comunicaciones y Transportes*).

"Section 7.8 Instruments" is defined in Section 7.8.

"Section 7.8 Terminations" is defined in Section 7.8.

"Seller" is defined in the Preamble.

"Seller Disclosure Schedule" is defined in Article 5.

"Seller Indemnitees" is defined in Section 9.3.

"Seller Fundamental Representations" means the representations and warranties contained in Section 5.1 (Organization of Seller and Seller Parent), Section 5.2 (Authorization of Agreement), Section 5.4 (Organization of Entities), Section 5.5 (Capitalization of the Entities), Section 5.7 (Title to Shares), Section 5.16(d) (Telecommunication Licenses) and Section 5.26 (Company Parent).

"Seller Guarantor" is defined in the Preamble.

"Seller Material Adverse Effect" means (i) a material adverse effect on the business, financial condition, assets used in the business or results of operations of the Entities taken as a whole or (ii) an effect that would prevent, materially delay or materially impair the ability of Seller or Seller Parent to consummate the transactions contemplated by this Agreement, provided, however, that for purposes of clause (i) only, any adverse effect will not be taken into account in determining whether there has been, or would reasonably be expected to be, a Seller Material Adverse Effect to the extent resulting from: (a) general conditions in the industry in which the Entities operate, (b) compliance by Seller with its covenants in this Agreement (other than Section 7.2, excluding, however, actions prohibited by Section 7.2(b)(F) in respect of which Seller sought consent that Purchaser unreasonably withheld), (c) changes in Mexican NIF (or official interpretations thereof) or changes in the regulatory or accounting requirements applicable to the industry in which the Entities operate, (d) any failure by the Entities to meet any projections of revenues, earnings or other operational or financial measures for any period ending on or after the date of this Agreement and before the Closing, provided, however, that the exception in this subsection (d) will not prevent or otherwise affect a determination that any change or occurrence underlying such failure has resulted in, or contributed to, a Seller Material Adverse Effect, (e) changes in the financial or securities markets (including the cost or availability of debt or equity financing) or general economic, regulatory or political conditions, in each case, globally, in Mexico or in any other jurisdiction, (f) changes (including changes in applicable Law or official

interpretations thereof) or conditions generally affecting the industry, the country or the regions in which the Entities operate, including any foreign exchange controls, (g) acts of war (whether or not declared), armed hostilities, acts of terrorism or any natural disasters, (h) adverse changes in the relationships of the Entities with their Employees, customers or suppliers (including any Employee departures and any actions taken by customers or suppliers of the Entities to discontinue or not renew their Contracts with the Entities or to terminate them in accordance with their terms), in each case proximately caused by the announcement of entry into this Agreement, (i) any action taken (or omitted to be taken) at the written request of Purchaser after the date hereof, and (j) solely for purposes of Section 8.1(h), any decline in the number of Subscribers to the Entities' iDEN network that occurs subsequent to December 31, 2014 and prior to the Closing Date that does not arise out of any breach by the Seller or Seller Parent of its covenants under this Agreement (or any actions or inactions occurring prior to the date hereof that would have been a breach of Seller or Seller Parent's covenants under this Agreement had this Agreement been in effect as of January 1, 2015) or applicable Law, provided, however, that the exception in this subsection (j) will not prevent or otherwise affect a determination that any change or occurrence underlying such decline has resulted in, or contributed to, a Seller Material Adverse Effect; provided, further, that with respect to subsections (a), (c), (e), (f) or (g), such matters will be considered to the extent that they disproportionately affect the Entities as compared to similarly situated businesses operating in the telecommunications industry in Mexico.

"Seller Parent" is defined in the Preamble.

"Seller Petition Date" is defined in Section 2.1.

"Seller Proceeding" means the bankruptcy case of Seller under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, which, following entry of the First Day Order, is jointly administered with the Bankruptcy Cases.

"Seller Returns" is defined in Section 11.1(a).

"Shares" is defined in Preliminary Statement D.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"Special Power of Attorney" is defined in Section 12.3.

"Straddle Period" means a taxable period that, to the extent it relates to any of the Entities, includes, but does not end on, the Closing Date.

"Specified Representations" means the representations and warranties contained in Section 5.14 (Labor), Section 5.17 (Environmental Matters) and Section 5.25 (Employee Benefits).

"Subscriber" means a mobile telephone number maintained by any Entity and assigned to an end user of the Entities' mobile wireless voice or data services that is paying any Entity for such service (regardless of whether such end user is current or delinquent in the payment at any given date of calculation).

"Subsidiary" is defined in Section 5.6.

"Seller Successor" is defined in Section 9.9.

"Successor" is defined in Section 4.6(b).

"Successful Bidder" is defined in the Bidding Procedures.

"Tax Claim" is defined in Section 11.5(a).

"Tax Return" means all returns, declarations, reports, estimates, claims for refunds, information returns, elections and statements required to be filed with any Governmental Authority in respect of any Taxes, including any amendments thereto and requests for the extension of time in which to file any such return, declaration, report, estimate, information return, election or statement.

"Taxes" (including, with correlative meaning, the term "Taxable" or "Taxing") means (a) all federal, state or local taxes imposed by any Governmental Authority, including all such taxes based on gross or net income, gross receipts, flat tax, capital, sales, use, ad valorem, transfer, franchise, profits, inventory, environmental, capital stock, license, withholding, payroll, employment, disability, social security, unemployment, excise, production, value added, severance, stamp, occupation, duties (*derechos* and *aprovechamientos*) and other taxes (including any other contributions (*contribuciones*) and employee payments for profit sharing (*participación de los trabajadores en las utilidades*)), property and estimated taxes, including any payments due under any social security Laws and those related to IMSS, INFONAVIT and SAR, and (b) all interest, penalties, fines, inflationary adjustments, additions to tax or additional amounts imposed by any Taxing authority in connection with any item described in subsection (a).

"Telecommunication Licenses" means any concession, permit, authorization or registration granted by the IFETEL, SCT or COFETEL for the operation of any kind of telecommunications services, including the use of spectrum, network or band-width.

"Terminated Plan" is defined in Section 7.12(b).

"Termination Date" means the Initial Termination Date or, if such date has been extended pursuant to Section 4.4(a), the later Extended Termination Date to which such date has been so extended.

"Third Party Claim" is defined in Section 9.4(a).

"Third Party Claim Notice" is defined in Section 9.4(a).

"Third Party Consents" means the approvals, consents or waivers that are set forth in Schedule 1.1(f).

"Trademark License Agreement" means the Fourth Amended and Restated Trademark License Agreement, dated July 27, 2011, between the Trademark Licensor and NII Holdings, as amended on July 9, 2013.

"Trademark Licensor" means Nextel Communications, Inc.

"Trademark Sublicense Agreement" means the Trademark Sublicense Agreement, dated January 1, 2012, between NII Holdings and the Company.

"Trademarks" is defined within the definition of Intellectual Property.

"Transaction Agreements" means this Agreement, the Escrow Agreement and the Transition Services Agreement.

"Transition Services Agreement" means a transition services agreement in the form attached as Exhibit D.

"Transfer Taxes" means any and all transfer Taxes (excluding Taxes measured in whole or in part by net income) and similar Taxes, fees, duties, levies, customs, tariffs, imposts, assessments, obligations and charges payable to a Governmental Authority by reason of the purchase and sale of the Company Parent Interests.

"Transmission Tower Standards" is defined in Section 5.16(f).

"Transmission Towers" is defined in Section 5.21(b).

"Unaudited Balance Sheet" is defined in Section 5.8(a).

"Unaudited Financial Statements" is defined in Section 5.8(a).

"Unresolved Items" is defined in Section 3.4(e).

"Uruguay Divestiture" is defined in Section 7.2(c).

"Uruguay Subsidiary" means Nextel Uruguay S.A.

"U.S." means the United States of America.

"U.S. Trustee" means the Office of the United States Trustee for the Southern District of New York.

"VAT" is defined in Section 11.4(a).

"Willful Breach" means a deliberate, volitional, non-coerced and non-accidental act or omission by a party in breach of its obligations hereunder.

1.2.    Construction Rules and Interpretative Matters.  The following rules of construction and interpretation will apply:

(a)     when calculating the period of time in which any act is to be performed pursuant to this Agreement, the date that is the reference date in calculating the beginning of such period will be excluded.  If the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(b)     any reference in this Agreement to "$" or "Dollars" will mean U.S. Dollars and to "Pesos" or "MXN$" means Mexican Pesos;

(c)     when sums of money expressed in Dollars or Pesos need to be converted into or expressed as the equivalent amounts in Pesos or Dollars, as the case may be, for purposes of this Agreement, such sums will be converted based on the exchange rate (*Tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana*) published by the Mexican Central Bank (*Banco de México*) on the Federal Official Gazette (*Diario Oficial de la Federación*) on the Business Day immediately preceding the date as of which such conversion is to be made or as of which such equivalent amount is to be expressed;

(d)     the Exhibits and Schedules (including the Seller Disclosure Schedule) to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement;

(e)     any reference in this Agreement to gender will include all genders, and words imparting the singular number only will include the plural and vice versa;

(f)     the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and will not affect or be utilized in construing or interpreting this Agreement;

(g)     all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified;

(h)    words such as "herein", "hereinafter", "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires;

(i)    the word "including" or any variation thereof means "including, without limitation" and will not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it;

(j)    any reference to the "date hereof" means the date of this Agreement;

(k)    references to Laws mean a reference to (i) such Laws as the same may be amended, modified or supplemented from time to time and (ii) all rules and regulations promulgated thereunder, unless the context requires otherwise; and

(l)    the Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## 2. PURCHASE AND SALE

2.1.    <u>Implementation Transactions</u>.  On the Business Day immediately following the date hereof, each of the Debtors will File a motion seeking entry of the First Day Order and File the Bidding Procedures Motion and seek entry of the Bidding Procedures Order.

2.2.    <u>Purchase and Sale of Company Parent Interests and Company Shares</u>.  Subject to the terms and conditions contained herein, at the Closing, Seller will sell and transfer to Purchaser, and Purchaser will purchase and accept transfer from Seller of, all of Seller's right, title and interest in and to the Company Parent Interests, free and clear of all 363 Interests, and Company Parent (a) will be, and will own the Company Shares, free and clear of all 363 Interests and (b) will indirectly own the Minority Company Shares free and clear of all 363 Interests.

## 3. CONSIDERATION

3.1.    <u>Consideration</u>.  The aggregate consideration for the Company Parent Interests will be the Final Purchase Price.

3.2.    <u>Purchase Price Deposit</u>.  Within two Business Days following entry of the Bidding Procedures Order, Purchaser will deposit with the Escrow Agent $32 million in immediately available funds (together with all accrued investment

income thereon, the "Deposit Amount").  The Deposit Amount will be released by the Escrow Agent and delivered to either Purchaser or Seller as follows:

(a)    if the Closing occurs, the Deposit Amount will be delivered to Seller and applied towards the amount payable by Purchaser under Section 3.3;

(b)    if this Agreement is terminated by Seller pursuant to Section 4.4(f), the Deposit Amount will, upon receipt by the Escrow Agent of a joint notice of release executed by Purchaser and Seller or a final and non-appealable order or judgment of a court of competent jurisdiction, be delivered to and retained by Seller; and

(c)    if this Agreement is terminated for any reason other than by Seller pursuant to Section 4.4(f) (as set forth in Section 3.2(b)), Purchaser and Seller will deliver a joint notice of release to the Escrow Agent within two Business Days after such termination providing for the release of the Deposit Amount to Purchaser as promptly as practicable after the date of such joint notice.

3.3.    Payment of Consideration at Closing.  On the Closing Date, (a) Purchaser will pay to Seller an amount in Dollars equal to (i) the Estimated Purchase Price, minus (ii) the Deposit Amount, and *minus* (iii) the Escrow Amount, by wire transfer of immediately available funds to an account or accounts designated by Seller, (b) Purchaser will pay on behalf of the Entities the Pay-Off Amount to the recipients specified in the Pay-Off Letters by wire transfer of immediately available funds to the accounts specified in such Pay-Off Letters, (c) Purchaser and Seller will cause the Deposit Amount to be delivered to Seller in accordance with Section 3.2(a), and (d) Purchaser will pay the Escrow Amount by wire transfer of immediately available funds to be held in the Escrow Account in accordance with the Escrow Agreement.

3.4.    Closing Date Purchase Price Adjustment.  (a)  At least five Business Days prior to the Closing Date, Seller will prepare and deliver to Purchaser a certificate executed by an executive officer of Seller (the "Estimated Closing Statement") consisting of Seller's estimates of the Final Net Indebtedness Amount (such estimate, the "Estimated Net Indebtedness Amount") and the Final Expenditure Adjustment Amount (such estimate, the "Estimated Expenditure Adjustment Amount").  The Estimated Closing Statement will be prepared in good faith and in accordance with Mexican NIF.  Purchaser will have the right to object to the amounts contained in the Estimated Closing Statement no later than the second Business Day immediately prior to the Closing Date if it in good faith determines that any such amount is materially inaccurate.  Seller will in good faith consider the objections, if any, of Purchaser to the Estimated Closing Statement and, if Purchaser has made any objections, will reissue an Estimated Closing Statement no later than 5:00 p.m. local time in Mexico City, Mexico on the last Business Day immediately prior to the Closing

Date with such revisions, if any, that Seller has determined in good faith are appropriate.

(b)     As promptly as practicable following the Closing Date (but in any event within 60 days thereafter), Purchaser will prepare, or cause to be prepared, and deliver to Seller a certificate executed by a duly authorized representative of Purchaser (the "Closing Statement") consisting of Purchaser's calculation of the Final Net Indebtedness Amount and the Final Expenditure Adjustment Amount.  The Closing Statement will be prepared in good faith and in accordance with Mexican NIF.

(c)     The Closing Statement will become final, binding and conclusive upon Seller and Purchaser on the 45th day following Purchaser's delivery of the Closing Statement unless prior to such 45th day Seller delivers to Purchaser a written notice (a "Closing Statement Dispute Notice") stating that Seller disputes one or more items contained in the Closing Statement (a "Disputed Item") and describing in reasonable detail each Disputed Item based on information then available to Seller.

(d)     If Seller delivers a Closing Statement Dispute Notice, then Purchaser and Seller will seek in good faith to resolve the Disputed Items during the 30-day period beginning on the date Purchaser receives the Closing Statement Dispute Notice (the "Resolution Period").  If Purchaser and Seller reach agreement with respect to any Disputed Items, Purchaser will revise the Closing Statement to reflect such agreement.

(e)     If Purchaser and Seller are unable to resolve all Disputed Items during the Resolution Period, then, at the request of either Party, Purchaser and Seller will jointly engage and submit the unresolved Disputed Items (the "Unresolved Items") to the Independent Accountant; provided that if Purchaser and Seller do not appoint an Independent Accountant within ten days after either Purchaser or Seller gives notice to the other of such request, either of them may request the American Arbitration Association to appoint as the Independent Accountant a partner in the Mexico City office of an internationally recognized independent registered public Independent Accountant based on its determination that the partner has had no material relationships with the Parties or their respective Affiliates within the preceding two years and taking into account such firm's material relationships during the preceding two years with the Parties and their respective Affiliates, and such appointment will be final, binding and conclusive on Purchaser and Seller.  Purchaser and Seller will use their respective reasonable best efforts to cause the Independent Accountant to issue its written determination regarding the Unresolved Items within 30 days after such items are submitted for review.  The scope of the disputes to be resolved by the Independent Accountant will be to make a determination with respect to the Unresolved Items in accordance with Mexican NIF and this Section 3.4(e) and the Independent Accountant is not to make any other determination.  The Independent Accountant's decision will be based solely on written submissions

by Purchaser and Seller.  Each written submission to the Independent Accountant will also be provided to the other Party.  The Independent Accountant may not assign a value greater than the greatest value for such item claimed by either Party or smaller than the smallest value for such item claimed by either Party.  Each Party will be afforded the opportunity to present to the Independent Accountant any material such Party deems relevant to the Independent Accountant's determination.  Each Party will use its commercially reasonable efforts to furnish to the Independent Accountant such work papers and other documents and information pertaining to the Unresolved Items as the Independent Accountant may request.  The determination of the Independent Accountant will be final, binding and conclusive on Purchaser and Seller absent manifest error.  The fees, expenses and costs of the American Arbitration Association and the Independent Accountant will be borne in the same proportion as the aggregate amount of the Unresolved Items that is unsuccessfully disputed by each (as finally determined by the Independent Accountant) bears to the total amount of the Unresolved Items submitted to the Independent Accountant.

(f)     Prior to Closing, Seller will provide Purchaser and its representatives such access to Employees, books and records of the Entities as Purchaser reasonably requests in connection with Purchaser's review of the Estimated Closing Statement.  From and after Closing, Purchaser will provide Seller and its representatives such access to Employees, books and records of the Entities as Seller reasonably requests in connection with Seller's review of the Closing Statement.

(g)     Following the determination of the Final Closing Statement, if (i) the Final Purchase Price exceeds the Estimated Purchase Price, then Purchaser will pay Seller the amount of such excess and (ii) the Estimated Purchase Price exceeds the Final Purchase Price, then Seller will pay Purchaser the amount of such excess.  The party that is required to make a payment pursuant to this Section 3.4(g) will make such payment within two Business Days after the determination of the Final Closing Statement.  Any payment under this Section 3.4(g) will be made in cash in accordance with Section 3.4(h).

(h)     Any amount paid pursuant to Section 3.4(g) will be (i) increased by interest on such amount, compounded daily, at an annual interest rate equal to 3%, from the Closing Date to and including the date of payment based on a 360-day year, and increased such that after all applicable withholding taxes, the payee receives a net after-tax amount equal to the full amount of accrued interest, (ii) made by wire transfer of immediately available cash funds in Dollars to an account designated by the receiving party, and (iii) treated as an adjustment to the Final Purchase Price for Tax reporting purposes.

3.5.     Intercompany Obligations.  If the Closing occurs, upon the Closing and effective without further action, as between Seller and its Affiliates (other than the Entities and Company Parent) and the Entities and Company Parent, all Intercompany Obligations will be netted against each other and the balance (if

any) will be, as applicable, contributed to the capital of the Company (if the net balance is an amount payable to Seller or its Affiliates) or deemed to have been distributed to Seller (if the net balance is an amount payable to the Entities or Company Parent), in each case, without any cash payment being made, and, except for the Transition Services Agreement, all Contracts between Seller and any of its Affiliates (excluding the Entities and Company Parent), on the one hand, and any Entity or Company Parent, on the other hand, will be terminated without any surviving Liabilities or other obligations of any of the parties thereto. If requested by Purchaser, Seller will cause the parties to such Contracts being so terminated to execute and deliver at Closing customary mutual releases with respect thereto in form and substance reasonably acceptable to Purchaser.

## 4. CLOSING AND TERMINATION

4.1.   Closing Date.  Subject to the satisfaction of the conditions set forth in Section 8.1, Section 8.2, and Section 8.3, or the waiver thereof by the Party entitled to waive that condition, the closing of the purchase and sale of the Company Parent Interests (the "Closing") will take place at the offices of Jones Day located at 222 East 41st Street, New York, New York, or at such other place as the Parties may agree in writing, at 10:00 a.m. New York City time, on the date that is three Business Days following the satisfaction or waiver of the conditions set forth in Article 8, other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions, unless another time or date, or both, are agreed to in writing by the Parties.

4.2.   Closing Deliveries by Seller.  At the Closing, Seller will deliver, or cause to be delivered, to Purchaser the following:

(a)   the officer's certificate required to be delivered pursuant Section 8.1(a) and Section 8.1(b);

(b)   the Instrument of Assignment, duly executed by Seller;

(c)   original executed counterparts of the unanimous shareholder or other applicable equity holder resolutions of each Entity (which will at the Closing also be executed by the Purchaser), approving:

(i)   the resignations, effective as of the Closing Date, of the directors (or equivalent) of each Entity, expressly releasing, effective as of the Closing Date, the respective Entity, the Seller and the Purchaser from any and all claims and actions arising out of their services as a director (other than claims for indemnity or insurance), and themselves obtaining a full release from the Entities and the Purchaser from any and all claims and actions (except for those resulting from fraud, bad faith and/or willful misconduct) resulting from the due performance of their respective duties as directors;

(ii)     the appointment of new directors (or equivalent) of the respective Entity as determined by Purchaser; and

(iii)     the revocation of all powers of attorney in existence as of the Closing (except for those identified by Purchaser in writing no later than five Business Days prior to the Closing Date) and the granting of powers of attorney to the Persons determined by Purchaser.

(d)     executed resignations of the directors (or equivalent) and officers, solely in their capacity as directors (or equivalent) or officers, as applicable, of each Entity other than those directors (or equivalent) and officers specified by Purchaser to Seller no later than the second Business Day prior to the Closing as exempt from this requirement (the "<u>Resigning Individuals</u>");

(e)     the Transition Services Agreement, duly executed by the Company and the other parties thereto;

(f)     the Amendment to Trademark Sublicense Agreement, duly executed by NII Holdings and the Company;

(g)     the amendments and releases, duly executed by each applicable party, referred to in <u>Section 3.5</u> or <u>Section 7.8</u>;

(h)     customary pay-off letters duly executed by CDB and reasonably satisfactory to Purchaser (the "<u>Pay-Off Letters</u>") confirming that, upon receipt by the party or parties identified therein of the Pay-Off Amount, the CDB Credit Facilities shall have been paid in full and all Encumbrances provided thereunder shall have been released;

(i)     originals of the Corporate Records (which may be delivered at the Company's principal executive offices) together with a certificate issued by each Entity's and Company Parent's secretary certifying that the Corporate Records of the applicable Entity or Company Parent comply in all material respects with applicable Laws;

(j)     the original share certificates or evidence of other equity interests, as applicable (where required by applicable Law) of each applicable Entity reflecting the capital structure set forth in Section 5.5(a) of the Seller Disclosure Schedule;

(k)     a certified copy of the Sale Order, as entered by the Bankruptcy Court;

(l)     an executed agreement between Company Parent and Seller, in form and substance reasonably satisfactory to Purchaser, effecting the Seller Liability Assumption and Company Parent Novation (as defined in the Sale Order);

(m)    evidence reasonably satisfactory to Purchaser that (i) the Uruguay Divestiture has been consummated and (ii) the requirements of Section 8.1(d) and Section 8.1(e) have been satisfied;

(n)    an executed original termination letter of trust agreement number F115/2000 (the "Mifel Trust") duly executed by Banca Mifel, S.A., in its capacity as trustee thereunder and by all the settlors/beneficiaries thereunder certifying that the Mifel Trust has been duly terminated releasing all parties thereunder from any and all liability in connection therewith;

(o)    any releases reasonably requested by Purchaser pursuant to, and copies of customary corporate documents effecting the netting, contribution or distribution contemplated by, Section 3.5; and

(p)    each of the Section 7.8 Terminations and, to the extent obtained as of the Closing Date, each of the Section 7.8 Instruments and Third Party Consents, in each case, executed and delivered by each party thereto.

4.3.    Closing Deliveries by Purchaser.  At the Closing, Purchaser will deliver, or cause to be delivered, to Seller (or, where applicable in the case of the Closing deliveries set forth in Section 4.3(c), the other Persons specified in Section 3.3) the following:

(a)    the officer's certificate required to be delivered pursuant Section 8.2(a) and Section 8.2(b);

(b)    the Instrument of Assignment, duly executed by Purchaser; and

(c)    the consideration specified in Section 3.3 delivered in accordance therewith.

4.4.    Termination of Agreement.  This Agreement may be terminated before the Closing as follows:

(a)    by Purchaser or Seller, if the Closing has not occurred by 5:00 p.m. local time in Mexico City, Mexico on June 30, 2015 (the "Initial Termination Date"), provided, however, that if (i) the Closing has not occurred because any of the conditions to Closing set forth in Section 8.1(i) or Section 8.3(b) remains unsatisfied and not waived and (ii) all other conditions to the respective obligations of the Parties to close hereunder that are capable of being fulfilled by the Initial Termination Date have been so fulfilled or waived (except for any closing conditions which by their terms are to be fulfilled at Closing, which closing conditions remain capable of being fulfilled), then such date shall be extended to September 30, 2015 (the "Extended Termination Date");

(b)    by mutual written consent of Seller and Purchaser;

(c)　　by Purchaser, if any condition to the obligations of Purchaser set forth in Section 8.1 or Section 8.3 has become incapable of fulfillment other than as a result of a material breach by Purchaser of any covenant contained in this Agreement, and such condition is not waived by Purchaser;

(d)　　by Seller, if any condition to the obligations of Seller set forth in Section 8.2 or Section 8.3 (other than Section 8.2(c) or Section 8.3(a)) has become incapable of fulfillment other than as a result of a material breach by Seller of any covenant contained in this Agreement, and such condition is not waived by Seller;

(e)　　by Purchaser, if Seller or Seller Parent breaches any representation or warranty or any covenant contained in this Agreement or any representation or warranty of Seller is inaccurate, such breach or inaccuracy would result in a failure of a condition set forth in Section 8.1 or Section 8.3 and such breach or inaccuracy has not been cured by the earlier of (i) ten Business Days after the giving of notice by Purchaser to Seller of such breach or inaccuracy and (ii) the Termination Date;

(f)　　by Seller, if Purchaser breaches any representation or warranty or any covenant contained in this Agreement or any representation or warranty of Purchaser is inaccurate, such breach or inaccuracy would result in a failure of a condition set forth in Section 8.2 or Section 8.3 and such breach or inaccuracy has not been cured by the earlier of (i) ten Business Days after the giving of notice by Seller to Purchaser of such breach or inaccuracy and (ii) the Termination Date;

(g)　　by Seller or Purchaser if there is in effect a Law or final non-appealable Order of a Governmental Authority of competent jurisdiction (other than the Bankruptcy Court) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(h)　　by Purchaser if (i) within one Business Day of the date hereof, the Debtors do not File a motion seeking the entry of the First Day Order or the Bidding Procedures Motion in the Bankruptcy Cases or (ii) the Bidding Procedures Order has not been entered by the Bankruptcy Court on or before February 17, 2015.

(i)　　by Purchaser if the Bidding Procedures Order is entered by the Bankruptcy Court and (i) the Auction is not held on or before March 20, 2015, unless an Auction is not required to be held pursuant to the terms of the Bidding Procedures, (ii) the Sale Hearing is not held on or before March 23, 2015, or (iii) the Sale Order has not become a Final Order or is not capable of becoming a Final Order on or before April 6, 2015;

(j)　　by Purchaser if either (i) following entry by the Bankruptcy Court of the Bidding Procedures Order, the Bidding Procedures Order is (A)

amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay or (ii) following entry by the Bankruptcy Court of the Bidding Procedures Order and the Sale Order, the Sale Order is (A) amended, modified or supplemented in any way without the Purchaser's prior written consent or (B) voided, reversed or vacated or is subject to a stay;

(k)　　following entry of the Bidding Procedures Order by the Bankruptcy Court and prior to the date that the Sale Order is entered by the Bankruptcy Court, by Seller at the conclusion of the Auction, if Seller enters into a Contract with respect to a Competing Transaction (without regard to the proviso in such definition related to a Back-Up Plan) pursuant to the Bidding Procedures; or

(l)　　by Purchaser, if (i) Purchaser is not selected as the Successful Bidder at the conclusion of the Auction or (ii) any Debtor or any Affiliate of the Debtors seeks, or does not use its reasonable best efforts to oppose any other Person in seeking, an order of the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason, provided that the foregoing will not apply to the dismissal of Company Parent's bankruptcy case as contemplated by this Agreement or (iii) any Debtor or any controlled Affiliate of the Debtors seeks, or does not use its reasonable best efforts to oppose any other Person in seeking, the Bankruptcy Court to enter an order appointing a trustee in the Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' businesses under Bankruptcy Code Section 1106(b), or such an order is entered for any reason.

For the avoidance of doubt, notwithstanding the foregoing, from and after the date hereof until the earlier of the Closing Date and the termination of this Agreement, all the restrictions set forth in Section 10.1 will apply.

4.5.　　Procedure for Termination.  If either Purchaser or Seller desires to terminate this Agreement pursuant to Section 4.4, it will provide notice to that effect to the other Party and this Agreement will terminate without further action by Purchaser or Seller upon delivery of such notice by such Party to the other Party.

4.6.　　Effect of Termination.  (a)  If termination pursuant to Section 4.4 occurs, (i) except as set forth in this Section 4.6, each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination, (ii) the Deposit Amount will be returned to Purchaser in accordance with Section 3.2(c) unless Section 3.2(b) applies, (iii) if termination occurs (A) by Purchaser pursuant to Section 4.4(i), (j), (l)(ii) or (l)(iii), Seller Parent, Seller, Company Parent and the Company will pay to Purchaser (x) the Expense Reimbursement within two Business Days thereof, plus (y) a Break-Up

Fee on the date a Competing Transaction is consummated, if such transaction is consummated within 365 days of the date of such termination, or (B) by Seller pursuant to Section 4.4(k) or Purchaser pursuant to Section 4.4(l)(i), Seller Parent, Seller, Company Parent and Company will pay to Purchaser (x) the Expense Reimbursement within five Business Days thereof *plus* (y) a Break-Up Fee within the earlier of (1) (a) a sale order becoming a Final Order or (b) a confirmation order becoming a Final Order, as applicable, approving a Competing Transaction (without regard to the proviso in such definition related to a Back-Up Plan) or (2) thirty days after a termination of this Agreement by Seller pursuant to Section 4.4(k) or Purchaser pursuant to Section 4.4(l)(i), and (iv) except as set forth in this Section 4.6, such termination will be without liability to Purchaser or Seller, provided, however, that the provisions of Section 3.2, Section 4.5, this Section 4.6, Section 10.2 and Article 12 (other than Section 12.2) and, to the extent necessary to effectuate the foregoing enumerated provisions, Section 1.1, will survive any such termination and will be enforceable hereunder, provided, further, that, other than pursuant to Section 4.6(c), nothing in this Section 4.6 will be deemed to release any Party from liability for any Willful Breach of its obligations under this Agreement that occurred prior to such termination. The obligations of Seller Parent, Seller, Company Parent and the Company to pay the Expense Reimbursement and Break-Up Fee as set forth above will be joint and several.

(b)      The obligations to return the Deposit Amount and pay the Break-Up Fee and Expense Reimbursement subject to and in accordance with Section 3.2, Section 4.5, this Section 4.6 and Section 10.2, will (i) be binding upon and enforceable against each Debtor immediately upon the Bankruptcy Court's entering the Bidding Procedures Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion, dismissal or consolidation of the Bankruptcy Cases, any plan of reorganization or liquidation in the Bankruptcy Cases, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to return the Deposit Amount and pay Purchaser the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement, are intended to be, and upon entry of the Bidding Procedures Order specifically provide that they are, binding upon (i) each of Seller's and Company Parent's affiliated debtors and debtors-in-possession, (ii) any successors or assigns of the Debtors, (iii) any trustee, examiner or other representative of a Debtor's estate, (iv) the reorganized Debtors, and (v) any other entity vested or revested with any right, title or interest in or to the Company Parent Interests or any Shares, or any other Person claiming any rights in or control (direct or indirect) over any of the Company Parent Interests or any Shares (each of (i) through (v), a "Successor") as if such Successor were a Seller hereunder. The obligations of Seller to return the Deposit Amount and the obligations to pay Purchaser the Break-Up Fee and Expense Reimbursement, as and when required under this Agreement may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

(c)     Notwithstanding anything to the contrary in this Agreement, in the event this Agreement is terminated by Seller pursuant to Section 4.4(f), and Purchaser offers to agree to the release of the Deposit Amount to Seller and Seller does not, promptly (and in any event within three Business Days) after such offer, reject such release and forego its entitlement thereto, the Deposit Amount will be the sole and exclusive remedy of Seller and its Affiliates against Purchaser and its Affiliates for any loss suffered as a result of any breach of any covenant or agreement in this Agreement (including termination of this Agreement), or in respect of any representation made or alleged to have been made in connection with this Agreement, and upon release and acceptance of such Deposit Amount, Purchaser and its Affiliates will have no further liability or obligation relating to or arising out of this Agreement (including termination thereof) or in respect of representations made or alleged to be made in connection herewith, whether in equity or at law, in contract, in tort or otherwise.

## 5. REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in (a) the disclosure schedule delivered by Seller to Purchaser together with this Agreement (the "Seller Disclosure Schedule") or (b) reports filed by NII Holdings with the Securities and Exchange Commission after January 1, 2013 and prior to the date of this Agreement ((x) only to the extent of disclosure in such reports the relevance of which to the applicable representation or warranty is reasonably apparent on its face and (y) excluding, in each case, any disclosures set forth in any risk factor section or in any other section to the extent they are forward-looking statements or cautionary, predictive or forward-looking in nature), Seller hereby represents and warrants to Purchaser that:

5.1.    Organization of Seller and Seller Parent.  Each of Seller and Seller Parent and each Seller Guarantor is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted subject to the limitations on such power and authority that are imposed on Seller Parent and each Seller Guarantor and will be imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, and is in good standing (to the extent such concept is recognized under applicable Law) in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be in good standing would not, individually or in the aggregate, materially and adversely affect the ability of Seller or Seller Parent or any Seller Guarantor to carry out its obligations under this Agreement or to consummate the transactions contemplated hereby.  Seller has been formed for the sole purpose of consummating the transactions contemplated hereby, has not engaged previously, and does not engage, in any business activities except for holding the Company Parent Interests, and as of the Closing does not have any assets of any kind other than the Company Parent Interests and does not

have any Liabilities of any kind or nature other than those incurred pursuant to this Agreement.

5.2. <u>Authorization of Agreement</u>.  Subject to entry of the Bidding Procedures Order and the Sale Order, each of Seller and Seller Parent and each Seller Guarantor has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party (the "<u>Ancillary Agreements</u>") and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby has been duly authorized by all requisite corporate action on the part of Seller and Seller Parent and each Seller Guarantor.  This Agreement and each Ancillary Agreement has been duly and validly executed and delivered by Seller and Seller Parent  and each Seller Guarantor and (assuming the due authorization, execution and delivery by the other Parties hereto, and the entry of the Bidding Procedures Order and the Sale Order) this Agreement and each Ancillary Agreement constitute legal, valid and binding obligations of Seller and Seller Parent and each Seller Guarantor, enforceable against Seller and Seller Parent and each Seller Guarantor in accordance with its respective terms, subject to General Enforceability Exceptions.

5.3. <u>Conflicts; Consents of Third Parties</u>.  (a)  The execution and delivery by Seller and Seller Parent and each Seller Guarantor of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby and compliance by Seller and Seller Parent and each Seller Guarantor with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation, the creation or acceleration of any obligation or change of any rights or the incurrence of any Encumbrance, under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity, or (ii) subject to entry of the Bidding Procedures Order and the Sale Order, (A) other than in respect of the Third Party Consents, any Contract, Permit or Telecommunications License to which Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity is a party or by which any of the properties or assets of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity are bound, (B) any Order of any Governmental Authority applicable to Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity or any of the properties or assets of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity, or (C) any applicable Law, other than, in the case of subsection (ii), such conflicts, violations, defaults, terminations, cancellations or other changes that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  The approval of an independent manager for NII International Telecom S.C.A. has been obtained to

the extent required to be obtained in connection with execution and delivery of this Agreement or the transactions contemplated hereby.

(b)   No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority is required on the part of Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity in connection with the execution and delivery of this Agreement or any Ancillary Agreement, the compliance by Seller or Seller Parent or any Seller Guarantor with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Seller, Seller Parent, Company Parent, any Seller Guarantor or any Entity of any other action contemplated hereby or thereby, except for (i) the Company Approvals, (ii) the entry of the Bidding Procedures Order and the Sale Order, and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications the failure of which to obtain or make would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.4.   Organization of the Entities.  Each Entity is duly organized, validly existing and in good standing (to the extent such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, duly qualified or authorized to do business under the Laws of its jurisdiction and has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now conducted and is in good standing (to the extent such concept is recognized under applicable Law) in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.5.   Capitalization of the Entities.  (a)  The Shares and the shares of the Subsidiaries of the Company are duly authorized and are validly issued, fully subscribed and paid, non-assessable and qualify as *acciones liberadas.*  The Shares comprise all the outstanding capital stock of the Company.  The number and type of issued and outstanding capital stock of each Entity, the record owners thereof and the jurisdiction of organization or formation of each Entity are listed in Section 5.5(a) of the Seller Disclosure Schedule.  All of the equity interests of each Subsidiary of the Company are owned by the Company or another Subsidiary of the Company free and clear of all 363 Interests.  There are no bonds, debentures, notes or other Indebtedness of any Entity that entitle holders thereof to vote (or to a veto or any similar type of negative control) on any matters on which holders of the Shares (or equity interests of the Subsidiaries) may vote.

(b)   There are no preemptive or, other than pursuant to this Agreement, other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights or repurchase rights of any character to which Seller, Seller Parent, Company Parent or any Entity is a party requiring,

and there are no securities of any Entity outstanding which upon conversion or exchange would require, the issuance, sale or disposition of any shares or other securities or obligations convertible into, exchangeable for or evidencing the right to subscribe for or purchase shares of any Entity.

(c)     NII Mexico, LLC (i) has not engaged previously, and does not engage, in any business or operations and (ii) as of the Closing does not have any assets of any kind and does not have any Liabilities of any kind.

5.6.    <u>Subsidiaries</u>.  The Company does not own any equity interest in any other Person except for the subsidiaries identified in Section 5.6 of the Seller Disclosure Schedule (the "<u>Subsidiaries</u>").

5.7.    <u>Title to Shares</u>.  Company Parent has legal title to the Company Shares and the Minority Shareholder has legal title to the Minority Company Shares, in each case free and clear of all 363 Interests other than this Agreement.  Subject to the entry of the Sale Order and the conditions set forth herein, at the Closing, Purchaser will be vested with indirect legal ownership of the Shares free and clear of all 363 Interests.  Except for this Agreement, none of Seller or any of its Affiliates is a party to any stockholder agreement, voting trust, proxy or other similar Contract with respect to the voting, purchase, repurchase or transfer of the Shares or any other equity interests of any of the other Subsidiaries.

5.8.    <u>Financial Statements</u>.  (a)  Prior to the date of this Agreement, Seller has delivered to Purchaser complete and correct copies of (i) the audited consolidated balance sheets of the Company as at December 31, 2012 and December 31, 2013 and the related consolidated statements of income and of cash flows of the Company for the years then ended, together with the notes thereto (the "<u>Audited Financial Statements</u>") and (ii) the unaudited consolidated balance sheet (the "<u>Unaudited Balance Sheet</u>") of the Company as at September 30, 2014 (the "<u>Balance Sheet Date</u>") and the related consolidated unaudited statements of income and of cash flows of the Company for the period ending on the Balance Sheet Date (the "<u>Unaudited Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>").  Each of the Financial Statements has been derived from the books of account and other financial records of the Entities and has been prepared in accordance with Mexican NIF and presents fairly, in all material respects, the consolidated financial position, results of operations and cash flows of the Company, as at the dates and for the periods indicated therein, except that the Unaudited Financial Statements described in subsection (ii) are subject to normal year-end adjustments (which will not be material in nature or amount).

(b)     The books and records of the Entities have been maintained in conformity with applicable Law and Mexican NIF.  Except as set forth in Section 5.8(b) of the Seller Disclosure Schedule, the corporate books of the Entities contain records of all meetings, and actions taken by written consent of,

the shareholders (or equivalent), the board of directors (or equivalent) and any committees of the board of directors (or equivalent) of the Entities that are complete and accurate in all material respects, and no material meeting, or material action taken by written consent has been held for which minutes have not been prepared and are not contained in such corporate books.

5.9.    Undisclosed Liabilities.  The Entities do not have any Liabilities except for (a) Liabilities reflected or reserved against on the balance sheet included in the Audited Financial Statements or the Unaudited Balance Sheet and not heretofore paid or discharged, (b) Liabilities incurred since the date of the Audited Financial Statements in the Ordinary Course of Business, or (c) Liabilities that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.10.  Taxes.  (a)  (i) All income and other material Tax Returns required to be filed by or on behalf of or with respect to each Entity have been timely filed (taking into account any applicable extension periods) with the appropriate Governmental Authority and all such Tax Returns are true, correct and complete in all material respects, (ii) the Company has, or has caused each of its Subsidiaries to have, duly and timely paid all amounts of Taxes and other charges shown to be due on such Tax Returns, except for those which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established and which are set forth on Section 5.10(a) of the Seller Disclosure Schedule, and (iii) none of the Entities has waived any statute of limitations in respect of a material amount of Taxes, which waiver is currently in effect.

(b)    Each of the Entities has timely collected or withheld all material amounts of Taxes required to be collected or withheld with respect to its Employees, independent contractors, creditors, stockholders or other third parties and have paid over to the appropriate Governmental Authority all amounts required to be so collected or withheld.

(c)    All written deficiencies or assessments made as a result of any audit, examination or investigation by any Governmental Authority of the Tax Returns of any of the Entities have been fully paid, and none of the Entities has received any notice in writing of any other audits, examinations or investigations in progress by any Governmental Authority relating to any Tax Returns of any of the Entities.  Except as set forth on Section 5.10(c) of the Seller Disclosure Schedule, none of the Entities has received any written notice from any Governmental Authority of the commencement of any audit, examination or investigation not yet in progress.

(d)    None of the Entities is a party to any Tax indemnification, Tax allocation or Tax sharing agreements pursuant to which such Entity will have any obligation to make any payments after the Closing Date, except for any agreement the primary purpose of which is not Tax.  None of the Entities is or

was subject to the Mexican tax consolidation regime which was in effect until December 31, 2013.

(e)     There are no Tax rulings, requests for rulings or closing agreements relating to or with respect to the income and/or assets of any of the Entities that could affect the liability for Taxes of any of the Entities for any period (or portion thereof) ending on or after the Closing Date.

(f)     None of the Entities is or will be required to include a material item of income, or exclude a material item of deduction, for any period (or portion thereof) ending on or after the Closing Date, as a result of, on or before the Closing Date, any (i) transaction treated as an installment sale or open transaction for any Tax purpose, (ii) receipt of a prepaid amount or deposit, (iii) change in method of accounting or similar adjustment that any of the Entities has agreed to, requested, or was required to make or (iv) agreement entered into with any Governmental Authority.

(g)     There are no Encumbrances for Taxes upon any assets of any of the Entities other than Permitted Encumbrances.

(h)     No written claim has ever been made by a Governmental Authority in any jurisdiction where any of the Entities does not file Tax Returns that such Entity is or may be subject to taxation by such jurisdiction.

(i)     None of the Entities has granted any extension or comparable consent regarding the application of the statute of limitations with respect to any material Taxes or Tax Return that is outstanding, nor has any request for any such extension or consent been made.

(j)     None of the Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending on or after the Closing Date as a result of any intercompany transactions in accordance with the Mexican Income Tax Law.

(k)     There are no restrictions or limitations on the deductibility of interest payable by any of the Entities for Mexican income tax purposes, in accordance with the provisions set forth in Article 27, Section VII and Article 28, Section XXVII of the Mexican Income Tax Law in force as of January 1, 2015, and the applicable Articles and Sections of the Mexican Income Tax Law in effect in prior years.

(l)     All transactions between the Company or one of its Affiliates, on the one hand, and the Company or another one of its Affiliates, on the other hand, have been entered on the same terms as would have been entered by unrelated parties acting at arm's-length, including compliance in all material respects with the provisions set forth in Articles 179 and 180 of the Mexican

Income Tax Law and Article 76, Sections IX and XII, as well as the corresponding articles of the Mexican Income Tax Law in force prior to 2015.

(m)     None of the Entities has made any entity classification election for U.S. federal income tax purposes or any other U.S. federal income tax election.

(n)     For U.S. federal income tax purposes, Company Parent has always been disregarded as separate from its owner.

(o)     Except as set forth on Section 5.10(o) of the Seller Disclosure Schedule, none of the Entities has executed or entered into any transaction that is required to be reported in format 76 in accordance with Article 31-A of the Mexican Federal Tax Code (*Código Fiscal de la Federación*) with respect to fiscal years 2014 and 2015.

(p)     Less than 50% of the value of the Entities derives directly or indirectly from real estate located in Mexico.

(q)     Company Parent is not a tax resident of Mexico and does not have a permanent establishment in Mexico.

(r)     For purposes of this <u>Section 5.10</u>, "Entities" or "Entity" includes Company Parent.

5.11.  <u>Real Property</u>.  (a)  Section 5.11(a) of the Seller Disclosure Schedule lists the street address (or equivalent identifying information) of each Owned Property and the current owner of each Owned Property.  The Entities have legal title to all Owned Property, free and clear of Encumbrances except for (a) Encumbrances set forth in Section 5.11(a) of the Seller Disclosure Schedule and (b) Permitted Encumbrances.  Seller has made available to Purchaser true and complete copies of (i) each deed for each Owned Property and all title insurance policies and surveys, if any, relating to the Owned Property and (ii) all documents evidencing all Encumbrances upon the Owned Property, in each case to the extent in Seller's or its Affiliates' possession.

(b)     Section 5.11(b) of the Seller Disclosure Schedule lists the street address (or equivalent identifying information) of each Leased Property and the identity of the lessor, lessee and current occupant (if different from lessee) of each such Leased Property.  Seller has made available to Purchaser true and complete copies of all leases in effect at the date hereof relating to the Leased Property; and, to the Knowledge of Seller, there has not been any sublease or assignment entered into by the Company or any of its Subsidiaries in respect of the Leased Property.

(c)     As of the date of this Agreement, except for such of the following as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, to the Knowledge of Seller, (i)

there are no special assessments or any planned public improvements that may result in a special assessment with respect to any Owned Property and (ii) there is no special proceeding pending or threatened in writing in which any Governmental Authority having jurisdiction over any of the Owned Property is seeking to increase the assessed value thereof.  To the Knowledge of Seller, there is no pending or threatened in writing condemnation proceeding with respect to any of the Owned Property or Leased Property that would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(d)     Except for such of the following as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, the use, operation and maintenance of the Owned Property and Leased Property (including all structures and improvements thereon) is in material compliance with all applicable Laws (including those relating to zoning and permitting), does not violate any restrictive covenant or any provision of any such applicable Laws and is not subject to "permitted non-conforming" use classifications or conditional use permits or zoning variances.

5.12.   Intellectual Property.  (a)  Section 5.12 of the Seller Disclosure Schedule describes all Intellectual Property owned by the Entities as of the date of this Agreement for which a patent, trademark, copyright or registration exists or has been applied for by or on behalf of the Entities and all material licenses or other covenants or rights under Intellectual Property which the Entities have been granted from any Person or which the Entities have granted to any Person ("Licenses").

(b)     The Entities solely and exclusively own all material Intellectual Property owned or purported to be owned by the Entities, and all such material Intellectual Property is subsisting and, to the Knowledge of Seller, valid and enforceable.

(c)     The Intellectual Property owned by the Entities, together with the right to use the Intellectual Property licensed to the Entities, constitutes all material Intellectual Property used in the business of the Entities as presently conducted.

(d)     Seller or its Affiliates (other than the Entities) do not own any material Intellectual Property that is used in the business of the Entities.

(e)     To the Knowledge of Seller, (i) as of the date of this Agreement, the material Intellectual Property owned by the Entities is not the subject of any challenge received by the Entities in writing and (ii) the Entities have not received, since six years prior to the date of this Agreement, any written notice of any default or breach under any material License to which the Entities are a party or by which they are bound.

(f)     The conduct of the business of the Entities does not and has not materially infringed or otherwise violated any Intellectual Property of any Person.

(g)     (i) The Entities are in compliance with all privacy policies of the Entities and with all applicable Laws regarding privacy and personal information, except where the failure to comply would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, and (ii) the Entities have used commercially reasonable measures to ensure the confidentiality, privacy and security of customer, Employee and other confidential and trade secret information, and, to the Knowledge of Seller, as of the date of this Agreement, no Person has gained unauthorized access to, or misused, any such information, except where the access or misuse would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(h)     To the Knowledge of Seller, no material Software owned or distributed by the Entities is subject to any "open source" license or any other agreement that requires making available source code, prohibits or limits the ability to charge fees or other consideration, grants any right to any Person to decompile or otherwise reverse-engineer such Software, or requires the licensing of any Software for the purpose of making derivative works.

(i)     (i) The Entities own or have rights to use all material information technology systems sufficient to operate their businesses as it is currently conducted, except where the failure to do so would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, (ii) the Entities have a disaster recovery plan, procedures and facilities in place and have taken all reasonable steps to safeguard the information technology systems utilized in the operation of their businesses as it is currently conducted, and (iii) as of the date of this Agreement, to the Knowledge of Seller, there have been no unauthorized material intrusions or breaches of the security of the information technology systems.

5.13.   Material Contracts.  (a)  Section 5.13(a) of the Seller Disclosure Schedule sets forth a list of the following Contracts (other than any statement of work, purchase, project, change or similar orders issued pursuant to any such Contracts to the extent consistent with the terms and conditions, and not constituting an amendment, of the applicable Contract) to which, as of the date hereof, the Entities are party and under which the Entities have any remaining rights or obligations, or to which the Entities' Affiliates are a party and under which the Entities receive any material benefit, as of the date of this Agreement (collectively, the "Material Contracts"):

(i)     any Contract evidencing Indebtedness for borrowed money having an aggregate principal amount outstanding in excess of MXN$40,000,000, including the CDB Credit Facilities;

(ii)     any Contract that forms or purports to form a corporate partnership, joint venture or similar entity or any profit sharing, management services, strategic alliance, stockholder or similar Contract;

(iii)     each Contract for distribution, supply, inventory, purchase, franchise, license, agency, dealership, resale, advertising or similar contract that is reasonably expected to involve the payment or receipt by the Entities of consideration of more than MXN$15,000,000 in any 12-month period or MXN$40,000,000 in the aggregate over the term of such Contract;

(iv)     any stock purchase agreement, asset purchase agreement or other Contract relating to the acquisition, lease or disposition by any Entities of material assets and properties or any equity interest of any Entity or under which any Entity has any material indemnification obligations surviving on the date hereof;

(v)     any Contract that is reasonably expected to involve the payment or receipt by the Entities of more than MXN$40,000,000 in any 12-month period or MXN$75,000,000 in the aggregate over the term of such Contract;

(vi)     any Contract involving the payment of royalties or other amounts calculated based upon the revenues or income of the Entities and that are reasonably expected to involve the payment or receipt by the Entities of more than MXN$7,500,000 in any 12-month period or MXN$15,000,000 in the aggregate over the term of such Contract;

(vii)     any Contract that is an interconnection, bundling or similar Contract (excluding roaming Contracts) in connection with which the equipment, networks and services of any Entity are connected to those of another service provider in order to allow their respective customers access to each other's services and networks;

(viii)     any Contract (excluding roaming Contracts) that contains any commitment to (A) provide wireless services coverage in a particular geographic area, (B) build out tower sites in a particular geographic area, (C) pay for a specified number of minutes of voice service, or (D) acquire video content to be placed on or accessed over a mobile wireless device or otherwise;

(ix)     any roaming Contract that cannot be terminated on 30 days' prior notice or less;

(x)     any Contract relating to the settlement of any Legal Proceeding within the past three years with (A) any Governmental Authority or (B) any Person (other than a Governmental Authority) for an aggregate amount of more than MXN$15,000,000;

(xi)     any Contract that (A) purports to limit either the type of business in which any Entity may engage or the manner or locations in which any of them may so engage in any business or purport to create any exclusive relationship restricting the business or operations of any Entity (including by covenant not to compete), (B) could require the disposition of any material assets or line of business of any Entity, or (C) grants "most favored nation" status; and

(xii)     any material Licenses.

(b)     Prior to the date of this Agreement, Seller has made available to Purchaser true and correct copies of each of the Material Contracts and all amendments, exhibits, annexes and schedules thereto, and, other than Material Contracts that have terminated at their scheduled termination date in accordance with their terms, each of the Material Contracts, as amended, is in full force and effect and is a legal, valid and binding obligation of the Entity party thereto, enforceable against such Entity in accordance with its terms, subject to General Enforceability Exceptions.  None of the Entities is in breach or violation of, or default under, any Material Contract in any material respect.  To the Knowledge of Seller, as of the date of this Agreement, no event has occurred that is reasonably likely to result in a breach or default by any Person under, require any consent or other action by any Person under, or give rise to any penalty or right of termination, cancellation, acceleration or other change of any right or obligation of any Entity or a loss of any benefit that any Entity is entitled under (in each case, with or without notice or lapse of time, or both) any Material Contract, except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  As of the date of this Agreement, the Entities have not received any notice of any default or breach by such Entities under any Material Contract, except for defaults or breaches that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.14.  Labor.  (a) Section 5.14(a) of the Seller Disclosure Schedule lists each labor or collective bargaining agreement to which any Entity is a party or otherwise bound as of the date of this Agreement (collectively, the "Labor Agreements").  To the Knowledge of Seller, as of the date of this Agreement, no campaigns are being conducted with respect to any Entity to authorize representation by any labor union or labor organization.

(b)     Seller has made available to Purchaser accurate and complete copies of each material Labor Agreement.  The Company and its Subsidiaries are in compliance in all material respects with the Labor Agreements.  The consummation of the transactions contemplated by this Agreement will not require the consent of, or advance notification to, any works councils, unions or similar labor organizations with respect to any Employees or other service providers.

(c)     To the Knowledge of Seller, except as would not, individually or in the aggregate, be material:  (i) no Entity, as of the date of this Agreement, is the subject of any proceeding asserting that it has committed an unfair labor practice or seeking to compel it to bargain with any labor union or labor organization; and (ii) there is no pending or, to the Knowledge of Seller, threatened grievance, charge, complaint, audit or investigation by or, as of the date of this Agreement, before any Governmental Authority with respect to any current or former Employees or service providers.

(d)     There is no pending and has been no organized labor strike, slowdown, picketing or work stoppage, except in each case as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(e)     No Entity is liable for any material payment to any trust or other fund or to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for current or former Employees (other than routine payments to be made in the Ordinary Course of Business consistent with past practice), agents, distributors, independent contractors and other service providers.  No Entity has any direct or indirect material Liability with respect to any misclassification of any Person as an independent contractor or temporary employee rather than as an Employee, or with respect to any employee leased from another employer that would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(f)     Section 5.14(f) of the Seller Disclosure Schedule sets forth as of the date of this Agreement a complete and accurate list of all Employees and employees of Finatrade Servicios, S.A. de C.V. who render their services to the Entities by employer, name, title, date of hire and seniority or service credit if different, status (i.e., whether active or on leave of absence), and if on leave, the type of leave, such as disability, family, medical or military leave.

(g)     Section 5.14(g) of the Seller Disclosure Schedule sets forth a list of all Legal Proceedings pending with respect to current or former Employees or other service providers that, to the Knowledge of Seller, is complete and accurate in all material respects.

5.15.   Litigation.  There are no Legal Proceedings pending or, to the Knowledge of Seller, threatened or, to the Knowledge of Seller, investigations pending or threatened against any Entity other than those that, if adversely determined, would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect and those that arise in the Ordinary Course of Business after the date hereof.  No Entity or any of their respective directors or officers in their capacities as such is a party to or subject to any order, decree, injunction or award with any Governmental Authority that

would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

5.16. <u>Compliance with Laws; Permits</u>.  (a)  Since January 1, 2010, each Entity is and has been in compliance with all Laws applicable to its business or operations, except where the failure to be in compliance would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  No regulatory review out of the ordinary course or investigation by any Governmental Authority with respect to any Entity is, to the Knowledge of Seller, pending or threatened in writing, nor has any Governmental Authority indicated in writing an intention to conduct the same, except for such regulatory reviews out of the ordinary course or investigations that would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  No Entity has received any written notice of any noncompliance with any such Laws that has not been cured, in each case, except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(b)     Each Entity currently has all Permits and Telecommunications Licenses that are required for it to own, lease or operate its properties and assets and to conduct the Business, except where the failure to have such Permits or Telecommunications Licenses would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  Since January 1, 2010, no Entity is or has been in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit or Telecommunications License to which it is a party, except where such default or violation would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(c)     Section 5.16(c) of the Seller Disclosure Schedule sets forth a true and complete list, of (i) all Telecommunication Licenses held by the Entities (the "<u>Company Telecommunication Licenses</u>"), (ii) all pending applications for Telecommunication Licenses that would be Company Telecommunication Licenses if issued or granted, and (iii) all pending applications by the Entities for modification, extension or renewal of any Company Telecommunication License.  The Company is not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a material default or violation), in any material respects, of any term, condition or provision of any Company Telecommunication License granted to any Entity.  There is not pending or, to the Knowledge of Seller, threatened before IFETEL, SCT or any other Governmental Authority any proceeding, notice of violation, order of forfeiture or complaint or investigation, requisition, confiscation, revocation, nullification, rescue and/or seizure against any Entity relating to any of the Permits or Company Telecommunication Licenses, that would, individually or in the aggregate, reasonably be expected to result in the suspension, revocation, cancellation, termination, forfeiture, or adverse modification of any material

Company Telecommunication License or any material Permit. The Governmental Authority's actions granting all Company Telecommunication Licenses, together with all underlying construction permits, have not been reversed, stayed, enjoined, annulled or suspended, and, as of the date hereof, there is not pending or, the Knowledge of Seller, threatened any application, petition, objection or other pleading with IFETEL, COFETEL or any other Governmental Authority that challenges or questions the validity of or any rights of the holder under any such Company Telecommunication License or Permit, in each case, except as would not, individually or in the aggregate, reasonably be expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(d)     The Entities have valid, binding and enforceable rights to the Company Telecommunication Licenses. The Company Telecommunication Licenses have not been sold, transferred, alienated, leased or encumbered or in any other manner has the right to use and enjoy ownership or possession of the Company Telecommunication Licenses been restricted, transferred or surrendered since the initial award thereof, and the Entities' title to all the Company Telecommunication Licenses is free and clear of any Encumbrances. The Entities have complied with all applicable Law in connection with obtaining each Company Telecommunication License and each Company Telecommunication License (i) has been legally and duly granted by the appropriate granting authority, (ii) is fully and unconditionally vested in an Entity, and (iii) is in full force and effect and paid for in full. None of the Entities owes any material fees or duties in connection with, or arising from, any Company Telecommunication Licenses, in each case, that are due and payable. The Entities do not own or use any license of the Federal Communications Commission of the U.S. No Entity holds any Telecommunications Licenses through a partnership, joint venture or other Person that is not an Entity.

(e)     All of the currently operating cell sites and microwave paths owned by the Entities in respect of which a filing with a Governmental Authority was required have been constructed and are currently operated as represented to such Governmental Authority in currently effective filings, and modifications to such cell sites and microwave paths have been preceded by the submission to such Governmental Authority of all required filings (the "Cell Site Standards"), in each case, except as would not, individually or in the aggregate, be reasonably expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(f)     All transmission towers owned by the Entities are obstruction-marked and lighted by an Entity to the extent required by, and in accordance with, the rules and regulations of any applicable Governmental Authority, in each case, except as would not, individually or in the aggregate, be reasonably expected to materially impair the ability of the Entities to conduct the Business as presently conducted. Appropriate notification to the applicable Governmental Authority has been made for each transmission tower owned or

leased by the Entities to the extent required to be made by an Entity by, and in accordance with, the rules and regulations of such Governmental Authority (the "<u>Transmission Tower Standards</u>"), in each case, except as would not, individually or in the aggregate, be reasonably expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(g)     All of the currently operating cell sites and microwave paths and transmission towers leased by the Entities (i) are subject to contractual arrangements with the lessor requiring compliance by such lessor with all aspects of the Cell Site Standards and the Transmission Tower Standards, (ii) if operated or maintained by the Entities, are so operated or maintained, as the case may be, in compliance with the Cell Site Standards and the Transmission Tower Standards, and (iii) to the Knowledge of Seller, each such lessor is in compliance with the Cell Site Standards and the Transmission Tower Standards, in each case, except as would not, individually or in the aggregate, reasonably be expected to materially impair the ability of the Entities to conduct the Business as presently conducted.

(h)     The Company does not hold any Permit or Telecommunications License to offer, and does not offer, any services or features other than wireless voice and data services and features, and any ancillary services or features thereto.  The Entities do not conduct any business other than the Business.

5.17.   <u>Environmental Matters</u>.  (a)  Except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, (i) each Entity has complied at all times with all applicable Environmental Laws, (ii) no property currently or formerly owned or operated by any Entity has been contaminated with any Hazardous Substance that could reasonably be expected to require remediation pursuant to any Environmental Law, (iii) no Entity is subject to any liability for Hazardous Substance disposal or contamination on any third party property, (iv) as of the date of this Agreement, no Entity has received any notice, demand, letter, claim or request for information indicating that it may be in violation of or subject to liability under any Environmental Law, and (v) no Entity is subject to any order, decree, injunction or agreement with any Governmental Authority or any indemnity with any third party relating to liability under any Environmental Law.

(b)     Seller has made available to Purchaser copies of all environmental reports, studies and assessments prepared since January 1, 2012 in its possession relating to the Entities or the Business.

(c)     The representations and warranties in this <u>Section 5.17</u> are Seller's only representations and warranties with respect to environmental matters and no other representations or warranties will be deemed breached or inaccurate by reason of any environmental matter.

5.18.  Broker's or Finder's Fee.  None of Seller, Seller Parent, Company Parent or any of the Entities has any liability or obligation to pay any fees or commissions to any broker, finder or other agent with respect to the transactions contemplated by this Agreement for which Purchaser or any of its Affiliates (including, after Closing, the Entities) could become liable or obligated.

5.19.  Insurance.  To the Knowledge of Seller, the properties and assets of the Entities are adequately insured against accident, damage, injury, third party loss (including product liability claims), loss of profits and any other risk normally insured against by a prudent person operating the types of business operated by the Entities and effect such insurances as required by Law and any Contracts that are binding upon the Entities.  Section 5.19 of the Seller Disclosure Schedule sets forth all insurance policies owned or held as of the date hereof by any Entity on the date of this Agreement and that currently cover the corresponding Entity, its business, assets, properties or personnel with respect to risks arising in connection with the operation or conduct of its business (collectively, the "Insurance Policies").  As of the date of this Agreement, none of the Entities has received any notice in writing, nor, to the Knowledge of Seller, orally, from any insurer or agent of any intent to cancel or not to renew any Insurance Policy, and there are no pending or, to the Knowledge of Seller, threatened, material claims related to the business, assets, properties or personnel of the Entities against any Insurance Policy as to which the insurer has denied coverage or asserted a reservation of rights.  None of the Entities is in default, in any material respect, under any Insurance Policy.

5.20.  Sufficiency of Assets.  The Owned Property and other assets owned by the Entities together with their respective rights under Contracts that survive the Closing (including pursuant to the Transition Services Agreement), constitute all the assets, properties and rights (a) necessary to conduct the Business in all material respects as presently conducted by the Entities and (b) used to generate the results of the Entities set forth in the Financial Statements. All of the wireless telecommunication services business of Seller and its Affiliates in Mexico is operated by the Entities and is included in the Business.

5.21.  Subscribers; Transmission Towers; Network Assets.  (a)  Section 5.21(a) of the Seller Disclosure Schedule sets forth as of December 31, 2014 (i) the total number of Subscribers, (ii) the total number of Postpay Subscribers, and (iii) the total number of Prepaid Subscribers, in each of clauses (i), (ii) and (iii), such number of Subscribers to be broken down by plan and type of device.

(b)  Section 5.21(b) of the Seller Disclosure Schedule lists, as of the date of this Agreement, each transmission tower and tower structure on which transmitters used in the network of the Business are located ("Transmission Towers"), whether owned or leased by the Entities and its location by street address and global positioning service coordinates.

5.22.  Certain Conduct; Sanctions.  (a)  None of the Entities or any of their Affiliates, nor any director, officer or employee of the Entities or any of their Affiliates, nor any agent, representative or other Person acting or purporting to act for the benefit of or on behalf of the Entities or any of their Affiliates, to the Knowledge of Seller, (i) has violated any provision of the FCPA, the Mexican Federal Anticorruption Law (*Ley Federal Anticorrupción en Contrataciones Públicas*), the Mexican Federal Criminal Code (*Código Penal Federal*), the Criminal Codes of the several states of Mexico or any other applicable Law that prohibits corruption, bribery or any of the foregoing actions, (ii) has been investigated by a Governmental Authority, or been the subject of any allegation, with respect to conduct within the scope of clause (i) above, (iii) will use all or any portion of the amounts paid by Purchaser hereunder in a manner that may violate any provision of the FCPA, the Mexican Federal Anticorruption Law (*Ley Federal Anticorrupción en Contrataciones Públicas*), the Mexican Federal Criminal Code (*Código Penal Federal*), the Criminal Codes of the several states of Mexico or any other applicable Law that prohibits corruption, bribery or any of the foregoing actions or (iv) is a "foreign official" within the meaning of the FCPA.

(b)     The accounting books and records of the Entities and their Affiliates accurately and fairly reflect in all material respects the transactions and the dispositions of assets of each of those entities in reasonable detail and the Entities and their Affiliates maintain systems of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with the actual levels at reasonable intervals and appropriate action is taken with respect to any differences, and (v) the Entities comply with the Laws referenced in Section 5.22(a).  The Entities and their Affiliates have instituted and maintain policies and procedures in relation to business conduct and ethics that are, to the Knowledge of Seller, reasonably designed to prevent or detect any conduct of business of the Entities involving the actions described in clause (i) of Section 5.22(a).

(c)     None of Seller, Seller Parent, Company Parent or the Entities is, nor to the Knowledge of Seller are any of their respective officers, directors or employees, an individual or entity that is a Person that is, or is acting under the direction of, on behalf of or for the benefit of a Person that is, or is owned or controlled by a Person that is, (i) the target of any Sanctions Laws or identified on any Sanctions Lists or (ii) located, organized or resident in a country or territory that is, or whose government is, the target of comprehensive trade sanctions under Sanctions Laws, including, as of the date of this Agreement, Cuba, Iran, North Korea, Sudan and Syria (collectively, the "Sanctioned Countries").

(d)     None of Seller, Seller Parent, Company Parent or the Company (or any of its Subsidiaries or Affiliates) does business with or, to the Knowledge of Seller, sponsors or provides assistance or support to, the government of, or, to the Knowledge of Seller, any other Person located in, any country, or with any other Person, targeted by any of the Sanctions Laws, including the Sanctioned Countries.

(e)     For purposes of this Section 5.22 only, "Affiliates" means only those Affiliates that act (and only to the extent they so act) in connection with the properties, assets or business of the Entities.

5.23.   Absence of Certain Changes.  Between December 31, 2013 and the date of this Agreement, the Entities have conducted their respective businesses only in, and have not engaged in any material transaction other than in accordance with, the Ordinary Course of Business and there has not been any:

(a)     circumstance, occurrence or development (including any adverse change with respect to any circumstance, occurrence or development existing on or prior to December 31, 2013) that constitutes or would reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect; or

(b)     action taken by any Entity that would require Purchaser's consent pursuant to Section 7.2(b)(D), (F)(1), (G), (H), (K)(1), (M), (O) or, solely with respect to the foregoing, Section 7.2(b)(U), if such action had been taken after the date hereof.

5.24.   Related Party Contracts.  Section 5.24 of the Seller Disclosure Schedule contains a list of loans, leases and other Contracts between Seller and its Affiliates (other than the Entities), or the directors, Employees or officers of the Entities (each of the foregoing, a "Related Party"), on the one hand, and any Entity, on the other hand (each of the foregoing, a "Related Party Contract"), except for Employee Plans.  As of the Adjustment Time, none of the Entities will have any Intercompany Obligations outstanding other than those remaining in place in accordance with Section 3.5 or Section 7.8.

5.25.   Employee Benefits.  (a) Section 5.25(a) of the Seller Disclosure Schedule sets forth an accurate and complete list of each Employee Plan.  With respect to each material Employee Plan, Seller has made available to Purchaser, to the extent applicable, accurate and complete copies of (i) the Employee Plan document, including any amendments thereto, and all related trust documents, insurance contracts or other funding vehicles, (ii) a written description of such Employee Plan if such plan is not set forth in a written document, and (iii) the most recently prepared actuarial report, if any.  To the Knowledge of Seller, no United States residents or taxpayers are employed by any Entity or participate in any Employee Plan. No Employee Plans are, or in the past six years have been,

subject to the Employee Retirement Income Security Act of 1974 ("ERISA") or other United States Law.

(b)     No Controlled Group Liability has been incurred by the Company or its ERISA Affiliates that has not been satisfied in full, and no condition exists that presents a risk to the Company or its ERISA Affiliates of incurring any such liability, except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.  No purpose of the transactions contemplated by this Agreement is for any of Seller or its Affiliates to avoid Liability arising out of Title IV of ERISA.

(c)     Except as would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect, each Employee Plan (including any related trusts) has been established, operated and administered in compliance with its terms, all applicable Laws and all applicable funding requirements.  All material contributions required to be made under the terms of any Employee Plan (including all employer contributions and employee salary reduction contributions) and all material obligations as of the date hereof have been timely made or are reflected in the Financial Statements.  Any Employee Plan that is required to be funded is fully funded as of the date hereof as required by applicable Law or, if not required to be fully funded, the book reserves (determined in accordance with Mexican NIF) are sufficient to provide for the payment of the relevant benefits.  Except as required by applicable Law, no Employee Plan provides material retiree or post-employment medical, disability, life insurance or other welfare benefits to any current or former Employee, and no Entity has any obligation to provide such benefits.

(d)     Excluding routine or ordinary course claims for benefits, there is no Legal Proceeding pending or, to the Knowledge of Seller, threatened, or, to the Knowledge of Seller, investigation by any Governmental Authority pending or threatened against or involving any Employee Plan that would, individually or in the aggregate, reasonably be likely to subject any Entity to a material Liability.

(e)     Neither the execution of this Agreement, nor the consummation of the transactions contemplated by this Agreement, (whether alone or in connection with another event) (i) entitles any current or former Employee, director, officer, independent contractor or other service provider of any Entity to severance pay (or other compensation or benefits) or any increase in severance pay (or other compensation or benefits), (ii) accelerates the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of any compensation or benefits under, or increase the amount payable or result in any other material obligation pursuant to, any of the Employee Plans, (iii) limits or restricts the right of the Company or any of its Subsidiaries or their successors to merge, amend or terminate any of the Employee Plans, or (iv) entitles the recipient of any payment or benefit to receive

a "gross up" payment or indemnity for any income or other taxes that might be owed with respect to such payment or benefit.

5.26. <u>Company Parent</u>. (a) Company Parent is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority to own, lease and operate its assets and to carry on its business as now conducted and is in good standing (to the extent such concept is recognized under applicable Law) in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

(b) Company Parent (i) has not engaged previously, and does not engage, in any business or operations except for holding the Company Shares and (ii) as of the Closing does not have any employees or assets of any kind other than the Company Shares and does not have any Liabilities of any kind.

(c) The Company Parent Interests (i) constitute all of the authorized and issued limited liability interests of Company Parent and there are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Company Parent Interests and (ii) are owned by Seller free and clear of all 363 Interests.

(d) Seller has made available to Purchaser true and complete copies of each of the constituent documents and operating agreements of Seller, Seller Parent and Company Parent and none of Seller, Seller Parent or Company Parent is in default or in violation in any material respect of any provision set forth therein.

(e) On January 23, 2015, Seller and Seller Parent consummated the Company Parent Transfer in accordance with their respective constituent documents and applicable Law pursuant to the transfer documentation provided to Purchaser prior to the date hereof.

5.27. <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Article 5</u>, Seller makes no other express or implied representation or warranty with respect to the Business, the Entities, the Company Parent Interests or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of Seller or its Affiliates' respective officers, directors, employees, agents or representatives. Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Entities. The disclosure of any matter or item in any schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would

reasonably be expected to result, individually or in the aggregate, in a Seller Material Adverse Effect.

## 6. REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1.  <u>Organization</u>.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of the state of its incorporation, has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted and is in good standing (to the extent such concept is recognized under applicable Law), in each jurisdiction where the ownership, lease or operation of its properties or the conduct of its business so requires, except where the failure to be in good standing would not, individually or in the aggregate, reasonably be expected to result in a Purchaser Material Adverse Effect.

6.2.  <u>Authorization of Agreement</u>.  Purchaser has the requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser.  This Agreement and each Ancillary Agreement has been duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties hereto) this Agreement and each Ancillary Agreement constitute legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its respective terms, subject to General Enforceability Exceptions.

6.3.  <u>Conflicts; Consents of Third Parties</u>.  (a)  The execution and delivery by Purchaser of this Agreement and each Ancillary Agreement, the consummation of the transactions contemplated hereby and thereby, or compliance by Purchaser with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation, the creation or acceleration of any obligation or change of any rights or the incurrence of any Encumbrances, under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, (iii) any Order of any Governmental Authority applicable to Purchaser or any of the properties or assets of Purchaser, or (iv) any applicable Law, other than, in the case of subsections (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.

(b)     No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Purchaser in connection with the execution and delivery of this Agreement and any Ancillary Agreement, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) the Company Approvals and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.

6.4.     <u>Litigation</u>.  There are no Legal Proceedings pending or, to the Knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.  Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to result, individually or in the aggregate, in a Purchaser Material Adverse Effect.

6.5.     <u>Broker's or Finder's Fee</u>.  Purchaser has no liability or obligation to pay any fees or commissions to any broker, finder or other agent with respect to the transactions contemplated by this Agreement for which Seller or any of its Affiliates could become liable or obligated.

6.6.     <u>Financial Capability</u>.  Purchaser has and will have at the Closing sufficient funds available to pay the Estimated Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.  Purchaser's obligations to complete the transactions contemplated hereby are not dependent upon or conditioned on receipt of financing.

6.7.     <u>Investigation</u>.  Purchaser acknowledges and agrees that it has made its own inquiry and investigation into the Entities, the Company Parent Interests, the business and the assets and liabilities of the Entities, the transactions contemplated by this Agreement and any other rights or obligations to be transferred, directly or indirectly, pursuant to this Agreement.  Purchaser further acknowledges and agrees that the only representations and warranties made by Seller or any of its Affiliates are the representations and warranties expressly set forth in <u>Article 5</u>.  Purchaser acknowledges that, except for the representations and warranties expressly set forth in <u>Article 5</u>, the assets and businesses of the Entities, as a result of the purchase and sale of the Company Parent Interests, are being transferred on a "where is" and, as to condition, "as is" basis.

6.8.     <u>No Other Representations or Warranties</u>.  Except for the representations and warranties contained in this <u>Article 6</u>, Purchaser makes no

other express or implied representation or warranty in connection with this Agreement or any Ancillary Agreement or the transactions contemplated by this Agreement, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser, or any of Purchaser or its Affiliates' respective officers, directors, employees, agents or representatives.

## 7. COVENANTS

7.1.   <u>Access to Information</u>.  Before the Closing Date, Purchaser will be entitled, through its officers, employees and representatives (including its legal advisors and accountants), to make such investigation of, and have access to, the employees, properties, businesses and operations of the Entities and their Affiliates and such examination of the books and records of the Entities and their Affiliates as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation, access or examination, and all communications with any Entity or Affiliate of an Entity and their respective representatives, will be coordinated through representatives designated by Seller.  Any such investigation, access and examination will be conducted upon reasonable notice and under reasonable circumstances during regular business hours and will be subject to restrictions under applicable Law.  Seller will cause the officers, Employees, consultants, agents, accountants, attorneys and other representatives of the Entities and their Affiliates to cooperate with the reasonable requests of Purchaser and its representatives in connection with such investigation, access and examination, and Purchaser and its representatives will cooperate with the Entities and their Affiliates and their respective representatives and will use its reasonable efforts to minimize any disruption to the Entities' and their Affiliates' business.  No such investigation, access or examination will be permitted to the extent that it would require any Entity or Affiliate of an Entity to (a) disclose information subject to attorney-client privilege, (b) violate any confidentiality obligations to which any Entity or Affiliate of an Entity is bound if Seller or the applicable Entity or Affiliate of such Entity, as applicable, will have used commercially reasonable efforts to obtain the consent of such third party to such investigation, access or examinations, or (c) in the event there is an Auction, disclose information regarding any bids, the identity of any bidder, confidentiality or non-disclosure agreements, letters of intent, expressions of interest or other proposals received in connection with transactions comparable to those contemplated by this Agreement or any information or analysis relating to any such communications. No later than 15 days following the date of this Agreement, Seller will deliver to Purchaser a schedule listing all Leased Property and setting forth the amount of rent due and payable under each Leased Property. Before the Closing Date, without the prior written consent of Seller (not to be unreasonably withheld, conditioned or delayed), Purchaser will not contact any suppliers to, or customers of, any Entity regarding the transactions contemplated by this Agreement.  Nothing contained herein is intended to modify or terminate the Non-Disclosure Agreement, which, until the Closing, will remain in full force and effect and applicable to Protected Information (as defined in the Non-Disclosure Agreement) provided to Purchaser

and its representatives hereunder or in connection herewith. Notwithstanding anything in this Section 7.1 to the contrary, with respect to Purchaser's rights to access and information from Affiliates of the Entities (other than Company Parent and the Entities) pursuant to this Section 7.1, Purchaser will have such rights only to the extent its request for access or information is related to the Employees, properties, businesses or operations of the Entities. For the avoidance of doubt, the term "Affiliates," as used in this Section 7.1, does not include the shareholders of NII Holdings, Inc. or any creditors of the Debtors.

7.2.    Conduct of the Business Pending the Closing.  (a)  From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, except (i) as set forth on Section 7.2(a) of the Seller Disclosure Schedule, (ii) as required by applicable Law (in which case, Seller will promptly notify Purchaser of any such condition), (iii) as otherwise expressly provided by this Agreement, or (iv) with the prior written consent of Purchaser (which may not be unreasonably withheld, conditioned or delayed), Seller will cause each Entity to:

(A)     conduct its business in the Ordinary Course of Business (as conducted since January 1, 2014); and

(B)     use its commercially reasonable efforts to preserve its present business operations, organization and goodwill and maintain existing relations with Governmental Authorities, customers, suppliers and other persons with whom they have material commercial relationships and keep available the services of their present Employees and agents, in each case, in all material respects.

(b)     From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, except (i) as set forth on Section 7.2(b) of the Seller Disclosure Schedule, (ii) as required by applicable Law (in which case, Seller will promptly notify Purchaser of any such condition), (iii) as otherwise expressly provided by this Agreement, or (iv) with the prior written consent of Purchaser (which may not be unreasonably withheld, conditioned or delayed with respect to the matters in clauses (F), (I), (Q), (R) or, to the extent related thereto, (U) of this Section 7.2(b)), Seller will not permit any of the Entities (which will include for purposes of clause (S) of this Section 7.2(b) Company Parent) to:

(A)     declare, set aside, make or pay any dividend or other distribution payable in cash, stock or property (or any combination thereof) in respect of its shares or other securities (including repayment of future capital contribution rights (*aportaciones para futuros aumentos de capital*)) or repurchase, redeem or otherwise acquire any outstanding shares or other securities of, or other ownership interests in, any Entity;

(B)     (1) split, combine, subdivide or reclassify its shares or other securities, (2) transfer, issue, sell, pledge, grant, encumber or dispose of any shares or other securities of any Entity or grant options, warrants, calls or other rights to purchase or otherwise acquire shares or other securities of any Entity, or (3) enter into any agreement with respect to the voting of its shares or other securities;

(C)     effect any recapitalization, reclassification or like change in its capitalization or voluntarily adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization of any Entity;

(D)     amend its certificate of incorporation or by-laws or other organizational documents;

(E)     enter into a Contract imposing non-competition, "most-favored nation" status, exclusivity or similar restrictions on the Business or requiring any Entity to effect material changes on the Business or, other than in the Ordinary Course of Business (as conducted since January 1, 2014), or enter into, terminate or modify (1) any Contract with Seller or any of its Affiliates or (2) any Contract that would have been a Material Contract if entered into prior to the date hereof;

(F)     (1)  increase the compensation or benefits of any directors or Employees, other than promotions, changes in positions, annual increases in salary or wages for non-officer Employees by no more than two percent in the aggregate in the Ordinary Course of Business (as conducted since January 1, 2014), (2) grant or pay any bonus, severance or new benefit or other compensation to any of its directors or Employees, provided that the Company and its Subsidiaries may pay annual cash bonuses with respect to the year 2014 or 2015 in the Ordinary Course of Business (as conducted since January 1, 2014) based on actual performance, (3) materially increase the coverage or benefits available under any (or create any new) Employee Plan or otherwise modify or amend or terminate any Employee Plan (or communicate in writing any intention to take such action), except, in each case, as required by applicable Law from time to time in effect or by the terms of any Employee Plan as of the date hereof, (4) take any action to accelerate the vesting or payment, or fund or secure the payment, of any amounts under any Employee Plan, (5) transfer the employment or service location of any individual to, or hire any individual to work at, a location in the United States, or (6) incur any charge, expense or other obligation under the Related Party Contract set forth on Schedule 7.2(b)(F);

(G)     subject any of its properties or assets (whether tangible or intangible and including any of the Shares) to an Encumbrance, except for the incurrence of Permitted Encumbrances in the Ordinary Course of Business (as conducted since January 1, 2014);

(H)     make any loans, advances, guarantees or capital contributions to or investments in any Person (other than (1) to the Entities or (2) advances to Employees, agents, consultants, accountants, service providers or representatives of any Entity in the Ordinary Course of Business (as conducted since January 1, 2014) and not in excess of MXN$75,000 for each advance and MXN$100,000 in the aggregate to any single such Person;

(I)     incur any Indebtedness for borrowed money other than (1) Indebtedness in an aggregate amount less than MXN$150,000,000, (2) Indebtedness associated with the conversion into debt of above 90 days past due supplier account payables, or (3) Indebtedness that is refinancing existing Indebtedness with Indebtedness maturing between the date of this Agreement and the Closing Date, in the case of clauses (1) and (3), only to the extent of Indebtedness (x) repayable at the option of the borrower without penalty or premium, (y) on terms reasonably acceptable to Purchaser and (z) in respect of which Seller has provided Purchaser with prior notice specifying the intended use of proceeds;

(J)     make or authorize any accrual or commitment for capital expenditures (excluding accruals or commitments that are fully used or spent before the Closing Date), in each case, in excess of 120% of the budgeted quarterly amounts under the 2015 Budget;

(K)     (1) purchase, lease or otherwise acquire any material properties, rights, spectrum or other assets, in each case, other than in the Ordinary Course of Business (as conducted since January 1, 2014), or (2) sell, assign, license, transfer, lease, mortgage, pledge, surrender, encumber, divest, cancel, abandon or fail to exercise any available rights to avoid the lapse or expiration of, or otherwise dispose of any of its material operations, properties, rights (including any rights in respect of transmission towers owned or leased by the Entities), product lines, spectrum, businesses, Intellectual Property, Company Telecommunication Licenses or assets (except sales of inventory to customers in the Ordinary Course of Business (as conducted since January 1, 2014) or sales of obsolete or worthless assets or inventory);

(L)     other than in the Ordinary Course of Business (as conducted since January 1, 2014), cancel or compromise any material debt or claim or waive or release any material right of any Entity;

(M)     enter into or agree to enter into any merger or consolidation with any corporation or other entity;

(N)     other than short-term financial investments made in the Ordinary Course of Business (as conducted since January 1, 2014), acquire the securities of any other Person;

(O)    change the accounting methods, practices or procedures applicable to the Entities, except as required by Mexican NIF or applicable Law;

(P)    (1) enter into any line of business in any geographic area other than the current lines of business of the Entities and products and services reasonably ancillary thereto, (2) except as currently conducted, engage in the conduct of any business in any state that would require the receipt of a new or transfer of an existing Company Telecommunication License (other than renewals or replacements of any existing Company Telecommunication License), or (3) conduct any business operations outside of Mexico (excluding pursuant to customary roaming arrangements);

(Q)    assign, transfer, sell, lease, voluntarily forfeit, cancel, surrender, abandon or fail to undertake reasonable best efforts to defend any Permit or Telecommunications License;

(R)    settle any action before or threatened to be brought before a Governmental Authority for an amount in excess of MXN$15,000,000 individually and MXN$75,000,000 in the aggregate;

(S)    make or change any material Tax election, change any method of Tax accounting, settle or otherwise finally resolve any dispute with respect to a material amount of Tax or file a claim for any refund of Tax outside the Ordinary Course of Business for claiming such refunds;

(T)    use infrastructure network technologies or billing systems other than their existing network technologies and billing systems or other network technologies and billing systems disclosed to Purchaser prior to the date hereof; or

(U)    commit or agree to do anything prohibited by this Section 7.2.

(c)    From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, except as expressly contemplated by this Agreement, Seller Parent and Seller will (i) not transfer, sell, pledge, grant, encumber or dispose of, and cause Company Parent and the Uruguay Subsidiary not to issue, any Company Parent Interests or other equity interests in Company Parent or the Uruguay Subsidiary or grant options, warrants, calls or other rights to purchase or otherwise acquire any such Company Parent Interests or other equity interests or enter into any agreement with respect thereto and (ii) cause Company Parent and the Uruguay Subsidiary not to (A) split, combine or subdivide its Company Parent Interests or other equity interests, (B) effect any recapitalization, reclassification or like change in its capitalization or voluntarily adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization, (C) amend its organizational documents

or operating agreement, (D) engage in any business or operations other than, in the case of Company Parent, holding the Company Shares, or (E) acquire any assets, hire employees or incur any Liabilities. Seller will cause Company Parent to transfer all equity interests in the Uruguay Subsidiary to Seller (the "Uruguay Divestiture") prior to Closing.

(d)     From the date of this Agreement until the Closing Date or, if earlier, the termination of this Agreement, (i) Seller and Seller Parent will contribute cash to the Entities in amounts sufficient for the Entities to conduct their business in the Ordinary Course of Business and in accordance with this Agreement and (ii) no later than the tenth Business Day after the end of each 2015 Budget Month and each calendar quarter that ends during the 2015 Budget Period, Seller will deliver a certificate signed on behalf of Seller by an authorized officer of Seller to Purchaser setting forth the amounts of Qualifying Capital Expenditures and Qualifying Sales and Marketing Expenditures made by the Entities and the amount of cash contributions made by Seller and Seller Parent to the Entities, in each case during such 2015 Budget Month or calendar quarter, as applicable, and, at the request of Purchaser, furnish or provide Purchaser access to, supporting documentation sufficient to support Purchaser's review of such certificate.

7.3.    Third Party Consents.  Seller will use (and Seller will cause each of the Entities to use) reasonable best efforts, and Purchaser will use commercially reasonable efforts to cooperate with Seller and each of the Entities, to obtain at the earliest practicable date all Third Party Consents and any other approvals, consents, acknowledgments or waivers required or advisable to be obtained from any third party that is not a Governmental Authority in order to consummate the transactions contemplated hereby; provided, however, that, subject to Section 7.8, in no event will Seller grant, or permit any of its Affiliates to grant, any concession by any Entity in connection with obtaining any such consents, acknowledgments or waivers.

7.4.    Governmental Approvals.  (a)  On the terms and subject to the conditions set forth in this Agreement (including Section 7.4(b)), each of Purchaser and Seller will (and Seller will cause each of the Entities to) cooperate with each other and use its reasonable best efforts to take such action as may be required to obtain the Company Approvals and any other Governmental Approvals as promptly as practicable after the execution of this Agreement and to avoid the entry of any Law or Order that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement (it being understood that nothing contained in this Agreement will require Purchaser or any of its Subsidiaries to reach any agreements or understandings in connection with obtaining any Governmental Approval prior to the Termination Date).  In furtherance of the foregoing, following the date hereof, on the terms and subject to the conditions set forth in this Agreement (including Section 7.4(b)), each of the Parties will (and Seller will cause each of the Entities to) use its reasonable best efforts to (i) make or cause

to be made all filings or applications required of each of them or their respective Affiliates to obtain the Company Approvals as promptly as practicable, and in any event within 20 calendar days after the date hereof, (ii) comply at the earliest practicable date with any request under any Regulatory Statutes for additional information, documents or other materials received by either of them or any of their respective subsidiaries from the IFETEL, the CFC or any other Governmental Authority in respect of such filings or applications, and (iii) cooperate with each other in connection with any such filings or applications (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing or non-applying Parties before filing or submitting an application and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any relevant Governmental Authority with respect to any such filing or application. Each Party will promptly inform the other Party of any material oral communication with, and provide copies of material written communications with, any Governmental Authority regarding any such filings or applications. Neither Party will participate, or permit any of its Affiliates or advisors to participate, in any formal meeting with any Governmental Authority in respect of any filings, applications, investigation (including any proposed investigation), litigation or other inquiry related to the transactions contemplated by this Agreement (other than any such meetings (or the portions thereof) not exclusively related to the transactions contemplated by this Agreement), unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives such other Party the opportunity to attend and participate in such meeting. Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this <u>Section 7.4</u> as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials. Subject to applicable Laws, Purchaser will have the right to direct all matters with any Governmental Authority consistent with its obligations hereunder.

(b)     Nothing in this Agreement will require, or be construed to require, Purchaser or any of its Affiliates to take or refrain from taking any action (including any divestiture, holding separate any business or assets or other similar action) or to agree to any restriction or condition relating to any assets, operations, business or the conduct of business of (i) Purchaser or any of its current or future Affiliates or (ii) any Entity, except, in the case of clause (ii) only, for any such restriction or condition that would not, individually or in the aggregate, reasonably be expected to result in a Seller Material Adverse Effect (disregarding the provisos set forth in the definition thereof) (the occurrence of any matter specified in clause (i) or clause (ii) above will constitute an "<u>Adverse Regulatory Condition</u>").

(c)     Nothing in this Agreement will require, or be construed to require, Purchaser or any of its Affiliates to alter, abandon or not pursue any business initiatives or transactions with any other Person, including any acquisition of other Telecommunication Licenses or spectrum rights (or businesses or Persons that own such Telecommunication Licenses or rights) and participation in any auction of additional spectrum and Seller will not, and will cause each of its Affiliates not to, (i) take any actions in respect of any approvals of which Seller or any of its Affiliates has Knowledge that Purchaser or any of its Affiliates may have pending during the pendency of this Agreement with Mexican Governmental Authorities with respect to any such business initiatives or transactions that would reasonably be expected to delay or impair Purchaser's or its Affiliates' ability to obtain such approvals or result in the imposition of any adverse term, condition, restriction or consequence in respect thereof or (ii) file petitions, pleadings or claims, or take any positions with respect to any investigation, proceeding, bid or auction or similar process before any Governmental Authority (including, without limitation, with respect to any Telecommunication Licenses or spectrum rights) that would be inconsistent with the terms of this Agreement and the transactions contemplated by this Agreement or with the positions taken by Purchaser and its Affiliates before Governmental Authorities of which Seller or any of its Affiliates has Knowledge.

7.5.    <u>Regulatory Compliance</u>.  (a)  During the period from the date of this Agreement to the Closing, Seller will, and will cause each of the Entities to, undertake reasonable best efforts to (i) take all actions reasonably necessary to maintain and preserve the Company Telecommunication Licenses and (ii) refrain from taking any action that would reasonably be expected to give any Governmental Authority with jurisdiction over Seller or any of the Entities reasonable grounds to suspend, revoke or modify any Company Telecommunication License in any adverse manner (other than in any *de minimis* respect).

(b)     Prior to the Closing, Seller will, and will cause each of the Entities to, use reasonable best efforts to renew material Permits and the Company Telecommunications Licenses, including preparing and filing with the applicable Governmental Authority all necessary applications in connection therewith as soon as reasonably practicable after the commencement of the period during which such applications may be made; provided that none of the Entities will apply for any Permit or Telecommunications License (other than renewals or replacements of the Company Telecommunication Licenses) the receipt of which would, individually or in the aggregate, reasonably be expected to prevent, materially impair or materially delay consummation of the transactions contemplated in this Agreement.

7.6.    <u>Further Assurances</u>.  Subject to the other provisions of this Agreement (including <u>Sections 7.3</u> and <u>7.4(b)</u>), each Party will, and Seller will cause each Entity to, use its reasonable best efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this

Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to its respective obligations to consummate the transactions contemplated by this Agreement.

7.7.    Publicity.  (a)  The initial press releases concerning this Agreement and the transactions contemplated hereby will be in substantially the forms previously agreed by the Parties.  Neither of the Parties will issue any press release or otherwise make any similar public announcement concerning this Agreement or the transactions contemplated hereby that in any material respect is inconsistent with or contains disclosures concerning this Agreement or the transactions contemplated hereby in addition to its initial press release without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless disclosure is otherwise required by applicable Law, stock exchange rules or by the Bankruptcy Court, provided, however, that the Party intending to make such release or announcement uses its reasonable best efforts consistent with such applicable Law, stock exchange rules or Bankruptcy Court requirement to consult in advance with the other Party with respect to the text thereof and to give the other Party a reasonable opportunity to comment thereon.

(b)    Seller and Purchaser will cooperate in developing language for a program of communications or notices relating to the transfer of ownership to be sent to customers of the Entities and Employees on or after the date of this Agreement and prior to the Closing.  Neither Purchaser nor Seller will, and will cause its respective Affiliates to not, send any communications or notices (other than bills and materials reasonably ancillary thereto, advertisements or other promotional materials, administrative notices or other correspondence in the Ordinary Course of Business and not making reference to the transactions contemplated by this Agreement, Purchaser, or its Affiliates) to customers of the Entities or Employees on or after the date of this Agreement and prior to the Closing without the prior approval of the other party (not to be unreasonably withheld, conditioned or delayed).

7.8.    Certain Agreements.  Prior to Closing, Seller will obtain each of the amendments or terminations set forth on Schedule 7.8(iii) (the "Section 7.8 Terminations"). From and after the date hereof, Seller will use (and until the Closing Seller will cause each of the Entities to use) reasonable best efforts, and, to the extent reasonably requested by Seller, Purchaser will use commercially reasonable efforts to cooperate with Seller and each of the Entities, to obtain at the earliest practicable date each of the assignments, terminations or consents set forth on Schedule 7.8(i) and (ii) (the "Section 7.8 Instruments"). If any Section 7.8 Instrument set forth on Schedule 7.8(i) or (ii) is not executed and delivered to Purchaser at or prior to Closing, then, from and after the Closing until such time as such Section 7.8 Instrument is executed by each party thereto and delivered to Purchaser, (a) Seller will provide and will cause its Affiliates to provide the Entities with the services and other benefits under each Contract to which such Section 7.8 Instrument relates, to the extent the applicable Entities received such

benefits in the ordinary course prior the date hereof, without any additional costs or expenses to the Entities, except for any such costs or expenses the Entities would have incurred pursuant to such Contract if such Section 7.8 Instrument had been obtained prior to Closing, and (b) the Entities receiving such services and other benefits will comply with and otherwise perform under such Contracts in the same manner as they did in the ordinary course prior the date hereof. Until such time that the applicable Section 7.8 Instrument or Section 7.8 Termination related to any Contract set forth on Schedule 7.8 is obtained, Seller will not, and will cause its Affiliates not to, terminate or modify any of such Contracts.

7.9.   <u>Preservation of Records</u>.  Seller and Purchaser agree that each of them will preserve and keep the records held by it or their Affiliates relating to the Entities and their business for a period of at least seven years from the Closing Date (except as provided below) and will make, upon reasonable notice and during regular business hours, such records and personnel available to the other to the extent reasonably required by such party in connection with any insurance claims by, Legal Proceedings or tax audits against or governmental or internal investigations of Seller or Purchaser or any of their Affiliates, provided, however, that (i) the access to such records will not unreasonably interfere with the business or operations of Purchaser or Seller, as applicable, or any of their Affiliates, (ii) the access to such records will not be permitted to the extent that it would require Purchaser or Seller, as applicable, or any of their Affiliates, to (A) disclose information subject to attorney-client privilege or (B) violate any confidentiality obligations to which Purchaser or Seller, as applicable, or any of their Affiliates, is bound if the applicable Person shall have used commercially reasonable efforts to obtain the consent of the applicable third party to grant access to such records, and (iii) Seller or Purchaser, as applicable, will reimburse the other Party and its Affiliates for any reasonable and documented out-of-pocket expenses incurred in connection with such access.  If Seller or Purchaser wishes to destroy such records before the end of such seven-year period, such Party will first give 60 days prior notice to the other and such other Party will have the right at its option and expense, upon prior notice given to such Party within such 60-day period, to take possession of the records within 90 days after the date of such notice.

7.10.   <u>Confidentiality</u>.  (a)  For a period of two years from and after the later of (i) the Closing Date and (ii) the provision of information, knowledge or data by Purchaser or its Affiliates to Seller or its Affiliates pursuant to <u>Section 7.9</u>, Seller and each of its Affiliates will treat as confidential and will safeguard any and all information, knowledge and data about the Entities and the Business by using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized use, dissemination or disclosure of such information, knowledge and data as Seller or its Affiliates used with respect thereto prior to the execution of this Agreement.  Effective upon the Closing, the confidentiality obligations under the Non-Disclosure Agreement will terminate.

(b)      For a period of two years from and after the date hereof, each of Seller and Purchaser will, and will cause (or, with respect to third-party representatives, use commercially reasonable efforts to cause) each of its Affiliates and representatives to, treat as confidential and safeguard each Transaction Agreements and the terms and conditions thereof using the same degree of care, but no less than a reasonable standard of care, to prevent the unauthorized dissemination or disclosure of such confidential information. Notwithstanding the foregoing, either party hereto or its Affiliates or representatives may disseminate or disclose such confidential information and will not be liable with respect to such dissemination or disclosure (i) to such party's officers directors, employees, agents, Affiliates, attorneys or advisors or other representatives; (ii) to the extent such dissemination or disclosure is requested or required by Law, by legal process (including pursuant to the assertion of such party's or any of its Affiliates' legal rights under any Transaction Agreements), or by regulatory process or request; or (iii) to the extent such dissemination or disclosure is reasonably necessary for purposes of compliance by such party or any of its Affiliates with Tax or regulatory reporting requirements; provided, however, that in the case of any disclosure to the Persons in clause (i) above, the parties hereto or their Affiliates or representatives (as applicable) will exercise their commercially reasonable efforts to preserve the confidentiality of such information disclosed.

(c)      Notwithstanding clauses (a) and (b) of this Section 7.10, nothing contained in the Transaction Agreements will be deemed to prohibit Purchaser or Seller, or any of their respective Affiliates, from disclosing any information as may be required, based on the advice of legal counsel, under the Bankruptcy Code or the Bankruptcy Rules or any legal process before, or any order of, any Governmental Authority.

7.11.    Trademark License Agreement.  During the term of the Trademark Sublicense Agreement and any period provided pursuant to Section 2.4 thereof (in each case, as amended by the Amendment to the Trademark Sublicense Agreement), Seller will, and will cause NII Holdings, Inc. to, (i) maintain the Trademark License Agreement in full force and effect and (ii) not amend, modify or otherwise waive any provision of the Trademark License Agreement in any manner that would adversely affect the rights of the Company or any of its Subsidiaries under the Trademark Sublicense Agreement.  Except as prohibited by applicable Law, from and after the date hereof until the Closing Date, to the extent reasonably requested by Purchaser, Seller will cause the Entities to cooperate with Purchaser in connection with winding down use of the Trademarks that are sublicensed to the Company pursuant to the Trademark Sublicense Agreement; provided that, for the avoidance of doubt, this Section will not obligate Seller or the Entities to take any steps to begin winding down such Trademarks.

7.12.    Certain Employees and Plans. (a)  With respect to any Employee who is employed by any Entity but whose job is not primarily related to the

Business, prior to the Closing, Seller will, or will cause its Affiliates to, take all necessary actions to transfer such Employee's employment to Seller or one of its Affiliates other than any Entity or Company Parent (or terminate their employment).  Seller will be responsible for any severance obligations that arise as a result of such transfer (or termination).

(b)     At least 30 days prior to the Closing, Seller will, or will cause its Affiliates to, take all actions necessary to terminate the Employee Plan set forth on Schedule 7.12(b) (the "Terminated Plan") and provide notice of such termination to the Employees and appropriate Governmental Authorities to the extent required by Law.

(c)     For the avoidance of doubt, the provisions of this Agreement are intended to be for the sole benefit of, and will be enforceable by, the Parties hereto, and nothing in this Section 7.12 or elsewhere in this Agreement, whether express or implied, will create any third-party beneficiary or other rights in any other Person, including any current or former employee or any dependent or beneficiary thereof.  Nothing contained herein, express or implied (i) will be construed to establish, amend or modify any benefit plan, program, agreement or arrangement of Purchaser or any of its Subsidiaries or (ii) will alter or limit the ability of Purchaser or any of its Subsidiaries to amend, modify or terminate any Employee Plan, or other benefit plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by Purchaser or any of its Subsidiaries.  The Parties acknowledge and agree that the terms set forth in this Section 7.12 will not create any right for any employee to any continued employment or engagement with Seller or any of its Subsidiaries or with Purchaser or any of its Subsidiaries.

7.13.   Financing Cooperation.  If requested by Purchaser in writing, Seller will, and will cause each of the Entities to, use its respective commercially reasonable efforts to take any actions and provide any cooperation reasonably requested by Purchaser in connection with the payment of the Pay-Off Amount or obtaining the Pay-Off Letters.

7.14.   Seller Disclosure Schedule.  Seller may, at its option, include in the Seller Disclosure Schedule items that are not required to be included in order to avoid any misunderstanding, and such inclusion, or any references to Dollar amounts, will not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information provided in one Section of the Seller Disclosure Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Section of the Seller Disclosure Schedule to which its relevance is reasonably apparent on its face.

7.15.   Extension Financing.  If, as of August 31, 2015, the Closing has not occurred and this Agreement has not been terminated, Seller and Purchaser will

discuss in good faith Seller's financing needs with respect to the Entities, if any, and consider possible financing alternatives, provided, however, that neither Seller nor Purchaser will have any obligations to provide or accept any financing to or from the other, provided that this Section 7.15 will not obligate Seller or its Affiliates to enter into any financing arrangement with Purchaser or any other third party.

7.16. Transition Services. The Parties agree that the applicable schedules to the Transition Services Agreement will include at least all services that were provided by Seller or any of its Affiliates (other than the Entities and Company Parent) or its or their third party service providers to the Entities or Company Parent, or by the Entities or Company Parent or their third party service providers to Seller or any of its Affiliates (other than the Entities and Company Parent), in each case, during the three-month period prior to the date hereof and that are reasonably required for the operation of the respective businesses of the applicable service recipients under the Transition Services Agreement after the Closing, provided, however, that, to the extent a third party service provider is obligated at the time of the Closing to provide the services contemplated by this Section directly to the applicable service recipients (whether as a result of an assignment of an agreement to the applicable service recipient or pursuant to an agreement entered into between such third party service provider and the applicable service recipient after the date hereof and before the Closing), such services will be provided pursuant to such agreement and not pursuant to the Transition Services Agreement. From and after the date hereof and prior to the Closing Date, each of Purchaser and Seller will (i) diligently and in good faith negotiate to identify all such services and develop and agree to full service descriptions for such services, and, once agreed, such descriptions will be set forth on the schedules to the Transition Services Agreement and (ii) begin the process of negotiating in good faith the service fees for such services in accordance with the Agreed Methodology (as such term is defined in Exhibit D). If for any reason, the Transition Services Agreement is not executed and delivered by the Closing, Seller, its Affiliates (other than the Entities and Company Parent) and Seller Successors and its and their third party service providers, to the extent permitted by applicable third party contracts (and to the extent not so permitted, pursuant to Section 2.2 of Exhibit D), and the Entities and their third party service providers, to the extent permitted by applicable third party contracts (and to the extent not so permitted, pursuant to Section 2.2 of Exhibit D), will provide such services to the applicable service recipient on the terms set forth in Exhibit D until such time as the Transition Services Agreement has been executed and delivered, and Purchaser and Seller will continue to use their respective commercially reasonable efforts to negotiate and finalize the Transition Services Agreement until it is executed and delivered.

## 8. CONDITIONS TO CLOSING

8.1. Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is

subject to the fulfillment, on or before to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    (i) the representations and warranties of Seller set forth in Section 5.23 (Absence of Certain Changes) shall be true and correct in all respects on the date of this Agreement, (ii) the representations and warranties of Seller set forth in Section 5.7 (Title to Shares) and Section 5.26(b)(ii) and (c) (Company Parent) shall be true and correct in all respects (A) on the date of this Agreement and (B) as of the Closing Date as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct in all respects as of such date), (iii) the Seller Fundamental Representations (other than the representations and warranties set forth in Section 5.7 (Title to Shares) and Section 5.26(b)(ii) and (c) (Company Parent)) and the representations and warranties of Seller set forth in Section 5.22 (Certain Conduct; Sanctions) (read for purposes of this Section 8.1(a) without any materiality or Seller Material Adverse Effect qualification or any similar qualification) shall be true and correct in all material respects (A) on the date of this Agreement and (B) at the Closing as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct in all respects as of such date), (iv) all other representations and warranties of Seller set forth in this Agreement shall be true and correct (A) on the date of this Agreement and (B) at the Closing as if given as of such date (except to the extent that any such representation and warranty speaks only as of a particular date, in which case such representation and warranty shall be true and correct as of such date), provided, however, that notwithstanding anything herein to the contrary, the condition set forth in this Section 8.1(a)(iv) shall be deemed to have been satisfied even if any representations and warranties of Seller are not so true and correct unless the failure of such representations and warranties of Seller to be so true and correct (read, for purposes of this Section 8.1(a)(iv) without any materiality or Seller Material Adverse Effect qualification or any similar qualification), individually or in the aggregate, has had or would reasonably be expected to result in a Seller Material Adverse Effect, and (v) Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect;

(b)    Seller and Seller Parent shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Seller or Seller Parent on or before the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated as of the Closing Date, to the foregoing effect;

(c)    the Bankruptcy Court shall have entered the Sale Order and the Bidding Procedures Order, and once entered, neither order shall have been

(i) amended, modified or supplemented in any way without the Purchaser's prior written consent or (ii) voided, reversed or vacated or subject to a stay, and each of the Bidding Procedures Order and the Sale Order shall be a Final Order;

(d)     Company Parent shall have Filed a notice of dismissal of its chapter 11 case in form and substance reasonably satisfactory to Purchaser (a "Notice of Dismissal");

(e)     with respect to the chapter 11 case of Company Parent, (i) all fees of the U.S. Trustee shall have been paid in full and no amounts shall be due and owing to the U.S. Trustee following the Closing and (ii) all required reports shall have been Filed with the Bankruptcy Court;

(f)     the closing deliveries set forth in Section 4.2(a) – (o) shall have been delivered to Purchaser;

(g)     (i) all Governmental Approvals, the failure of which to obtain, individually or in the aggregate, would have or be reasonably expected to result in a Seller Material Adverse Effect, shall have been obtained and (ii) at Closing, no such Governmental Approvals or any Company Approvals (A) are subject to a written request for a stay or any similar written request that is pending, (B) are subject to a stay that is in effect or have been vacated, reversed, set aside, annulled or suspended, (C) are subject to any written petition for rehearing or reconsideration or written application for review that is pending, (D) are being reconsidered following applicable procedures by any Governmental Authority of competent jurisdiction that has undertaken in writing to reconsider the action on its own motion, or (E) are subject to any appeal that is pending (including other administrative or judicial review) or in effect, unless, in the case of the circumstances described in clause (A), (C) or (E), such circumstance would not reasonably be expected to result in (1) vacating, reversing, setting aside, annulling or suspending such Governmental Approval or (2) modifying such Governmental Approval in any manner that would impose any term, condition or consequence that would, individually or in the aggregate, reasonably be likely to have or result in an Adverse Regulatory Condition.  All Governmental Approvals that have been obtained shall have been obtained without the imposition of any term, condition, restriction or consequence that would, individually or in the aggregate with all other terms, conditions, restrictions or consequences imposed in connection with obtaining other Governmental Approvals, have, or reasonably be expected to result in, an Adverse Regulatory Condition;

(h)     since the date of this Agreement, there shall not have occurred any change, event, circumstance or development that, individually or in the aggregate, has had, or is reasonably expected to result in, a Seller Material Adverse Effect;

(i)      there shall not be instituted or pending any suit, action or proceeding commenced by a Governmental Authority of competent jurisdiction which is seeking to (i) prohibit, limit, restrain or impair Purchaser's ability to own operations, rights, product lines, businesses or interest therein of any Entity from and after the Closing or any of the assets, licenses, operations, rights, product lines, businesses or interest therein of any Entity (including by requiring any sale, divestiture, transfer, license, lease, disposition of or encumbrance or hold separate arrangement with respect to any such assets, licenses, operations, rights, product lines, businesses or interest therein), in each case, in a manner that would reasonably be expected to result in an Adverse Regulatory Condition, or (ii) prohibit or limit in any material respect Purchaser's ability to vote, transfer, receive dividends or distributions or otherwise exercise full ownership rights with respect to the Company Parent Interests or any Shares;

(j)      the Corporate Records of the Company and its Subsidiaries delivered under Section 4.2(j) shall be complete in all material respects and updated as of the Closing Date to accurately reflect the capital structure set forth in Section 5.5(a) of the Seller Disclosure Schedule; and

(k)      each of the Third Party Consents, Section 7.8 Terminations and Section 7.8 Instruments listed on Schedule 8.1(k) shall have been executed by each party thereto and delivered to Purchaser and shall be in full force and effect.

8.2.    Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or before the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)      the representations and warranties of Purchaser contained in Article 6 shall be true and correct (i) on the date of this Agreement and (ii) at the Closing as if given as of such date (except to the extent that any such representation and warranty expressly speaks as of a particular date, in which case such representation and warranty shall be true and correct as of such date); provided, however, that notwithstanding anything herein to the contrary, the condition set forth in this Section 8.2(a) shall be deemed to have been satisfied even if any representations and warranties of Purchaser are not so true and correct unless the failure of such representations and warranties of Purchaser to be so true and correct (read for purposes of this Section 8.2(a) without any materiality or Purchaser Material Adverse Effect qualification or any similar qualification), individually or in the aggregate, has had or would reasonably be expected to result in a Purchaser Material Adverse Effect and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or before the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated as of the Closing Date, to the foregoing effect;

(c)     the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been voided, reversed or vacated or made subject to a stay; and

(d)     the Closing deliveries set forth in Section 4.3 shall have been delivered to Seller or, where applicable in the case of the Closing deliveries set forth in Section 4.3(c), the other Persons specified therein.

8.3.     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or before the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Law or Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(b)     the Company Approvals shall have been obtained.

8.4.     Frustration of Closing Conditions.  Neither Purchaser nor Seller may rely on the failure of any condition set forth in Section 8.1 or Section 8.2 if such failure was the direct result of such Party's material breach of this Agreement.

# 9. INDEMNIFICATION

9.1.     Survival.  The representations and warranties contained in this Agreement will survive the Closing and will remain in full force and effect until 5:00 p.m. local time in Mexico City, Mexico on the date that is the 12-month anniversary of the Closing Date (the "Release Date"), at which time they will terminate, except that (a) the Seller Fundamental Representations will survive the Closing and will remain in full force and effect indefinitely and (b) the Specified Representations will survive the Closing and will remain in full force and effect until 5:00 p.m. local time in Mexico City, Mexico, on the 24-month anniversary of the Closing Date.  The covenants and agreements contained in this Agreement that are to be performed in full prior to the Closing will survive the execution and delivery of this Agreement and the Closing and will thereafter terminate at 5:00 p.m. local time in Mexico City, Mexico, on the Release Date. The covenants and agreements that are to be performed after the Closing will

survive the Closing until performed in accordance with their terms. The last day on which a representation and warranty or covenant or agreement survives pursuant to this Section 9.1 is referred to herein as the "End Date" with respect to such representation and warranty or covenant or agreement, provided that, the indemnification in Section 9.2(e) will survive until 60 days after the expiration of the relevant statute of limitations. No claim for indemnification pursuant to this Article 9 may be brought following the applicable End Date. Notwithstanding the foregoing, if on or prior to the applicable End Date, a Third Party Claim Notice or a Direct Claim Notice has been given to an Indemnifying Party, the applicable claim as set forth in such notice will survive until satisfaction or other resolution thereof and may be amended to allow for adjusted Damages based on substantially the same facts and circumstances giving rise to such claim.

     9.2.   Indemnification by Seller. From and after the Closing, Seller will indemnify and save and hold harmless Purchaser and its Affiliates and their respective officers and directors (collectively, the "Purchaser Indemnitees") from and against any and all demands, claims, actions or causes of action, assessments, losses, damages (including diminution of value to the extent recoverable under the laws of the State of New York applicable to Contracts and consequential damages, to the extent reasonably foreseeable), liabilities, costs and expenses, including interest, penalties and reasonable and documented attorneys' fees and expenses ("Damages") resulting from, arising out of or incurred in connection with: (a) any failure of any representation or warranty made by Seller to be true and correct as of the date of this Agreement or as of the Closing Date as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case, as of such date), (b) any nonfulfillment, violation or breach of any covenant or agreement made by Seller or Seller Parent in this Agreement, (c) Purchaser's acquisition of the Company Parent Interests to the extent such Damages would not have resulted, arisen or been incurred had Purchaser acquired the Company Shares directly (instead of through the acquisition of the Company Parent Interests), (d) the Uruguay Subsidiary or the Uruguay Divestiture, and (e) the Terminated Plan (including the termination of the Terminated Plan in accordance with Section 7.12(b) and regardless of whether Damages arose prior to, at or after the Closing). For the purposes of Section 9.2(a), with respect to any representation or warranty that is limited or qualified by any materiality or Seller Material Adverse Effect qualification or any similar qualification, the occurrence of any failure of such representation or warranty to be true and correct, and the amount of Damages subject to indemnification hereunder, will be determined as if any such qualifications were not contained therein; provided, however, that this sentence will not apply to (i) any such qualifications contained in the definition of any defined term used herein, (ii) the representations and warranties set forth in any of Section 5.8 (Financial Statements), Section 5.9 (Undisclosed Liabilities) or Section 5.13 (Material Contracts) and (iii) any such qualifications used for the purposes of defining the scope of items or matters required to be set forth on a list.

9.3.    Indemnification by Purchaser.  From and after the Closing, Purchaser will indemnify and save and hold harmless Seller and its Affiliates and their respective officers and directors (collectively, the "Seller Indemnitees" and, together with the Purchaser Indemnitees, the "Indemnified Parties") from and against any Damages resulting from, arising out of or incurred in connection with: (a) any failure of any representation or warranty made by Purchaser to be true and correct as of the date of this Agreement or as of the Closing Date as if given as of such date (except to the extent that such representation and warranty speaks only as of a particular date, in which case, as of such date), and (b) any nonfulfillment, violation or breach of any covenant or agreement made by Purchaser in this Agreement.

9.4.    Indemnification Procedures.  (a)  If an Indemnified Party desires to assert any claim for indemnification provided for under this Article 9 in respect of, arising out of or involving a claim or demand made by any Person (other than a Party or Affiliate thereof) against the Indemnified Party (a "Third Party Claim"), such Indemnified Party will notify Purchaser or Seller, as the case may be (the "Indemnifying Party"), in writing of such Third Party Claim, including the amount or the estimated amount of Damages sought thereunder to the extent then ascertainable (which estimate will not be conclusive of the final amount of such Third Party Claim), any relevant time constraints relating thereto and, to the extent practicable, any other material details pertaining thereto (a "Third Party Claim Notice") promptly after receipt by such Indemnified Party of written notice of the Third Party Claim; provided, however, that the failure to timely give such notice will not reduce the Damages for which the Indemnifying Party is obligated to indemnify the Indemnified Party under this Article 9 except to the extent of any Damages resulting from the Indemnifying Party being prejudiced by such failure. The Indemnified Party will deliver to the Indemnifying Party, promptly after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim; provided, however, that failure to provide any such copies will not affect the indemnification obligations provided hereunder except to the extent of any Damages resulting from the prejudice of any claim or defense available to the Indemnifying Party as a result of such failure.

(b)     If a Third Party Claim is made against an Indemnified Party, the Indemnifying Party will be entitled to participate in the defense thereof and, within 30 days of receiving a Third Party Claim Notice with respect to such Third Party Claim, may assume the defense thereof and select counsel to act in such defense (which counsel will be reasonably satisfactory to the Indemnified Party). Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party will not be liable to the Indemnified Party for legal expenses subsequently incurred by the Indemnified Party in connection with the defense thereof, unless, in the reasonable opinion of counsel (including in-house counsel) to the Indemnified Party, counsel for the Indemnifying Party could not adequately represent the interests of the Indemnified Party because the interests of the Indemnifying Party are in conflict with those of the Indemnified Party.  If the

Indemnifying Party assumes such defense, the Indemnified Party will have the right to participate in the defense thereof and to employ counsel, at its own expense (except as provided in the immediately preceding sentence), separate from the counsel employed by the Indemnifying Party. The Indemnifying Party will be liable for reasonable fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof and as otherwise contemplated by the two immediately preceding sentences. If the Indemnifying Party chooses to defend any Third Party Claim, the Indemnified Party will cooperate in the defense or prosecution thereof.

(c)     If the Indemnifying Party, within 30 days after written notice of any such Third Party Claim (or sooner if the nature of the Third Party Claim so requires) (i) does not assume control of the defense or (ii) after assuming control of the defense, fails or ceases to diligently defend such Third Party Claim, which failure or cessation is not cured within 15 days after written notice thereof from the Indemnified Party, then the Indemnified Party will have the right to undertake the defense of such Third Party Claim, and (iii) the reasonable and documented fees and expenses of counsel to the Indemnified Party in connection therewith will be considered "Damages" for purposes of this Agreement; provided, however, that in no event will the fees and expenses of more than one counsel (in addition to one local counsel in each jurisdiction that is reasonably necessary) for the Indemnified Party with respect to a single Third Party Claim or a series of related Third Party Claims be considered "Damages" for purposes of this Agreement.

(d)     The Indemnified Party will not settle, compromise or discharge a Third Party Claim without the Indemnifying Party's prior written consent, which consent will not be unreasonably withheld, conditioned or delayed. The Indemnifying Party may pay, settle or compromise a Third Party Claim without the Indemnified Party's prior written consent, so long as such payment, settlement or compromise (i) includes an unconditional release of the Indemnified Party from all Liability in respect of such Third Party Claim, (ii) does not subject the Indemnified Party to any injunctive relief or other equitable remedy, (iii) does not include a statement or admission of fault, culpability or failure to act by or on behalf of any Indemnified Party, and (iv) simultaneously with the effectiveness of such settlement, payment or compromise, the Indemnifying Party pays in full any obligation imposed on the Indemnified Party by such settlement, compromise or consent or such obligation is paid in full from the Escrow Account.

(e)     The Parties will act in good faith in responding to, defending against, settling or otherwise dealing with any Third Party Claims, and cooperate in any such defense and give each other reasonable access during normal business hours and upon reasonable advance notice to all information relevant thereto. Without limiting the generality of this Section 9.4(e), the Party controlling the defense of any Third Party Claim will deliver, or cause to be delivered, to the

other party copies of all correspondence, pleadings, motions, briefs, appeals or other written statements relating to or submitted in connection with the defense of the Third Party Claim, and timely notices of, and the right to participate in any hearing or other court proceeding, meeting or negotiation relating to the Third Party Claim.

(f)     If an Indemnified Party desires to assert any claim for indemnification provided for under this Article 9 other than a claim in respect of, arising out of or involving a Third Party Claim (a "Direct Claim"), such Indemnified Party will notify the Indemnifying Party in writing of such Direct Claim, including the amount or the estimated amount of Damages sought thereunder to the extent then ascertainable (which estimate will not be conclusive of the final amount of such Direct Claim), and, to the extent practicable, any other material details pertaining thereto (a "Direct Claim Notice"); provided, however, that the failure to timely give such notice will not reduce the Damages for which the Indemnifying Party is obligated to indemnify the Indemnified Party under this Article 9 except to the extent of such Damages resulting from the Indemnifying Party being prejudiced by such failure.

9.5.    Limitations on Indemnification.

(a)     Seller will have no liability for any claim for indemnification pursuant to Section 9.2(a) if (i) in case of a claim (other than a Third Party Claim) arising out of an action Purchaser, the Entities or their respective Affiliates take after the Closing Date to obtain any Permit required for, or to comply with Transmission Tower Standards applicable to, an individual Transmission Tower in relation to facts or circumstances that would constitute a breach of the representations made in respect of Permits or Transmission Tower Standards in Section 5.16(a), Section 5.16(d) or Section 5.16(f), the Damages for which it would be responsible for such claim on a per-Transmission Tower basis are less than $5,000 and (ii) in the case of all other claims, the Damages for which it would be responsible for such claim and all related claims arising from substantially the same facts or circumstances are less than $50,000 (each such claim and, in the case of clause (ii), related claims, a "De Minimis Claim").  Seller will have no liability for indemnification pursuant to Section 9.2(a) unless and until the aggregate amount of Damages (excluding De Minimis Claims) for which it would be responsible for claims hereunder exceeds an amount equal to $10,000,000 (the "Basket Amount"), in which case Seller will, subject to the other limitations hereunder, be liable for all such Damages (excluding Damages associated with De Minimis Claims) in excess of the Basket Amount.  The limitations set forth in this Section 9.5(a) will not apply to any claim for indemnification in respect of a breach or inaccuracy of the Seller Fundamental Representations.

(b)     The maximum aggregate amount of indemnifiable Damages payable by Seller in respect of claims pursuant to Section 9.2(a) (other than in

respect of a breach or inaccuracy of the Seller Fundamental Representations) will not exceed the Escrow Amount (the "Cap").

(c)      Purchaser will have no liability for any claim for indemnification pursuant to Section 9.3(a) that is a De Minimis Claim or until the aggregate amount of Damages (excluding all Damages associated with De Minimis Claims) for which it would be responsible for claims hereunder exceeds the Basket Amount, in which case Purchaser will, subject to the other limitations hereunder, be liable for all such Damages (excluding De Minimis Claims) in excess of the Basket Amount.  The maximum aggregate amount of indemnifiable Damages payable by Purchaser in respect of claims pursuant to Section 9.3(a), taken together, will not in any event exceed the Cap.

(d)      No party hereto will be obligated to indemnify any other Person with respect to any Damages with respect to any matter that was included in the calculation of the adjustments reflected in the Final Purchase Price pursuant to Section 3.4 (to the extent so included).

(e)      Notwithstanding anything to the contrary in this Agreement, the Parties agree and acknowledge that, for any amounts finally determined to be payable by Seller (i) in respect of claims pursuant to Section 9.2(a) (other than in respect of a breach or inaccuracy of any of the Seller Fundamental Representations), such amounts will solely be paid from funds then available in the Escrow Account and Seller will not be obligated to pay any such amounts remaining unpaid after the funds in the Escrow Account have been exhausted, provided that, subject to the Cap, Seller will be obligated to pay in full any such amounts remaining unpaid after the funds in the Escrow Account have been exhausted up to the amount of funds from the Escrow Account that were released to a Purchaser Indemnitee in respect of claims pursuant to (A) Section 9.2(a) in respect of a breach or inaccuracy of any of the Seller Fundamental Representations, (B) Section 9.2(b), Section 9.2(c), Section 9.2(d) or Section 9.2(e), or (C) Article 11 and (ii) in respect of claims pursuant to (A) Section 9.2(a) in respect of a breach or inaccuracy of any of the Seller Fundamental Representations or (B) Section 9.2(b), Section 9.2(c), Section 9.2(d) or Section 9.2(e), such amounts will be paid from funds then available in the Escrow Account only to the extent Purchaser elects at any time, by written notice to Seller, to have such amounts paid from the Escrow Account and Seller will be obligated to pay any such amounts not so paid from the Escrow Account.

(f)      Notwithstanding anything to the contrary in this Agreement, in no event will an Indemnifying Party have liability to any Indemnified Party for any exemplary or punitive damages, except to the extent paid to a third party in connection with a Third Party Claim.

9.6.    Indemnity Payments.  (a)  In calculating the amount of any Damages, (i) the proceeds actually received by the Indemnified Party or any of its Affiliates under any insurance policy or pursuant to any claim, recovery,

settlement or payment by or against any other Person, in each case, net of any actual costs, expenses or premiums incurred in connection with securing or obtaining such proceeds will be deducted, except to the extent that the adjustment itself would excuse, exclude or limit the coverage of all or part of such Damages, (ii) all such Damages will be reduced by the net present value of any net Tax benefits attributable to such Damages reasonably expected by the Indemnified Party in its good faith discretion, after consultation with the Indemnifying Party, to be actually utilized by the Indemnified Party or its Affiliates within the taxable year in which such damages are incurred and the following two taxable years, and (iii) any payment made pursuant to this <u>Article 9</u> will be treated as an adjustment to the price for which the Company Parent Interests are purchased by the Purchaser for all Tax purposes unless otherwise required by applicable Law.  In determining the taxable year in which, and the extent to which, any such tax benefit is reasonably expected to be utilized, such tax benefit shall be deemed to have been utilized only after all other available tax attributes and benefits, including net operating losses and any other deductions, are utilized.

(b)     If an Indemnified Party recovers an amount from a third party in respect of Damages that is the subject of indemnification hereunder after all or a portion of such Damages has been paid by an Indemnifying Party pursuant to this <u>Article 9</u>, the Indemnified Party will promptly remit to the Indemnifying Party the excess (if any) of (i) the amount paid by the Indemnifying Party in respect of such Damages, plus the amount received from the third party in respect thereof, less (ii) the full amount of Damages; provided that if the Indemnified Party is Purchaser and the amount paid by the Indemnifying Party was paid from the Escrow Account and the Escrow Agreement will not yet have been terminated, Purchaser will promptly remit such recovered amount to the Escrow Account instead of the Indemnifying Party.

(c)     Subject to <u>Section 9.5(e)</u>, (i) The Indemnifying Party will pay all amounts payable pursuant to this <u>Article 9</u>, by wire transfer of immediately available cash funds in Dollars, promptly following receipt from an Indemnified Party of a bill for Damages that are the subject of indemnification hereunder, unless the Indemnifying Party in good faith reasonably disputes the Damages, in which event it will promptly notify the Indemnified Party, and (ii) in any event, the Indemnifying Party will pay to the Indemnified Party, by wire transfer in immediately available cash funds in Dollars, the amount of any Damages for which it is liable hereunder no later than three days following any determination of such Damages and the Indemnifying Party's liability therefor.  A "determination" will exist when (A) the parties to the dispute have entered into a legally binding agreement with respect to the dispute, (B) a court of competent jurisdiction will have entered a final and non-appealable order or judgment, or (C) an arbitration or like panel will have rendered a final and non-appealable determination with respect to disputes the parties have agreed to submit thereto.

9.7.  Exclusivity of Indemnity.  Except in the case of actual fraud (as to which none of the limitations set forth in this Article 9 will apply), from and after the Closing, the rights of any Indemnified Party under this Article 9 will be the sole and exclusive remedy of such Indemnified Party for monetary damages with respect to claims for breach or inaccuracy of any of the representations, or warranties, or breach of any of the covenants and agreements, in each case, that are indemnifiable under this Article 9.

9.8.  Tax Indemnification.  The foregoing provisions of this Article 9 will not apply with respect to indemnification for Taxes (including for any breach of any representation or warranty contained in Section 5.10 or any covenant contained in Section 7.2(b)(S) or Article 11), which will be governed solely by Article 11.

9.9.  Successors.  The obligations of Seller under this Article 9 are intended to be, and the Sale Order will specifically provide that they will be, binding upon (a) any successors or assigns of Seller, (b) any trustee, examiner, or other representative of Seller's estate, (c) any reorganized Seller, and (d) any other entity vested or revested with any right, title or interest in or to a material portion of Seller's assets or any other Person claiming any rights in or control over a material portion of Seller's assets (each of (a) through (d), a "Seller Successor") as if such Seller Successor were Seller hereunder.

## 10. BANKRUPTCY COURT MATTERS

10.1.  Competing Transaction.  (a)  Each Debtor and each of Seller Parent and Seller agrees that (i) between the date hereof and the date the Bidding Procedures Order is entered by the Bankruptcy Court and (ii) from and after the date that the Auction is declared closed by Seller, Seller will not, and will not permit its Affiliates or its or their respective officers, directors, agents or representatives to, directly or indirectly, (A) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction (including a Back-Up Plan) or otherwise facilitate any effort or attempt to make a proposal or offer with respect to a Competing Transaction (including a Back-Up Plan), (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data to any Person relating to, any Competing Transaction (including a Back-Up Plan), (C) enter into or seek to enter into any agreement with respect to, make any Filings in furtherance of, or negotiate in any respect, a Competing Transaction (including a Back-Up Plan), and (D) request to amend or waive this Section 10.1(a); provided that Seller and its Affiliates or its or their respective officers, directors, representatives and agents may provide materials and information ("Participation Materials") to, and enter into discussions and negotiations with, Interested Parties or Potential Bidders (as defined in the Bidding Procedures) to the extent expressly permitted by and in accordance with the Bidding Procedures. Until the entry of the Bidding Procedures Order, Seller agrees that it will promptly (and, in any event, within 24 hours) notify Purchaser if

any inquiries, proposals or offers with respect to a Competing Transaction are received by, any such information is requested from, or any such discussions or negotiation are sought to be initiated or continued with, it or any of its Affiliates or its or their respective officers, directors, agents or representatives indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposals or offers (including, if applicable, copies of any written requests, proposals or offers, including proposed agreements) and thereafter shall keep Purchaser informed, on a current basis, of the status and terms of any such proposals or offers (including any amendments thereto) and the status of any such discussions or negotiations, if any, including any change in the Debtors' or Seller Parent's intentions as previously notified.

(b)     Other than to the extent expressly permitted by and in accordance with the Bidding Procedures, each Debtor and each of Seller Parent and Seller agrees that from and after the date the Bidding Procedures Order is entered by the Bankruptcy Court until the date that the Auction is declared closed by Seller, Seller will not, and will not permit its Affiliates or its or their respective officers, directors, agents or representatives to, directly or indirectly, (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person with respect to a Competing Transaction (including a Back-Up Plan) or (ii) enter into or seek to enter into any agreement with respect to, make any Filings in furtherance of, or negotiate in any respect, a Competing Transaction. For the avoidance of doubt, the Debtors will not pursue or agree to any Competing Transaction or Back-Up Plan other than as expressly permitted by and in accordance with the Bidding Procedures.

10.2.   <u>Break-Up Fee and Expense Reimbursement</u>.

(a)     The obligations to pay (i) the Break-Up Fee and the Expense Reimbursement as provided herein and (ii) any amounts payable pursuant to <u>Article 9</u>, in each case, will be entitled to superpriority administrative expense status pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, senior to all other administrative expense claims in the Bankruptcy Cases.

(b)     Each Party agrees and acknowledges that Purchaser's due diligence, efforts, negotiation and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal and other resources by Purchaser and its Affiliates, and that such due diligence, efforts, negotiation and execution have provided value to the Debtors and their respective Affiliates. The provision of the Break-Up Fee and Expense Reimbursement is an integral part of this Agreement, without which Purchaser would not have entered into this Agreement.

10.3.   <u>Bankruptcy Court Filings</u>. (a) Within one Business Day of the date hereof, the Debtors will File a motion seeking the entry of the First Day Order and the Bidding Procedures Motion in the Bankruptcy Cases. In addition to the

foregoing, the Debtors will File prior to 6:45 a.m. local time in New York City, New York on the date hereof, a copy of the Support Stipulation executed by the Debtors, the Purchaser, the official committee of unsecured creditors, Aurelius Capital Management, LP and Capital Research and Management Company.

(b)     Each of the Debtors and Seller Parent will use its best efforts to seek to obtain entry of (i) the First Day Order within 15 days of the date hereof, (ii) Bidding Procedures Order within 22 days of the date hereof, and (iii) the Sale Order within 56 days of the date hereof, and to cause such order to become a Final Order not later than 70 days from the date hereof.

(c)     Purchaser agrees that it will use commercially reasonable efforts to take such actions as are reasonably requested by the Debtors to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for Filing for the purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Sale Order or the Bidding Procedures Order is appealed, Purchaser will use its reasonable best efforts to defend such appeal.

(d)     The Debtors will give timely notice of all motions, orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby (i) as ordered by the Bankruptcy Court, (ii) to all Persons entitled to such notice, including all Persons that have asserted or, to the Knowledge of Seller, may hold Encumbrances or Liabilities in Company Parent, the Company Parent Interests or the Shares and all Governmental Authorities in jurisdictions applicable to Seller, in each case as required by the Bankruptcy Rules, or (iii) as Purchaser may reasonably request.

(e)     After entry of the Sale Order, to the extent Purchaser is the Successful Bidder at the Auction or if, in accordance with the Bidding Procedures Order, no Auction is held, none of the Debtors or Company Parent will take, and each will ensure that none of their respective Affiliates take, any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, vacation, modification in any manner or staying of the Sale Order.

(f)     The Debtors and their affiliated debtors and debtors-in-possession will be responsible for making all appropriate Filings relating to the transactions contemplated hereby, which Filings will be submitted to Purchaser prior to their Filing for Purchaser's prior review and comment, which comments will be considered in good faith by the Debtors to the extent consistent with the transactions contemplated hereby.

(g)     The Debtors will and will cause their affiliated debtors and debtors-in-possession to timely consult in good faith with Purchaser regarding pleadings it or its Affiliates intend to File in connection with, or which might

reasonably affect (i) the consummation of the transactions contemplated hereby, including the timing of consummation or (ii) the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order.

(h)     After the entry of the Sale Order and in connection with the Closing, the Debtors will cause Company Parent to pay in full all fees of the U.S. Trustee and File the Notice of Dismissal and all required reports with the Bankruptcy Court in order to effectuate the consummation of the transactions contemplated hereby.

(i)     The Debtors will not pursue approval of the Existing Plan Documents in the form currently on file with the Bankruptcy Court, and will announce to the Bankruptcy Court no later than the hearing on approval of the Bidding Procedures Order whether the Debtors intend to promptly withdraw, or to amend, replace or supersede the Existing Plan Documents to account for the transactions contemplated by this Agreement.

# 11. TAX MATTERS

11.1.  <u>Tax Return Preparation</u>.  (a)  <u>Pre-Closing Tax Returns</u>.  Seller will prepare and file, or cause to be prepared and filed, all Tax Returns in respect of any of the Entities relating to Pre-Closing Periods that are due after the Closing Date (including Tax Returns required to be filed by or with respect to any of the Entities on a combined or unitary basis with Seller or any Affiliate thereof) ("<u>Seller Returns</u>").  Seller will furnish Purchaser any Seller Return due after the Closing for Purchaser's review and comment at least 30 Business Days prior to the due date any such Seller Return is filed (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return), and Purchaser will provide Seller with Purchaser's written comments no later than 15 Business Days (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return) before the due date of any such Seller Return.  Seller will consider in good faith any revisions to the Seller Returns that are timely and reasonably requested by Purchaser in respect of any such Tax Return.  Seller and Purchaser agree to consult and promptly resolve in good faith any issue arising as a result of Purchaser's review of such Seller Returns.  Seller will pay or cause to be paid to the relevant Governmental Authority all amounts required to be paid in respect of such Tax Returns as determined pursuant to this <u>Section 11.1(a)</u>, to the extent not already taken into account in determining the Final Purchase Price or attributable to a Purchaser Tax Act.

(b)     <u>All Other Tax Returns</u>.  Purchaser will prepare and file, or cause to be prepared and filed, all Tax Returns other than those described in <u>Section 11.1(a)</u> above required to be filed by or on behalf of or in respect of any of the Entities, including Tax Returns for a Straddle Period ("<u>Purchaser Returns</u>").  Purchaser will furnish Seller any Purchaser Return for which Seller could be

liable under this Article 11 for Seller's review and comment at least 30 Business Days prior to the due due date of any such Purchaser Return (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return), and Seller will provide Purchaser with Seller's written comments no later than 15 Business Days (or such shorter period as the circumstances require, but only in the case of a non-income Tax Return or a monthly Tax Return) before the due date of any such Purchaser Return. Purchaser will consider in good faith any revisions to the Purchaser Returns that are timely and reasonably requested by Seller. Seller and Purchaser agree to consult and resolve promptly in good faith any issue arising as a result of Seller's review of such Purchaser Returns. Purchaser will pay or cause to be paid to the relevant Governmental Authority all amounts required to be paid in respect of such Purchaser Returns, as determined pursuant to this Section 11.1(b). Within 10 Business Days after determining the amount of Tax for which Seller is responsible pursuant to this Agreement in respect of any Pre-Closing Period (including the pre-Closing portion of any Straddle Period), Seller will pay such amount to Purchaser (or, at the direction of Purchaser, the Company or another Affiliate of Purchaser), to the extent not already taken into account in determining the Final Purchase Price or attributable to a Purchaser Tax Act.

11.2.  Assistance and Cooperation.  After the Closing, each of Purchaser and Seller will (and cause their respective Affiliates to):

(a)  assist the other party in preparing and filing any Tax Returns which such other party is responsible for preparing and filing in accordance with this Article 11;

(b)  reasonably cooperate with the other party in preparing for any audits of, or disputes with Governmental Authorities regarding, any Tax Returns which such other party is responsible for preparing and filing in accordance with this Article 11;

(c)  make available to the other party and to any Governmental Authority as reasonably requested all information, records and documents relating to Taxes of the Entities;

(d)  provide timely notice to the other Party in writing of any pending or threatened Tax audits or assessments of the Entities for taxable periods for which the other Party may have a Liability under this Article 11;

(e)  furnish the other Party with copies of all correspondence received from any Governmental Authority in connection with any Tax audit or information request with respect to any taxable period for which the other Party may have a Liability under this Article 11; and

(f)  timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce),

or file Tax Returns or other reports with respect to, Taxes resulting from the transactions contemplated by this Agreement, and timely provide the other party with powers of attorney or similar authorizations necessary to carry out the purposes of this Article 11.

11.3.   Certain Tax Agreements.  Effective as of the Closing, all Tax indemnification, Tax allocation and Tax sharing agreements to which any of the Entities is a party will be terminated and, after the Closing, none of the Entities will have any further obligations under any such Tax indemnification, Tax allocation or Tax sharing agreement, other than any such Agreement solely between or among the Entities.

11.4.   Tax Indemnification.

(a)  Except to the extent attributable to a Purchaser Tax Act, Seller will be responsible for, and will indemnify and hold harmless Purchaser and its Affiliates for, without duplication, all Taxes and Damages relating to (i) any Taxes imposed on the Entities that are attributable to any Pre-Closing Period and, with respect to any Straddle Period, the portion of such Straddle Period deemed to end on and include the Closing Date; (ii) any breach of any representation or warranty contained in Section 5.10, or of any covenant contained in Section 7.2(b)(S) or this Article 11; (iii) Seller's share of any Transfer Taxes pursuant to Section 11.11; (iv) Taxes of Purchaser and its Affiliates that would not have arisen had Purchaser acquired the Company Shares directly (instead of through the acquisition of the Company Parent Interests);(v) the Uruguay Subsidiary or the Uruguay Divestiture; and (vi) any *impuesto al valor agregado* ("VAT") liability that arises as a result of the netting of Intercompany Obligations under Section 3.5 and is not offset or credited against VAT favorable balances attributable to such netting.

(b)   Notwithstanding anything to the contrary in this Agreement, the Parties agree and acknowledge that, for any amounts finally determined to be payable by Seller under this Article 11, such amounts will be paid solely from funds then available in the Escrow Account only to the extent Purchaser elects at any time, by written notice to Seller, to have such amounts paid from the Escrow Account and Seller will be obligated to pay any such amounts not so paid from the Escrow Account.

(c)   Any payment made pursuant to this Section 11.4 will be treated as an adjustment to the price for which the Company Parent Interests are purchased by the Purchaser for all Tax purposes unless otherwise required by applicable Law.

(d)   Seller will not have any liability to indemnify Purchaser in respect of any Tax under this Article 11 to the extent that (i) such Tax is reduced or eliminated through the utilization of net operating losses of one or more of the Entities attributable to a Pre-Closing Period (including the pre-Closing portion of

a Straddle Period) (such net operating losses, the "Pre-Closing NOLs"); (ii) such Tax is offset or credited against VAT favorable balances of one or more of the Entities attributable to a Pre-Closing Period (including the pre-Closing portion of a Straddle Period) (such balances, the "Pre-Closing VAT Favorable Balances"); provided, however, that any reduction in Seller's indemnification obligation pursuant to this clause (ii) will not exceed the net Pre-Closing VAT Favorable Balances of the Entities, taken as a whole.  After the Closing Date, Purchaser will use and will cause its Affiliates to use commercially reasonable efforts to utilize first any Pre-Closing NOLs or Pre-Closing VAT Favorable Balances to reduce Taxes otherwise indemnifiable under this Article 11 before utilizing any other available tax attributes and benefits, including other net operating losses and any other deductions; provided, however, for the avoidance of doubt, a restructuring of the Entities, Purchaser or its Mexican Affiliates will not be commercially reasonable for this purpose.

11.5.   Indemnification Procedures and Contest Provisions.  (a)  If a written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim (a "Tax Claim") is delivered or sent to or commenced or initiated against any of the Entities by any Governmental Authority with respect to Taxes or Tax Returns of any of the Entities for which Purchaser or its Affiliates may reasonably be entitled to indemnification pursuant to Section 11.4 above, Purchaser or its Affiliates will promptly notify Seller in writing of the Tax Claim; provided, however, that the failure to timely give such notice will not limit and reduce Purchaser's right to indemnification hereunder except to the extent that the Indemnifying Party is prejudiced thereby.

(b)     With respect to Tax Claims of or relating solely to Taxes of the Entities for any Pre-Closing Period for which Seller may be liable under Section 11.4, Seller may, upon written notice to Purchaser, assume and control the defense of such Tax Claim at its own cost and expense and with its own counsel.  Purchaser may retain separate co-counsel at its sole cost and expense and participate in the defense of the Tax Claim (including participation in any relevant meetings and conference calls).  Seller will not enter into any settlement with respect to any such Tax Claim without Purchaser's prior written consent, which will not be unreasonably delayed, conditioned or withheld, and Seller will keep Purchaser informed of all developments and events relating to all Tax Claims the defense of which is controlled by Seller (including promptly forwarding copies to Purchaser of any related correspondence).

(c)     With respect to Tax Claims of or relating to Taxes of the Entities for any Straddle Period, Purchaser will control the contest of any such claims at its own cost and expense.  To the extent any such contest relates to Taxes for which Seller might be liable under this Article 11, Seller may retain separate co-counsel at its sole cost and expense and participate in the defense of the Tax Claim (including participation in any relevant meetings and conference calls).  Purchaser will not enter into any settlement with respect to any such Tax

Claim without Seller's prior written consent, which will not be unreasonably delayed, conditioned or withheld, and Purchaser will keep Seller informed of all developments and events relating to such Tax Claim (including promptly forwarding copies to Purchaser of any related correspondence).

(d)     With respect to Tax Claims of or relating solely to Taxes of the Entities for any Post-Closing Period, Purchaser will control the defense of such Tax Claim at its own cost and expense and with its own counsel.

(e)     Any payment required to be made pursuant to this Section 11.5 will be made by wire transfer of immediately available cash funds in Pesos within 30 Business Days after the indemnified party makes written demand upon the indemnifying party, but in no case earlier than ten Business Days prior to the date on which the relevant Taxes are required to be paid to the relevant Governmental Authority.  Any payment not timely made will accrue interest at the rate of 6.0% per annum, compounded quarterly.  Such interest will be increased such that after all applicable withholding taxes, Purchaser receives a net after-tax amount equal to the full amount of accrued interest.

11.6.   Allocation of Straddle Period Taxes.  For purposes of this Article 11, in order to apportion appropriately any Taxes relating to a Straddle Period, the parties will, to the extent permitted or required under any applicable Law, treat the Closing Date as the last day of the taxable year or period of the Company or relevant Subsidiary for all Tax purposes.  In any case where the applicable Law does not permit the Company or relevant Subsidiary to treat the Closing Date as the last day of the taxable year or period, the portion of any Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date will be:

(a)     in the case of Taxes that are imposed on a periodic basis, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of calendar days in the Straddle Period ending on and including the Closing Date and the denominator of which is the number of calendar days in the entire relevant Straddle Period;

(b)     in the case of Taxes not described in clause (a) (such as Taxes that are either (i) based upon or related to income or receipts or (ii) imposed in connection with any sale or other transfer or assignment of property), deemed equal to the amount that would be payable if the taxable year or period ended on the Closing Date; and

(c)     for purposes of this Section 11.6, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated to the portion of the Straddle Period in the same manner as that set forth in Section 11.6(a).

11.7.  <u>Other Tax Matters</u>.  (a)  The indemnification provided for in this <u>Article 11</u> will be the sole remedy for any claim in respect of Taxes for which an indemnity is provided under this Agreement (including the representations with respect to Taxes set forth in <u>Section 5.10</u>), and the provisions of <u>Article 9</u> will not apply to such claims.

(b)  The covenants and indemnity in this Article 11 will survive until 60 days after the expiration of the relevant statute of limitations.

11.8.  <u>Tax Refunds</u>.  Purchaser will pay to Seller any refunds of Taxes (or reductions in Tax liability), including interest paid therewith, of the Entities that result from the receipt of such refund that relate to any Pre-Closing Period (including the pre-Closing portion of any Straddle Period), other than any refunds that are attributable to any carryback of net operating losses, capital losses or other similar Tax items relating solely to a Post-Closing Period.  For purposes of this Section 11.8, the term "refunds of Taxes" means the Entity's actual receipt of any refund, reimbursement or similar Tax item from any Person after the Closing to the extent such refund, reimbursement or similar Tax item is attributable to any Pre-Closing Period (including the pre-Closing portion of any Straddle Period), other than any refund taken into account in determining the Final Purchase Price and excludes any net tax profit account (cuenta de utilidad fiscal neta or "CUFIN"), capital contribution account (cuenta de capital de aportación or "CUCA"), recoverable asset tax and foreign tax credit and income tax credit from dividends distributed in excess of CUFIN.  Purchaser will make payment of any such refund described in this Section 11.8, net of any reasonable costs incurred by or on behalf of Purchaser in obtaining such refund, to Seller within ten Business Days of the actual receipt of such refund.  Any refunds of Taxes paid to Seller pursuant to this Section 11.8 will be treated as an adjustment to the Final Purchase Price.

11.9.  <u>Amendment of Tax Returns</u>.  Except as required in order to comply with applicable Law or pursuant to the resolution of a Tax-related Legal Proceeding, neither Purchaser nor any of its Affiliates may amend, file, refile, revoke or otherwise modify any Tax Return or Tax election of any Entity with respect to a Pre-Closing Period (including the pre-Closing portion of any Straddle Period), without the prior written consent of Seller, which consent will not be unreasonably withheld, conditioned or delayed.

11.10. <u>Certain Tax Elections</u>.  In connection with the transactions contemplated by this Agreement, Purchaser may timely make or cause to be timely made elections pursuant to Section 338(g) of the Code with respect to each Entity that, as of the Closing Date, is treated as a corporation for U.S. federal income tax purposes; provided, however, that Purchaser will provide to Seller written notice of Purchaser's decision to make or not make such elections  no later than the earlier of (i) 30 calendar days prior to Purchaser's making such election or elections, as the case may be, and (ii) 30 calendar days

prior to the last date upon which such election or elections, as the case may be, may be timely made.

11.11. <u>Transfer Taxes</u>.  Any Transfer Taxes imposed as a result of the transactions contemplated by this Agreement will be borne 50% by Purchaser and 50% by Seller.  The Party so required by applicable Law will file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by the applicable Law, the other Party will, and will cause its Affiliates to join in the execution of any such Tax Returns and other documentation.  If a Party is required under <u>Section 11.4</u> to indemnify the other Party in respect of any Transfer Taxes, the amount of the indemnification will be an amount equal to the amount by which the other Party has paid or is obligated to pay exceeds 50% of the total amount of such Transfer Taxes.

11.12. <u>Company Parent</u>.  For purposes of this <u>Article 11</u>, "Entities" or "Entity" includes Company Parent.

## 12. MISCELLANEOUS

12.1.  <u>Expenses</u>.  Except as otherwise provided in this Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses (including any finder's or investment banker's fees and attorneys' and accountants' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring the expense.  All such costs and expenses payable by any Entity will be paid and satisfied in full by Seller prior to the Closing.

12.2.  <u>Injunctive Relief</u>.  Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party will be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants contained in this Agreement.  Subject to <u>Section 4.6(c)</u>, the rights set forth in this <u>Section 12.2</u> will be in addition to any other rights that a Party may have at law or in equity.

12.3.  <u>Submission to Jurisdiction</u>.  Without limiting a Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as indicated in <u>Section 12.7</u> hereof, provided, however, that

following entry of a final decree pursuant to Section 350 of the Bankruptcy Code, if the Bankruptcy Court is unwilling to hear such proceedings, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court thereof, for the resolution of any such claim or dispute and each Party hereby waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same or any other jurisdiction that could apply by virtue of their present or future domiciles or for any other reason.  Each Party irrevocably designates CT Corporation as its agent and attorney-in-fact for the acceptance of service of process and making an appearance on its behalf in any such claim or proceeding and for the taking of all such acts as may be necessary or appropriate in order to confer jurisdiction over it before the courts specified in this <u>Section 12.3</u> and each Party stipulates that such consent and appointment is irrevocable and coupled with an interest. The Parties irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. On the date hereof, Seller will cause the Company to deliver to Purchaser an irrevocable special power of attorney in favor of the Process Agent in the form of <u>Exhibit G</u> for lawsuits and collections duly executed and delivered by the Company in the presence of a Mexican Notary Public (the "<u>Special Power of Attorney</u>").

12.4.  <u>Waiver of Jury Trial</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 12.4</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.5.  <u>Entire Agreement; Amendments and Waivers</u>.  (a)  This Agreement (including the Schedules and Exhibits to this Agreement), the Escrow Agreement, the Non-Disclosure Agreement and the Transition Services Agreement represent the entire understanding and agreement between the Parties with respect to the subject matter of this Agreement.

(b)     This Agreement may be amended, supplemented or changed, and any provision of this Agreement may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(c)     No action taken pursuant to this Agreement, including any investigation by or on behalf of a Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

12.6.   <u>Governing Law</u>.  This Agreement will be governed by and construed in accordance with the Laws of the State of New York.

12.7.   <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given or delivered (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or email, or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller, Seller Parent or any Seller Guarantor, to:

NIU Holdings LLC
c/o NII Holdings, Inc.
1875 Explorer Street,
Reston, VA 20191
Attention:  Gary D. Begeman, General Counsel
Fax:          703-390-5191
Email:       Gary.Begeman@nii.com

NYI-524627067v14
SC1:3765114.10

With a copy (which will not constitute notice) to:

Jones Day
222 East 41st Street
New York, New York 10017
Attention:  Robert A. Profusek
Fax:         212-755-7306
Email:       raprofusek@jonesday.com


If to Purchaser, to:

AT&T Inc.
One AT&T Plaza
208 South Akard Street, Suite 3702
Dallas, Texas 75202
Attention:  D. Wayne Watts
Fax.:        (214) 746-2103
Email:       wayne.watts@att.com


With a copy (which will not constitute notice) to:

Sullivan & Cromwell LLP
125 Broad Street
New York, New York  10004
Attention:  Sergio J. Galvis
            Werner F. Ahlers
Fax.:        (212) 558-3588
Email:       galviss@sullcrom.com
            ahlersw@sullcrom.com

    12.8.  <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

    12.9.  <u>Binding Effect; Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations

hereunder may be made by any Party, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Party and any attempted assignment without the required consents will be void, provided, however, that (a) the Debtors may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities (including one or more reorganized Debtors) pursuant to a plan of reorganization confirmed by the Bankruptcy Court, provided that any such entity must provide to Purchaser evidence of adequate assurance of future performance as if this Agreement was being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code and (b) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its Affiliates. No assignment will relieve the assigning Party of any obligation. Upon any permitted assignment, the references in this Agreement to the assigning Party will also apply to any such assignee unless the context otherwise requires. In addition to the foregoing, any entity that constitutes a Debtor Successor (as defined in clause (x) of paragraph 49 of the Sale Order attached hereto), must (x) assume all of the Debtors' obligations hereunder (and the other Transaction Documents) and (y) prior to the consummation of such transactions and assumption, provide to Purchaser evidence of adequate assurance of future performance as if this Agreement was being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code. Any such assumption will not relieve the Debtors of their respective obligations under this Agreement or the other Transaction Documents.

12.10. <u>Non-Recourse</u>. Except pursuant to an assignment contemplated by <u>Section 12.9</u> or pursuant to <u>Section 12.13</u>, no past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of a Party will have any liability for any obligations or liabilities of such Party under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

12.11. <u>Legal Representation</u>. (a) Purchaser agrees that, as to all communications prior to the Closing between Jones Day, on the one hand, and Seller, NII Holdings, the Entities or any of their respective Affiliates, on the other hand, to the extent that they are in respect of to the transactions contemplated by this Agreement (collectively, the "<u>Privileged Communications</u>"), the attorney-client privilege and the expectation of client confidence with respect to the Privileged Communications belongs to Seller and/or NII Holdings and may be controlled by Seller and/or NII Holdings and will not pass to or be claimed by Purchaser or any of its Affiliates (including, after the Closing, the Entities). The Privileged Communications are the property of Seller and/or NII Holdings, and, from and after the Closing, none of Purchaser or its Affiliates (including the Entities), or any Person purporting to act on behalf of or through Purchaser or its Affiliates (including the Entities) will have the right to obtain such communications, whether by waiver of the attorney-client privilege or through other means. The Privileged Communications may be used by Seller, NII Holdings or any of their respective Affiliates in connection with any dispute that

relates to the transactions contemplated by this Agreement, including in any claim brought by Purchaser.  Notwithstanding the foregoing, in the event that a dispute arises after the Closing between Purchaser or its Affiliates (including the Entities) and a third party (other than a Party to this Agreement or any of their respective Affiliates), Purchaser or its Affiliates (including the Entities) may assert the attorney-client privilege to prevent disclosure of confidential communications by counsel to such third party, provided, however, that none of Purchaser or its Affiliates (including the Entities) may waive such privilege without the prior written consent of Seller (not to be unreasonably withheld, conditioned or delayed).

(b)     The Parties agree that Purchaser will not, and will cause any Affiliates (including, after Closing, the Entities) not to, seek to have Jones Day disqualified from representing Seller or its Affiliates in connection with any dispute that may arise between Seller or its Affiliates and any of Purchaser or any of its Affiliates (including, after Closing, the Entities) in connection with this Agreement or the transactions contemplated by this Agreement.

12.12. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

12.13. <u>Seller Guarantors</u>.  (a)  The Seller Guarantors hereby absolutely, unconditionally and irrevocably guarantee, jointly and severally, on behalf of themselves and on behalf of all of their Affiliates that are direct or indirect legal, record or beneficial owners of any equity interests in Seller, to Purchaser the full, complete and timely payment and performance, subject to the terms and conditions hereof, by Seller and Seller Parent of each and every payment and performance obligation of Seller or Seller Parent in this Agreement, without any set off, restriction, condition or deduction for or on account of any counterclaim. If Seller or Seller Parent defaults for any reason whatsoever on any such payment obligation or fails to perform such performance obligation when and to the extent that any of the same will become due and payable, then the Seller Guarantors will unconditionally pay or cause to be paid such payment obligation or perform or cause to be performed such performance obligation immediately upon notice from Purchaser specifying the default so that the same benefits will be conferred on Purchaser as would have been received if such payment or performance obligations had been duly performed and satisfied by Seller or Seller Parent.  Purchaser will not be required to demand payment or performance from, or initiate Legal Proceedings against, Seller, Seller Parent or any other Person prior to or contemporaneously with proceeding against the Seller Guarantors or demand payment therefrom or performance thereby more than once.  Subject to the terms and conditions hereof, the Seller Guarantors waive (i) any and all legal and equitable defenses available to a guarantor (other than payment in full by Seller or Seller Parent) and (ii) promptness, diligence, presentment, protest, order and any notices hereunder, including any notice of any amendment of this Agreement or waiver or other similar action granted

pursuant to this Agreement and any notice of acceptance.  The guarantee set forth in this Section 12.13(a) will be deemed a continuing guarantee and will remain in full force and effect until the satisfaction in full of all payment and performance obligations of Seller and Seller Parent under this Agreement, notwithstanding the winding-up, liquidation, dissolution, merger or other incapacity or other restructuring of Seller or Seller Parent or any change in the status, control or ownership of Seller or Seller Parent.  The guarantee set forth in this Section 12.13(a) is a primary guarantee of payment and not just of collection.

(b)      Each Seller Guarantor agrees, on behalf of itself and on behalf of all of its Affiliates that are direct or indirect legal, record or beneficial owners of any equity interests in Seller, that any performance or payment obligations expressed to be undertaken by Seller or Seller Parent that may not be enforceable against or recoverable from Seller or Seller Parent by reason of any legal disability or incapacity on or of Seller or Seller Parent or any fact or circumstance (other than any limitation imposed hereunder) will nevertheless be enforceable against and recoverable from such Seller Guarantor as though the same had been incurred by such Seller Guarantor and such Seller Guarantor were the sole or principal obligor in respect thereof and will be performed or paid or caused to be performed or paid by such Seller Guarantor on demand.

(c)      The obligations of the Seller Guarantors under this Section 12.13 are intended to be, and the Sale Order will specifically provide that they will be, binding upon (i) any successors or assigns of a Seller Guarantor, (ii) any trustee, examiner, or other representative of a Seller Guarantor's estate, (iii) any reorganized Seller Guarantor, and (iv) any entity that constitutes a Debtor Successor (as defined in clause (x) of paragraph 49 of the Sale Order attached hereto) (each of (i) through (iv), a "Guarantor Successor") as if such Guarantor Successor were a Seller Guarantor hereunder.

(d)      The obligations of the Seller Guarantors under this Section 12.13, will be entitled to superpriority administrative expense status pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code, senior to all other administrative expense claims, in the Bankruptcy Cases, including any superpriority administrative expense claims that may be sought in the Bankruptcy Cases.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its officers thereunto duly authorized, as of the date first written above.

**NEW CINGULAR WIRELESS SERVICES, INC.**

By: _____

Name: Rick L. Moore
Title: Senior Vice President-Corporate
Development

**NIU HOLDINGS LLC**

By: *Shana C. Smith*
      Name: Shana C. Smith
      Title: Manager


**NIHD TELECOM HOLDINGS B.V.**

By: *Shana C. Smith*
      Name: Shana C. Smith
      Title: Managing Director


**NEXTEL INTERNATIONAL
(URUGUAY) LLC**

By: *Shana C. Smith*
      Name:Shana C. Smith
      Title: Manager


**COMUNICACIONES NEXTEL DE
MÉXICO SA. DE C.V., as Seller
Guarantor**

By: _____
      Name: Antonio Garza Canovas
      Title: Vice President and General
      Counsel

**NIU HOLDINGS LLC**

By: _____
　　　Name: Shana C. Smith
　　　Title: Manager


**NIHD TELECOM HOLDINGS B.V.**

By: _____
　　　Name: Shana C. Smith
　　　Title: Managing Director


**NEXTEL INTERNATIONAL
(URUGUAY) LLC**

By: _____
　　　Name:Shana C. Smith
　　　Title: Manager


**COMUNICACIONES NEXTEL DE
MÉXICO SA. DE C.V., as Seller
Guarantor**

By: _____
　　　Name: Antonio Garza Canovas
　　　Title: Vice President and General
　　　Counsel

**NII INTERNATIONAL TELECOM
S.C.A., as Seller Guarantor**

**Represented by its Sole Manager
NII International Holdings S.á. r.l.**

By: *Shana C. Smith*
      Name: Shana C. Smith
      Title: Class B Manager


**NII INTERNATIONAL HOLDINGS
S.À.R.L., as Seller Guarantor**

By: *Shana C. Smith*
      Name: Shana C. Smith
      Title: Class B Manager


**NII GLOBAL HOLDINGS, INC., as
Seller Guarantor**

By: 
      Name: Gary D. Begeman
      Title: Vice President and Secretary


**NII CAPITAL CORP., as Seller
Guarantor**

By: 
      Name: Gary D. Begeman
      Title: Vice President and Secretary

**NII HOLDINGS, INC., as Seller Guarantor**

By: _____
    Name: Gary D. Begeman
    Title: Executive Vice President and
    General Counsel

**Exhibit A**

**Form of Bidding Procedures**

[*see attached*]

# BIDDING PROCEDURES[1]

By motion (the "<u>Motion</u>"), dated January **[___]**, 2015, NII Holdings, Inc. ("<u>NII Holdings</u>") and its affiliated debtors, including NIU Holdings LLC (the "<u>Seller</u>"), each as a debtor and debtor-in-possession (collectively, with NII Holdings and the Seller, the "<u>Debtors</u>"), sought, among other things, approval of the process and procedures solely for the sale of 100% of the outstanding membership interests (the "<u>Company Parent Interests</u>") of Nextel International (Uruguay), LLC ("<u>Company Parent</u>") to effectuate an indirect sale of Comunicaciones Nextel de México, S.A. de C.V. (the "<u>Company</u>") outside the ordinary course of business.

A purchase and sale agreement (including all exhibits, schedules and ancillary agreements related thereto, the "<u>Purchase and Sale Agreement</u>"), dated as of January **[___]**, 2015, has been entered into, subject to the Bidding Procedures described below (the "<u>Bidding Procedures</u>"), among the Seller, Company Parent, Seller Parent, Seller Guarantors and New Cingular Wireless Services, Inc. (the "<u>Stalking Horse Purchaser</u>"), which Purchase and Sale Agreement contemplates a transaction for the sale of the Company Parent Interests to Purchaser (the "<u>Sale Transaction</u>").

On February **[17]**, 2015, the Bankruptcy Court entered the Bidding Procedures Order that, among other things, authorized the Debtors to establish separate escrow accounts to hold the Good Faith Deposit of the Stalking Horse Purchaser and pursue the Sale Transaction through the Bidding Procedures, subject to the approval of Sale Transaction by the Bankruptcy Court following a hearing before the Bankruptcy Court scheduled for March 23, 2015, at 2:00 p.m. (ET) (the "<u>Sale Hearing</u>").

1. **<u>Important Dates and Contact Information</u>**

Following entry of the Bidding Procedures Order, the Debtors will:

(a)    solicit and assist Potential Bidders (as defined below) in conducting their respective due diligence investigations and accept Qualified Bids (as defined below) until the deadline for receipt of Qualified Bids, which is 9:00 a.m. (prevailing Eastern time) on March 17, 2015;

(b)    negotiate with Qualified Bidders (as defined below) in preparation for an auction (the "<u>Auction</u>") to begin at 10:00 a.m. (prevailing Eastern time) on March 20, 2015; and

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Bidding Procedures Order or the Motion, as applicable.

(c)     after consultation with the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Creditors' Committee") select the Successful Bidder (as defined below) at the conclusion of the Auction and seek authority to sell the Company Parent Interests to such Successful Bidder at the Sale Hearing to be held by the Bankruptcy Court at 2:00 p.m. (prevailing Eastern time) on March 23, 2015.

Information that must be provided under these Bidding Procedures must be provided to the following parties (the "Notice Parties"): (i) NII Holdings, Inc., 1875 Explorer Street, Reston, Virginia 20190 (Attn:  Gary D. Begeman, Esq.) and at gary.begeman@nii.com; (ii) Rothschild Inc. ("Rothschild"), 1251 Avenue of the Americas #51, New York, New York 10020 (Attn:  J. Nicholas Melton and Homer Parkhill) and at nick.melton@rothschild.com and homer.parkhill@rothschild.com; (iii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Robert A. Profusek, Esq., and Scott J. Greenberg, Esq.) and at rprofusek@jonesday.com, sgreenberg@jonesday.com; (iv) Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn:  Kenneth Eckstein, Esq.. Adam C. Rogoff, Esq. and Stephen D. Zide, Esq.) and at keckstein@kramerlevin.com, arogoff@kramerlevin.com, szide@kramerlevin.com; and (v) FTI Consulting, Inc., Three Times Square, New York, New York 10036 (Attn: Steven Simms and Andrew Scruton) and at steven.simms@fticonsulting.com, Andrew.scruton@fticonsulting.com; (v) Akin Gump Strauss Hauer & Feld LLP, as counsel to Aurelius Capital Management, LP ("Aurelius"), One Bryant Park, New York, New York  10036 (Attn: Daniel Golden, Esq. and David Botter, Esq.) and at dgolden@akingump.com, dbotter@akingump.com; (vi) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to Capital Research and Management ("Capital Group"), 1285 Avenue of the Americas, New York, New York 10019 (Attn: Andrew N. Rosenberg, Esq. and Elizabeth R. McColm, Esq.) and at arosenberg@paulweiss.com, emccolm@paulweiss.com.

All dates and times set forth in these Bidding Procedures may be adjusted by the Debtors after consultation with the Creditors' Committee and with the consent of the Stalking Horse Purchaser.

2.     **The Sale Hearing.**

At the Sale Hearing, the Debtors will seek the entry of an order in substantially the form of the order attached as Exhibit **[___]** to the Motion, *inter alia,* authorizing and approving the Sale Transaction (the "Sale Order") (a) if no other Qualified Bid with respect to the Company Parent Interests is received by the Debtors, to the Stalking Horse Purchaser pursuant to the terms and conditions set forth in the Purchase and Sale Agreement or (b) if another Qualified Bid is received by the Debtors with respect to the Company Parent Interests, to the Stalking Horse Purchaser and/or such other Qualified Bidder(s) as the Debtors, in the exercise of their good faith business judgment, after consultation with the Creditors' Committee, determine to have made the highest or otherwise best offer to purchase the Company Parent Interests, consistent with the Bidding Procedures.  After consultation with the Creditors' Committee, the Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to

parties, including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing.

3.  **Determination by the Debtors**

The Bidding Procedures as described herein are calculated to obtain the highest or otherwise best offer solely for the Company Parent Interests.  The Debtors will (a) determine, with the assistance of their financial advisor, Rothschild, and after consultation with the Creditors' Committee, whether any person or entity is a Qualified Bidder, (b) receive bids from Qualified Bidders, (c) negotiate any bids, and (d) conduct the Auction (clauses (a) through (d) and Section 1 above, collectively, the "Bidding Process").  Any person or entity who wishes to make a bid to purchase the Company Parent Interests in the Bidding Process must be a Qualified Bidder.  Neither the Debtors nor any of their representatives will be obligated to furnish any information of any kind whatsoever relating to the Company Parent Interests, Company Parent or the Company to any person or entity who is not a Potential Bidder and who does not comply with the requirements set forth herein.

4.  **Participation Requirements**

Unless otherwise ordered by the Bankruptcy Court, to participate in the Bidding Process, each interested person or entity (each an "Interested Party") must deliver the following (unless previously delivered) to the Notice Parties so as to be received no later than 5:00 p.m. (prevailing Eastern time) on March 11, 2015:

(a)     an executed confidentiality agreement in form and substance satisfactory to the Debtors;

(b)     a statement and other factual support demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing the Company Parent Interests; and

(c)     sufficient information, as determined by the Debtors, to allow the Debtors in the exercise of their reasonable business judgment to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal or other authorizations to complete the Sale Transaction, including financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors in their discretion).

If the Debtors determine that an Interested Party has a *bona fide* interest in acquiring the Company Parent Interests, no later than two Business Days after the Debtors make that determination and have received all of the materials required above, such Interested Party will be deemed a "Potential Bidder" and the Debtors will deliver to such Potential Bidder: (a) an information package containing information and financial data with respect to the Company Parent Interests, Company Parent and the Company

NYI-524634633v7
SC1:3790811.1

(the "<u>Information Package</u>"), (b) an electronic copy of the Purchase and Sale Agreement, and (c) access to the Debtors' confidential electronic data room concerning the Company Parent Interests, Company Parent and the Company (the "<u>Data Room</u>"). The Debtors reserve the right to determine whether an Interested Party has satisfied the above participation requirements such that it is eligible to be a Potential Bidder. Once an Interested Party is deemed a Potential Bidder, its identity will be disclosed to (a) the Stalking Horse Purchaser and any other Potential Bidders, and (b) the Notice Parties.

5.    **Due Diligence**

Following the determination by the Debtors that any Interested Party is a Potential Bidder until the Bid Deadline (as defined below), in addition to access to the Data Room, the Debtors will provide such Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors determine to be reasonable in the circumstances. All additional due diligence requests must be directed to Nick Melton of Rothschild at nick.melton@rothschild.com. The Debtors, with the assistance of Rothschild, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders. In the event that any such due diligence material is in written form and has not previously been provided to any other Potential Bidder, the Debtors will simultaneously provide such materials to all Potential Bidders, as well as to the Stalking Horse Purchaser and the professionals (the "<u>Creditors' Committee Professionals</u>") retained by the Creditors' Committee.

Unless otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if: (a) the Potential Bidder does not become a Qualified Bidder during the period commencing on the Bid Deadline and concluding on the Auction Date or (b) the Bidding Process is terminated. Except as provided above with respect to the Information Package, the Purchase and Sale Agreement and access to the Data Room, or as to the Stalking Horse Purchaser only as provided in the Purchase and Sale Agreement, neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever relating to the Company Parent Interests, Company Parent or the Company to any party.

6.    **Bid Deadline**

A Potential Bidder that desires to make a bid must deliver written and electronic copies of its bid in <u>both</u> Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to the Notice Parties so as to be received no later than 9:00 a.m. (prevailing Eastern time) on March 17, 2015 (the "<u>Bid Deadline</u>").

7.    **Form and Content of a Qualified Bid**

A bid is a written proposal from a Potential Bidder that provides, at a minimum, that:

(a)    the Potential Bidder offers to purchase solely the Company Parent Interests at the purchase price and upon the terms and conditions set forth

NYI-524634633v7
SC1:3790811.1

in a copy of the Purchase and Sale Agreement enclosed therewith, marked to show any proposed amendments and modifications (the "Marked Agreement");

(b)     states that all necessary filings under applicable regulatory, antitrust and other Laws will be made (pursuant to the terms and conditions in the Marked Agreement) and that payment of the fees associated with such filings will be made by the Potential Bidder;

(c)     is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Marked Agreement) and is not subject to any due diligence or contingency and is irrevocable until the selection of the Successful Bid, as set forth herein;

(d)     does not entitle a bidder (other than the Stalking Horse Purchaser) to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and includes a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the Company Parent Interests;

(e)     is determined by the Debtors, after consultation with the Creditors' Committee, to be higher or better than the terms of the Purchase and Sale Agreement, taking into account the Break-Up Fee, Expense Reimbursement (which shall be deemed to be $10 million) and the Minimum Overbid;

(f)     is accompanied by the Good Faith Deposit;

(g)     includes cash consideration sufficient to pay the Break-Up Fee and the Expense Reimbursement; and

(h)     is received by the Bid Deadline.

The Debtors will not qualify any bid to participate in the auction contemplated by the Bidding Procedures Order that is not accompanied by the Good Faith Deposit and does not include at a minimum an additional amount of cash consideration sufficient to repay the Break-Up Fee and the Expense Reimbursement.

The Debtors, after consultation with the Creditors' Committee, will have the right to determine that a bid is not a Qualified Bid if the Debtors determine in good faith that the terms of the bid are substantially more burdensome or conditional than the terms of the Purchase and Sale Agreement and are not offset by a material increase in purchase price or other terms, which determination may take into consideration:

(a)     indemnification and other provisions;

NYI-524634633v7
SC1:3790811.1

(b)     whether the bid provides sufficient cash consideration to pay transfer taxes or other cash costs of the transaction (including professionals' fees, the Break-Up Fee and the Expense Reimbursement);

(c)     whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; and

(d)     any other factors the Debtors may deem relevant.

A Potential Bidder must accompany its bid with:  (a) written evidence of available cash, a binding commitment for financing (not subject to any conditions other than those expressly set forth in the applicable Marked Agreement) or such other evidence of ability to consummate the transaction contemplated by the applicable Marked Agreement as the Debtors may reasonably request, (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed, (c) a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements, (d) if the purchase price includes non-cash consideration or fewer contingencies than are in the Purchase and Sale Agreement, an analysis in reasonable detail of the value of the non-cash consideration and sufficient back-up documentation that demonstrates that the bid is a higher and better offer than the transaction contemplated by the Purchase and Sale Agreement, and (e) if the Qualified Bid includes a Marked Agreement that is not executed, a signed statement that such bid is irrevocable until the selection of the Successful Bid.

A Potential Bidder must deposit with an escrow agent selected by the Debtors (the "Escrow Agent") a deposit equal to $32 million (any such deposit, a "Good Faith Deposit").  The Good Faith Deposit must be made by wire transfer and will be held by the Escrow Agent in accordance with the terms of the escrow agreement.

If a bid is received and, in the Debtors' judgment, it is not clear whether the bid is a Qualified Bid, the Debtors may consult with the Potential Bidder and seek additional information in an effort to establish whether or not a bid is a Qualified Bid.

A bid received from a Potential Bidder that is determined by the Debtors, after consultation with the Creditors' Committee, to meet the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits a Qualified Bid will be considered a "Qualified Bidder."  For purposes hereof, the Stalking Horse Purchaser is a Qualified Bidder and the Purchase and Sale Agreement executed by the Purchaser is a Qualified Bid.  A Qualified Bid and bids at the Auction may be valued by the Debtors, after consultation with the Creditors' Committee, based upon factors as they determine in good faith to be relevant, including:  (a) the purported amount of the Qualified Bid, including non-cash consideration if applicable, (b) the value to be provided to the Debtors under the Qualified Bid, including the net economic effect upon the Debtors' estates after payment of the Break-Up Fee and Expense Reimbursement, if applicable, (c) contingencies with respect to the Sale Transaction and the ability to

NYI-524634633v7
SC1:3790811.1

close the proposed Sale Transaction on a basis acceptable to the Debtors, and any incremental costs to the Debtors in closing delays, (d) the ability to obtain any and all necessary antitrust or other applicable regulatory approvals for the proposed transaction, and (e) any other factors the Debtors may deem relevant.

A party may only participate in the Bidding Process by submitting a bid to purchase 100% of the Company Parent Interests.

The Debtors, after consultation with the Creditors' Committee, reserve the right to impose additional terms and conditions with respect to Qualified Bidders. With respect to the Stalking Horse Purchaser, the terms of the Purchase and Sale Agreement (as may be consensually modified at any Auction) and not the terms of this paragraph will control in connection with the matters described in the immediately preceding sentence.

8. **Baseline Bid**

Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction. The Debtors, after consultation with the Creditors' Committee, will select what they determine to be the highest or best Qualified Bid (or collection of Qualified Bids) for the Company Parent Interests (the "Baseline Bid") to serve as the starting point at the Auction taking into account all relevant considerations, including payment of the Break-Up Fee and Expense Reimbursement, financial condition of the applicable bidder and certainty of closing. As soon as reasonably practicable and not later than two days prior to the Auction, the Debtors will identify the Baseline Bid and provide to all Qualified Bidders and the Creditors' Committee Professionals copies of all Qualified Bids (with such distribution permissible by electronic means, including posting to the Data Room). For the avoidance of doubt, any Baseline Bid must provide for at least of $10 million of incremental value to the Debtors after taking into account the payment of the Break-Up Fee and Expense Reimbursement (which shall be deemed to be $10 million) to the Stalking Horse Purchaser.

9. **"As Is, Where Is"**

Any Sale Transaction will be on an "as is, where is" basis and without representations or warranties of any kind by the Debtors, their agents or the Debtors' chapter 11 estates, except and solely to the extent expressly set forth in the final purchase agreement approved by the Bankruptcy Court. Each Qualified Bidder will be required to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Company Parent Interests that are the subject of the Auction prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid. Except as otherwise provided in the final purchase agreement approved by the Bankruptcy Court, all of the Debtors' right, title and interest in the Company Parent Interests will be sold free and clear of liens, claims, interests and encumbrances as proposed in the form of sale order attached to the Motion (collectively, "Liens"), with any Liens to attach to the proceeds of the Sale Transaction as provided in the proposed form of sale order.

NYI-524634633v7
SC1:3790811.1

10. **Auction**

If more than one Qualified Bid is received by the Bid Deadline, the Debtors will conduct the Auction. The Auction will take place at 10:00 a.m. (prevailing Eastern time) on March 20, 2015 (the "Auction Date"), at the offices of Jones Day, located at 222 East 41st Street, New York, New York, or such other time as the Debtors may notify Qualified Bidders who have submitted Qualified Bids. Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith. A reasonable number of representatives of the professional advisors and members of the Creditors' Committee will be permitted to attend and observe the Auction.

At the Auction, participants (including the Stalking Horse Purchaser) will be permitted to increase their bids. Bidding on the Company Parent Interests will start at the purchase price and terms proposed in the Baseline Bid, and will proceed thereafter in increments of $10 million (the "Minimum Overbid"). If the Stalking Horse Purchaser bids at the Auction, the Stalking Horse Purchaser will be entitled to a "credit" in the amount of the Expense Reimbursement (which shall be deemed to be $10 million) and the Break-Up Fee to be counted towards its bid such that the cash and other consideration proposed by the Stalking Horse Purchaser plus the Expense Reimbursement and Break-Up Fee "credit" must exceed the most recent bid by at least the Minimum Overbid amount.

The Debtors may adopt rules for the Auction at any time that the Debtors, after consultation with the Creditors' Committee, determine in any material respect to be appropriate to promote the goals of the Bidding Process and do not conflict with these Bidding Procedures; provided that any Auction rules adopted by the Debtors will not modify or conflict with the immediately prior paragraph or any of the terms of the Purchase and Sale Agreement (as may be consensually modified at any Auction) without the consent of the Stalking Horse Purchaser.

The Debtors reserve the right to and may, after consultation with the Creditors' Committee, reject at any time before entry of the relevant Sale Order any bid (other than the Purchase and Sale Agreement) that, in the Debtors' judgment, is: (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures or the terms and conditions of the Sale Transaction, or (c) contrary to the best interests of the Debtors and their estates.

Prior to the conclusion of the Auction, the Debtors, in consultation with the Creditors' Committee, will: (a) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction, (b) identify the highest or otherwise best offer or collection of offers (the "Successful Bid") solely for the Company Parent Interests, (c) inform and consult with the professional advisors to the Creditors' Committee regarding the foregoing, and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder (the "Successful Bidder"), the amount and other material terms of the

Successful Bid. Absent irregularities in the conduct of the Auction or reasonable and material confusion during the bidding, each as determined by the Bankruptcy Court, the Debtors will not consider bids made after the Auction has been closed. In the event the Stalking Horse Purchaser's bid is the only Qualified Bid received by the Debtors by the Bid Deadline, no Auction will be conducted, and Purchaser will be the Successful Bidder. At the Sale Hearing, the Debtors will present the Successful Bid to the Bankruptcy Court for approval. Following the entry of the Sale Order, the Debtors will proceed to close the Sale Transaction upon the satisfaction or waiver of all applicable conditions precedent to closing.

11. **Acceptance of Qualified Bids**

The Debtors presently intend to seek approval of, and thereafter consummate the Sale Transaction with the Successful Bidder, subject to the entry of the Sale Order.

If a failure to consummate the purchase is the result of a breach by the Successful Bidder, the Debtors may retain the Good Faith Deposit of such Successful Bidder and reserve the right to seek, in addition to the Good Faith Deposit, any and all available damages from such Successful Bidder, including, but not limited to, with respect to any Good Faith Deposit. With respect to the Stalking Horse Purchaser and the Purchase and Sale Agreement, the terms of the Purchase and Sale Agreement (as may be consensually modified at any Auction) and not the terms of this paragraph will control in connection with the matters described in this paragraph.

12. **Modification of Bidding Procedures**

The Debtors, with the consent of the Creditors' Committee, may amend these Bidding Procedures or the Bidding Process at any time and from time to time in any manner that they determine in good faith will best promote the goals of the Bidding Process, including extending or modifying any of the dates described herein; provided that, with respect to the Stalking Horse Purchaser and the Stalking Horse Purchase Agreement, the terms of the Stalking Horse Purchase Agreement (as may be consensually modified at any Auction) and not the terms of this paragraph shall control.

13. **Return of Good Faith Deposit**

The Good Faith Deposits of all Qualified Bidders, including Purchaser, will be held in escrow by the Escrow Agent and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Bankruptcy Court. The Escrow Agent will retain the Good Faith Deposits of the Successful Bidder until the closing of the Sale Transaction unless otherwise ordered by the Bankruptcy Court. The Good Faith Deposits (other than the Successful Bidder) of the other Qualified Bidders will be returned within two Business Days of the entry of the Sale Order. At the closing of the Sale Transaction contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit. Upon the return of the Good Faith Deposits, their respective owners will receive any and all interest that has

NYI-524634633v7
SC1:3790811.1

accrued thereon.  With respect to the Stalking Horse Purchaser and the Purchase and Sale Agreement, the terms of the Purchase and Sale Agreement and the Escrow Agreement (each as may be consensually modified at any auction) and not the terms of this paragraph will control the Purchaser's rights with respect to the Good Faith Deposit.

14. **Consultation Matters**

In the event that any member of the Creditors' Committee or an affiliate thereof submits a Qualified Bid, the Creditors' Committee's professional advisor must exclude such member from any discussions or deliberations between the Creditors' Committee's professional advisors and the Committee regarding the sale of the Company Parent Interests and must not provide any information regarding the sale of the Company Parent Interests to such member, and any obligation of the Debtors hereunder or otherwise to consult with the affected party will be without further action waived, discharged and released.

NYI-524634633v7
SC1:3790811.1

**Exhibit B**

**Form of Bidding Procedures Order**

[*see attached*]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                          :   Chapter 11
In re:                                    :
                                          :   Case No. 14-12611 (SCC)
NII Holdings, Inc., et al.,¹              :
                                          :   (Jointly Administered)
                        Debtors.          :
                                          :   Related Docket No. [___]
-----------------------------------------------------------x
```

### ORDER (A) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE PURCHASE AGREEMENT, (C) APPROVING THE NOTICE PROCEDURES, AND (D) SCHEDULING A SALE HEARING

Upon consideration of the motion [Docket No. [●]] (as amended, the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for (i) an order (a) authorizing and approving (x) the bidding procedures (as attached hereto as Exhibit 1, the "Bidding Procedures") and the Break-Up Fee and Expense Reimbursement granted pursuant to the Purchase and Sale Agreement by and among NIHD Telecom Holdings B.V. ("Seller Parent"), NIU Holdings LLC ("Seller"), Nextel International (Uruguay) LLC ("Company Parent"), Comunicaciones Nextel de México, S.A. de C.V., NII International Telecom S.C.A.,

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases") are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); and NII Mercosur, LLC (4079).

On January [__], 2015, the following additional Debtor filed a chapter 11 bankruptcy petition: NIU Holdings LLC (N/A).

The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

[2] Unless otherwise stated, all capitalized terms not defined herein shall have the same meanings ascribed to such terms in the Bidding Procedures or the Stalking Horse Purchase Agreement, as applicable.

NII International Holdings S.à.r.l., NII Global Holdings, Inc., NII Capital Corp. and NII

Holdings, Inc. (collectively, "Seller Guarantor") and New Cingular Wireless Services, Inc.

("Stalking Horse Purchaser") dated as of January [●], 2015 (as appended to the Motion as

Exhibit B and, together with all Schedules and Exhibits thereto,  as such agreement, schedules

and exhibits may be amended, modified or supplemented from time to time in accordance with

the terms thereof, the "Stalking Horse Purchase Agreement") and (y) the Debtors' entry into the

Stalking Horse Purchase Agreement, (b) granting superpriority administrative expense status

with respect to payment of the Break-Up Fee and Expense Reimbursement under or in

connection with the Stalking Horse Purchase Agreement, (c) approving the form and manner of

notice of the Sale and the Sale Order (the "Notice Procedures") and (d) setting the time, date and

place for a hearing (the "Sale Hearing") to consider, among other things, the sale by Seller to

Purchaser of the Company Parent Membership Interests, free and clear of all 363 Interests (the

"Sale") (collectively, the "Bidding Procedures Relief") and (ii) an order (a) authorizing all of the

transactions contemplated by the Stalking Horse Purchase Agreement, (b) authorizing and

approving the Sale, (c) authorizing and directing the assumption by the Debtors of the Contracts

set forth in the Contract and Cure Schedule (as defined below), (d) approving the assumption by

Seller and novation by Company Parent of certain interests in Company Parent and enjoining the

enforcement of such interests against Company Parent, (e) authorizing and directing the

dismissal of the Chapter 11 Case of Company Parent and (f) granting certain related  relief; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b); and the Court having considered the

-2-

[DECLARATION], dated January [●], 2015 [Docket No. [●] and the [DECLARATION], dated

January [●], 2015 [Docket No. [●]]; and this Court having determined that the relief requested in

the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in

interest; and it appearing that proper and adequate notice of the Motion has been given and that,

except as otherwise ordered herein, no other or further notice is necessary; and after due

deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[3]

A.    The statutory and legal predicates for the relief requested in this Order are

sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101

*et seq.* (the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 6006-1 of the Local Rules for the

United States Bankruptcy Court for the Southern District of New York (the "Local Rules").

B.    Good and sufficient notice of the relief granted by this Order has been given and

no further notice is required.  A reasonable opportunity to object or be heard regarding the relief

granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy

Rule 6004(a).

C.    The Debtors' proposed notice of the Sale and the other matters to be considered at

the Sale Hearing, substantially in the form attached to the Motion as Exhibit [●] (the "Sale

Notice"), and proposed publication notice, substantially in the form attached to the Motion as

Exhibit [●] (the "Publication Notice"), are appropriate and reasonably calculated to provide all

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the
extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the
extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

-3-

interested parties with timely and proper notice of the Bidding Procedures, Auction, Sale Motion, Sale Hearing, Sale, Injunction, Seller Liability Assumption and Company Parent Novation and Company Parent Dismissal.

D.    No further or other notice beyond that described in the foregoing paragraphs is required in connection with the foregoing.

E.    The Bidding Procedures attached hereto as <u>Exhibit 1</u> are fair, reasonable, appropriate and are designed to maximize recovery to the Debtors' estates and creditors.

F.    The Debtors have demonstrated compelling and sound business justifications for entering into the Stalking Horse Purchase Agreement and incurring the obligations arising thereunder or in connection therewith, including the provisions related to the payment of the Break-Up Fee and Expense Reimbursement under the circumstances, timing, and procedures set forth therein.

G.    The Seller's and Seller Guarantor's incurrence of the obligations arising under or in connection with the Stalking Horse Purchase Agreement, including the provisions related to payment of the Break-Up Fee and Expense Reimbursement and the Seller Guarantor's guarantee thereof are (a) actual and necessary costs of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, because, among other things, they induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum or floor bid for the Sale on which the Debtors, their creditors and other bidders can rely, (c) reasonable and appropriate in light of the size and nature of the proposed Sale and the efforts that have been and will be expended by the Stalking Horse Purchaser, and (d) necessary to induce the Stalking Horse Purchaser to enter into the Stalking Horse Purchase Agreement and to continue to pursue the Sale.

-4-

H.    The Company Parent Transfer is in the best interests of the Debtors' estates, creditors and all other parties in interest and represent a reasonable exercise of the Debtors' sound business judgment.

I.    The Company Parent Membership Interests comprise 100% of the equity interests of Company Parent, and no other equity interests are outstanding or issuable by Company Parent. Neither Seller nor Company Parent is obligated, contractually or otherwise, to issue, directly or indirectly, any other equity interests or rights to acquire equity interests in Company Parent. Following the Company Parent Transfer, the Company Parent Membership Interests are the property of Seller's estate and legal and beneficial title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Seller's estate has no assets or liabilities other than the Company Parent Membership Interests.

J.    The Shares comprise 100% of the equity interests of the Company, and no other equity interests are outstanding or issuable by the Company.  The Company is not obligated, contractually or otherwise, to issue, directly or indirectly, any other equity interests or rights to acquire equity interests in the Company.  The Company Shares are the property of Company Parent's estate and legal and beneficial title thereto is vested in the Company Parent's estate within the meaning of section 541(a) of the Bankruptcy Code.  Company Parent's estate has no other assets other than the Company Shares and the Uruguay Interests.

K.    The Bidding Procedures comply with the requirements of Local Rule 6004-1 and the Sale Guidelines.

L.    There is no cause to dismiss the bankruptcy case of Seller under section 1112(b) of the Bankruptcy Code.  Specifically, none of the events set forth in section 1112(b)(4) of the

NYI-524634634v10
SC1:3790810.1

Bankruptcy Code have occurred with respect to Seller, and Seller's bankruptcy petition was filed in good faith.

M.     The entry of this Order is in the best interests of the Debtors and their estates, creditors, and interest holders and all other parties in interest herein; and therefore

IT IS HEREBY ORDERED THAT:

1.     The Bidding Procedures Relief is GRANTED to the extent set forth herein.

2.     To the extent approval for the Company Parent Transfer is required, the Company Parent Transfer is hereby approved.

**Approval of Debtors' Entry Into Stalking Horse Purchase Agreement**

3.     The Debtors are authorized and directed to perform all of their respective pre-closing obligations under the Stalking Horse Purchase Agreement; provided that, for the avoidance of doubt, consummation of the transactions contemplated by the Stalking Horse Purchase Agreement shall be subject to entry of the Sale Order and the satisfaction or waiver of the other conditions to closing on the terms set forth in the Stalking Horse Purchase Agreement.

**The Bidding Procedures**

4.     The Bidding Procedures attached hereto as <u>Exhibit 1</u> are hereby approved in all respects.

5.     The Debtors shall conduct a sale of the Company Parent Membership Interests and, indirectly, the Company, pursuant to the Bidding Procedures and the terms of this Order.

NYI-524634634v10
SC1:3790810.1

6. The Stalking Horse Purchaser is a Qualified Bidder and the Stalking Horse Purchase Agreement is a Qualified Bid, in each case, pursuant to the Bidding Procedures for all purposes.

7. Any party seeking to acquire any Company Parent Membership Interests or Shares, or a material portion of assets of the Company, in each case directly or indirectly, shall do so in compliance with the Bidding Procedures.

### The Break-Up Fee and Expense Reimbursement

8. The Break-Up Fee and Expense Reimbursement as set forth in the Stalking Horse Purchase Agreement, and the provisions of the Stalking Horse Purchase Agreement relating thereto, are hereby approved. The Debtors shall pay the Break-Up Fee and Expense Reimbursement to the Stalking Horse Purchaser to the extent due and payable under the Stalking Horse Purchase Agreement.

9. All of Seller's, Company Parent's and Seller Guarantor's obligations arising under or in connection with the Stalking Horse Agreement with respect to the Break-Up Fee and the Expense Reimbursement shall (a) survive termination of the Stalking Horse Purchase Agreement, (b) constitute an administrative expense claim under section 503(b) and 507(a)(2) of the Bankruptcy Code and shall be senior to all other administrative expense claims that may be approved in the Bankruptcy Case, and (c) be payable under the terms and conditions of the Stalking Horse Purchase Agreement and this Order without any further order of this Court.

10. Seller's, Company Parent's and Seller Guarantor's obligations relating to the Break-Up Fee and the Expense Reimbursement arising under or in connection with the Stalking Horse Purchaser Agreement shall be binding and enforceable against each such party and their respective estates, and, as applicable, (i) any of their respective successors or assigns,

-7-

(ii) any trustee, examiner, or other representative of the Debtors' estate, (iii) the reorganized Debtors, and (iv) any other entity vested or revested with any right, title or interest in or to a material portion of the assets directly or indirectly owned by Seller, Company Parent or Seller Guarantor, or any other person claiming any rights in or control over a material portion of such assets (collectively, the "Debtor Successors") as if such Debtor Successors were the Debtors.

### Notice Procedures

11.     The Sale Notice and the Publication Notice are sufficient to provide effective notice to all interested parties of the Bidding Procedures, Auction, Sale Motion, Sale Hearing, Sale, Injunction, Seller Liability Assumption, Company Parent Novation and Company Parent Dismissal pursuant to Bankruptcy Rules 2002 and 6004 and Local Rules 4001-1 and 6004-1, and each is hereby approved.

12.     As soon as reasonably practicable, but in no event later than the third (3rd) business day after entry of this Order, the Debtors (or their agent) shall serve the Sale Notice by first-class mail, postage prepaid, and/or via overnight mail, facsimile, hand delivery or electronic transmission upon:

(a)     the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee");

(b)     Kramer Levin Naftalis & Frankel, LLP, counsel to the Creditors' Committee;

(c)     Paul, Weiss, Rifkind, Wharton & Garrison, on behalf of certain noteholders;

(d)     Akin, Gump, Strauss, Hauer & Feld LLP, on behalf of certain noteholders;

(e)     Kirkland & Ellis LLP, on behalf of certain noteholders;

(f)     U.S. Bank National Association, solely in its capacity as the trustee under the indenture governing those certain 8.875% senior unsecured notes due in 2019;

-8-

(g)     Wilmington Savings Fund Society, FSB, solely in its capacity as the trustee under the indenture governing those certain 10% senior unsecured notes due in 2016;

(h)     Wilmington Trust, National Association, solely in its capacities as the trustee under the indentures governing those certain 11.375% senior unsecured notes due in 2019 and those certain 7.875% senior unsecured notes due in 2019

(i)     all other parties known to hold, or have asserted, any Company Parent 363 Interest;

(j)     all other parties known to hold, or have asserted, any 363 Interest in the Company Parent Membership Interests;

(k)     all non-Debtor parties to the Assumed Contracts (as defined below);

(l)     all entities reasonably known to have expressed, since January 1, 2014, an interest in the acquisition, directly or indirectly, of Company Parent, the Shares, the Company or a material portion of the Company's assets;

(m)     federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that (i) as a result of the Sale, may have claims, contingent or otherwise, in connection with the Seller's ownership of the Company Parent Membership Interests or (ii) may have any claim against Company Parent or other reasonably known interest in the relief requested by the Sale Motion; and

(l)     all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date hereof.

13.     As soon as reasonably practicable, but in no event later than the third (3rd) business day after entry of this Order, the Debtors shall publish the Publication Notice (a) one

NYI-524634634v10
SC1:3790810.1

time in the global edition of the *Wall Street Journal*, (b) one time in *Reforma* and (b) on the

Debtors' website hosted by Prime Clerk at https://cases.primeclerk.com/nii.

14.     Concurrently with the filing of the Sale Notice, the Debtors shall file with

the Court a schedule (a "<u>Contract and Cure Schedule</u>") of cure obligations for the Contracts that

may be assumed or assumed and assigned by the Debtors at Closing (the "<u>Assumed Contracts</u>"

and each, an "<u>Assumed Contract</u>"), which may be amended from time to time.  The Contract and

Cure Schedule shall include a description of each Assumed Contract and the Cure Costs, if any,

necessary to cure such Assumed Contracts pursuant to section 365 of the Bankruptcy Code.  A

copy of the Contract and Cure Schedule, together with the Sale Notice and a copy of this Order,

will be served by first-class mail on each of the non-debtor parties listed on the Contract and

Cure Schedule, and such notice is appropriate and reasonably calculated to provide such parties

with timely and proper notice of the assumption of the Assumed Contracts.

<p align="center"><strong><u>Objection Procedures</u></strong></p>

15.     The deadline for objecting, for any reason, to approval of the Sale

(including the sale of the Company Parent Membership Interests free and clear of 363 Interests),

the Injunction, the Seller Liability Assumption and Company Parent Novation or the Company

Parent Dismissal shall be **<u>4:00 p.m. (ET) on March 16, 2015</u>** (the "<u>Sale Objection Deadline</u>").

Any and all written objections as contemplated by this Order must be:  (a) in writing; (b) state

with specificity the basis of the objection, (c) signed by counsel or attested to by the objecting

party; (d) in conformity with the Bankruptcy Rules, the Local Rules and the case management

procedures in these chapter 11 cases; (e) filed with the Bankruptcy Court; and (f) served on

(i) the U.S. Trustee, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Susan D.

Golden, Esq. and Brian Masumoto, Esq.); (ii) the Debtors, c/o NII Holdings, Inc. 1875 Explorer

<p align="center">-10-</p>

Street, Suite 800, Reston, VA 20190 (Attn: General Counsel); (iii) Jones Day, 222 East 41st

Street, New York, New York 10017 (Attn: Scott J. Greenberg, Esq. and Lisa Laukitis, Esq.);

(iv) Kramer Levin Naftalis & Frankel, 1177 Avenue of the Americas, New York, New York

10036 (Attn: Kenneth Eckstein, Esq., Adam Rogoff, Esq., and Stephen Zide, Esq.); and

(v) Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn:  Michael H.

Torkin, Esq. and David R. Zylberberg, Esq.) so as to be received on or before the Sale Objection

Deadline.

16.     Failure to object to the relief requested in the Motion by the Sale

Objection Deadline shall be deemed to be "consent" for purposes of section 363(f) of the

Bankruptcy Code.

17.     Any objections to any proposed Cure Costs (any such objection, a "Cure

Objection") must be in writing and filed with the Court and served on the Notice Parties so as to

be received by the later of (a) **4:00 p.m. (ET) on March 16, 2015** and (b) 4:00 p.m. (ET) on the

date that is 14-days following the Debtors' delivery of notice to an affected counterparty.  If no

timely Cure Objection is filed and served with respect to an Assumed Contract, the Cure Costs

identified in the Contract and Cure Schedule with respect to such Assumed Contract will be the

only amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary

defaults under such Assumed Contract.  Any party failing to timely file a Cure Objection shall be

forever barred from objecting to the Cure Costs and from asserting any additional cure or other

amounts against the Debtors, their estates or the Successful Bidder.

18.     Any objections to the provision of adequate assurance of future

performance under any Assumed Contract (any such objection, an "Adequate Assurance

Objection"), must be filed with the Court and served on the Notice Parties so as to be received by

-11-

the later of (a) **4:00 p.m. (ET) on March 16, 2015**, (b) 4:00 p.m. (ET) on the date that is 14-days following the Debtors' delivery of notice to the affected counterparty and (c) if the Successful Bidder is not the Stalking Horse Purchaser, prior to the commencment of the Sale Hearing. If no timely Adequate Assurance Objection is filed and served with respect to an Assumed Contract, the applicable Debtor will be deemed to have provided adequate assurance of future performance under the applicable Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code if such Debtor ultimately assumes such Assumed Contract at Closing of the Sale.

19.     If a timely Cure Objection or Adequate Assurance Objection is received and any such objection cannot otherwise be resolved by the parties, such objection shall be resolved at the Sale Hearing or at a subsequent hearing set by the Court.

20.     All objections to the Motion or the relief requested therein (and all reservations of rights included therein), as it pertains to the entry of this Order, are overruled to the extent they have not been withdrawn, waived or otherwise resolved.

### Other Relief Granted

21.     The Auction is scheduled for **10:00 a.m. (ET) on March 20, 2015** at the offices of Jones Day, 222 East 41st Street, New York, New York 10017.

22.     The Sale Hearing shall be held in this Court at **2:00 p.m. (ET) on March 23, 2015**. The Sale Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing or by the filing of a hearing agenda.

23.     The Good Faith Deposits of the Stalking Horse Purchaser and any other bidder, and any other amounts deposited into escrow pursuant to the applicable purchase agreement (which, in the case of the Stalking Horse Purchaser, shall be the Stalking Horse

-12-

Purchase Agreement), shall be held in escrow by the Deposit Agent and shall not become property of the Seller's bankruptcy estates unless the Deposit or other escrow amount is otherwise due and payable to Seller in accordance with the applicable purchase agreement (which, in the case of the Stalking Horse Purchaser, shall be the Stalking Horse Purchase Agreement). The Escrow Agreement shall be binding and enforceable against Seller and its estate in all respects and Seller is authorized and directed to perform its obligations thereunder. Seller is authorized to enter into an escrow agreement substantially in the form of the Escrow Agreement with each other bidder (if any), and when executed by Seller, such escrow agreements (if any) shall be binding and enforceable against Seller and its estate in all respects.

24.     Notwithstanding anything to the contrary in this Order, any other order of this Court or any plan of reorganization or liquidation of any Debtor, Purchaser shall not be required to file or serve a proof of claim with respect to claims arising under or in connection with the Stalking Horse Purchase Agreement with respect to payment of the Breakup Fee and Expense Reimbursement, and no bar date shall be imposed with respect to such claims.

25.     The Debtors will not pursue approval of the Existing Plan Documents in the form currently on file with the Court,[4] and will announce to the Court no later than the hearing on approval of the Bidding Procedures Order whether the Debtors intend to promptly withdraw, or to amend, replace or supersede the Existing Plan Documents to account for the transactions contemplated by the Stalking Horse Purchase Agreement. For the avoidance of

---

[4]     "Existing Plan Documents" means, collectively, the Plan Support Agreement filed as an exhibit to Docket No. 320, the *Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors* [Docket No. 322] and the *Disclosure Statement for Joint Plan of Reorganization Proposed by Debtors and Debtors in Possession and Official Committee of Unsecured Creditors* [Docket No. 323].

-13-

doubt, the Debtors shall be permitted to consummate the Existing Plan Documents if the Stalking Horse Purchase Agreement is validly terminated according to its terms.

26.     In the event there is a conflict between this Order and the Motion or the Stalking Horse Purchase Agreement, this Order shall control and govern.

27.     This Order shall be binding in all respects upon any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy cases or upon a conversion to chapter 7 under the Bankruptcy Code.

28.     The Stalking Horse Purchaser has standing to seek to enforce the terms of this Order.

29.     Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their reasonable business judgment and without further delay, take any action and perform any act authorized under this Order.  For the avoidance of doubt, the Break-Up Fee and Expense Reimbursement approved by this Order shall be immediately appealable and failure to appeal in accordance with the Bankruptcy Rules or other applicable law shall constitute a waiver of such rights.

30.     The requirements set forth in Local Rule 9013-1(b) are satisfied.

31.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

32.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

-14-

33.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: February __, 2015
       New York, New York

_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

NYI-524634634v10
SC1:3790810.1

**Exhibit C**

**Form of Sale Order**

[*see attached*]

Exhibit C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :
In re:                                        :    Chapter 11
                                              :
NII Holdings, Inc., et al.,[1]                :    Case No. 14-12611 (SCC)
                          Debtors.            :
                                              :    (Jointly Administered)
                                              :
---------------------------------------------------------------x

### ORDER: (I) APPROVING PURCHASE AND SALE AGREEMENT; (II) AUTHORIZING  THE SALE OF ALL OF THE MEMBERSHIP INTERESTS OF NEXTEL INTERNATIONAL (URUGUAY) LLC FREE AND CLEAR OF INTERESTS; (III) AUTHORIZING AND DIRECTING THE ASSUMPTION BY THE DEBTORS OF CERTAIN EXECUTORY CONTRACTS; (IV) APPROVING THE TRANSFER AND NOVATION OF THE LIABILITIES OF NEXTEL INTERNATIONAL (URUGUAY) LLC, ENJOINING THE ENFORCEMENT OF SUCH LIABILITIES AND DISMISSING ITS CHAPTER 11 CASE AND (V) GRANTING CERTAIN RELATED RELIEF

Upon consideration of the motion [Docket No. [●]] (the "Sale Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 6006 and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the

---

[1]    The Debtors in these chapter 11 cases (the "Chapter 11 Cases") are comprised of the following thirteen entities (the last four digits of their respective U.S. taxpayer identification numbers follow in parentheses): NII Holdings, Inc. (1412); Nextel International (Services), Ltd. (6566); NII Capital Corp. (6843); NII Aviation, Inc. (6551); NII Funding Corp. (6265); NII Global Holdings, Inc. (1283); NII International Telecom S.C.A. (7498); NII International Holdings S.à r.l. (N/A); NII International Services S.à r.l. (6081); Airfone Holdings, LLC (1746); Nextel International (Uruguay), LLC (5939); McCaw International (Brazil), LLC (1850); and NII Mercosur, LLC (4079).

On January 25, 2015, the following additional Debtor filed a chapter 11 bankruptcy petition:  NIU Holdings LLC (N/A).

The location of the Debtors' corporate headquarters and the Debtors' service address is: 1875 Explorer Street, Suite 800, Reston, VA 20190.

[2]    Unless otherwise stated, all capitalized terms not defined herein shall have the same meanings ascribed to such terms in the Sale Motion or the Purchase Agreement, as applicable.

Southern District of New York (the "Local Rules"), seeking the entry of an order (the "Sale Order") (i) approving that certain Purchase and Sale Agreement (collectively with all exhibits and schedules thereto and all ancillary documents and agreements (including the Transition Services Agreement and Escrow Agreement), and as any may be further amended, modified or supplemented in accordance with the terms hereof and thereof, the "Purchase Agreement"), dated as of January [●], 2015, by and among NIHD Telecom Holdings B.V. ("Seller Parent"), NIU Holdings LLC ("Seller"), Nextel International (Uruguay) LLC ("Company Parent"), Comunicaciones Nextel de México, S.A. de C.V., NII International Telecom S.C.A., NII International Holdings S.à.r.l., NII Global Holdings, Inc., NII Capital Corp. and NII Holdings, Inc. (collectively, "Seller Guarantor") and New Cingular Wireless Services, Inc. ("Purchaser"), a copy of which is attached hereto as **Exhibit 1;** (ii) authorizing all of the transactions contemplated by the Purchase Agreement, including the sale by Seller of the membership interests in Company Parent (the "Company Parent Membership Interests") free and clear of all 363 Interests[3] (the "Sale") pursuant to and in accordance with the Purchase Agreement; (iii) authorizing and directing the assumption by the Debtors of the Contracts set forth on the Contract and Cure Schedule attached hereto as **Exhibit 2** (the "Assumed Contracts"); (iv) approving the assumption by Seller and novation by Company Parent of all Company Parent 363

---

[3] The term "363 Interests" means interests, as such term is used in section 363(f) of the Bankruptcy Code, and which includes all Encumbrances and Liabilities (each as defined in the Purchase Agreement), whether direct or indirect, absolute, contingent, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, material or non-material, disputed or undisputed, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute, or otherwise, and whether arising prior to, on or after the commencement of any Chapter 11 Cases, which 363 Interests include, without limitations, any claims arising from or in connection with the Funded Debt.

2

Interests[4] and enjoining the enforcement of Company Parent 363 Interests against Company Parent; (v) subject to the occurrence of the Closing, authorizing and directing the dismissal of the Chapter 11 Case of Company Parent pursuant to section 1112(b) of the Bankruptcy Code; and (vi) granting certain related relief; and the Court having entered the *Order (a) Authorizing and Approving the Bidding Procedures, Break-Up Fee and Expense Reimbursement, (b) Authorizing and Approving the Debtors Entry Into the Stalking Horse Purchase Agreement, (c) Approving the Notice Procedures, and (d) Scheduling a Sale Hearing* on February [●], 2015 [Docket No. [●]] (the "Bid Procedures Order"); and [no Qualified Bids having been received and, accordingly, pursuant to the Bid Procedures, the Debtors having canceled the Auction][the Debtors having conducted the Auction on March [●], 2015], and having determined, after an extensive marketing process and upon consultation with the Official Committee of Unsecured Creditors (the "Committee"), that Purchaser submitted the highest or otherwise best offer for the Company Parent Membership Interests; and upon adequate and sufficient notice of the Auction, Sale Motion, the hearing before the Court on March [●], 2015 (the "Sale Hearing"), and all related transactions having been given in the manner directed by the Court pursuant to the Bid Procedures Order; and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, if any, and (z) the statements of counsel and evidence presented in support of the relief requested by the Debtors at the Sale Hearing; and the Court having considered the [DECLARATION] [Docket No.[●]] and the [DECLARATION] [Docket No.[●]]; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing

---

[4] The term "Company Parent 363 Interests" means all 363 Interests that have been or at any time could be asserted against Company Parent or its assets, including the Company Shares.

establish just cause for the relief granted herein; and it appearing that the relief requested in the

Sale Motion is in the best interests of the Debtors, their estates, creditors, and other parties in

interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in these

Chapter 11 Cases, including the Sale Motion; and after due deliberation thereon and good and

sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**[5]

### Jurisdiction and Venue

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28

U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper in this District and this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Statutory Bases

B.    The statutory and other bases for the relief requested in the Sale Motion and entry

of this Sale Order are sections 105, 305, 350, 363, 365, and 1112 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, 6004 , 6006 and 9007 and Local Rules 4001-1, 6004-1 and 6006-

1.

### Final Order

C.    This Sale Order constitutes a final order within the meaning of 28 U.S.C. §

158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary

under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made

applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for

---

[5]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
       pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All
       findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale
       Motion and the Sale are hereby incorporated herein to the extent not inconsistent herewith. To the extent that
       any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any
       of the following conclusions of law constitute findings of fact, they are adopted as such.

4

NYI-524634636v6
SC1:3790817.1

delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

<p style="text-align:center"><b><u>Compliance with Bid Procedures Order</u></b></p>

D.     As demonstrated by (i) the testimony and other evidence proffered or introduced at the Sale Hearing and (ii) the representations of counsel on the record at the Sale Hearing, the Debtors have thoroughly and fairly marketed the Company and conducted the related sale process in good faith and in compliance in all respects with the Bid Procedures Order.

E.     The Bid Procedures set forth in the Bid Procedures Order were non-collusive and substantively and procedurally fair to all parties.  Moreover, the Bid Procedures enabled the Debtors to obtain the highest or otherwise best offer for the Company Parent Membership Interests and, indirectly, the Company.  All interested persons and entities have been afforded a full, fair and reasonable opportunity to (i) conduct due diligence investigations, (ii) prior to the entry of the Bid Procedures Order, submit higher or otherwise better bids to purchase the Company, (iii) following the entry of the Bid Procedures Order, submit higher or otherwise better bids to purchase the Company Parent Membership Interests, and (iv) object and be heard in connection with the Sale Motion and the relief granted by this Sale Order.

F.     Purchaser is the Successful Bidder (as defined in the Bid Procedures) for the Company Parent Membership Interests.  The consideration provided by Purchaser under the Purchase Agreement constitutes the highest or otherwise best offer for the Company Parent Membership Interests and, indirectly, the Company, and provides fair and reasonable consideration to the Debtors for the sale of the Company Parent Membership Interests and, indirectly, the Company.  Purchaser has complied in all respects with the Bid Procedures Order and any other applicable order of this Court in negotiating and entering into the Purchase

<p style="text-align:center">5</p>

Agreement.  The Sale and Purchase Agreement likewise comply with the Bid Procedures Order and all other applicable orders of this Court.

<div align="center">**Notices**</div>

G.      As evidenced by the affidavits of service and publication previously filed with the Court [Docket Nos. [●]], proper, timely, adequate and sufficient notice of the Auction, Sale Motion, Sale Hearing, Sale, Injunction, Seller Liability Assumption and Company Parent Novation (as defined below), Company Parent Dismissal and the assumption of the Assumed Contracts was provided in accordance with the Bid Procedures Order, sections 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006 and 9007 and Local Rules 4001-1, 6004-1, 6006-1 and 9006-1(b).  Such notice was good, sufficient and appropriate under the circumstances, and no other or further notice of any of the foregoing is or shall be required.

H.      Actual written notice of the Auction, Sale Motion, Sale Hearing, Sale, Injunction, Seller Liability Assumption and Company Parent Novation, Company Parent Dismissal and assumption of the Assumed Contracts, and a fair and reasonable opportunity to object or otherwise be heard with respect thereto, has been afforded to all known interested individuals and entities, including the following parties:

(a)      the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee");

(b)      Kramer Levin Naftalis & Frankel, LLP, as counsel to the Committee;

(c)      Paul, Weiss, Rifkind, Wharton & Garrison, on behalf of certain noteholders;

(d)      Akin, Gump, Strauss, Hauer & Feld LLP, on behalf of certain noteholders;

(e)      Kirkland & Ellis LLP, on behalf of certain noteholders;

<div align="center">6</div>

(f)     U.S. Bank National Association, solely in its capacity as the trustee under the indenture governing those certain 8.875% senior unsecured notes due in 2019;

(g)     Wilmington Savings Fund Society, FSB, solely in its capacity as the trustee under the indenture governing those certain 10% senior unsecured notes due in 2016;

(h)     Wilmington Trust, National Association, solely in its capacities as the trustee under the indentures governing those certain 11.375% senior unsecured notes due in 2019 and those certain 7.875% senior unsecured notes due in 2019

(i)     all other parties known to hold, or have asserted, any Company Parent 363 Interest;

(j)     all other parties known to hold, or have asserted, any 363 Interest in Company Parent Members Interests;

(k)     all non-Debtor parties to Assumed Contracts;

(l)     all entities reasonably known to have expressed, since January 1, 2014, an interest in the acquisition, directly or indirectly, of Company Parent, the Shares, the Company or a material portion of the Company's assets;

(m)     federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that (i) as a result of the Sale, may have claims, contingent or otherwise, in connection with the Seller's ownership of the Company Parent Membership Interests or (ii) may have any claim against Company Parent or other reasonably known interest in the relief requested by the Sale Motion; and

(n)     all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date hereof.

I.       The Debtors also published a notice of the Auction, the deadline to submit bids for the Company Parent Membership Interests, the time and place of the Auction, the time and place of the Sale Hearing and the time for filing an objection to the relief requested in the Sale Motion (x) in the global edition of *The Wall Street Journal* on February [●], 2015 [Docket No. [●]], (y) in *Reforma* on February [●], 2015 [Docket No. [●]] and (z) on the Debtors' website hosted by Prime Clerk at https://cases.primeclerk.com/nii [Docket No. [●]].  Such publication notice was good, sufficient and proper notice to any interested parties whose identities are unknown to the Debtors, and reasonably calculated under the circumstances to reach such parties.

J.       In accordance with the provisions of the Bid Procedures Order, the Debtors have served notice upon the counterparties to the Assumed Contracts (i) that the Debtors may seek to assume the Assumed Contracts on the Closing Date, (ii) of the relevant Cure Costs, and (iii) of the deadline by which any counterparty to the Assumed Contracts must object to the assumption of the Assumed Contracts.  The service of such notice was due, proper, timely, good, sufficient and appropriate under the circumstances, and no other or further notice of the assumption of the Assumed Contracts is required.  Each counterparty to the Assumed Contracts has had an opportunity to object to the assumption of the Assumed Contracts and to the Cure Costs set forth in the notice.

K.       On March [●], 2015, the Debtors caused the *Notice of Successful Bidder* [Docket No. [●]] to be filed with the Court identifying Purchaser as the Successful Bidder in accordance with the Bid Procedures.

NYI-524634636v6
SC1:3790817.1

**Highest or Otherwise Best Offer**

L.     The Debtors conducted a sale process in accordance with, and have otherwise complied in all respects with, the Bid Procedures Order.  [The Auction was held in a non-collusive and fair manner and afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Company Parent Membership Interests.]

M.     The Debtors have concluded, upon consultation with the Committee, that the offer of Purchaser, upon the terms and conditions set forth in the Purchase Agreement, constitutes the highest or otherwise best offer for the Company Parent Membership Interests and, indirectly, the Company, and provides a greater certainty of recovery than would be provided by any other available alternative.  The Debtors' determination that (i) the Purchase Agreement constitutes the highest or otherwise best offer for the Company Parent Membership Interests and, indirectly, the Company and (ii) the structure of the Sale, including the terms of the Injunction (defined below), Company Parent Dismissal and Bidding Procedures, maximizes the total consideration to be realized by the Debtors in connection with a direct or indirect sale of the Company, in each case, constitutes a reasonable exercise of the Debtors' sound business judgment.

N.     The Purchase Agreement represents a fair and reasonable offer to purchase the Company Parent Membership Interests under the circumstances of these Chapter 11 Cases.  Prior to the entry of the Bid Procedures Order, no other entity or group of entities has offered to directly or indirectly purchase the Company for greater overall value to the Debtors' estates than Purchaser, and following the entry of the Bid Procedures Order, no other entity or group of entities has offered to purchase the Company Parent Membership Interests for greater overall value to the Debtors' estates than Purchaser.

9

O.    Approval of the Sale, Sale Motion, Injunction, Company Parent Dismissal, Seller Liability Assumption and Company Parent Novation and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors' estates, creditors and other parties in interest.

## Arm's Length Sale

P.    The Purchase Agreement was negotiated, proposed by the Debtors and Purchaser and entered into by the Seller, Seller Parent, Seller Guarantor, Company Parent and Purchaser without collusion, in good faith and from arm's length bargaining positions.  Neither the Debtors nor Purchaser has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, Purchaser has not acted in a collusive manner with any person and the Final Purchase Price was not controlled by any agreement among the bidders.  In addition, Purchaser is not an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

Q.    The disclosures made by the Debtors concerning the Purchase Agreement, Auction, Sale, Sale Hearing, Injunction, Seller Liability Assumption and Company Parent Novation, Company Parent Dismissal and assumption of the Assumed Contracts were good, complete and adequate, and no further disclosures are warranted or required.

## Good Faith of Purchaser

R.    Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law.  Purchaser has at all times proceeded in good faith in all respects in connection with the Debtors' Chapter 11 Cases in that, among other things: (i) Purchaser recognized that the Debtors were free to deal with any other party interested in

10

acquiring, directly or indirectly, the Company, including by acquiring the Company Parent Membership Interests subject to the requirements of the Bid Procedures; (ii) Purchaser in no way induced or caused the chapter 11 filings by the Debtors; and (iii) all payments to be made by Purchaser in connection with the Sale have been disclosed. Purchaser will continue to act in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale as contemplated by the Purchase Agreement.

<div align="center">

**No Fraudulent Transfer or Merger**

</div>

S. The consideration provided by Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and otherwise best offer for the Company Parent Membership Interests, (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practical available alternatives, and (iv) constitutes reasonably equivalent value, fair consideration and fair value (as those terms are defined in each of the Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the laws of the United States, any state, territory, possession or the District of Columbia. No other person, entity or group of entities has offered to purchase the Company, directly or indirectly, for greater overall value to the Debtors' estates than Purchaser.

T. The Purchase Agreement was not entered into for the purpose of hindering, delaying, preferring or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession and the District of Columbia. Neither the Seller, Seller Parent, Seller Guarantor nor Purchaser entered into the transactions contemplated by the Purchase Agreement fraudulently, thereby negating the possibility of any liability of Purchaser for any statutory or common law fraudulent conveyance or fraudulent transfer claims.

<div align="center">11</div>

## Validity of Transfer

U.    The consummation of the Purchase Agreement and the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Purchase Agreement.

V.    Each Party to the Purchase Agreement has (i) full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (iii) taken all corporate action necessary to authorize and approve the Purchase Agreement and the consummation of the transactions contemplated thereby.  Each other Debtor has, to the extent necessary and applicable, (i) all corporate authority necessary to consummate the transactions contemplated by the Purchase Agreement, and (ii) taken all corporate action necessary to authorize and approve the consummation of the transactions contemplated by the Purchase Agreement.

W.    The Service Provider has (i) full corporate power and authority to execute and deliver the Transition Services Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Transition Services Agreement, and (iii) taken all corporate action necessary to authorize and approve the Transition Services Agreement and the consummation of the transactions contemplated thereby. No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the Sale, the Purchase Agreement and the other transactions contemplated thereby.

NYI-524634636v6
SC1:3790817.1

X.      The transfer of the Company Parent Membership Interests to Purchaser under the Purchase Agreement will (a) vest Purchaser with good and marketable title in and to the Company Parent Membership Interests and (b) be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Company Parent Membership Interests, in each case, free and clear of all 363 Interests.

Y.      The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale.

**Seller Liability Assumption and Company Parent Novation**

Z.      The Shares comprise 100% of the equity interests of the Company, and no other equity interests are outstanding or issuable by the Company. The Company is not obligated, contractually or otherwise, to issue, directly or indirectly, any other equity interests or rights to acquire equity interests in the Company.  The Company Shares are the property of Company Parent's estate and legal and beneficial title thereto is vested in Company Parent's estate within the meaning of section 541(a) of the Bankruptcy Code.  Following the Seller Liability Assumption and Company Parent Novation, (a) Company Parent's estate will have no other assets other than the Company Shares and will be free and clear of all 363 Interests other than in respect of its obligations under the Purchase Agreement and (b) the Company Shares will be free and clear of all 363 Interests.

AA.      The Seller Liability Assumption and Company Parent Novation will not result in any undue burden or prejudice to any holders of any Company Parent 363 Interests because all such Company Parent 363 Interests shall attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have against Company Parent and subject to any claims and defenses the Debtors, their estates or

13

other parties may possess with respect to such Company Parent 363 Interests; *provided* that the Company Parent 363 Interests shall rank senior in right of payment to the Seller 363 Interests (as defined below).

BB.     All holders of Company Parent 363 Interests who did not object or who withdrew their objections to the Sale, the Seller Liability Assumption and Company Parent Novation or the Sale Motion are deemed to have consented to the Sale, the Seller Liability Assumption and Company Parent Novation and the other relief requested in the Sale Motion.  All other holders of Company Parent 363 Interests, including those who maintained and did not withdraw objections to the Sale, Seller Liability Assumption and Company Parent Novation or Sale Motion, if any, are adequately protected by having their Company Parent 363 Interests, if any, attach to the net proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such holders had prior to the Sale, subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Company Parent 363 Interests; *provided* that the Company Parent 363 Interests shall rank senior in right of payment to any Seller 363 Interests.

CC.     Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, creditors and other parties in interest, if (a) the Seller Liability Assumption and Company Parent Novation were not approved in all respects or (b) Company Parent and the Company Parent Shares were not free and clear of all 363 Interests.

DD.     Without the Seller Liability Assumption and Company Parent Novation, it would be impossible for the Debtors to maximize the value of their estates given the unique circumstances of these Chapter 11 Cases.

EE. The Seller Liability Assumption and Company Parent Novation are essential to the successful reorganization of the Debtors and necessary to permit the Sale of the Company for fair and reasonable consideration.

FF. The Seller Liability Assumption and Company Parent Novation are necessary and appropriate to carry out the provisions of the Bankruptcy Code and preserve the value of the Debtors' estates and the rights of the Debtors and their creditors and other parties in interest, and such relief does not conflict with the provisions of the Bankruptcy Code.

## **Transfer of Company Parent Membership Interests**

GG. The Company Parent Membership Interests comprise 100% of the equity interests of Company Parent, and no other equity interests are outstanding or issuable by Company Parent. Neither Seller nor Company Parent is obligated, contractually or otherwise, to issue, directly or indirectly, any other equity interests or rights to acquire equity interests in Company Parent. The Company Parent Membership Interests are the property of Seller's estate and legal and beneficial title thereto is vested in the Seller's estate within the meaning of section 541(a) of the Bankruptcy Code. Subject to (a) the receipt of the consideration for the Sale and (b) the transfer of the Uruguay Interests, Seller's estate has no assets other than the Company Parent Membership Interests.

HH. The transfer of the Company Parent Membership Interests to Purchaser free and clear of all 363 Interests will not result in any undue burden or prejudice to any holders of any Seller 363 Interests, if any, because all Seller 363 Interests,[6] if any, shall attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same

---

[6] The term "Seller 363 Interests" means all 363 Interests that have been or at any time could be asserted against Seller or its assets, including the Company Parent Membership Interests.

NYI-524634636v6
SC1:3790817.1

validity, force and effect which they now have against the Company Parent Membership Interests and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Seller 363 Interests; *provided* that the Seller 363 Interests, if any, shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

II.       All holders of Seller 363 Interests who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented to the Sale and the relief requested in the Sale Motion.  All other holders of Seller 363 Interests, including those who maintained and did not withdraw objections to the Sale or the Sale Motion, if any, are adequately protected by having their Seller 363 Interests, if any, attach to the net proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such holders had prior to the Sale, subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Seller 363 Interests; *provided* that the Seller 363 Interests shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

JJ.       Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, creditors and other parties in interest, if the Company Parent Membership Interests were not free and clear of all 363 Interests.

KK.       Not selling the Company Parent Membership Interests free and clear of all 363 Interests would make it impossible for the Debtors to maximize the value of their estates, and the sale of the Company Parent Membership Interests other than required by the Purchase Agreement would be of substantially less benefit to the Debtors' estates.

NYI-524634636v6
SC1:3790817.1

**Injunction**

LL.     The Injunction will not result in any undue burden or prejudice to any holders of any Company Parent 363 Interest or Seller 363 Interest (collectively, a "Specified 363 Interest") as all holders of such Specified 363 Interests are adequately protected by having their Specified 363 Interests attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have against the Company Parent or the Company Parent Membership Interests, as applicable, and subject to any claims and defenses the Debtors, their estates or other parties may possess with respect to such Interests; *provided* that the Seller 363 Interests shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

MM.     Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, their creditors and other parties in interest, if the Injunction was not approved in all respects or if Purchaser, its affiliates, or their respective officers, directors, managers, members or shareholders would, or in the future could, be liable for any Specified 363 Interests, or would have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff or otherwise, directly or indirectly, any Specified 363 Interests.

NN.     Without the Injunction, it would be impossible for the Debtors to maximize the value of their estates given the unique circumstances of these Chapter 11 Cases.

OO.     The Injunction is essential to the successful reorganization of the Debtors and necessary to permit the Sale of the Company for fair and reasonable consideration.

NYI-524634636v6
SC1:3790817.1

PP.     The Injunction is necessary and appropriate to carry out the provisions of the

Bankruptcy Code and preserve the value of the Debtors' estates and the rights of the Debtors and

their creditors and other parties in interest, and such relief does not conflict with the provisions

of the Bankruptcy Code.

### Assumption of the Assumed Contracts

QQ.     The assumption of the Assumed Contracts is in the best interests of the Debtors,

their estates, creditors and all other parties in interest, and represents a reasonable exercise of the

Debtors' sound business judgment.

RR.     On or before the Closing Date, the Debtors shall have:  (a) cured, or provided

adequate assurance of cure of, any monetary default existing as of and including the Closing

Date under any of the Assumed Contracts within the meaning of section 365(b)(1)(A) of the

Bankruptcy Code; (b) provided compensation, or adequate assurance of compensation, to any

party for actual pecuniary loss to such party resulting from a monetary default existing as of and

including the Closing Date under any of the Assumed Contracts, within the meaning of section

365(b)(1)(B) of the Bankruptcy Code; and (c) provided adequate assurance of future

performance under any of the Assumed Contracts in accordance with section 365(f)(2)(B) of the

Bankruptcy Code.

### Compelling Circumstances

SS.     The Debtors have demonstrated both (a) good, sufficient and sound business

purposes and justifications and (b) compelling circumstances for (i) the Sale other than in the

ordinary course of business, before, and outside of a plan of reorganization, (ii) the Injunction,

(iii) the Seller Liability Assumption and Company Parent Novation and (iv) the Company Parent

Dismissal in that, among other things, the immediate implementation of this Sale Order, the

18

consummation of the Sale and the Seller Liability Assumption and Company Parent Novation, the implementation of the Injunction and the Company Parent Dismissal are each necessary both to preserve and maximize the value of the Debtors' assets for the benefit of the Debtors, their estates, their creditors and all other parties in interest, and to provide the means for the Debtors to maximize creditor recoveries.

TT.     The transactions contemplated by the Purchase Agreement and this Sale Order neither impermissibly restructure the rights of any Debtor's creditors or equity holders nor impermissibly dictate the terms of a chapter 11 plan for any Debtor, and therefore, do not constitute a *sub rosa* chapter 11 plan.

UU.     To maximize the value of the Company Parent Membership Interests, preserve the viability of the Company and avoid deterioration, erosion of value and uncertainty with respect to the future operations of the Company, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement.

VV.     Nothing in the Purchase Agreement creates any third party beneficiary rights in any person or entity not a party to the Purchase Agreement.

**Dismissal of Company Parent's Bankruptcy Case**

WW.     Cause exists under section 1112(b) of the Bankruptcy Code to dismiss the Chapter 11 Case of Company Parent.

XX.     Purchaser would not have entered into the Purchase Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, creditors and other parties in interest, if the Chapter 11 Case of Company Parent were not dismissed.

NYI-524634636v6
SC1:3790817.1

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.      The relief requested in the Sale Motion with respect to this Sale Order is GRANTED to the extent set forth herein.

2.      The Sale is authorized as set forth herein and in the Purchase Agreement.

3.      All objections and responses, if any, to the Sale, Injunction, Seller Liability Assumption and Company Parent Novation, Company Parent Dismissal or Sale Motion that have not been withdrawn, waived or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are overruled on the merits and denied with prejudice.  All persons and entities given notice of the Sale Motion that failed to timely object thereto are deemed to have consented to the relief sought therein.  All parties given notice of proposed Cure Costs that failed to timely object thereto or to object to the provision of adequate assurance of future performance are deemed to have consented to the Cure Costs and to the assumption of the applicable Assumed Contract.

4.      The Court's findings of fact and conclusions of law set forth in the Bid Procedures Order are incorporated herein by reference.

5.      All of the provisions of this Sale Order are non-severable and mutually dependent.

**Approval of the Purchase Agreement**

6.      The Purchase Agreement and all of the terms and conditions thereof are hereby authorized and approved in all respects.  The Debtors are authorized and directed to perform all

20

of their respective obligations under the Purchase Agreement, and such obligations shall be enforceable by Purchaser in accordance with the terms hereof and thereof.

7.  The Debtors are authorized and directed (i) to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement and effectuate the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement), together with any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Purchase Agreement, this Sale Order, the Sale, the Seller Liability Assumption and Company Parent Novation, the Company Parent Dismissal and the Injunction, and to take all further actions as may be reasonably requested by Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to Purchaser, or reducing to possession, the Company Parent Membership Interests, free and clear of all 363 Interests; (ii) to pay to Purchaser, from time to time, amounts (if any) owing to Purchaser pursuant to the Purchase Agreement; and (iii) to take any and all actions as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Purchase Agreement and this Sale Order, without any further corporate action or order of this Court. The Debtors and their officers, employees and agents are hereby authorized to execute and deliver the Purchase Agreement and any and all documents necessary, required or contemplated by the Purchase Agreement. The Debtors' obligations to pay to Purchaser, from time to time, amounts (if any) owing to Purchaser pursuant to the Purchase Agreement (including, for the avoidance of doubt, the Break-Up Fee and Expense Reimbursement) constitute administrative expense claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code, and the Break-Up Fee and Expense Reimbursement shall be senior to all other administrative expense claims that may be approved in the Chapter 11 Cases.

21

8.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto strictly in accordance with, and subject to all limitations on amendments that are set forth in, the terms of the Purchase Agreement without further order of the Court, *provided* that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

9.     Purchaser has no obligation to proceed with the Closing unless and until all conditions precedent to its obligations to do so, as set forth in the Purchase Agreement, have been met, satisfied or waived in accordance with the terms of the Purchase Agreement.

10.     The failure specifically to include any particular provision of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.

11.     The Debtors are hereby authorized and directed, after consultation with the Committee, to (i) instruct the Escrow Agent to hold the Deposit Amount, and, upon the consummation of the transactions contemplated by the Purchase Agreement, the Indemnification Escrow Amount and the Tax Withholding Amount, in each case, in accordance with the Escrow Agreement and (ii) release and deliver the Deposit Amount, the Indemnification Escrow Amount and the Tax Withholding Amount, in each case, pursuant to the terms of the Purchase Agreement and Escrow Agreement.

12.     If the Seller determines to reject the release of the Deposit Amount, in accordance with section 4.6(c) of the Purchase Agreement, the Seller must obtain the consent (not to be unreasonably withheld) of the Committee  or further order of the Court prior to taking such action.

NYI-524634636v6
SC1:3790817.1

## Seller Liability Assumption and Company Parent Novation

13.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, upon the consummation of the transactions set forth in the Purchase Agreement, (x) Seller shall assume from Company Parent, and Company Parent shall have been deemed to novate, all Company Parent 363 Interests to Seller, and following such assumption and novation, Company Parent shall have no liability therefor and (y) all equity interests in Nextel Uruguay S.A (the "Uruguay Interests") shall be transferred to Seller by Company Parent ((x) and (y), together, the "Seller Liability Assumption and Company Parent Novation").

14.     The Seller Liability Assumption and Company Parent Novation shall constitute a legal, valid, binding and effective (a) assumption and novation of all Company Parent 363 Interests and (b) transfer of the Uruguay Interests.

15.     All  Company Parent 363 Interests shall attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have as against Company Parent and subject to any claims or defenses the Debtors, their estates or other parties may possess with respect to such Interests; *provided* that the Company Parent 363 Interests shall rank senior in right of payment to the Seller 363 Interests.

16.     Following the Seller Liability Assumption and Company Parent Novation, Company Parent will be free and clear of all Company Parent 363 Interests and the Company Shares shall be free and clear of all 363 Interests, other than in respect of Company Parent's pre-closing obligations under the Purchase Agreement.

NYI-524634636v6
SC1:3790817.1

## Transfer of the Company Parent Membership Interests

17.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Seller is authorized to transfer the Company Parent Membership Interests to Purchaser on the Closing Date pursuant to the terms and conditions of the Purchase Agreement, free and clear of all Seller 363 Interests, with all Seller 363 Interests to attach to the net proceeds of the Sale when received by the Seller, in the order of their priority, with the same validity, force and effect which they now have as against the Company Parent Membership Interests and subject to any claims or defenses the Debtors, their estates or other parties may possess with respect to such Interests; *provided* that the Seller 363 Interests shall be subject to and rank junior in right of payment to the Company Parent 363 Interests.

18.     The transfer of the Company Parent Membership Interests to Purchaser shall constitute a legal, valid, binding and effective transfer of all such Company Parent Membership Interests and shall vest Purchaser with all right, title and interest of the Seller in the Company Parent Membership Interests free and clear of all Seller 363 Interests.

## Injunction

19.     Following the Closing Date, all persons and entities (as defined in section 101(15) of the Bankruptcy Code) and their respective successors and assigns holding or asserting Specified 363 Interests (i) arising prior to or on the Closing Date or, directly or indirectly, from the transfer of the Company Parent Membership Interests to Purchaser or (ii) relating in any way to the Debtors are hereby forever barred, estopped and permanently enjoined from (x) asserting such Specified 363 Interests against Purchaser and Purchaser's Affiliates, its and their successors and assigns, and its and their property, including the Company Parent Membership Interests and the Shares and (y) commencing or continuing in any matter any action or other proceeding, in

24

any jurisdiction, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Purchaser, Purchaser's Affiliates, its and their successors and assigns, or its and their respective assets (including the Company Parent Membership Interests and the Shares) in connection with such Specified 363 Interests, including the following actions: (i) any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing such Interests; (iv) asserting any setoff, right of subrogation or recoupment of any kind in respect of such Interests; (v) commencing or continuing any action, in any manner, place or jurisdiction, that does not comply with, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the assets of the Company ((x) and (y), collectively, the "Enjoined Actions").

20.    Following the Closing Date, no holder of any Specified 363 Interest shall interfere with Purchaser's title to or use and enjoyment of the Company Parent Membership Interests, Company Parent, the Shares and/or the Company based on or related to such Specified 363 Interests, or based on any action the Debtors may take in their Chapter 11 Cases.

21.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the (i) Seller to sell and transfer the Company Parent Membership Interests to Purchaser in accordance with the terms of the Purchase Agreement and this Sale Order and (ii) other Debtors to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement and effectuate the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and this Sale Order.

25

22. All persons and entities that are in possession of some or all of the Company Parent Membership Interests on the Closing Date are directed to surrender possession of such Company Parent Membership Interests to Purchaser on the Closing Date.

23. Upon consummation of the transactions contemplated in the Purchase Agreement, Purchaser shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing or financing statement recorded to attach, perfect or otherwise notice any Specified 363 Interest.

24. A certified copy of this Sale Order may be filed with any appropriate clerk and/or recorded with any appropriate recorder to act to cancel any of the Specified 363 Interests and to resolve any title issue with respect to the Company Parent Membership Interests, Company Parent or the Company Shares.

25. If any person or entity which has filed statements or other documents or agreements evidencing Specified 363 Interests shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary or desirable to Purchaser for the purpose of documenting the release of all Specified 363 Interests that the person or entity has or may assert with respect to all or any portion of the Company Parent Membership Interests, Company Parent or the Company Shares, the Debtors and Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Company Parent Membership Interests or Company Shares, as applicable.

26. This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of

26

mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments (including departments of foreign governments), secretaries of state, federal, foreign and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing is hereby directed to accept for filing any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

27.     No foreign or domestic governmental unit may revoke or suspend any permit or licenses relating to the operation of the Company on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale.  To the extent available under applicable law, the Company shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other foreign or domestic governmental authorization or approval of the Debtors with respect to the Business, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred with the Company as of the Closing Date.

28.     Following the Closing Date, the Company and the Company's direct and indirect assets, including the Shares, will be free and clear of all 363 Interests (x) arising from, related to or incurred in connection with (i) the 10% senior unsecured notes issued by NII Capital, due in 2016, (ii) 8.875% senior unsecured notes issued by NII Capital Corp. due in 2019, (iii) 7.625% senior unsecured notes issued by NII Capital Corp. due in 2021, (iv) 11.375% senior unsecured notes issued by NII International Telecom S.C.A., due in 2019, and (v) 7.875% senior unsecured

27

notes issued by NII International Telecom S.C.A., due in 2019 ((i)-(v), collectively, the "Funded Debt") and (y) that have been, are or could be asserted by the Debtors or any of their Affiliates. Except as expressly permitted by the Purchase Agreement or this Sale Order, all persons and entities (as defined in section 101(15) of the Bankruptcy Code), are hereby forever barred, estopped and permanently enjoined from the Enjoined Actions with respect to such 363 Interests (paragraphs 18 through 27, collectively, the "Injunction").

## Assumption of Contracts

29.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date, the Debtors are authorized and directed to assume each of the Assumed Contracts.

30.     The Cure Amounts set forth on the Cure Cost and Schedule are the sole amounts necessary to be paid by Purchaser upon assumption of the Assumed Contracts listed thereon under sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of the applicable Cure Amounts shall (x) effect a cure of all defaults existing under the Assumed Contracts as of and including the Closing Date, and (y) compensate the counterparties to the Assumed Contracts for any actual pecuniary loss resulting from all defaults existing under the Contracts as of and including the Closing Date.  Upon the payment of the Cure Amounts by the Debtors, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, would constitute such a default.  After the payment of the Cure Amounts, the Debtors shall not have any further liabilities to the counterparties to the Assumed Contracts other than the Debtor's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

NYI-524634636v6
SC1:3790817.1

31.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, all counterparties to the Assumed Contracts are hereby forever barred and permanently enjoined from raising or asserting against the Debtors, Purchaser or the Company any default, acceleration, breach, claim or pecuniary loss arising under or related to the Assumed Contracts existing as of and including the Closing Date or arising by reason of the closing of the Sale, or any purported written or oral modification to the Assumed Contracts.

32.     There shall be no rent accelerations, increases or any other fees charged to the Debtors as a result of the assumption of any Assumed Contract.  The failure of the Debtors to enforce at any time one or more terms or conditions of any Related Contract shall not be a waiver of such terms or conditions, or of the Debtors' rights to enforce every term and condition of the Assumed Contract.

33.     Notwithstanding anything to the contrary in this Sale Order, no Assumed Contracts shall be assumed until the Closing.

34.     The Debtors, their Affiliates and any Debtor Successors (as defined below) are authorized and directed to provide the benefits (including the past, present and future benefits available to the Company, directly or indirectly, in connection with the Assumed Contracts immediately prior to the Closing) of the Assumed Contracts in a manner consistent with past practice.

### No Successor, Transferee or Other Liability

35.     Purchaser shall not assume any liability or other obligation of the Debtors arising under or related to the Company Parent Membership Interests, Company Parent or the Company or its subsidiaries.  Without limiting the generality of the foregoing, Purchaser shall not be liable for any 363 Interests against the Debtors or any of their predecessors or affiliates, and Purchaser

NYI-524634636v6
SC1:3790817.1

shall not have any successor, transferee or vicarious liabilities of any kind or character

("Successor Liability") in connection with, or in any way relating to, the Company Parent

Membership Interests, Company Parent or the Company or its subsidiaries prior to and including

the Closing Date.

36.     Purchaser has given substantial consideration under the Purchase Agreement for

the benefit of the holders of any 363 Interest.  The consideration given by Purchaser shall

constitute valid and valuable consideration for the releases of any potential claims of Successor

Liability of Purchaser, which releases shall be deemed to have been given in favor of Purchaser

by all holders of any 363 Interests.

37.     Upon the Closing Date, all persons and entities are hereby forever prohibited and

permanently enjoined from commencing or continuing in any manner any action or other

proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding

against Purchaser, its successors and assigns, or Company Parent, the Company or its

subsidiaries, with respect to any Successor Liability, including the Enjoined Actions.

## Good Faith of Purchaser

38.     The transactions contemplated by the Purchase Agreement are undertaken by the

Debtors and Purchaser without collusion and in good faith, as that term is defined in section

363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the

authorization provided in this Sale Order to consummate the Sale shall not affect the validity of

the Sale (including the assumption of the Assumed Contracts), unless such authorization and

consummation of such Sale are duly stayed pending such appeal.

39.     Neither the Debtors nor Purchaser has engaged in any action or inaction that

would cause or permit the Sale to be avoided or costs, damages or other remedy to be imposed

NYI-524634636v6
SC1:3790817.1

under section 363(n) of the Bankruptcy Code. The consideration provided by Purchaser for the Company Parent Membership Interests under the Purchase Agreement is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

## Dismissal of the Chapter 11 Case of Company Parent

40. Immediately prior to the Closing, the Debtors are authorized and directed to file a notice (the "Dismissal Notice") of dismissal of the Chapter 11 Case of Company Parent (the "Company Parent Case") with this Court, in form and substance reasonably acceptable to the Committee and Purchaser. Upon the filing of the Dismissal Notice, the Company Parent Case shall be dismissed.

41. Upon the dismissal of the Bankruptcy Case, the Clerk of the Court is authorized and directed to promptly take all actions to close the Company Parent Case.

42. Notwithstanding section 349 of the Bankruptcy Code or otherwise, all orders entered in the Company Parent Case shall survive the dismissal and closing of the Company Parent Case.

43. The dismissal of the Company Parent Case shall have no effect on the other Chapter 11 Cases with which it is jointly administered.

44. In respect of the Company Parent Case, all fees of the U.S. Trustee shall be paid in full and no amounts shall be due and owing to the U.S. Trustee following the Closing, and all required reports shall be filed with this Court.

45. Professional fee administrative claims related to the Company Parent Case may continue to be sought through the filing of appropriate applications in the Debtors' jointly administered cases; *provided* such claims shall be asserted only against Seller or its other affiliated debtors, and not Company Parent.

NYI-524634636v6
SC1:3790817.1

## Relief from Automatic Stay

46.      Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement or any other Sale-related document or deliver any notice provided for in this Sale Order or the Purchase Agreement.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the preceding sentence or any other provisions of this Sale Order.  The requirements of Local Rule 4001-1 have been satisfied with respect to this Sale Order.

## Other Provisions

47.      Upon the Closing, all Intercompany Obligations shall be netted against each other and the balance (if any) will be, as applicable, contributed to the capital of the Company (if the net balance is an amount payable to Seller or its Affiliates) or deemed to have been distributed to Seller (if net balance is an amount payable to the Entities), in each case, without any cash payment being made.  Notwithstanding the netting of Intercompany Obligations as set forth herein and in the Purchase Agreement, which shall be enforceable by the Purchaser, Company Parent, the Company and their respective Affiliates, the netting of such Intercompany Obligations shall be disregarded solely for purposes of allocating the net proceeds of the Sale following the Closing among the Debtors which shall be allocated pursuant to a chapter 11 plan in the Debtors' Chapter 11 Cases.  For the avoidance of doubt, such allocation shall not have any impact on the Purchaser, Company Parent, the Company or their respective Affiliates.

48.      Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, 9014 or otherwise, this Sale Order shall be immediately effective and enforceable upon entry, and the Debtors and Purchaser are authorized to close the Sale immediately upon entry of this

NYI-524634636v6
SC1:3790817.1

Sale Order. Time is of the essence in closing the Sale, and the Debtors and Purchaser intend to close the Sale as soon as practicable. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being dismissed as moot.

49.     This Sale Order shall be binding in all respects upon (i) the Debtors and their non-Debtor Affiliates (including, for the avoidance of doubt, Seller, Seller Parent, Seller Guarantor, Company Parent and Service Provider) and their estates, (ii) all creditors of, and holders of equity interests in, any Debtor (including all creditors, whether known or unknown, of Company Parent), (iii) any holders of 363 Interests (whether known or unknown) in or against or on all or any portion of the Company Parent Membership Interests, Company Parent or the Company Shares, (iv) Purchaser and its successors and assigns, (v) all counterparties to the Assumed Contracts, (vi) other parties in interest, (vii) trustees, examiners and other representatives or fiduciaries, if any, subsequently appointed in any of the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any of the Debtors' Chapter 11 Cases or upon the dismissal of any of the Debtors' Chapter 11 Cases, (viii) any successors or assigns of any Debtor, (ix) any reorganized Debtor and (x) any Person succeeding directly or indirectly to all or substantially all of the Debtors' business in Brazil (as existing on the date hereof) (the "Brazil Business") in connection with (A) any restructuring transaction under or prior to the consummation of any chapter 11 plan in these Chapter 11 Cases with respect to the Debtors, or (B) a sale of all or substantially all of the Brazil Business, which sale is consummated under or prior to the consummation of a chapter 11 plan in these Chapter 11 Cases with respect to the Debtors ((vii) through (x), collectively, "Debtor Successors"). For the avoidance of doubt, NII International Mobile S.á.r.l. and its direct or indirect subsidiaries that currently own the Brazil

33

Business shall not be Debtor Successors; provided that the reorganized Debtors continue to indirectly own (and they or their Affiliates have not executed a definitive agreement to sell) the Brazil Business upon consummation of any chapter 11 plan in the Chapter 11 Cases (the "Controlled Brazil Owners").

50.     The Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and all ancillary documents shall be binding upon (x) the Debtors and their non-Debtor Affiliates (including, for the avoidance of doubt, Seller, Seller Parent, Seller Guarantor, Company Parent and Service Provider, but excluding the Controlled Brazil Owners) and their estates, (y) any Debtor Successor and (z) Purchaser and its successors and assigns.

51.     In addition, any Debtor Successor specified in clause (x) of paragraph 49 shall have to provide to Purchaser adequate assurance of future performance as if the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and all ancillary documents were being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code. Any such assumption shall not relieve the Debtors of their respective obligations under the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and Escrow Agreement) and all ancillary documents. This Sale Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, creditors, Purchaser, and the respective successors and assigns of each of the foregoing.

52.     Notwithstanding anything to the contrary in this Order, any other order of this Court or any plan of reorganization or liquidation of any Debtor, Purchaser shall not be required to file or serve a proof of claim with respect to claims arising under or in connection with the

34

Stalking Horse Purchase Agreement, and no bar date shall be imposed with respect to such claims.

53.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind in these Chapter 11 Cases, any subsequent chapter 7 cases in which these Chapter 11 Cases may be converted or any related proceedings subsequent to the entry of this Sale Order, shall alter or affect the terms and conditions of the Sale, the Purchase Agreement (including, for the avoidance of doubt, the Transition Services Agreement and the Escrow Agreement), the Assumed Contracts or the terms or implementation of this Sale Order.

54.     Notwithstanding the dismissal of the Company Parent Case, this Court shall retain jurisdiction and power to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including retaining jurisdiction to (i) compel delivery of the Company Parent Membership Interests to Purchaser in accordance with the Purchase Agreement, (ii) interpret, implement and enforce the provisions of this Sale Order, (iii) protect Purchaser against any 363 Interests in or against the Debtors, Company Parent, the Company Parent Membership Interests or the Company Shares of any kind or nature whatsoever, (iv) compel Debtor Successors, as applicable, to (x) perform under the Purchase Agreement (including, for the avoidance of the doubt, the Transition Services Agreement and Escrow Agreement) and (y) provide the benefits of the Assumed Contracts to Purchaser and the Company, (v) enter any orders under sections 363 or 365 of the Bankruptcy Code with respect to the Company Parent Membership Interests, the Seller Liability Assumption and Company Parent Novation and the Assumed Contracts and (vi) notwithstanding the possible applicability of section 530(b) of the

35

Bankruptcy Code or Bankruptcy Rule 5010, reopen the Chapter 11 Case of any Debtor in order to effect each of subsections (i) – (vi) in this paragraph.

55.     Purchaser has standing to seek to enforce the terms of this Order.

56.     The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Sale Order.

57.     To the extent this Sale Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.

Dated:    March ___, 2015
              New York, New York

_____
HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

NYI-524634636v6
SC1:3790817.1

**Exhibit 1**

**<u>Purchase Agreement</u>**

**Exhibit 2**

**<u>Assumed Contracts</u>**

**Exhibit D**

**Form of Transition Services Agreement**

[*see attached*]

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (this "Agreement"), dated **[_____] [__]**, 2015, is between Comunicaciones Nextel de México, S.A. de C.V., a variable capital corporation (*sociedad anónima de capital variable*) existing under the Laws of Mexico (the "Company"), **[_____]**, a **[_____]** existing under the Laws of **[_____]** ("Holdings") and **[_____]**, a **[_____]** existing under the Laws of **[_____]** ("[●]")[1] ([●] or Holdings, a "Seller Service Provider", and collectively, the "Seller Service Providers") (each Seller Service Provider or the Company, a "Party" and collectively, the "Parties").

## PRELIMINARY STATEMENTS

A.     On January 26, 2015 ("Signing Date"), New Cingular Wireless Services, Inc., a corporation existing under the Laws of Delaware ("Purchaser"), NIU HOLDINGS LLC, a limited liability company existing under the Laws of Delaware ("Seller") and other parties thereto executed a Stock Purchase Agreement (the "SPA").

B.     The Parties desire to enter into this Agreement in order to establish certain terms and conditions applicable to the provision of certain services to be provided between the Entities, the Seller Service Providers and the Seller Service Recipients (each as defined herein).

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises contained herein and in the SPA, and for other good and valuable consideration, the receipt and sufficiency of which the Parties acknowledge, the Parties agree as follows:

## 1. DEFINITIONS

1.1     Definitions.  For purposes of this Agreement, the following terms have the meanings specified below:

"Additional Services" is defined in Section 2.1(b).

"Agreed Methodology" is defined in Section 3.1.

"Agreement" is defined in the Preamble.

"Company" is defined in the Preamble.

"Confidential Information" is defined in Section 9.1(a).

---

[1] NTD: Any entity that is identified in Schedule 1 as a provider of a service needs to be a signatory.

"Early Termination" is defined in Section 2.4(a).

"Excluded Taxes" means any of the following Taxes imposed on or required to be withheld or deducted from a payment of Service Fees: (a) Taxes imposed on or measured by income (however denominated), franchise Taxes, branch profits Taxes, cross-border withholding Taxes (whether imposed directly or collected by withholding), (b) Taxes imposed as a result of a present or former connection between any Service Provider or any Affiliate of any Service Provider and the jurisdiction imposing such Taxes (other than connections arising solely from any Service Provider having provided the Transition Services), (c) wage, social security, social contribution and other similar taxes, and (d) value added tax (*impuesto al valor agregado*) shifted (*trasladado*) to any Service Provider, its Affiliates or third party service providers or as a result of incurring necessary expenses to provide the Transition Services.

"Extension Period" is defined in Section 2.4(b).

"Force Majeure Event" is defined in Section 5.1.

"Former Affiliate" is defined in Section 2.1(e).

"Former Transition Services" is defined in Section 2.1(e).

"Implied Services" is defined in Section 2.1(d).

"Indemnified Taxes" means all Taxes imposed on or in respect of the provision of the Transition Services hereunder and the payment of the Service Fee other than Excluded Taxes.  For the avoidance of doubt, value added tax (*impuesto al valor agregado*) shifted (*trasladado*) to any Service Recipient is considered as an Indemnified Tax.

"Payment Due Date" is defined in Section 3.3.

"Permitted Purpose" is defined in Section 9.1(a).

"Prime Rate" is defined in Section 3.2.

"Receiving Party" is defined in Section 9.1(a).

"Scheduled Services" means the services set forth in Schedule 1 hereto.

"Seller" is defined in in the Preliminary Statement A.

"Seller Service Provider" is defined in the Premable.

"Seller Service Recipient" means any entity that is identified in Schedule 2 as the recipient of a service, in such capacity.

"Service Fees" is defined in Section 3.1.

"Service Provider" means any Seller Service Provider or the Company providing any Transition Service pursuant to this Agreement, in such capacity.

"Service Recipient" means any Seller Service Recipient or any of the Entities to which any Transition Service is provided pursuant to this Agreement, in such capacity

"SPA" is defined in Preliminary Statement A.

"Termination Effective Date" is defined in Section 2.4(a).

"Third Party Fees" in defined in Section 2.2(a).

"Transition Period" is defined in Section 2.3.

"Transition Services" means the services set forth in Schedule 1 or Schedule 2, the Additional Services and the Implied Services.

1.2    Construction Rules and Interpretative Matters.  The following rules of construction and interpretation will apply:

(a)    capitalized terms used but not defined herein will have the respective meanings set forth in the SPA; and

(b)    the construction rules and interpretative matters set forth in Section 1.2 of the SPA will apply.

## 2. AGREEMENT TO PROVIDE TRANSITION SERVICES

2.1    Services.

(a)    The Seller Service Providers will provide, or cause their third party service providers to provide, to the Entities, subject to the terms of this Agreement and in accordance with applicable Laws, the services set forth in Schedule 1 hereto.  The Company will provide, or cause its third party service providers to provide, to Seller Service Recipients, subject to the terms of this Agreement and in accordance with applicable Laws, the services set forth in Schedule 2 hereto.  Holdings is responsible for all obligations and liabilities of each Seller Service Provider and Seller Service Recipient hereunder.

(b)    With respect to any services that (i) are not encompassed by the services set forth in Schedule 1 or Schedule 2, as applicable, and (ii) were provided by or on behalf of any Service Provider or its third party service providers to any Service Recipient during the three-month period prior to the Signing Date or during the period between the Signing Date and the Closing Date (the "Additional Services"), such Service Provider will provide, or cause its third party service providers to provide, such Additional Services subject to the terms of this Agreement and in accordance with applicable Laws.  Unless otherwise agreed by the parties in writing, the Transition Period for such Additional Services shall be 18 months from the Closing Date, and the

Service Fees for such Additional Services shall be agreed upon in writing by the applicable Service Provider and Service Recipient through diligent and good faith cooperation, provided that the Parties agree to use the Agreed Methodology to calculate the applicable Service Fees. The Parties will amend Schedule 1 or Schedule 2, as applicable, to add any Additional Services.

(c)    If any Service Recipient requests in writing that any service that is not contemplated by either Schedule 1, Schedule 2 or Section 2.1(b) be provided under this Agreement, the applicable Service Provider will consider and respond in good faith to any such request. If such Service Provider agrees to provide such service, the Parties will negotiate in good faith to amend Schedule 1 or Schedule 2, as applicable, to add any such service, including the time period and Service Fees for such service; provided that the Parties agree to use the Agreed Methodology to calculate the applicable Service Fees. Upon execution of such amendment, such service shall be considered an "Additional Service" for all purposes hereunder (other than Section 2.1(b)).

(d)    Service Provider agrees to provide any services, functions or responsibilities that are not specifically described in this Agreement or the Schedules, but that would be reasonably anticipated to be necessary for the proper performance and delivery of the services set forth in Schedule 1 or Schedule 2, as applicable, which services, functions and responsibilities will be deemed to be implied by and included within the scope of such services to the same extent and in the same manner as if specifically described in this Agreement or the Schedules (the "Implied Services").

(e)    No Service Provider or any of its Affiliates will have any obligation to: (i) provide or cause to be provided to any Service Recipient any services that were not provided to such Service Recipient by Service Provider or its Affiliates during the three-month period prior to the Signing Date or the period between the Signing Date and the Closing Date; (ii) operate any Service Recipient or its business or any portion thereof or engage in the exercise of any business judgment or general management of any Service Recipient or its business (it being acknowledged and agreed by the Parties that providing the Transition Services will not be deemed to be operating any Service Recipient or its business or any portion thereof or engaging in the exercise of any business judgment or general management of any Service Recipient); (iii) engage in any unlawful activity; (iv) implement systems, processes, technologies, plans or initiatives developed, acquired or utilized by Service Provider or its Affiliates after the Closing Date or adapt any of its systems, processes technologies, plans or initiatives to accommodate those acquired or utilized by any Service Recipient after the Closing Date, in each case, except to the extent required for Service Provider or its Affiliates to provide or cause to be provided the Transition Services to any Service Recipient on terms and conditions set forth herein; (v) perform or cause to be performed any of the Transition Services for the benefit of any third party, other than the any Service Recipient's wholly-owned Subsidiaries; or (vi) expand their facilities, incur capital expenses or employ additional personnel in order to provide the Transition Services, in each case except to the extent required for Service Provider or its Affiliates to provide or cause to be provided the Transition Services to any Service Recipient on terms and

conditions set forth herein. Under no circumstances will any Service Provider or any of its Affiliates be deemed to provide any legal advice or legal services to any Service Recipient, and any Service Recipient may use its own counsel with respect to any legal advice that such Service Recipient desires to obtain. In the event any Service Provider ceases for any reason to be an Affiliate of Holdings (such entity, a "Former Affiliate"), and it is not reasonably practicable for Holdings or any of its other Affiliates to provide one or more Transition Services previously provided by such Former Affiliate (such Transition Services, the "Former Transition Services"), then Holdings shall reasonably and in good faith cooperate with the applicable Service Recipient to find an adequate substitute third party service provider for such Former Transition Services. Under no circumstances will this Agreement or the provision of the Transition Services obligate any Service Provider or any of its Affiliates to (i) hire any additional employees, (ii) maintain the employment of any specific employee, (iii) purchase, lease or license any additional assets (except as set forth in Section 2.3), or (iv) create or supply any documentation or information not currently existing or readily available, except as described in Schedule 1.

(f)     Each Service Recipient agrees to provide to the applicable Service Provider and its employees, agents and representatives access to, and all necessary rights to utilize, such Service Recipient's facilities, personnel, assets, systems and technologies, in each case, during regular business hours and to the extent reasonably necessary for such Service Provider to provide the Transition Services, subject to: (i) such Service Recipient having the right to appoint a representative present at all times that Service Provider and its employees, agents and representatives are accessing or utilizing such Service Recipient's facilities, assets, systems or technologies or communicating with such Service Recipient's employees or representatives; (ii) such Service Recipient imposing any reasonable safety and access restrictions on such access and use, provided that any such restrictions are substantially similar to those imposed on such Service Recipient's own employees or representatives engaged in similar activities; and (iii) the confidentiality provisions contained in Section 9.1 applying to such access and use and any information obtained or otherwise discovered in connection therewith. Each Service Recipient will, and will cause its employees, agents and representatives to, reasonably cooperate with the applicable Service Provider and its employees, agents and representatives to facilitate the provision of the Transition Services to such Service Recipient in accordance with the terms hereof.

(g)     During the term of this Agreement, each Service Provider will use commercially reasonable efforts to respond to each Service Recipient's requests for information related to the functionality and operation of the Transition Services.

(h)     Each Service Provider will have the right to hire third party service providers to provide all or part of any Transition Service hereunder; provided, however, that (i) such Service Provider may not hire or use any direct or indirect competitor of the applicable Service Recipient or its Affiliates without such Service Recipient's prior written consent, and (ii) if such Service Provider decides to outsource all or substantially all of any of the Transition Services hereunder to a third party, then such Service Provider will promptly notify the applicable Service Recipient in writing of such decision

and the name of the third party service provider.  In the event that any Service Provider uses any third party to perform any Transition Services, such Service Provider will remain responsible for the Transition Services, including obligations to meet the service standard or any applicable service levels, provided by each third party to the same extent as if such Service Provider had performed the Transition Services itself.

(i)     Nothing contained in this Agreement gives any Service Recipient any right, or creates any obligation for any Service Provider, with respect to any information, service or other action beyond the scope of the business of the Service Recipients as they exist as of the date of this Agreement or any time during the term of this Agreement.

2.2     Licenses and Third Party Fees; Consents.

(a)     Each Service Recipient will be solely liable for any portions of costs and expenses of any Software and other licenses and related maintenance fees, and all other third party fees and expenses, in each case, directly allocable to the Transition Services and actually paid by any Service Provider to third parties (for clarity, not including any Affiliate of any Service Provider) that may be reasonably required to be obtained from time to time by any Service Provider in order for Service Recipient to receive any Transition Services in accordance with the terms of this Agreement (such portions of costs and expenses, "Third Party Fees"); provided, however, that such Service Provider will be required to receive written consent from the Service Recipient prior to incurring any material costs and expenses under this Section 2.2(a).

(b)     If the consent of a third party supplier, lessor, vendor or licensor is required for the provision of a Transition Service, the Service Provider will use commercially reasonable efforts, cooperating in good faith and in consultation with the applicable Service Recipient, to obtain such consent.  If such consent is refused despite the use of such commercially reasonable efforts, or if the third party supplier, lessor, vendor or licensor requires a modification, amendment or alteration of or to the applicable agreement with Service Provider that would be materially detrimental to Service Provider or any of its Affiliates, then the Parties will use commercially reasonable efforts, cooperating in good faith, to mutually agree on a work-around arrangement, reasonably satisfactory to the Service Recipient, to enable the provision of the Transition Service.

2.3     Transition Period.  Each Service Provider will provide, or cause to be provided, to the Service Recipients the Transition Services for the periods set forth in Schedule 1 or Schedule 2 (as each may be amended to include Additional Services from time to time, the "Transition Period"), unless earlier terminated in accordance with Section 2.4(a) or extended in accordance with Section 2.4(b).  If there is no period specified in Schedule 1 or Schedule 2 for any Transition Service, the Transition Period for such Transition Service will be 18 months, unless earlier terminated in accordance with Section 2.4(a) or extended in accordance with Section 2.4(b). No Service Provider will be obligated to provide or cause to be provided to any Service Recipient any Transition Service during any period other than the applicable Transition Period unless

extended in accordance with Section 2.4(b).  The Parties acknowledge the transitional nature of the Transition Services.  Accordingly, as promptly as reasonably practicable following the execution of this Agreement, each Service Recipient will use commercially reasonable efforts to transition each Transition Service to such Service Recipient's own independent internal organization or to obtain its own alternate third party source to provide each Transition Service, in each case at such Service Recipient's sole expense.

2.4    Termination or Extension of Transition Services.  Each Service Recipient will have the right, in its sole discretion, to direct that any or all of the Transition Services be:

(a)    terminated effective at the end of a month designated by such Service Recipient (an "Early Termination") that is before the end of the Transition Period.  Any such Early Termination will be effective no earlier than 10 days after written notice of the Early Termination is received by the applicable Service Provider ("Termination Effective Date"), unless such Service Provider consents in writing to a shorter period.  Any such Early Termination will be irrevocable unless otherwise agreed by such Service Provider in writing.  From and after the Termination Effective Date, the Service Recipient will have no obligation to pay any fees associated with the terminated Transition Service, including any fees set forth in Schedule 1 or Schedule 2 (in each case, as may be amended to include Additional Services), as applicable, for such Transition Service and any fees payable pursuant to Section 2.2 in connection with such Transition Service; or

(b)    extended for a period of up to three months after the end of the applicable Transition Period (an "Extension Period") by written notice to the applicable Service Provider not later than 30 days prior to the end of the Transition Period.

2.5    Contact Persons.  Each Service Provider and Service Recipient shall appoint a person or persons for the purpose of coordinating the provision and the migration of the Transition Services, and shall inform each other applicable Service Provider or Service Recipient of the identity and contact information of such person or persons within 7 days of the Closing Date.  Each Service Provider and Service Recipient may change such contact person from time to time upon written notice to the other applicable Parties.

## 3.  PAYMENT FOR TRANSITION SERVICES

3.1    Service Fees.  Within the 90 calendar days following the execution of this Agreement, the Parties shall cooperate diligently and in good faith with a view towards agreeing upon, in writing, the service fees for the Transition Services (the "Service Fees"), provided that the Parties agree that the following methodology shall be used to calculate such Service Fees (the "Agreed Methodology"): the Service Fees shall equal the primary (*i.e.*, direct) costs that are directly attributable to the implementation and performance of the applicable Transition Service, excluding (i) secondary (*i.e.*, indirect) costs (*e.g.*, corporate overhead expenses, branding or other intercompany allocated expenses), but including any salary, benefits, reasonable travel expenses and

temporary services directly attributable to the implementation and performance of a particular Transition Service (calculated in proportion to the work done by each of the employees of such Service Provider that is directly attributable to the implementation and performance of such Transition Service), (ii) other extraordinary expenses (*e.g.*, employee severance costs or restructuring expenses) to the extent they are not directly attributable to the implementation or performance of a particular Transition Service, and (iii) any margin, premium or profit accruing to the applicable Service Provider, in each case, for the period during which the applicable Transition Service was provided by such Service Provider.

      3.2    <u>Payment</u>.  Each Service Recipient shall pay the applicable Service Fee to the corresponding Service Provider.  In addition, in the event that any Service Provider incurs any Third Party Fees, the applicable Service Recipient will reimburse such Service Provider for such fees in accordance with the invoicing procedures set forth in <u>Section 3.3</u>.  For the avoidance of doubt, the fees for the Implied Services are included in the Service Fees, and the Service Recipients are not required to pay any additional fees for the Implied Services.  Any portion of the Service Fees that is not paid when due (as set forth in <u>Section 3.3</u>) will accrue interest at a rate per annum equal to the Prime Rate plus 2.0%, calculated for the actual number of days elapsed, accrued from and including the date on which such payment was due up to and including the date of payment.  All amounts payable hereunder to any Party will be in United States dollars.  If any Service Fees are not paid more than 45 days after the Payment Due Date for any Transition Services provided in this Agreement, the applicable Service Provider will be entitled to suspend, at its sole discretion, the provision of such Transition Services until such Service Fees have been paid, provided that any Service Recipient's failure to pay amounts disputed in accordance with <u>Section 3.3</u> will not be grounds for suspension of any Transition Service.  For purposes of this Agreement, the term "<u>Prime Rate</u>" means the prime lending rate as reported in The Wall Street Journal from time to time as the base rate on corporate loans.

      3.3    <u>Invoicing of Service Fees</u>. Each Service Provider will invoice in arrears for Service Fees and Third Party Fees promptly after the end of each calendar month during the Transition Period.  Such invoice must meet all legal and tax requirements under applicable Law, regulations or administrative rules.  In addition, such invoice will contain reasonable detail of the Transition Services and the related Service Fees and Third Party Fees and a sufficiently detailed itemization of (a) the price for each of the categories of Transition Services for such month and (b) the amount of any applicable Indemnified Taxes in respect of such Transition Services.  During the term of this Agreement and for one year thereafter, each Service Provider will maintain records in reasonable detail of the Transition Services provided, Service Fees invoiced and payments made hereunder, and will make such records available to the applicable Service Recipient, promptly after receipt of written request therefor.  Each Service Recipient will pay the invoices by wire transfer of immediately available funds not later than 45 days calendar days after receipt of such invoice ("<u>Payment Due Date</u>").  In the event that any Service Recipient has a good faith dispute with regard to any fees invoiced, such Party shall provide the other with written notice of such dispute, together with a reasonably detailed explanation of such dispute, at the time payment would have

otherwise been due, and such Party may withhold payment of any disputed amounts pending resolution of the dispute.  For the avoidance of doubt, such Party's failure to pay amounts disputed in accordance with this Section will not be grounds for a claim of breach or suspension of work by the applicable Service Providers, and such amounts will not accrue interest until the claim has been resolved.

3.4    Indemnified Taxes.  The Service Fees do not include any amounts in respect of Indemnified Taxes.  Any Indemnified Taxes required to be charged by any Service Provider or any of its Affiliates are in addition to the amounts otherwise to be paid by the Service Recipients for the Transition Services.  Each Service Recipient will provide the applicable Service Provider with official governmental tax receipts (or certified copies of such tax receipts) evidencing the timely payment of any Indemnified Taxes or other evidence of such timely withholding and payment reasonably satisfactory to such Service Provider.  If, as a result of a final determination by an applicable Governmental Authority or other Taxing authority, any Service Provider or any of its Affiliates is required to pay any Indemnified Tax required to be paid by any Service Recipient pursuant to this Section 3.4, such Service Recipient will promptly reimburse such Service Provider or its applicable Affiliate for any such Indemnified Tax, to the extent that such tax is not payable as a result of the failure of such Service Provider to comply with applicable Law or tax requirements or to keep, maintain and provide the appropriate supporting documentation to the Governmental Authority or Taxing authority.  If any Service Provider or any of its Affiliates is or becomes entitled to claim an exemption from or reduction of withholding under applicable Law with respect to payments to such Service Provider or any of its Affiliates under this Agreement, such Service Provider or its applicable Affiliate will provide the applicable Service Recipient (to the extent such Service Provider or such Affiliate is entitled to do so under applicable Law) with all properly completed forms or other evidence as may be required by applicable Law to substantiate such Service Recipient's or its Affiliate's entitlement to claim such exemption or reduction.  If any Service Provider or any its Affiliates receive a refund of an Indemnified Tax paid by any Service Recipient, such Service Provider will promptly pay an equal amount to such Service Recipient.  Each Party will reasonably cooperate to minimize the imposition of any Taxes with respect to any Service Fees or to obtain a refund of such Taxes.

## 4.  SERVICE STANDARD AND WARRANTY DISCLAIMER

4.1    Service Standard.  All Transition Services (including products, services and systems) that any Service Provider or its third party service providers provide pursuant to this Agreement will (a) except as expressly provided in the Schedules, be substantially the same products, services and systems provided to or used by the applicable Service Recipient during the three-month period prior to the Signing Date or during the period between the Signing Date and the Closing Date, as applicable to products, services and systems that were provided during such time periods, and with substantially the same degree of care, skill and diligence and (b) with respect to services that are also provided to controlled Affiliates of any Service Provider, be made available to the applicable Service Recipient in the manner and on the schedules and at the same service levels as provided to or used by such controlled Affiliates, provided

that specific performance standards for performance of particular Transition Services, if any, will be set forth on Schedule 1 or Schedule 2, in which event, each Service Provider will meet such service levels in their performance of the Transition Services. Each Service Provider will have the sole and exclusive responsibility for selecting and managing the personnel who provide the Transition Services and will supervise them in connection with the performance of the Transition Services. Each Service Provider will ensure, in good faith, that such personnel will be qualified for the tasks to which they are assigned. Except as expressly provided in the SPA or in this Agreement, each Service Provider makes no representations or warranty that the products, services and systems used by such Service Provider in connection with the provision of the Transition Services will be adequate for any Service Recipient's operation of its business following the Closing.

4.2 Disclaimer of Warranty. EXCEPT AS EXPRESSLY PROVIDED IN THE SPA OR THIS AGREEMENT, EACH SERVICE PROVIDER EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, WITH RESPECT TO THE TRANSITION SERVICES. UNLESS OTHERWISE EXPRESSLY SET FORTH IN THE SPA OR THIS AGREEMENT, ALL TRANSITION SERVICES ARE PROVIDED ON AN "AS IS, WHERE IS" BASIS WITHOUT WARRANTY OF ANY KIND; PROVIDED, HOWEVER, THAT NOTHING CONTAINED HEREIN WILL HAVE THE EFFECT OF LIMITING THE REPRESENTATIONS AND WARRANTIES MADE UNDER THE SPA.

## 5. FORCE MAJEURE; MAINTENANCE

5.1 Force Majeure. The Parties to this Agreement will not be liable for any interruption, delay or failure of performance attributable to acts, events or causes (including war, riot, rebellion, civil disturbances, terrorism, epidemics, pandemics, power failures, failures of communications lines and equipment, strikes, lockouts, labor disputes, flood, storm, fire and earthquake or other acts of God or conditions or events of nature, or any Law, demand or requirement of any Governmental Authority, or unfeasible technological requirements) beyond their reasonable control (collectively, a "Force Majeure Event"), provided, however, that the Party failing to satisfy its obligations hereunder shall have used commercially reasonable efforts to minimize, to the extent such Party in its sole discretion deems practicable, the effect of the Force Majeure Event on its obligations hereunder. The affected provisions and other requirements of this Agreement will be suspended during the period of such Force Majeure Event and the Parties will have no liability to any other applicable Party in connection therewith. A Party wishing to rely on a Force Majeure Event must give the other applicable Parties written notice as soon as practicable of the occurrence of that Force Majeure Event, giving reasonable details thereof. Each Party will, if reasonably practicable, use commercially reasonable efforts to remove such Force Majeure Event as soon as and to the extent reasonably practicable and each Service Provider will resume performance hereunder as soon as reasonably practicable after the cessation of such Force Majeure Event. During the period when any Service Provider is not providing such Transition

Services, the other applicable Party will not be obligated to pay such Service Provider for any Transitions Services that are subject to a Force Majeure Event.

5.2     Maintenance.  Each Service Provider will have the right to shut down temporarily for routine maintenance purposes the operation of the facilities providing any Transition Service whenever in its reasonable business judgment such shutdown is necessary or appropriate, provided such proposed shut down is conducted in the ordinary course of business, in the minimum time reasonably feasible to conduct such maintenance, and is scheduled in such a way as to (so far as is reasonably possible in the circumstances) not materially interfere with the operation of the applicable Service Recipient and is conducted in accordance with the maintenance program of such Service Provider.  Each Service Provider will provide the applicable Service Recipient with advance notice of any such shutdown.  Each Service Provider will be relieved of its obligations hereunder to provide Transition Services only for the period of time that its facilities are so shut down.

## 6.  INDEMNIFICATION; LIMITATION OF LIABILITY

6.1     Indemnification.  From and after the date of this Agreement, each Service Provider will indemnify, defend and hold harmless each Service Recipient, each of its Affiliates, and each of its and their employees, officers, directors and agents, and their heirs, successors and permitted assigns, from and against any and all Damages, whether in respect of third party claims, claims between the Parties hereto, or otherwise, resulting from, arising out of or incurred in connection with (a) any third party claim that any Transition Service (or use thereof) provided by such Service Provider infringes, misappropriates or otherwise violates any Intellectual Property of any third party, (b) such Service Provider's or its Affiliates' failure to comply with applicable Laws with respect to the subject matter of this Agreement, (c) any third party claim that arises out of or relates to any grossly negligent act or omission or willful or intentional misconduct by such Service Provider or its Affiliates (or any of its or their employees, agents or contractors) in providing Transition Services hereunder, or default by such Service Provider in the performance of its obligations under this Agreement, or (d) any breach or violation by such Service Provider of this Agreement.

6.2     Limitation of Liability.  EXCEPT FOR ANY BREACH OF SECTION 9.1 OR TO THE EXTENT ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL OR INTENTIONAL MISCONDUCT OF SERVICE PROVIDER OR ANY OF ITS EMPLOYEES, AGENTS OR CONTRACTORS: (A) NO SERVICE PROVIDER OR ANY OTHER PERSON INVOLVED AT SUCH SERVICE PROVIDER'S REQUEST IN THE PROVISION OF THE TRANSITION SERVICES TO ANY SERVICE RECIPIENT WILL BE LIABLE (WHETHER IN CONTRACT, TORT OR OTHERWISE) FOR ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING ANY DAMAGES FOR LOST REVENUE, INCOME OR PROFITS, LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, OR DIMINUTION IN VALUE OF CUSTOMER OR OTHER ASSETS OF SUCH SERVICE RECIPIENT OR ANY OF ITS AFFILIATES, EVEN IF SUCH SERVICE PROVIDER OR SUCH OTHER PERSON HAS BEEN ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES, AND (B)

THE AGGREGATE DAMAGES FOR ANY CAUSE WHATSOEVER FOR WHICH ANY SERVICE PROVIDER AND ANY OTHER PERSON INVOLVED AT SERVICE PROVIDER'S REQUEST IN THE PROVISION OF THE TRANSITION SERVICES TO ANY SERVICE RECIPIENT WILL BE LIABLE IN CONNECTION WITH OR AS A RESULT OF THIS AGREEMENT OR THE TRANSITION SERVICES WILL NOT EXCEED THE AGGREGATE AMOUNT OF SERVICE FEES PREVIOUSLY PAID BY SUCH SERVICE RECIPIENT TO SUCH SERVICE PROVIDER UNDER THIS AGREEMENT.

## 7. CERTAIN COVENANTS

7.1     Use of Services.  Each Service Provider will be required to provide the Transition Services only in connection with the operation of each Service Recipient's business as its exists as of the date of this Agreement or any time during the term of this Agreement.  Service Recipients will not resell any Transition Services to any Person or permit the use of the Transition Services by any Person other than Customer.

7.2     Appropriate Licenses.  Each Service Provider agrees that the software products that such Service Provider installs on each Service Recipient's system used by such Service Provider to perform the Transition Services will be properly licensed and that access and use by Service Provider in connection with the Transition Services will not be a breach of the license agreements for such software products.  Each Service Recipient agrees that the software products running on such Service Recipient's system used by any Service Provider to perform the Transition Services and that are not otherwise installed by any Service Provider will be properly licensed and that access and use by any Service Provider in connection with the Transition Services will not be a breach of the license agreements for such software products.  Each Service Recipient acknowledges that it will acquire no right, title or interest in any firmware or software of any Service Provider or its third party service providers in connection with the provision of the Transition Services hereunder.

7.3     Continuity.  The obligations of each Seller Service Provider under this Agreement are intended to be, and the Sale Order shall specifically provide that they shall be, binding upon (a) any successors or assigns of such Seller Service Provider, (b) any trustee, examiner, or other representative of such Seller Service Provider's estate, (c) any reorganized Seller Service Provider, and (d) any other entity vested or revested with any right, title or interest in or to a material portion of such Seller Service Provider's assets or any other Person claiming any rights in or control over a material portion of such Seller Service Provider's assets (each of (a) through (d), a "Seller Service Provider Successor") as if such Seller Service Provider Successor were a Seller Service Provider hereunder.  In addition, any entity or entities succeeding to all or substantially all of the assets of each Seller Service Provider in connection with any restructuring transaction (including under any plan of reorganization or liquidation, or in connection with a sale of all or substantially all of the assets directly or indirectly owned by Holdings) shall have to provide to Purchaser adequate assurance of future performance as if this Agreement were being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code.

## 8.  TERMINATION

8.1    <u>Termination</u>.  This Agreement will automatically terminate on the earliest to occur of (a) the latest date of any Transition Period (as may be extended in accordance with <u>Section 2.4(b)</u>), (b) the date on which the provision of all Transition Services has terminated or been canceled in accordance with <u>Section 2.4(a)</u>, and (c) the date on which this Agreement is terminated pursuant to, and to the extent provided in, <u>Section 8.2</u>.

8.2    <u>Breach of Agreement</u>.  If any Service Provider or Service Recipient materially breaches this Agreement and fails to cure such breach for a period of 30 days following receipt of notice thereof, the non-defaulting Party may terminate this Agreement immediately by providing written notice of termination.  The failure of a Party to exercise its rights hereunder with respect to a breach by any other Party will not be construed as a waiver of such rights nor prevent such Party from subsequently asserting such rights with regard to the same or similar breaches.

8.3    <u>Sums Due</u>.  In the event of any termination of this Agreement, whether in whole or in part (including any Early Termination), pursuant to the terms hereof, each Service Provider will be entitled to all outstanding amounts due from each Service Recipient for Transition Services rendered (without proration for any partial months) prior to the date of such termination.

8.4    <u>Effect of Termination</u>.  <u>Article 3</u> (as to any unpaid amounts), <u>Article 6</u>, <u>Article 7</u>, <u>Article 8</u>, and <u>Article 9</u> will survive (a) any termination, cancellation or expiration of this Agreement, and (b) any conversion, dismissal or consolidation of the Bankruptcy Cases or any plan of reorganization or liquidation in the Bankruptcy Cases. Termination of this Agreement will not relieve either Party of any liability to any other Party for any breach or non-fulfillment of any covenant or agreement contained in this Agreement occurring prior to such termination.  The obligations of Seller Service Providers under this Agreement may not be discharged or abandoned under the Bankruptcy Code or otherwise.

8.5    <u>Transfer Procedures</u>.  Prior to or upon any termination of this Agreement (in whole or in part, including any Early Termination), each Service Provider will cooperate with each Service Recipient as reasonably necessary to assist such Service Recipient in transferring responsibility for the provision of the terminated Transition Services to such Service Recipient or its third party service providers.

## 9.  GENERAL PROVISIONS

9.1    <u>Confidential Information</u>.

(a)    During the term of this Agreement and thereafter, each Party will (and in the case of Service Provider, will cause its Affiliate to), and will cause its respective representatives to, maintain in confidence and not disclose to any third party any confidential or proprietary information of any other Party obtained or otherwise discovered in connection with this Agreement, including such other Party's financial,

technical, sales, marketing, development, personnel and other proprietary or confidential information, records or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications, however recorded or preserved, whether written or oral (any such information, "Confidential Information"). Each Party will protect the other Parties' Confidential Information with the same degree of care, but no less than reasonable care, as it uses to protect its own Confidential Information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party (the "Receiving Party") receiving any Confidential Information of any other Party may use such Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "Permitted Purpose"). Any Receiving Party may disclose such Confidential Information only to its representatives that have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 9.1, and the Receiving Party will be liable for any breach of these confidentiality provisions by such Persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by applicable Laws or Orders, in which case the Receiving Party will promptly notify, to the extent possible, the disclosing party (the "Disclosing Party") and will take reasonable steps to assist in contesting such Laws or Orders in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party will only disclose such Confidential Information that it is advised by its counsel in writing it is so legally bound to disclose.

(b) Notwithstanding the foregoing, "Confidential Information" will not include any information that the Receiving Party can demonstrate (i) was publicly known at the time of disclosure to such Receiving Party or has become publicly known through no act of the Receiving Party or its representatives in breach of this Section 9.1, (ii) was rightfully received from a third party without a duty of confidentiality, or (iii) was developed by such Receiving Party independently without any reliance on the Confidential Information.

(c) Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Transition Service, the Receiving Party agrees promptly to return or destroy, at the Disclosing Party's option, all Confidential Information. If such Confidential Information is destroyed, then an authorized officer of the Receiving Party will, following the Disclosing Party's request for such destruction, certify such destruction in writing.

9.2 <u>Injunctive Relief</u>. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party will be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants contained in this Agreement. The rights set forth in this Section 9.2 will be in addition to any other rights that a Party may have at law or in equity.

9.3 <u>Entire Agreement; Amendments and Waivers</u>.

(a)     This Agreement, the Schedules hereto and the SPA (and the Schedules and Exhibits thereto) represent the entire understanding and agreement between the Parties with respect to the subject matter of this Agreement.

(b)     This Agreement may be amended, supplemented or changed, and any provision of this Agreement may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(c)     No action taken pursuant to this Agreement, including any investigation by or on behalf of a Party, will be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

9.4     Submission to Jurisdiction.  Without limiting a Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as indicated in Section 9.7 hereof, provided, however, that following entry of a final decree pursuant to Section 350 of the Bankruptcy Code, if the Bankruptcy Court is unwilling to hear such proceedings, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court thereof, for the resolution of any such claim or dispute and each Party hereby waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same or any other jurisdiction that could apply by virtue of their present or future domiciles or for any other reason.  Each Party irrevocably designates CT Corporation as its agent and attorney-in-fact for the acceptance of service of process and making an appearance on its behalf in any such claim or proceeding and for the taking of all such acts as may be necessary or appropriate in order to confer jurisdiction over it before the courts specified in this Section 9.4 and each Party stipulates that such consent and appointment is irrevocable and coupled with an interest.  The Parties irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance

of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

    9.5    Waiver of Jury Trial.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 9.5 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

    9.6    Governing Law.  This Agreement will be governed by and construed in accordance with the Laws of the State of New York.

    9.7    Notices.  All notices and other communications under this Agreement will be in writing and will be deemed given or delivered (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission) or email, or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this provision):

    If to Holdings, to:

            [_____]
            c/o **[__]** Holdings, Inc.
            1875 Explorer Street,
            Reston, VA 20191
            Attention: Gary D. Begeman, General Counsel
            Fax no.: 703-390-5191
            E-mail address: Gary.Begeman@nii.com

    With a copy (which will not constitute notice) to:

            Jones Day
            222 East 41st Street
            New York, New York 10017
            Attention: Robert A. Profusek
            Fax no.: 212-755-7306
            E-mail address: raprofusek@jonesday.com

    If to [●], to:

**[●]**
**[Address]**
Attention: **[●]**
Fax no.: **[●]**
E-mail address: **[●]**

With a copy (which will not constitute notice) to:

**[●]**
**[Address]**
Attention: **[●]**
Fax no.: **[●]**
E-mail address: **[●]**

If to the Company, to:

**[●]**
**[Address]**
Attention: **[●]**
Fax no.: **[●]**
E-mail address: **[●]**

With a copy (which will not constitute notice) to:

**[●]**
**[Address]**
Attention: **[●]**
Fax no.: **[●]**
E-mail address: **[●]**

        9.8    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

        9.9    <u>Binding Effect; Assignment</u>.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any Party, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other Parties and any attempted assignment without the required consents will be void, provided, however, that (a) the Debtors may assign some or all of their rights or delegate some or all of their obligations hereunder to successor entities pursuant to a

plan of reorganization confirmed by the Bankruptcy Court, provided that any entity or entities succeeding to all or substantially all of the assets of the Debtors in connection with any restructuring transaction (including under any plan of reorganization or liquidation, or in connection with a sale of all or substantially all of the assets directly or indirectly owned by the Debtors) shall have to provide to Purchaser adequate assurance of future performance as if this Agreement was being assumed and assigned to such entity or entities pursuant to section 365 of the Bankruptcy Code and (b) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its Affiliates. No assignment will relieve the assigning Party of any obligation. Upon any permitted assignment, the references in this Agreement to the assigning Party will also apply to any such assignee unless the context otherwise requires.

      9.10   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

      9.11   <u>Specific Performance</u>. The parties agree that, if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that the parties will be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.

      9.12   <u>Conflicts</u>. In case of conflict between the terms and conditions of this Agreement and the SPA, the SPA will control. In the case of a conflict between the terms and conditions of this Agreement and any Schedule to this Agreement, the terms and conditions of such Schedule will control and govern as it relates to the Transition Services to which such terms and conditions apply.

      9.13   <u>No Agency, Authority or Franchise</u>. No Service Provider or Service Recipient, will act or represent or hold itself or themselves out as having authority to act as an agent or partner of the other, or in any way bind or commit the other to any obligations, and each Service Provider will act under this Agreement solely as an independent contractor acting in its ordinary course of business. Nothing contained in this Agreement will be construed as creating a partnership, joint venture, agency, trust or other association of any kind, each party being individually responsible only for its obligations as set forth in this Agreement, including for the supervision of its own employees. Furthermore, nothing contained in this Agreement, or any party's performance under this Agreement, will be construed as creating a franchisee/franchisor relationship.

<p align="center">[<em>Remainder of page intentionally left blank</em>]</p>

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its officers thereunto duly authorized, as of the date first written above.

Comunicaciones Nextel de México, S.A. de C.V.

By: _____
     [name], [title]

[HOLDINGS]

By: _____
     [name], [title]

[●]

By: _____
     [name], [title]

**SCHEDULE 1**

**TRANSITION SERVICES FROM THE SELLER SERVICE PROVIDERS TO THE COMPANY**

**[To be provided]**

| | |
|---|---|
| Transition Services | [●] |
| Entities for which Transition Services Provided | [●] |
| Transition Period | |
| Term | [●] |
| Service Fees | [●] |
| **[Extension Period]** | |
| Term | [●] |
| Service Fees | [●] |

**SCHEDULE 2**

**TRANSITION SERVICES FROM THE COMPANY TO THE SELLER SERVICE RECIPIENTS**

**[To be provided]**

| Transition Services | [●] |
|---|---|
| Entities for which Transition Services Provided | [●] |
| Transition Period | |
| Term | [●] |
| Service Fees | [●] |
| **[Extension Period]** | |
| Term | [●] |
| Service Fees | [●] |

**Exhibit E**

**Form of Amendment to Trademark Sublicense Agreement**

[*see attached*]

**FORM OF AMENDMENT TO TRADEMARK SUBLICENSE AGREEMENT**

This Amendment to the Trademark Sublicense Agreement (the "<u>Amendment</u>") is entered into as of [●], 2015 (the "<u>Amendment Effective Date</u>"), by and between NII Holdings, Inc. ("<u>Holdings</u>") and Comunicaciones Nextel de México, S.A. de C.V. (the "<u>Company</u>") (each a "<u>Party</u>" and collectively the "<u>Parties</u>").

WHEREAS, Holdings and the Company are parties to that certain Trademark Sublicense Agreement, dated January 1, 2012 (the "<u>Trademark Sublicense Agreement</u>"); and

WHEREAS, in connection with that certain Stock Purchase Agreement dated January [●], 2015, among New Cingular Wireless Services, Inc., a corporation existing under the Laws of Delaware, NIHD TELECOM HOLDINGS B.V., a private company with limited liability existing under the Laws of the Netherlands, NIU HOLDINGS LLC, a limited liability company existing under the Laws of Delaware and Nextel International (Uruguay) LLC, a limited liability company existing under the Laws of Delaware, the Parties wish to amend the Trademark Sublicense Agreement as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. <u>Amendment to Section 2.2</u>. Section 2.2 of the Trademark Sublicense Agreement is hereby amended by replacing the entire section with the following:

"2.2     <u>Termination</u>.  If either party violates or fails to perform any of its material obligations hereunder, the other party shall have the right to terminate this agreement upon sixty (60) days written notice, and such termination shall become effective at the end of the such sixty-day period, unless the defaulting party completely remedies the default within such sixty-day period."

2. <u>Amendment to Section 2.3</u>. Section 2.3 of the Trademark Sublicense Agreement is hereby amended by replacing the entire section with the following:

"2.3     <u>Other Termination</u>.  This Agreement shall terminate either (a) immediately and automatically upon the effective date of termination of the Master License Agreement; or (b) ninety (90) days after written notice from NCI in the event of a Change of Control of Sublicensee, whichever occurs first.  Sublicensee shall report any Change of Control of Sublicensee within ten (10) business days after learning of such event.  NII shall report any termination of the Master License Agreement or notice of termination of the Master License Agreement to Sublicensee."

3. <u>Amendment to Section 2.4</u>. Section 2.4 of the Trademark Sublicense Agreement is hereby amended by replacing the entire section with the following:

"2.4     <u>Effect of Termination</u>.  Termination of this Agreement for any reason shall be without prejudice to any other rights or remedies which either party may have at

law or in equity against the other.  Upon any termination hereof, Sublicensee shall have a reasonable time, not exceeding one hundred eighty (180) days, in which to distribute, dispose of, or use its inventory of Licensed Activities (including Wireless Devices or Wireless Accessories) or promotional or advertising materials for the Licensed Activities and/or the Licensed Services (to the extent such inventory of Licensed Activities or promotional or advertising materials was on hand or subject to a non-cancelable contract as of the effective date of termination of this Agreement).

4.  <u>Miscellaneous.</u>

    4.1.   <u>No Other Amendments; Trademark Sublicense Agreement Remains in Effect</u>.  Except as expressly amended by this Amendment, the Trademark Sublicense Agreement shall remain in full force and effect in the form in which it existed immediately prior to the execution and delivery of this Amendment.

    4.2.   <u>Entire Agreement; Amendment</u>.  This Amendment and the Trademark Sublicense Agreement contain a complete statement of all arrangements between the Parties with respect to their subject matter, and shall not be changed or terminated orally.  Except as expressly provided otherwise herein, any amendment to this Amendment or the Trademark Sublicense Agreement shall be made by a written instrument executed by a duly authorized officer of each Party.

    4.3.   <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Any counterpart or other signature delivered in electronic form or by facsimile by a Party shall be deemed for all purposes as being a good and valid execution and delivery of this Amendment by that Party.

    4.4.   <u>Governing Law</u>.  This Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, United States of America, applicable to agreements made and to be performed in the Commonwealth of Virginia, without regard to the Virginia conflict of laws principles that would result in application of the laws of any other jurisdiction.  In any dispute relating to this Amendment, the Parties hereto admit venue and submit themselves to the non-exclusive jurisdiction of the tribunals of the Unites States District Court for the Eastern District of Virginia, expressly waiving any different venue to which they may be entitled by their present or future domiciles.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed and delivered as of Amendment Effective Date.


NII HOLDINGS, INC.            COMUNICACIONES NEXTEL DE MÉXICO, S.A. DE C.V.

By:_____

Name:

Title:

By:_____

Name:

Title:

**Exhibit F**

**Form of Instrument of Assignment**

[*see attached*]

**FORM OF INSTRUMENT OF ASSIGNMENT**
**[●], 2015**

**FOR VALUE RECEIVED**, [NIU HOLDINGS LLC], a limited liability company existing under the laws of Delaware ("<u>Seller</u>"), hereby sells, assigns and transfers to [•], a [•] ("<u>Purchaser</u>"), all of Seller's rights, title and interest in and to all of the limited liability company membership interests (the "<u>Company Parent Interests</u>") of Nextel International (Uruguay) LLC, a limited liability company existing under the laws of Delaware ("<u>Company Parent</u>"), recorded in the name of Seller on the books of Company Parent and does hereby irrevocably constitute and appoint any duly authorized officer of Company Parent as its attorney-in-fact to record and effect such sale, transfer and assignment of the Company Parent Interests on the books of Company Parent with full power of substitution in the premises.

*[Signature page follows]*

**[NIU HOLDINGS LLC]**

By:_____
    Name:
    Title:


**[PURCHASER]**

By:_____
    Name:
    Title:

**Exhibit G**

**Special Power of Attorney**

[*see attached*]

**Special Power of Attorney**

## PODER GENERAL IRREVOCABLE
### *[A ser otorgado ante la presencia de y protocolizado por un Notario Público en México]*

En la Ciudad de México a los [ ] días del mes de [ ] del año [ ], yo, el licenciado [ ], titular de la notaría número [ ] del Distrito Federal, hago constar el PODER GENERAL IRREVOCABLE, que se consigna al tenor de la siguiente:

Por medio del presente instrumento, [Comunicaciones Nextel de México, S.A. de C.V.] (el "Otorgante"), otorga en favor de la sociedad denominada CT Corporation System (el "Agente de Proceso"), para actuar en nombre y representación del Otorgante, un poder general irrevocable para pleitos y cobranzas, en los términos de los artículos 2553 (dos mil quinientos cincuenta y tres) y 2554 (dos mil quinientos cincuenta y cuatro) del Código Civil Federal y correlativos de las entidades federativas de los Estados Unidos Mexicanos y del Distrito Federal, limitado en cuanto su objeto pero tan amplio como sea necesario, para ser *ejercido* en nombre y representación del Otorgante, y a efecto de que el Agente de Proceso reciba, en nombre y representación del Otorgante, toda clase de avisos, notificaciones y emplazamientos de cualquier naturaleza en relación con cualquier demanda, acción, procedimiento o juicio, incluyendo sin limitación alguna procedimientos judiciales, administrativos o arbitrales, derivados de los documentos celebrados o a ser celebrados por el Otorgante, en relación con (i) el contrato de compraventa de acciones (Purchase and Sale Agreement), a ser celebrado entre el Otorgante, [Purchaser], NIHD TELECOM HOLDINGS B.V., [NIU Holdings LLC] y Nextel International (Uruguay) LLC y (ii) cualquier otro contrato, instrumento o documento relacionado con los anteriormente señalados. La Otorgante señala como domicilio convencional en Estados Unidos de América para recibir cualquiera de las notificaciones o emplazamientos antes citados el ubicado en 111 (ciento once) Eighth Avenue, New York, New York 10011 (diez mil once), Estados Unidos de América, o cualquier otro domicilio que en el futuro le notifique por escrito el Agente de Proceso al Otorgante. El poder que se otorga será irrevocable de conformidad con el artículo 2596 (dos mil quinientos noventa y seis) del Código Civil Federal y sus artículos correlativos en los Códigos Civiles de las entidades federativas de los Estados Unidos Mexicanos y del Distrito Federal.

El Agente de Proceso actuará en el ejercicio del presente poder, en los siguientes términos:

El Agente de Proceso no tendrá facultades para otorgar, delegar y revocar poderes generales y especiales, sin contar con la autorización expresa del Otorgante, así como para sustituir en favor de terceros los poderes otorgados por el Otorgante.

En cumplimiento con el artículo dos mil quinientos cincuenta y cuatro del Código Civil Federal a continuación se transcribe dicho artículo:

"En todos los poderes generales para pleitos y cobranzas, bastará que se diga que se otorga con todas las facultades generales y las especiales que requieran cláusula especial conforme a la ley, para que se entiendan conferidos sin limitación alguna.

En los poderes generales para administrar bienes, bastará expresar que se dan con ese carácter, para que el apoderado tenga toda clase de facultades administrativas.

En los poderes generales, para ejercer actos de dominio, bastará que se den con ese carácter para que el apoderado tenga todas las facultades de dueño, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos.

Cuando se quisieren limitar, en los tres casos antes mencionados, las facultades de los apoderados, se consignarán las limitaciones, o los poderes serán especiales.

Los notarios insertarán este artículo en los testimonios de los poderes que otorguen."

EN TESTIMONIO DE LO ANTERIOR, este poder ha sido legal y válidamente otorgado el [ ] de [ ] de dos mil quince.

# Schedule 1.1(a): 2015 Budget

USD (in 000's)

| | | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Total Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
| **Sales and Marketing Expenditures** | | **(47,594)** | **(46,595)** | **(48,985)** | **(49,761)** | **(51,716)** | **(52,655)** | **(55,489)** | **(52,867)** | **(56,154)** | **(56,909)** | **(53,683)** | **(57,079)** | **(629,484)** |
| Marketing & Related | | (9,260) | (9,463) | (8,312) | (8,657) | (9,571) | (8,252) | (9,887) | (7,607) | (10,330) | (9,981) | (8,901) | (10,845) | (111,066) |
| Equipment Upgrades | | (13,657) | (12,182) | (13,658) | (12,975) | (13,012) | (14,366) | (14,807) | (13,707) | (13,727) | (14,230) | (12,304) | (12,607) | (161,232) |
| Equipment Sales | | (14,082) | (13,827) | (15,270) | (16,078) | (16,834) | (17,586) | (18,232) | (18,758) | (19,125) | (19,426) | (19,652) | (19,850) | (208,720) |
| Direct Commissions | | (1,886) | (1,997) | (2,242) | (2,423) | (2,666) | (2,845) | (3,042) | (3,175) | (3,371) | (3,550) | (3,705) | (4,005) | (34,909) |
| Other costs | | (8,708) | (9,126) | (9,501) | (9,628) | (9,633) | (9,606) | (9,521) | (9,619) | (9,601) | (9,720) | (9,121) | (9,772) | (113,557) |
| **Capital Expenditures** | | | | | | | | | | | | | | |
| Capex | | **(24,968)** | **(15,469)** | **(20,367)** | **(13,536)** | **(13,536)** | **(13,536)** | **(13,536)** | **(13,536)** | **(13,536)** | **(13,536)** | **(13,536)** | **(13,536)** | **(182,627)** |

## Schedule 1.1(b): Certain Letters of Credit

| Type of Document | Issuing Bank | Beneficiary | Applicant | Date | Cash Amounts |
|---|---|---|---|---|---|
| Irrevocable Standby Letter of Credit No. S135749 | Banco Santander (Mexico), S.A., Institucion de Banca Multiple, Grupo Financiero Santander Mexico | Payback Mexico, S. de R.L. de C.V. | Comunicaciones Nextel de Mexico, S.A. de C.V. | June 13, 2014 | MXN$20 million |

# Schedule 1.1(c): License Payment Amounts

| No. | Descripción de las Concesiones | Nombre de la Concesionaria | Tipo de Concesión | Fecha de Otorgamiento | Fecha de Prorroga | Vigencia (Número de Años) | Fecha de Vencimiento | Licitación? | PAGA Derechos anuales por uso de espectro | Solicitud de Prórroga | Estatus Solicitud de Prórroga | Pago de Derechos 2015 (APROXIMADO) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Sistemas de Comunicaciones Troncales, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 23 de agosto de 1991 | 24 de agosto de 2012 | 15 | 24 de agosto de 2021 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $14,739,967 |
| 2 | Comunicaciones 2000, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 17 de diciembre de 1991 | 24 de agosto de 2012 | 15 | 18 de diciembre de 2021 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $5,010,117 |
| 3 | Autofón de México, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 12 de octubre de 1993 | 24 de agosto de 2012 | 15 | 13 de octubre de 2023 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $17,004,708 |
| 4 | Equipos de Radiocomunicación, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 21 de mayo de 1992 | 24 de agosto de 2012 | 15 | 22 de mayo de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $11,324,973 |
| 5 | Juana Leticia Arizpe González | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 12 de junio de 1992 | 24 de agosto de 2012 | 15 | 13 de junio de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $322,800 |
| 6 | Miguel Ángel Reta Martínez | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 14 de octubre de 1993 | 24 de agosto de 2012 | 15 | 15 de octubre de 2023 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $2,832,972 |
| 7 | Nacional de Telecomunicaciones, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 30 de abril de 1992 | 24 de agosto de 2012 | 15 | 1 de mayo de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $29,339,315 |

| 8 | Promoción de Servicios de Telecomunicación, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 24 de febrero de 1992 | 24 de agosto de 2012 | 15 | 25 de febrero de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $18,113,808 |
| 9 | Telecomunicaciones Radial, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 5 de junio de 1992 | 24 de agosto de 2012 | 15 | 6 de junio de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $2,874,263 |
| 10 | Servicios Troncalizados, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 28 de septiembre de 1995 | 24 de agosto de 2012 | 10 | 24 de septiembre de 2016 | No | Sí. 244D | 12 de septiembre de 2012 | En trámite | $14,092,410 |
| 11 | Esaw´s Comunicaciones de México, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 23 de noviembre de 1994 | 24 de agosto de 2012 | 15 | 24 de noviembre de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $248,700 |
| 12 | Servicios de Radiocomunicación Móvil de México, S.A. de C.V. | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 23 de abril de 1992 | 24 de agosto de 2012 | 15 | 24 de abril de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $4,896,872 |
| 13 | Comintermex, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 28 de septiembre de 1995 | 15 de diciembre de 2009 | 10 | 24 de septiembre de 2016 | No | Sí. 244D | 12 de septiembre de 2012 | En trámite | $6,370,937 |
| 14 | Telecomunicaciones Elektra, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 23 de agosto de 1991 | 15 de diciembre de 2009 | 15 | 24 de agosto de 2021 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $78,679,755 |
| 15 | Telecomunicaciones Elektra, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 7 octubre de 1993 | 30 de abril de 2010 | 15 | 08 de octubre de 2023 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $4,199,431 |
| 16 | Telecomunicaciones Móviles de México, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 15 de noviembre de 1994 | 30 de abril de 2010 | 15 | 16 de noviembre de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $7,570,825 |

| 17 | Radiocom del Pacífico, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 30 de noviembre de 1994 | 30 de abril de 2010 | 15 | 01 de diciembre de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $9,345,118 |
| 18 | FM 500, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 14 de octubre de 1993 | 30 de abril de 2010 | 15 | 15 de octubre de 2023 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $3,055,008 |
| 19 | Internacional Lamothe, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 24 de agosto de 1994 | 30 de abril de 2010 | 15 | 25 de agosto de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $4,650,573 |
| 20 | Servicios Troncalizados de Occidente, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 15 de noviembre de 1994 | 30 de abril de 2010 | 15 | 16 de noviembre de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $435,114 |
| 21 | Deltacom, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 24de noviembre de 1994 | 30 de abril de 2010 | 15 | 25 de noviembre de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $3,308,346 |
| 22 | Portacom de Monterrey, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 4 de junio de 1992 | 15 de diciembre de 2009 | 15 | 06 de junio de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $1,162,643 |
| 23 | Javier Enrique Soriano Frías (sólo Aguascalientes) (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 18 de diciembre de 1991 | 15 de diciembre de 2009 | 15 | 19 de diciembre de 2021 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $165,903 |
| 24 | Investigación y Desarrollo en Sistemas de Comunicación, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 26 de agosto de 1994 | 30 de abril de 2010 | 15 | 27 de agosto de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $1,406,574 |
| 25 | Rogelio Salcedo Leos (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 14 de octubre de 1993 | 30 de abril de 2010 | 15 | 15 de octubre de 2023 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $2,242,652 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 | Inversiones Nextel de México, S.A. de C.V. (Licitación 15 Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 17 de marzo de 2005 | No Aplica | 20 | 17 de marzo de 2025 | Sí. 2005 | Sí. 244D | 30 de agosto de 2014 | En trámite | $127,553,365 |
| 27 | Inversiones Nextel de México, S.A. de C.V. (Licitación 16 Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 17 de marzo de 2005 | No Aplica | 20 | 17 de marzo de 2025 | Sí. 2005 | Sí. 244D | 30 de agosto de 2014 | En trámite | $62,616,374 |
| 28 | Inversiones Nextel de México, S.A. de C.V. (Licitación 17 Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 17 de marzo de 2005 | No Aplica | 20 | 17 de marzo de 2025 | Sí. 2005 | Sí. 244D | 30 de agosto de 2014 | En trámite | $125,021,979 |
| 29 | Servicios de Radiocomunicación Móvil de México, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 28 de septiembre de 1995 | 15 de diciembre de 2009 | 10 | 24 de septiembre de 2016 | No | Sí. 244D | 12 de septiembre de 2012 | En trámite | $1,090,480 |
| 30 | Javier Enrique Soriano Frías (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 18 de diciembre de 1991 | 15 de diciembre de 2009 | 15 | 19 de diciembre de 2021 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $18,212,010 |
| 31 | Javier Enrique Soriano Frías (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 3 de febrero de 1994 | 30 de abril de 2010 | 15 | 04 de febrero de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $9,915,644 |
| 32 | Empresa de Comunicaciones de Tabasco, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 28 de septiembre de 1992 | 15 de diciembre de 2009 | 15 | 29 de septiembre de 2022 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $43,348 |
| 33 | Telecomunicaciones de Innovación, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 22 de agosto de 1994 | 30 de abril de 2010 | 15 | 23 de agosto de 2024 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $7,116,689 |
| 34 | Central de Autotransportes y Maniobras Estación, Grupo Número Uno, S.A. de C.V. (Bandas) | NII TELECOM, S. DE R.L. DE C.V. (800 MHz) | Bandas | 12 de octubre de 1993 | 30 de abril de 2010 | 15 | 13 de octubre de 2023 | No | Sí. 244D | 30 de agosto de 2014 | En trámite | $2,822,619 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | NII Digital, S. de R.L. de C.V. (Licitación 20 región 4) | NII DIGITAL, S. DE R.L. DE C.V. | Bandas | 1 de octubre de 2010 | No Aplica | 20 | 01 de octubre de 2030 | Sí. 2010 | Sí. 244B. | 30 de agosto de 2014 | En trámite | $110,794,300 |
| 36 | NII Digital, S. de R.L. de C.V. (Licitación 21 región 1 a la 9) | NII DIGITAL, S. DE R.L. DE C.V. | Bandas | 1 de octubre de 2010 | No Aplica | 20 | 01 de octubre de 2030 | Sí. 2010 | Sí. 244E | 30 de agosto de 2014 | En trámite | $1,202,884,500 |

| | |
|---|---|
| **TOTAL 2015 (APROXIMADO)** | **1,911,465,091** |

| Permisos Microondas | Descripción de los Permisos | Pago de Derechos 2015 (aproximado) |
|---|---|---|
| 1 | Nombre del Permisionario — Radiophone, S. de R.L. de C.V.<br>Fecha de Otorgamiento — 11 de marzo de 1994<br>Servicios Amparados — 1 enlace de privado de microondas locales (Permiso N° 21)<br>Vigencia — Hasta que la permisionaria deje de operar los enlaces que se autorizan<br>Cobertura — Ciudad de México, D.F.<br>Frecuencia — 6.5 GHz | $17,502.00 |
| 2 | Nombre del Permisionario — Radiophone, S. de R.L. de C.V.<br>Fecha de Otorgamiento — 13 de noviembre de 1992<br>Servicios Amparados — 5 enlaces de privados de microondas locales (Permiso N° 48)<br>Vigencia — Hasta que la permisionaria deje de operar los enlaces que se autorizan<br>Cobertura — México, D.F, Puebla y Querétaro<br>Frecuencia — 6.5 GHz | $87,510.00 |
| | Nombre del Permisionario — Radiophone, S. de R.L. de C.V.<br>Fecha de Otorgamiento — 5 de enero de 1995 | |

| 3 | Servicios Amparados | 24 enlaces de privados de microondas locales (Permiso N° 1) | $840,096.00 |
|---|---|---|---|
| | Vigencia | Hasta que la permisionaria deje de operar los enlaces que se autorizan | |
| | Cobertura | Puebla, Veracruz, Jalisco, Michoacán y Jalisco | |
| | Frecuencia | 7 GHz | |

| 4 | Nombre del Permisionario | NII Telecom, S. de R.L. de C.V. | $735,084.00 |
|---|---|---|---|
| | Fecha de Otorgamiento | 9 de marzo de 1994 | |
| | Servicios Amparados | 21 enlaces de privados de microondas locales (Permiso N° 20) | |
| | Vigencia | Hasta que la permisionaria deje de operar los enlaces | |
| | Cobertura | Querétaro, Guanajuato, San Luis Potosí, Nuevo León, Coahuila y Tamaulipas | |
| | Frecuencia | 6.5 GHz | |

| 5 | Nombre del Permisionario | NII Telecom, S. de R.L. de C.V. | $1,540,176.00 |
|---|---|---|---|
| | Fecha de Otorgamiento | 10 de enero de 1995 | |
| | Servicios Amparados | 44 enlaces de privados de microondas locales (Permiso N° 3) | |
| | Vigencia | Hasta que la permisionaria deje de operar los enlaces | |
| | Cobertura | Jalisco, Nayarit, Sinaloa, Sonora y Baja California | |
| | Frecuencia | 7 GHz | |

| TOTAL 2015 (APROXIMADO) | $3,220,368.00 |
|---|---|

## Schedule 1.1(d): List of Persons of Purchaser

- D. Wayne Watts – Senior Executive Vice President and General Counsel

## <u>Schedule 1.1(e): List of Persons of Seller</u>

- Steven M. Shindler – Chief Executive Officer of NII Holdings, Inc.
- Juan R. Figuereo – Chief Financial Officer of NII Holdings, Inc.
- Gary Begeman – Executive Vice President and General Counsel of NII Holdings Inc.
- Mark Zindler – Sr. Director of Corporate Development of NII Holdings, Inc.
- Tony Franklin – Chief Compliance Officer of NII Holdings, Inc.
- Shana Smith – Deputy General Counsel of NII Holdings, Inc.
- Pedro D'Andrea – Chief Auditor NII Holdings, Inc.
- Alfonso Sanchez Leal – Internal Auditor
- Salvador Álvarez Valdes – President
- Antonio Garza Canovas– Legal VP
- Mauricio Sandoval Gutierrez – Supply Chain Director
- Edgar Aroldo Rodríguez Rudich– Governmental Affairs & Communications Director
- Nino Fernando Liaño Egozcue – Financial Planning Director
- Angel Ariel Pozo – Marketing VP
- Armando Alduenda Tirado – Sales VP
- Gabriel Cejudo Funes – Customer Care VP
- Romeo Orozco Roman – Network VP
- Luis Fernando Valdeon Villalba – IT VP
- Rafael Lira Oaxaca – Finance VP
- José Miguel Hartasánchez Garaña – Human Resources VP
- Eli Manuel Ramirez Villaseñor – Attorney
- Alejandro Giordano Carranco – Legal Director
- Iliana Garcia Caballero– Director of Employee Relations
- Antuan Chahin de la Vega– Director of Treasury
- Blanca Lilia Chavez Trueba– Director of Strategic Relations
- Carlos Vega Merino - Tax Director

# Schedule 1.1(f): Third Party Consents

References to each Contract in this Schedule 1.1(f) shall include all amendments, schedules, exhibits, addenda and other attachments to the Contract.

| No. | Data Room No. | Agreement | Parties | Date | Requires Consent |
|-----|---------------|-----------|---------|------|------------------|
| 1. | 1.26.1.2 | Credit Agreement | • Comunicaciones Nextel de México, S.A. de C.V., as Borrower<br>• China Development Bank Corporation, as Lender, as Administrative Agent and as Arranger | July 12, 2011 | Yes |
| 2. | 1.26.1.1 | Credit Agreement | • Comunicaciones Nextel de México, S.A. de C.V., as Borrower<br>• China Development Bank Corporation, as Lender, as Administrative Agent and as Arranger | July 12, 2011 | Yes |
| 3. | 2.30.2.7.29.6 | Purchase and Sale Agreement | • MATC Digital, S. de R.L. de C.V.<br>• NII Digital, S. de R.L. de C.V. | August 8, 2013 | Yes |
| 4. | 2.22.2 | International Roaming Agreement | • Intelfon, S.A. de C.V.<br>• NII Holdings, Inc. | June 17, 2010 | Yes |
| 5. | 2.22.3.1 to 2.22.3.4 | International Roaming Agreement | • Radiomovil Dipsa, S.A. de C.V.<br>• NII Holdings, Inc. | May 10, 2013 | Yes |
| 6. | 2.30.2.2.2.1 to 2.30.2.2.2.8 | Services Agreement (Roaming) | • Pegaso PCS, S.A. de C.V.<br>• NII Digital, S. de R.L. de C.V. | December 23, 2013 | Yes |
| 7. | 2.23.23.4 | Commercial Agreement | • Tiendas Chedraui, S.A. de C.V.<br>• Inmobiliaria Kira, S.A. de C.V.<br>• Corporativo Coapexpan, S.A. de C.V.<br>• Crucero Chedraui, S.A. de C.V.<br>• Tiendas Crucero Chedraui, S.A. de C.V.<br>• Grandes Superficies de Mexico, S.A. de C.V.<br>• Confort y Turismo, S.A. de C.V.Comunicaciones Nextel de México, S.A. de C.V. | October 1st, 2014 | Yes |

## Schedule 1.1(g): Excluded Acquirer

- Alestra, S. de R.L. de C.V.
- América Móvil, S.A.B. de C.V.
- Axtel, S.A.B. de C.V.
- Cablevision Systems Corporation
- DISH Network Corporation
- Grupo Salinas, S.A. de C.V.
- Grupo Televisa, S.A.B.
- Sprint Corporation
- T-Mobile US, Inc.
- Telefónica Móviles México S.A. de C.V.
- SoftBank Corp.
- Verizon Communications Inc.
- Virgin Mobile Telecoms Ltd.

## Schedule 7.2(b)(F): Related Party Contracts

Incentive Compensation Chargeback Agreement between NII Holdings, Inc. and Servicios de Radiocomunicación Móvil de Mexico, S.A. de C.V., dated as of September 26, 2012.

## Schedule 7.8: Certain Contracts Terminated or Amended

References to each Contract in this Schedule 7.8 shall include all amendments, schedules, exhibits, addenda and other attachments to the Contract.

(i)  With respect to each Contract set forth below, (A) an assignment, executed and delivered by each party to such Contract, reasonably satisfactory to Purchaser, of all of the rights and obligations of the party thereto that is an Affiliate of the Seller (other than obligations accruing prior to such assignment and any Liabilities related thereto) under such Contract to the Company to the extent reasonably necessary to permit the Entities to continue enjoying all the benefits they have received in respect of such Contract prior to the date of the Agreement at no additional cost or expense to the Entities (in excess of the costs and expenses the Entities prior to the date of the Agreement) for the full term (including terms pursuant to extension or renewal rights provided thereby) of such Contract, (B) in respect of each of the Contracts listed as numbers 16 through 20 below, an extension and renewal (as the case may be), executed and delivered by each party to such Contract, reasonably satisfactory to Purchaser, that extends the applicable rights of the applicable Entity under such Contract to which such Contract was assigned for no less than a period of 18 months following the Closing Date and (C) in respect of the Contract listed as number 15 below, an amendment or confirmation provided by the vendor in the consent documentation, executed and delivered by each party to such Contract, reasonably satisfactory to Purchaser, that removes any termination provisions under such Contract triggered by the transactions contemplated by the Agreement:

1. Amended and Restated 3G Master Supply Agreement between NII Holdings, Inc. and Ericsson, Inc., dated May 14, 2010

2. Master Services Agreement between Global Crossing Telecommunications, Inc. and NII Holdings, Inc., dated November 3, 2010

3. Master Outsourcing Agreement between NII Holdings, Inc., Hewlett-Packard Company and HP Enterprise Services, LLC, dated February 12, 2010

4. Subscriber Unit Purchase Agreement between Motorola, Inc. and NII Holdings, Inc. dated January 1, 2005

5. Master Purchase Agreement between Gemalto, Inc. and NII Holdings, Inc., dated April 10, 2007

6. Master Supply Agreement between Research in Motion Ltd. and NII Holdings, Inc., dated July 27, 2006

7. International iDEN Roaming and Dispatch Interconnection Agreement between Intelfon S.A. de C.V. and NII Holdings, Inc., dated June 17, 2010

8. Interoperability Short Services Agreement, between NII Holdings, Inc. and Sybase 365 LLC (f/k/a InphoMatch, Inc. and Mobile 365, Inc.), dated May 24, 2004

9. Master Purchase Agreement for Software, Equipment and Related Services among NII Holdings, Inc. and Astellia, Inc., dated June 30, 2009

10. Information and Network Product and Services Agreement, between NII Holdings, Inc. and Syniverse Technologies, LLC (f/k/a TSI Telecommunication Network Services, Inc.), dated November 25, 2002

11. Support Services Agreement, between Tellabs International, Inc. and NII Holdings, Inc. dated January 1, 2002

12. Master Purchase Agreement for Products and Related Services, between NII Holdings, Inc. and Superior Communication, Inc. dated December 28, 2012

13. Master Supply Agreement between NII Holdings, Inc. and Nokia Siemens Networks OY, dated November 23, 2010

14. Master Purchase and Software Licensing Agreement, between NII Telecom, S. de R.L. de C.V., NII Holdings, Inc., Alcatel-Lucent de Mexico S.A. de C.V. and Alcatel-Lucent France, dated September 1, 2009

15. Communications Service Provider Agreement between Openwave Systems Inc., Teletransportes Integrales S.A. de C.V., and NII Holdings, Inc., dated December 26, 2002

16. Oracle License and Services Agreement, between Oracle America, Inc. and NII Holdings, Inc. dated April 21, 2010

17. Master Services Agreement for Hosted Over-the-Air Services, between NII Holdings, Inc. and SmartTrust AB, dated October 22, 2009

18. QChat Operator License Agreement, between Qualcomm Incorporated and NII Holdings, Inc., dated September 10, 2009

19. ELA Order, between NII Holdings, Inc. and VMware International Limited, dated December 30, 2011

20. Microsoft Mobile Business and Services Framework Agreement, between NII Holdings, Inc. and Microsoft Corporation, dated September 30, 2010

21. International Roaming Agreement, between Radiomovil Dipsa, S.A. de C.V. Telcel and NII Holdings, Inc., dated May 23, 2013

22. Software Development and License Agreement, between Opera Software ASA and NII Holdings, Inc., dated January 15, 2010

23. Wireless Content Supply Agreement, between Wireless Latin Entertainment, Inc. and NII Holdings, Inc., dated September 23, 2009

24. Hosted Software and Services Agreement, between MOMAC, B.V. and NII Holdings, Inc., dated September 15, 2011

(ii)  With respect to each Contract set forth below, an amendment or termination reasonably satisfactory to Purchaser, executed and delivered by each party to such Contract, effecting the removal of NII Holdings Inc. and its Affiliates (other than any Entity party to such Contract) from such Contract without any other modifications of such Contract:

1.  iDEN Infrastructure Equipment Supply Agreement among Motorola, Inc., Nextel International, Inc. (now NII Holdings, Inc.) and Comunicaciones Nextel de Mexico, S.A. de C.V., dated June 30, 2000

(iii)  With respect to each Contract set forth below, an amendment or termination reasonably satisfactory to Purchaser, executed and delivered by each party to such Contract, effecting the removal of any Entity as a party to such Contract as of the Closing Date and the release of such Entity from all Liabilities arising therefrom or related thereto:

1. Master Purchase Agreement between Brightstar Corp. and NII Holdings, Inc. dated June 10, 2013

2. iPhone Agreement between NII Holdings, Inc. and Apple Inc., and Contract of Adherence between Apple and CNM, each dated October 4, 2013

3. International Roaming Agreement between T-Mobile USA, Inc., NII Holdings, Inc. and Comunicaciones Nextel de Mexico, S.A. de C.V., dated March 15, 2013

4. Global Subscriber Service Agreement between NII Holdings, Inc. and Nokia Siemens Networks, OY, dated April 6, 2010

## Schedule 7.12(b): Terminated Plan

Retirement, death and permanent disability pension plan established in favor of Servicios de Radiocomunicación Móvil de Mexico, S.A. de C.V.'s personnel.

# Schedule 8.1(k): Required Consents

References to each Contract in this Schedule 8.1(k) shall include all amendments, schedules, exhibits, addenda and other attachments to the Contract.

Each of the Section 7.8 Instruments with respect to the following Contracts which are hereby incorporated by reference into this Schedule 8.1(k) (numbers refer to the list on Schedule 7.8(i)):

1. Schedule 7.8(i):

   2. Master Services Agreement between Global Crossing Telecommunications, Inc. and NII Holdings, Inc., dated November 3, 2010

   4. Subscriber Unit Purchase Agreement between Motorola, Inc. and NII Holdings, Inc. dated January 1, 2005

   5. Master Purchase Agreement between Gemalto, Inc. and NII Holdings, Inc., dated April 10, 2007

   6. Master Supply Agreement between Research in Motion Ltd. and NII Holdings, Inc., dated July 27, 2006

   8. Interoperability Short Services Agreement, between NII Holdings, Inc. and Sybase 365 LLC (f/k/a InphoMatch, Inc. and Mobile 365, Inc.), dated May 24, 2004

   10. Information and Network Product and Services Agreement, between NII Holdings, Inc. and Syniverse Technologies, LLC (f/k/a TSI Telecommunication Network Services, Inc.), dated November 25, 2002

   15. Communications Service Provider Agreement between Openwave Systems Inc., Teletransportes Integrales S.A. de C.V., and NII Holdings, Inc., dated December 26, 2002

   16. Oracle License and Services Agreement, between Oracle America, Inc. and NII Holdings, Inc. dated April 21, 2010

   17. Master Services Agreement for Hosted Over-the-Air Services, between NII Holdings, Inc. and SmartTrust AB, dated October 22, 2009

   19. ELA Order, between NII Holdings, Inc. and VMware International Limited, dated December 30, 2011

   22. Software Development and License Agreement, between Opera Software ASA and NII Holdings, Inc., dated January 15, 2010

Each of the Section 7.8 Terminations with respect to the following Contracts which are hereby incorporated by reference into this Schedule 8.1(k) (numbers refer to the list on Schedule 7.8(iii)):

2. Schedule 7.8(iii):

    2.    iPhone Agreement between NII Holdings, Inc. and Apple Inc., and Contract of Adherence between Apple and CNM, each dated October 4, 2013

# EXHIBIT 3

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT is entered into as of January 26, 2015 (this "Agreement") by and among New Cingular Wireless Services, Inc., a corporation existing under the Laws of Delaware ("Purchaser"), NIU Holding LLC, a limited liability company organized and existing in accordance with the Laws of the State of Delaware ("Seller" and together with Purchaser, sometimes referred to individually as "Party" and collectively as the "Parties"), and Citibank, N.A. ("Citibank"), a national banking association organized and existing under the laws of the United States (the "Escrow Agent"). Capitalized terms used but not otherwise defined in this Agreement have the respective meanings ascribed thereto in the Purchase and Sale Agreement (as defined below), which is solely for the convenience for the Parties.

WHEREAS, on January 25, 2015, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Bankruptcy Court") for the Southern District of New York (the "Seller Bankruptcy"). Seller has sought joint administration of its chapter 11 case with the chapter 11 cases of its affiliated debtors and debtors-in-possession (the "Bankruptcy Case").

WHEREAS, pursuant to the Purchase and Sale Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Purchase and Sale Agreement"), by and among Purchaser, Seller and the other signatories party thereto, the parties thereto have agreed to establish an escrow arrangement for the purposes set forth therein.

WHEREAS, as and when required pursuant to Section 3.2 of the Purchase and Sale Agreement, Purchaser will deposit with the Escrow Agent Purchaser's Good Faith Deposit (as defined in the Bidding Procedures) in an aggregate amount in cash equal to $32 million (the "Deposit Amount"), by wire transfer of immediately available funds, into a segregated non-interest bearing United States dollar escrow account maintained and established by the Escrow Agent hereunder (the "Deposit Account") to be held and distributed in accordance with the terms and subject to the conditions set forth herein.

WHEREAS, pursuant to Section 3.3(d) of the Purchase and Sale Agreement, on the Closing Date, which date shall be certified in writing by the Purchaser to the Escrow Agent, Purchaser will deposit with the Escrow Agent an aggregate amount in cash equal to $187.5 million (the "Escrow Amount") by wire transfer of immediately available funds, into a segregated non-interest bearing United States dollar escrow account maintained and established by the Escrow Agent hereunder and separate from the Deposit Account (the "Escrow Account") and distributed in accordance with the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. **Appointment**. The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment under the terms and conditions set forth herein.

2.      **Deposit Account**.

(a)      <u>Deposit; Escrow Property; Compensation</u>. As and when required pursuant to Section 3.2 of the Purchase and Sale Agreement, Purchaser shall deposit the Deposit Amount with the Escrow Agent to be held in the Deposit Account in accordance with the terms hereof. Any funds in the Deposit Account will be deposited in Citibank's Dollars on Deposit in Custody Account ("<u>DDCA</u>"). Good Faith Deposits (if any) of other Qualified Bidders (as defined in the Bidding Procedures) shall be held in separate segregated accounts not held by the Escrow Agent and shall not be held in the Deposit Account. The Escrow Agent will make the balances in the Deposit Account available to the Citibank treasury division on a daily basis. The Deposit Account will earn compensation at a rate that will be determined daily and that is equal to the compensation rate paid by Citibank treasury division to the trust and custody department (which rate, as of the date hereof, is 5bps per year). Should the calculation method no longer be available, the Escrow Agent will notify the Parties no less than thirty (30) days prior. Compensation will be paid monthly, on the second (2nd) Business Day of the following month, by a credit to the Deposit Account. Monthly compensation will be reported on an Internal Revenue Service ("<u>IRS</u>") Form 1099-INT if applicable.

(b)      <u>Investment of the Deposit Account</u>. The Deposit Account shall remain uninvested and no interest shall accrue thereon (<u>provided</u> that the Deposit Account will earn compensation in accordance with <u>Section 2(a)</u>). With respect to any specific day, the Escrow Agent shall have no obligation to deposit funds held in the Deposit Account in the DDCA if all or a portion of such Deposit Amount deposited in the Deposit Account (collectively, the "<u>Deposit Fund</u>") is deposited with the Escrow Agent after 2:00 p.m. New York City time on such day. Requests or instructions received after 2:00 p.m. New York City time by the Escrow Agent to release all or any portion of the Deposit Fund will be treated as if received on the following Business Day in New York. The Escrow Agent shall have the right to liquidate the DDCA to the extent necessary to provide funds necessary to make required payments under this Agreement.

(c)      <u>Deposit Income</u>. The Parties agree that all compensation, if any, earned on, or derived from, the Deposit Account ("<u>Deposit Income</u>") shall accrue to the Deposit Fund and that Purchaser shall be treated as the owner of the cash portion of the Deposit Fund for income tax purposes only, and shall report all Deposit Income as the income of Purchaser in the taxable year in which income is properly includable. An IRS Form W-9 or original IRS Form W-8, as applicable, for Seller or Purchaser, as applicable, is being provided to the Escrow Agent upon execution of this Agreement. In the event the payee of any distribution from the Deposit Fund is not a Party, the Parties shall provide the Escrow Agent with the applicable duly completed and properly executed IRS form along with any reasonably required supporting documentation from such payee prior to payment being made. The Parties understand that, in the event valid U.S. tax forms or other reasonably required supporting documentation are not provided to the Escrow Agent, the tax law may require withholding of tax on any earnings, proceeds or distributions from the Deposit Fund and further, such withholdings will be taken from the Deposit Fund and deposited with the IRS in the manner prescribed for the Escrow Agent to perform its reporting obligations under the Code, the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), the Foreign Investment in Real Property Tax Act of 1980 ("<u>FIRPTA</u>") or any other applicable law or regulation. Purchaser shall be responsible for paying taxes (including any

NYI-524635381v2
SC1:3765128.9

penalties and interest thereon) on all income earned on the cash portion of the Deposit Fund and for filing all necessary tax returns with respect to such Deposit Income; provided, that, within five (5) Business Days after payment of such taxes by Purchaser pursuant to this Section 2(c), Purchaser and Seller shall execute and deliver a Joint Release Notice providing for the disbursement to Purchaser in cash of an amount equal to the amount actually paid in taxes attributable to the Deposit Income by Purchaser. Except as provided for in this Section 2(c) or Section 3(c), the Escrow Agent shall not have any obligation to file or prepare any tax returns or to prepare any other reports for any taxing authorities concerning the matters covered by this Agreement; provided, that for each tax year in which income or compensation is earned on the Deposit Fund, the Escrow Agent shall timely prepare and promptly deliver to Purchaser a duly completed IRS Form 1099 (or IRS Form 1042-S). The Escrow Agent shall be responsible only for tax reporting to the IRS with respect to income earned on the Deposit Fund. If IRS imputed interest requirements apply, the Parties are solely responsible to inform the Escrow Agent, provide the Escrow Agent with all imputed interest calculations, and direct the Escrow Agent to disburse imputed interest amounts. The Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information or for the failure of the Parties to provide such calculations or information. Should the Escrow Agent become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment made hereunder, the Parties agree, jointly and severally, to reimburse without duplication the Escrow Agent for such taxes, interest and penalties upon written demand. Without limiting the foregoing, the Escrow Agent shall be entitled to deduct such taxes, interest and penalties from the Deposit Fund.

(d)     Information. The Deposit Fund shall be registered and held in the name of the Escrow Agent in its capacity as the escrow agent for Purchaser and Seller. The Escrow Agent will send account statements to Purchaser and Seller on a monthly basis reflecting activity with respect to the Deposit Fund for the preceding month. The Parties agree to notify the Escrow Agent of any errors, delays or other problems within thirty (30) calendar days after receiving notification that a transaction has been executed. If it is determined that any transaction was delayed or erroneously executed, then, unless such delay or error was a result of the Escrow Agent's fraud, gross negligence or willful misconduct, the Escrow Agent's sole obligation shall be to pay or refund such amounts as may be required by applicable law. In no event shall the Escrow Agent be responsible for any incidental or consequential damages or expenses in connection with the instruction. Any claim for interest payable will be at the Escrow Agent's published savings account rate in effect in New York, New York.

(e)     Distribution of the Deposit Account. The Escrow Agent is directed to distribute and release all or a portion of the Deposit Account, as applicable, only in accordance with this Section 2(e) during the term of this Agreement or otherwise in accordance with Section 2(f):

(i)     upon the Closing Date (as set forth in Section 3.2(a) of the Purchase and Sale Agreement), Purchaser and Seller shall jointly execute and deliver to the Escrow Agent a notice in substantially the form of Exhibit A attached hereto (a "Joint Release Notice") executed, on behalf of each of Purchaser and Seller, by any person designated as such Party's authorized

-3-

representative on Schedule 1 attached hereto (any such person, with respect to such Party, an "Authorized Representative") and the Escrow Agent shall, upon the receipt of, and in accordance with, such Joint Release Notice, disburse the Deposit Amount to the account designated by Seller on such Joint Release Notice or otherwise designated in writing by the Seller to the Escrow Agent, by transfer of immediately available funds;

(ii)     in the event that the Purchase and Sale Agreement is terminated by Seller pursuant to Section 4.4(f) of the Purchase and Sale Agreement (as set forth in Section 3.2(b) of the Purchase and Sale Agreement), the Escrow Agent shall, upon receipt of and in accordance with (x) a Joint Release Notice executed by Purchaser and Seller or (y) a final and non-appealable order or judgment of a court of competent jurisdiction, disburse the entire amount of the Deposit Account to the account designated by Seller in such Joint Release Notice or otherwise designated in writing by the Seller to the Escrow Agent, by transfer of immediately available funds; or

(iii)    if the Purchase and Sale Agreement is terminated for any reason other than by Seller pursuant to Section 4.4(f) of the Purchase and Sale Agreement (as set forth in Section 3.2(c) of the Purchase and Sale Agreement), the Escrow Agent shall, within three (3) Business Days after receipt of and in accordance with (x) a Joint Release Notice executed by Purchaser and Seller or (y) a final and non-appealable order or judgment of a court of competent jurisdiction, disburse the Deposit Amount to the account designated by Purchaser in such Joint Release Notice or otherwise designated in writing by the Purchaser to the Escrow Agent, by transfer of immediately available funds.

(f)     Distribution of the Deposit Account Upon Termination. If this Agreement terminates prior to a distribution of all of the Deposit Account pursuant to Section 2(e), then the Deposit Account then held hereunder shall be transferred to a new escrow agent mutually selected by Purchaser and Seller, or as directed pursuant to a final court order, in each case in accordance with Section 6 of this Agreement.

3.     **Escrow Account.**

(a)     Deposit; Escrow Property; Compensation. On the Closing Date, Purchaser shall deposit the Escrow Amount with the Escrow Agent to be held in the Escrow Account in accordance with the terms hereof. Any funds in the Escrow Account will be deposited in Citibank's Dollars on Deposit in Custody Account ("DDCA"). The Escrow Agent will make the balances in the Escrow Account available to the Citibank treasury division on a daily basis. The Escrow Account will earn compensation at a rate that will be determined daily and that is equal to the compensation rate paid by Citibank treasury division to the trust and custody department (which rate, as of the date hereof, is 5bps per year). Should the calculation method no longer be available, the Escrow Agent will notify the Parties no less than thirty (30) days prior. Compensation will be paid monthly, on the second (2nd) Business Day of the following month, by a credit to the Escrow Account. Monthly compensation will be reported on a Form 1099 INT if applicable.

-4-

(b)    <u>Investment of the Escrow Account</u>.  The Escrow Account shall remain uninvested and no interest shall accrue thereon (<u>provided</u> that the Escrow Account will earn compensation in accordance with <u>Section 3(a)</u>).  With respect to any specific day, the Escrow Agent shall have no obligation to deposit funds held in the Escrow Account in the DDCA if all or a portion of such Escrow Amount deposited in the Escrow Account (collectively, the "<u>Escrow Fund</u>") is deposited with the Escrow Agent after 2:00 p.m. New York City time on such day.  Requests or instructions received after 2:00 p.m. New York City time by the Escrow Agent to release all or any portion of the Escrow Fund will be treated as if received on the following Business Day in New York.  The Escrow Agent shall have the right to liquidate the DDCA to the extent necessary to provide funds necessary to make required payments under this Agreement.

(c)    <u>Escrow Income</u>.  The Parties agree that all compensation, if any, earned on, or derived from, the Escrow Account ("<u>Escrow Income</u>") shall accrue to the Escrow Fund and that Seller shall be treated as the owner of the cash portion of the Escrow Fund for income tax purposes only, and shall report all Escrow Income as the income of Seller in the taxable year in which income is properly includable.  An IRS Form W-9 or original IRS Form W-8, as applicable, for Seller or Purchaser, as applicable, is being provided to the Escrow Agent upon execution of this Agreement.  In the event the payee of any distribution from the Escrow Fund is not a Party, the Parties shall provide the Escrow Agent with the applicable duly completed and properly executed IRS form along with any reasonably required supporting documentation from such payee prior to payment being made.  The Parties understand that, in the event valid U.S. tax forms or other reasonably required supporting documentation are not provided to the Escrow Agent, the tax law may require withholding of tax on any earnings, proceeds or distributions from the Escrow Fund and further, such withholdings will be taken from the Escrow Fund and deposited with the IRS in the manner prescribed for the Escrow Agent to perform its reporting obligations under the Code, FATCA, FIRPTA or any other applicable law or regulation. Seller shall be responsible for paying taxes (including any penalties and interest thereon) on all income earned on the cash portion of the Escrow Fund and for filing all necessary tax returns with respect to such Escrow Income; <u>provided</u>, that, within five (5) Business Days after payment of such taxes by Seller pursuant to this <u>Section 3(c)</u>, Purchaser and Seller shall execute and deliver a Joint Release Notice providing for the disbursement to Seller in cash of an amount equal to the amount actually paid in taxes attributable to the Escrow Income by Seller. Except as provided for in this <u>Section 3(c)</u> or <u>Section 2(c)</u>, the Escrow Agent shall not have any obligation to file or prepare any tax returns or to prepare any other reports for any taxing authorities concerning the matters covered by this Agreement; <u>provided</u>, that for each tax year in which income or compensation is earned on the Escrow Fund, the Escrow Agent shall timely prepare and promptly deliver to Seller a duly completed IRS Form 1099 (or IRS Form 1042-S). The Escrow Agent shall be responsible only for tax reporting to the IRS with respect to income earned on the Escrow Fund.  If IRS imputed interest requirements apply, the Parties are solely responsible to inform the Escrow Agent, provide the Escrow Agent with all imputed interest calculations, and direct the Escrow Agent to disburse imputed interest amounts.  The Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information or for the failure of the Parties to provide such calculations or information.  Should the Escrow Agent become liable for the payment of taxes, including withholding taxes relating to any funds, including interest and penalties thereon, held by it pursuant to this Agreement or any payment

-5-

made hereunder, the Parties agree, jointly and severally, to reimburse without duplication the Escrow Agent for such taxes, interest and penalties upon written demand.

(d)     Information. The Escrow Fund shall be registered and held in the name of the Escrow Agent in its capacity as the escrow agent for Purchaser and Seller.  The Escrow Agent will send account statements to Purchaser and Seller on a monthly basis reflecting activity with respect to the Escrow Fund for the preceding month.  The Parties agree to notify the Escrow Agent of any errors, delays or other problems within thirty (30) calendar days after receiving notification that a transaction has been executed. If it is determined that any transaction was delayed or erroneously executed then, unless such delay or error was a result of the Escrow Agent's fraud, gross negligence or willful misconduct, the Escrow Agent's sole obligation shall be to pay or refund such amounts as may be required by applicable law.  In no event shall the Escrow Agent be responsible for any incidental or consequential damages or expenses in connection with the instruction.  Any claim for interest payable will be at the Escrow Agent's published savings account rate in effect in New York, New York.

(e)     Distributions.

(i)     *Undisputed Distributions of Escrow Amount*.

(1)     Purchaser and Seller may at any time jointly execute and deliver to the Escrow Agent a Joint Release Notice instructing the Escrow Agent to distribute all or a portion of the Escrow Fund. Within three (3) Business Days after the date on which the Escrow Agent receives an executed Joint Release Notice, the Escrow Agent shall disburse the portion of the Escrow Fund set forth in the Joint Release Notice to the person(s) or account(s) designated on such Joint Release Notice.

(2)     If Purchaser intends to assert a claim against the Escrow Fund for Damages pursuant to Article 9 or Article 11 of the Purchase and Sale Agreement (each, a "Claim"), then Purchaser shall deliver a written notice to Escrow Agent (with a copy to Seller) (each, a "Claim Notice") describing such Claim in reasonable detail and stating a reasonable estimate of the amount of the Escrow Fund to be reserved with respect to such Claim prepared in good faith based on information then available (the amount set forth in the applicable Claim Notice, the "Claimed Amount").

(3)     If, on or prior to the last day of the 30-day period beginning on the date the Escrow Agent receives the Claim Notice (the "Objection Period"), the Escrow Agent does not receive a written notice (the "Objection Notice") executed and delivered by Seller (with a copy to Purchaser) disputing in reasonable detail Purchaser's right to indemnification, the amount of indemnification sought in the Claim Notice and/or the sufficiency of the Claim Notice, then Seller shall be deemed to have agreed to such Claimed Amount without dispute, and the Escrow

-6-

Agent shall, within five (5) Business Days following the expiration of the Objection Period, release to Purchaser out of the Escrow Fund an amount equal to the lesser of (x) the amount of the available remaining Escrow Fund and (y) the Claimed Amount specified in such Claim Notice. If the Escrow Agent receives an Objection Notice executed and delivered by Seller on or prior to the last day of the Objection Period, the provisions of Section 3(e)(ii) below shall apply.

      (ii)    *Disputed Distributions of Escrow Amount.* If the Escrow Agent receives an Objection Notice executed and delivered by Seller on or prior to the last day of the Objection Period, the Escrow Agent shall (A) if such Objection Notice specifically provides for the release of funds to Purchaser for items that are not in dispute, promptly (but in any event within five (5) Business Days of receipt of such Objection Notice) release to Purchaser out of the remaining Escrow Fund an amount equal to the lesser of (x) the amount of the available remaining Escrow Fund and (y) the amount that is specifically set forth in the Objection Notice as not being disputed by Seller and (B) continue to hold in the Escrow Account the amount in dispute (each such amount, a "Disputed Claim Amount"), which shall be the difference between the Claimed Amount and the amount agreed to be paid pursuant to clause (y) above, as an undivided portion of the Escrow Fund, until the earlier to occur of the Escrow Agent's receipt of (1) a Joint Release Notice executed and delivered by Purchaser and Seller directing the disposition of all or part of such Disputed Claim Amount in respect of which a dispute between Purchaser and Seller has been resolved or (2) written notice executed and delivered by Purchaser or Seller (with a copy to the other Party) accompanied by a copy of (i) a legally binding agreement entered into by the Parties with respect to the dispute, (ii) a final and nonappealable order or judgment of a court of competent jurisdiction with respect to the dispute, or (iii) a final and nonappealable determination of an arbitration or like panel to which the Parties have agreed to submit with respect to the dispute (each, a "Final Judgment"). The Escrow Agent shall be under no duty to institute or defend any proceedings in the prosecution of any dispute between Purchaser and Seller in respect of a Disputed Claim Amount and none of the costs and expenses of any such proceedings shall be borne by the Escrow Agent. For the avoidance of doubt, only the amount awarded to Purchaser in the applicable Final Judgment shall be distributed to Purchaser, and any applicable Disputed Claim Amount which is not so distributed to Purchaser shall be considered part of the Escrow Amount and held in the Escrow Account. Upon receipt of any such Joint Release Notice or Final Judgment, the Escrow Agent shall promptly (but in any event within five (5) Business Days) comply with its terms and disburse to Purchaser the portion of the Escrow Fund as provided in such Joint Release Notice or Final Judgment, if any. Notwithstanding anything herein to the contrary, any Final Judgment delivered to the Escrow Agent by Purchaser or Seller under this Agreement (including any Final Judgment accompanying any Final Notice provided in accordance with Section 3(e)(iii)(2)) shall be accompanied by an executed certificate of the delivering Party to the effect that such Final Judgment is final and non-appealable and that the copy of such Final Judgment being so

-7-

delivered is true and correct, and it shall contain a cover letter signed by an Authorized Representative for such presenting Party which shall contain payment instructions to be utilized by the Escrow Agent.

(iii)    *Scheduled Distribution of Escrow Fund.*

(1)    Within five (5) Business Days after the second anniversary of the Closing Date (such date, the "Final Release Date"), Purchaser and Seller shall execute and deliver a Joint Release Notice to the Escrow Agent instructing it to release from the Escrow Account, to Seller, the excess of the entire balance then remaining in the Escrow Account (if any) less the sum of (A) the aggregate Claimed Amount in respect of all Disputed Claim Amounts still pending or disputed and (B) the aggregate Claimed Amount in respect of all Claims with respect to which the Objection Period has not yet expired, in each case pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date.

(2)    After the Final Release Date and upon resolution of any dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount, Seller and Purchaser shall deliver a Joint Release Notice to the Escrow Agent to release from the Escrow Account, (x) to Purchaser, the applicable amount, if any, with respect to such Disputed Claim Amount that is payable pursuant to Section 3(e)(ii) and (y) to Seller, an amount equal to the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed pursuant to Claim Notices executed and delivered by Purchaser and received by the Escrow Agent prior to 6:00 p.m. local time in New York, New York, on the Final Release Date, in each case, if any.  Subsequent to the Final Release Date, after the earlier receipt by the Escrow Agent of (x) a Joint Release Notice setting forth instructions with respect to the disbursement of the last Disputed Claim Amount or (y) written notice executed and delivered by Purchaser or Seller (with a copy to the other) accompanied by a Final Judgment (delivered in accordance with the applicable requirements of Section 3(e)(ii)) resolving the last dispute that was the subject of an Objection Notice giving rise to a Disputed Claim Amount (in either case, the "Final Notice"), the Escrow Agent shall promptly (but in any event within five (5) Business Days) release from the Escrow Account, by wire transfer of immediately available funds, (x) to the account or accounts of Purchaser designated in the Final Notice, the amount, if any, set forth in the Final Notice as payable to Purchaser and (y) to the account or accounts of Seller designated in the Final Notice, the remaining portion of the Escrow Fund (if any).

-8-

(iv)  *Release Procedures*.  Any Joint Release Notice executed and delivered by Purchaser and Seller pursuant to Section 3(e)(iii) shall include the amount of the Escrow Fund to be released to Seller or Purchaser, as applicable, and the Escrow Agent shall have no duty or obligation to perform any calculations under this Agreement.  Any cash distributed from the Escrow Account to Purchaser and/or Seller hereunder shall be distributed via wire transfer to their respective accounts as set forth in the applicable Joint Release Notice.

(f)  Disbursements of Escrow Income. Upon termination of the Escrow Account, any Escrow Income remaining therein shall be promptly distributed to Seller.

4.  **Termination**. This Agreement, the duties of the Escrow Agent, the Deposit Account and the Escrow Account shall automatically terminate upon (x) if no portion of the Deposit Amount and Escrow Fund has been deposited with the Escrow Agent, the valid termination of the Purchase and Sale Agreement in accordance with its terms and notification of such termination by joint notice in writing by the Purchaser and Seller to the Escrow Agent, (y) if any portion of the Deposit Amount but not the Escrow Fund has been deposited with the Escrow Agent, the later to occur of (i) disbursement in full by the Escrow Agent of the Deposit Fund and (ii) termination of the Purchase and Sale Agreement and notification of such termination by joint notice in writing by the Purchaser and Seller to the Escrow Agent, or (z) if any portion of the Deposit Amount and Escrow Fund has been deposited with the Escrow Agent, disbursement in full by the Escrow Agent of both the Deposit Fund and the Escrow Fund, in each case as directed herein, subject, however, to the survival of obligations specifically contemplated in this Agreement.

5.  **Escrow Agent**.  The Escrow Agent shall have only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties shall be implied.  The Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement between the Parties, nor shall the Escrow Agent be required to determine if any Party has complied with any other agreement.  Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of the Escrow Agent.  The Escrow Agent may conclusively rely upon any instructions, notice, certification, demand, consent, authorization, receipt, power of attorney or other writing delivered to it by any Party without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order delivered in accordance with Section 9 believed by it to be genuine and to have been signed by an Authorized Representative(s), as applicable, without inquiry and without requiring substantiating evidence of any kind and the Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request.  The Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party (as determined by a court of competent jurisdiction through a final order).  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents.   In the event the Escrow Agent receives instructions, claims or demands from any Party hereto which conflict with the provisions of this Agreement, or if the Escrow

Agent receives conflicting instructions from Purchaser and Seller, the Escrow Agent shall be entitled either to (a) refrain from taking any action until it shall (x) be given a joint written notice executed and delivered by Purchaser and Seller which eliminates such conflict or (y) have received a final court order which eliminates such conflict (it being understood and agreed that any court order delivered to the Escrow Agent by Purchaser or Seller pursuant to this clause (y) shall be accompanied by an executed certificate of the delivering Party to the effect that such order is final and non-appealable and that the copy of such order being so delivered is true and correct)  or (b) file an action in interpleader.  The costs and expenses (including reasonable attorneys' fees and expenses) incurred by the Escrow Agent in connection with any interpleader or related proceeding to resolve such conflicting instructions shall be paid by, and be the joint and several obligation of, the Parties.  The Escrow Agent shall have no duty to solicit any payments that may be due to it or to the Escrow Fund, including, without limitation, the Escrow Amount, nor shall the Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder.  ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE FOR SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.  The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected to the extent acting in accordance with the opinion and instructions of such counsel.  The Escrow Agent shall not be responsible for or under, or chargeable with knowledge of, the terms and conditions of any agreement, instrument or document executed between/among the parties hereto other than this Agreement.  This Agreement sets forth all of the obligations of the Escrow Agent, and no additional obligations shall be implied from the terms of this Agreement or any other agreement, instrument or document.

6. **Resignation and Removal; Succession.**  The Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties.  The Parties may remove the Escrow Agent at any time, with or without cause, by a joint written notice to the Escrow Agent executed and delivered by Purchaser and Seller thirty (30) calendar days in advance of such removal.  The Escrow Agent's sole responsibility after such thirty (30) calendar day notice period expires shall be to hold the Escrow Fund (without any obligation to perform any further obligations hereunder or to reinvest the same) and to deliver the same to a designated substitute escrow agent, if any, appointed by joint written notice to the Escrow Agent executed and delivered by Purchaser and Seller, or such other person designated jointly in writing executed and delivered by Purchaser and Seller, or in accordance with the directions of a final court order delivered to the Escrow Agent (it being understood and agreed that any court order so delivered to the Escrow Agent by Purchaser or Seller shall be accompanied by an executed certificate of the delivering Party to the effect that such order is final and non-appealable and that the copy of such order being so delivered is true and correct), at which time of delivery, the Escrow Agent's obligations hereunder shall cease and terminate.  If, prior to the effective resignation or removal date, the Parties have failed jointly to appoint a successor escrow agent, or jointly to instruct the Escrow Agent in writing to deliver the Escrow Fund to another person, in each case as provided above, at

-10-

any time on or after the effective resignation or removal date, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief.  Any joint appointment of a successor escrow agent in accordance with this Section 6 shall be binding upon the Parties and no appointed successor escrow agent shall be deemed to be an agent of the Escrow Agent.  The Escrow Agent shall deliver the Escrow Fund to any appointed successor escrow agent, less the Escrow Agent's fees, costs and expenses pursuant to Section 7 (it being understood that each of Purchaser and Seller hereby agree between themselves to each pay fifty percent (50%) of any such fees, costs and expenses), at which time the Escrow Agent's obligations under this Agreement shall cease and terminate.  Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business may be transferred, shall be the Escrow Agent under this Agreement without further act.

7.    **Compensation**.  The Parties jointly and severally agree to pay the Escrow Agent upon execution and delivery of this Agreement and from time to time thereafter reasonable compensation for the services to be rendered hereunder, which unless otherwise agreed in writing, shall be as described in the fee schedule attached as Schedule 2 hereto.  Any reasonable and documented attorney's fees incurred in connection with the preparation and negotiation of this Agreement and any Escrow Agent acceptance fees shall be due and payable upon the execution and delivery of this Agreement. Without altering or limiting the joint and several obligations of the Parties to the Escrow Agent under this Section 7, each of Purchaser and Seller hereby agree between themselves to each pay fifty percent (50%) of any such fees and expenses.  Each of the Parties, jointly and severally, agrees to reimburse the Escrow Agent on demand for such reasonable and documented expenses and in addition, the Escrow Agent shall have the right to reimburse itself for such reasonable and documented expenses from the Escrow Fund.

8.    **Indemnification and Reimbursement**.  The Parties agree jointly and severally to indemnify, defend, hold harmless, pay or reimburse the Escrow Agent and its affiliates and their respective successors, assigns, directors, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, costs or expenses (including, without limitation, the reasonable and documented out of pocket fees and reasonable and documented out of pocket expenses of outside counsel and all expense of document location, duplication and shipment) (collectively "Losses"), arising out of or in connection with (a) this Agreement or the Escrow Agent's performance of its duties hereunder, except to the extent that such Losses are determined by a court of competent jurisdiction through a final order to have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee; and (b) the Escrow Agent's following of any instructions or directions, whether joint or singular, executed and delivered by Purchaser and Seller in accordance with this Agreement; provided that without altering or limiting the joint and several obligations of the Parties to the Escrow Agent under this Section 8, each of Purchaser and Seller hereby agrees between themselves to each pay fifty percent (50%) of any such indemnification claims.  The Parties hereby grant the Escrow Agent a lien on, right of set-off against and security interest in the Escrow Fund for the payment of any claim for indemnification, fees, expenses and amounts due to the Escrow Agent or an Indemnitee.  The obligations set forth in this Section 8 shall survive the resignation, replacement or removal of the Escrow Agent or the termination of this Agreement.

-11-

9.    **Notices; Wire Instructions**.  All communications hereunder shall be in writing or set forth in a PDF attached to an email, and all instructions, notices or other communications executed and delivered by a Party or the Parties to the Escrow Agent shall be executed by an Authorized Representative of such Party or Parties (as applicable), and each shall be deemed to be delivered in accordance with the terms of this Agreement (a) if delivered by facsimile, immediately upon confirmation of successful transmission, (b) if delivered by PDF attached to an email, by return e-mail or other notice delivered by the receiving party acknowledging having received such email (whether by an automatic "read receipt" or similar notice) or (c) when actually received, if delivered by hand, by certified mail return receipt requested, or by courier or express delivery service (with receipt showing signature) to the appropriate fax number, email address, or notice address set forth for each party.

If to Purchaser:

> AT&T
> One AT&T Plaza
> 205 South Akard Street, Room 2713
> Dallas, Texas 75202
> Attention:        Sherri Bazan, CPA
> Fax:              (214) 746-2277
> Email:            sb2038@att.com

> with copies (which shall not constitute notice) to:

> AT&T
> One AT&T Plaza
> 205 South Akard Street, 32nd Floor
> Dallas, Texas 75202
> Attention:        John O'Connor, Senior Vice President and
>                   Assistant General Counsel
>                   Bill Caldwell, General Attorney
> Fax:              (214) 746-2216
> Email:            JO8009@att.com
>                   Wc2842@att.com

> with additional copies (which shall not constitute notice) to:

> Sergio J. Galvis
> Werner F. Ahlers
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, New York  10004
> fax: (212) 757-3990
> Email: Galviss@sullcrom.com, Ahlersw@sullcrom.com

-12-

if to Seller:

NIU Holdings LLC

c/o NII Holdings, Inc.
1875 Explorer Street
Attention: Shana Smith
Fax:  (703) 390-5191
Email: shana.smith@nii.com

with a copy (which shall not constitute notice) to:

Robert A. Profusek
Jones Day LLP
222 East 41st Street
New York, NY 10017
Fax:  (212) 755-7306
Email:  raprofusek@jonesday.com

if to the Escrow Agent:

Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY  10013
Attn.: Mary Ellen Connolly
Phone: (201) 763-1884
Facsimile: (973) 461-7191 or (973) 461-7192
E-mail: mary.e.connolly@citi.com

with a copy to (if sent by personal delivery, overnight courier or registered or certified mail):

Citibank, N.A.
Agency & Trust
480 Washington Blvd. 18th Floor
Jersey City, NJ 07310
Attn: Mary Ellen Connolly

Any party hereto may provide notice per this Section 9 of any change in address or Authorized Representative as appropriate.  In the event that Purchaser or Seller changes its Authorized Representatives in accordance with the preceding sentence, Schedule 1 attached hereto shall be

-13-

updated to reflect such changes. If transfer instructions for the Deposit Fund or the Escrow Fund, as the case may be, are given (other than in writing at the time of execution and delivery of this Agreement), in writing in accordance with this Agreement, the Escrow Agent is authorized to seek confirmation of such instructions by telephone call back to the person or persons designated in Schedule 1 attached hereto, and the Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. The persons and telephone numbers for call backs may be changed only in writing actually received by the Escrow Agent.

Any funds to be paid to the Escrow Agent hereunder shall be sent by wire transfer pursuant to the following instructions:

> **CITIBANK, N.A**.
> ABA: 0210-0008-9
> Account Name: Escrow Concentration Account
> A/C#.: 36855852
> Ref: 11400900 New Cingular Deposit Account
> Ref: 11401100 New Cingular Escrow Account

      10.    **Compliance with Court Orders.**  If any of the Deposit Fund or the Escrow Fund, as the case may be, shall be attached, garnished, levied upon, or otherwise be subject to any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such order it shall not be liable to either of the Parties or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

      11.    **Miscellaneous**.

      (a)    The provisions of this Agreement may be waived, altered, amended or supplemented only by a writing executed and delivered by the Escrow Agent, Purchaser and Seller. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Parties or the Escrow Agent in any other respect or at any other time. The waiver by the Parties and the Escrow Agent of a breach of any of the provisions of this Agreement or failure to exercise any right or privilege hereunder shall not be construed as a waiver of any other breach of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

      (b)    Neither Party may directly or indirectly assign any of its rights or delegate any of its obligations under this Agreement, by operation of Law or otherwise, without the prior written consent of the other Party and the Escrow Agent. Any purported direct or indirect assignment in violation of this Section 11(b) shall be null and void *ab initio*, provided, however, that (a) Seller shall assign its rights and delegate its obligations hereunder to any party

NYI-524635381v2
SC1:3765128.9

to whom Seller has validly assigned its rights and obligations under the Purchase and Sale Agreement in accordance with the terms thereof and (b) Purchaser may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more of its affiliates; provided, further, however, that any such assignment by the Purchaser shall not relieve the Purchaser of its obligations hereunder (including any obligation to indemnify the Escrow Agent in accordance with the terms hereof), and shall be subject to the successful completion by the Escrow Agent of its customary due diligence procedures.

(c) This Agreement shall be governed by and construed under the laws of the State of New York. Each Party hereto agrees that it shall bring any action or proceeding in respect of this Agreement or the transactions contained in or contemplated by this Agreement, (x) if during the administration of the Bankruptcy Case, exclusively in the Bankruptcy Court, or (y) if following the conclusion of the Bankruptcy Case, the Bankruptcy Court is unwilling to hear such proceedings, in the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court thereof (collectively, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or the transactions that are the subject of this Agreement (A) irrevocably submits to the exclusive (except with respect to actions to enforce any judgment issued by the Bankruptcy Court or any Chosen Court in accordance with this Section 11(c)) jurisdiction of the Bankruptcy Court or the Chosen Courts, as applicable, thereby expressly and unconditionally waiving any other jurisdiction to which it may be entitled, either by reason of domicile (present or future) or otherwise, (B) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court or the Chosen Courts, (C) waives any objection that the Bankruptcy Court or the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto and (D) agrees that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with Section 9 of this Agreement. Each Party irrevocably designates CT Corporation as its agent and attorney-in-fact for the acceptance of service of process and making an appearance on its behalf in any such claim or proceeding and for the taking of all such acts as may be necessary or appropriate in order to confer jurisdiction over it before the courts specified in this Section 11(c) and each Party stipulates that such consent and appointment is irrevocable and coupled with an interest. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

(d) None of Purchaser, Seller or the Escrow Agent shall be liable to any other party for losses due to, or if it is unable to perform its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, or other causes reasonably beyond its control.

(e) All cash deposited into or released from the Escrow Account shall be denominated in U.S. Dollars.

(f) This Agreement and any joint instructions executed and delivered by Purchaser and Seller may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or

NYI-524635381v2
SC1:3765128.9

instruction, as applicable. All signatures of the parties to this Agreement may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

(g)     The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

(h)     Nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Deposit Fund, the Escrow Fund or this Agreement.

(i)     No printed or other material in any language, including prospectuses,  notices, reports, and promotional material that mentions " "Citibank", "Citigroup" or "Citi"" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any Parties, or on such party's behalf, without the prior written consent of the Escrow Agent.

(j)     Patriot Act Disclosure.  Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA PATRIOT Act") requires the Escrow Agent to implement reasonable procedures to verify the identity of any person that opens a new account with it. Accordingly, each of the Parties acknowledge that Section 326 of the USA PATRIOT Act and the Escrow Agent's internal policies require the Escrow Agent to follow reasonable procedures to verify the identity including without limitation name, address and organizational documents ("identifying information").  The Parties agree to provide the Escrow Agent with and consent to the Escrow Agent obtaining from third parties any such identifying information required as a condition of opening an account with or using any service provided by the Escrow Agent.

(k)     In the event that the Bankruptcy Court fails to approve any provisions of this Agreement prior to the deposit of the Deposit Amount with the Escrow Agent and such failure materially and adversely affects the rights, protections, duties and obligations of the Escrow Agent, then unless the Escrow Agent receives replacement protection reasonably sufficient to make up for such material adverse effect (including indemnification or other security reasonably satisfactory to the Escrow Agent, as applicable) from the Purchaser or its Affiliates, then the Escrow Agent shall be entitled to refuse acceptance of the Deposit Amount and resign with immediate effect from this Agreement, and shall have no further duties or obligations hereunder.

*[Signature Page Follows]*

-16-

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its officers thereunto duly authorized, as of the date first written above.

**NEW CINGULAR WIRELESS SERVICES, INC.**

By: _____

       Name:  Rick L. Moore
       Title: Senior Vice President-Corporate
             Development

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

NIU HOLDINGS LLC, AS SELLER

By: _Shana C. Smith_____
    Name: Shana C. Smith
    Title: Manager

**CITIBANK, N.A., AS ESCROW AGENT**

By: _____
    Name: Albert P. Mari, Jr.
    Title: Vice President

*[Signature Page to Escrow Agreement]*

## SCHEDULE 1
## AUTHORIZED LIST OF SIGNERS

This form supplements the Agreement and related documents and applies to instruction given by facsimile (or e-mail with .pdf attachment) for securities or funds transfers and for other purposes under the Agreement. In giving any facsimile (or e-mail with .pdf attachment) instruction as specified in the Agreement the Parties acknowledge that facsimile (or e-mail with .pdf attachment) present a high degree of risk or error, security, and privacy. Nevertheless the Parties wish to use facsimile (or e-mail with .pdf attachment) as a means of instruction. The Parties designate below the individuals who are authorized to initiate transfers or other instructions by facsimile (or e-mail with .pdf attachment) on behalf of the Parties and select the security procedures specified herein. The Parties accept the associated risks of unauthorized or erroneous instruction and agree to be bound by such instruction whether or not actually authorized by the Parties, provided the Escrow Agent has complied with the stated security procedure. The Parties are responsible for keeping confidential the contents of this Schedule 1. The Parties should be careful in completing this Schedule 1 as it may be rejected if it contains erasures or white outs.

X New          ☐ Addition          ☐ Supersede

**NIU Holding LLC**

|  |  | Specimen Signature |
|---|---|---|
| Name | Daniel Freiman |  |
| Title | Manager | |
| Phone | 703-390-5209 | |
| E-mail Address | dan.freiman@nii.com | |
| | | |
| Name | Shana Smith |  |
| Title | Manager | |
| Phone | 703-390-7286 | |
| E-mail Address | shana.smith@nii.com | |

Where applicable, the Escrow Agent will confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| 703-390-5209 | Daniel Freiman |
| 703-390-7286 | Shana Smith |
|  |  |
|  |  |

**Test Word**

PIZZA

*[Signatures to Schedule 1 of Escrow Agreement]*

# SCHEDULE 1
## AUTHORIZED LIST OF SIGNERS

This form supplements the Agreement and related documents and applies to instruction given by facsimile (or e-mail with .pdf attachment) for securities or funds transfers and for other purposes under the Agreement. In giving any facsimile (or e-mail with .pdf attachment) instruction as specified in the Agreement the Parties acknowledge that facsimile (or e-mail with .pdf attachment) present a high degree of risk or error, security, and privacy. Nevertheless the Parties wish to use facsimile (or e-mail with .pdf attachment) as a means of instruction. The Parties designate below the individuals who are authorized to initiate transfers or other instructions by facsimile (or e-mail with .pdf attachment) on behalf of the Parties and select the security procedures specified herein. The Parties accept the associated risks of unauthorized or erroneous instruction and agree to be bound by such instruction whether or not actually authorized by the Parties, provided the Escrow Agent has complied with the stated security procedure. The Parties are responsible for keeping confidential the contents of this Schedule 1. The Parties should be careful in completing this Schedule 1 as it may be rejected if it contains erasures or white outs.

☐ New          ☐ Addition          ☐ Supersede

## New Cingular Wireless Services, Inc.

Specimen Signature

| | | |
|---|---|---|
| Name | Andrew B. Keiser | |
| Title | Exec. Director/Financial Analysis AT&T Inc. | |
| Phone | 214-757-7997 | |
| E-mail Address | andrew.keiser@att.com | |

| | | |
|---|---|---|
| Name | Sherri Bazan | |
| Title | Assistant Treasurer | |
| Phone | 214-757-5037 | |
| E-mail Address | sherri.bazan@att.com | |

| | | |
|---|---|---|
| Name | Elaine Lou | |
| Title | Assistant Treasurer | |
| Phone | 214-757-5816 | |
| E-mail Address | ying.lou@att.com | |

Where applicable, the Escrow Agent will confirm the instructions received by return call to one of the telephone numbers listed below.

| Telephone Number (including Country code) | Name |
|---|---|
| 214-757-3196 | Stacy Roth |
| 214-757-5739 | Cathy Koschik |
| 214-757-5724 | Kyle Garner |
| 214-757-5718 | Cheryl Capp |

## Test Word

| ATT |
|---|

SCHEDULE 2
SCHEDULE OF ESCROW AGENT FEES

[See attached]



388 Greenwich Street
New York, NY 10013

Wayne R. Stahl
Director
Tel 212 816-5836
Fax 212 816-5544

# SCHEDULE OF FEES FOR SERVICES
## AS ESCROW AGENT
## BETWEEN

# NEW CINGULAR WIRELESS, INC.

## AND

# NIU HOLDINGS, LLC

### January 23, 2015

**Acceptance Fee:**

To cover the acceptance of the Escrow Agent role, the study of the Escrow Agreement and all supporting documents submitted in connection with the execution and delivery of this transaction, communication with other members of the working group. To be paid in advance.

### WAIVED

**Flat Annual Administration Fee:**

To cover the administrative functions of the Escrow Agent under the agreement, including the establishment and maintenance of the escrow accounts and activation, safekeeping of assets, maintenance of the records, follow-up of the agreement provisions, and other duties required of the agent under the terms of the agreement. To be paid annually in advance.

| | |
|---|---|
| **USD Account** | **WAIVED (pursuant to funds being held in Citi DDCA for at least 3 months, otherwise a one-time fee of $15,000 will be assessed.)** |

**Legal Fees:**

To cover the review of legal documents by Citibank's outside counsel on behalf of the agent, if necessary. Legal fees are to be paid regardless of the successful close of the escrow agreement.

### AT COST

**Amendment Fee:**

To cover the administrative functions of amending the Agreements, if and when required.

### TO BE MUTUALLY AGREED UPON PRIOR TO CITI REVIEW OF ANY AMENDMENT



## Schedule Assumptions:

- Establishment of Escrow Account to hold approximately $187.5MM for around 24 months.
- Escrow Agreement to be governed by New York law and subject to internal approval and satisfactory review of the documentation.
- Escrowed balances will be deposited in Citi's Dollars on Deposit in Custody Account ("DDCA") for which a revenue share of 5 bps will be provided by Citibank, N.A. (the revenue share amount is subject to change with 30 days' prior notice), or funds may be invested in an Institutional Money Market fund from a list of providers we will supply/have supplied to you. These fund distributors may provide Citibank with Shareholder Servicing fees in addition to the fees being directly billed to you by Citibank. These fees are discussed in the fund's prospectus, which has been or will be delivered to you prior to investment.

---

The above schedule of fees does not include reasonable charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform in either an agency or fiduciary capacity. Fees are also subject to Citibank's satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this transaction is subject to internal approval of all parties depositing moneys into the accounts and able to direct the agent. Should this schedule of fees be accepted and agreed upon and work commenced on this transaction but subsequently halted and the transaction described is not consummated by February 25th, 2015, Acceptance Fee and legal fees incurred, if any, will still be payable in full. This Fee Schedule is offered for and applicable to the transaction described only, and is guaranteed for sixty days from the date on this proposal. After sixty days, this offer can be extended in writing only.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citibank to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citibank. What this means for you: when you open an account or establish a relationship, we will ask for your business name, a street address and a tax identification number, that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y). We appreciate your cooperation.

Signed:
**CITIBANK, N.A.**

_____
Wayne R. Stahl
Director

Agreed and Accepted:
**NIU HOLDINGS, LLC**

_____
(Signature)

_____
(Print Name & Title)

_____
(Date)

Agreed and Accepted:
**NEW CINGULAR WIRELESS, INC.**

_____
(Signature)

_____
(Print Name & Title) Assistant Treasurer

_____
(Date)



## Schedule Assumptions:

· Establishment of Escrow Account to hold approximately $187.5MM for around 24 months.
· Escrow Agreement to be governed by New York law and subject to internal approval and satisfactory review of the documentation.
· Escrowed balances will be deposited in Citi's Dollars on Deposit in Custody Account ("DDCA") for which a revenue share of 5 bps will be provided by Citibank, N.A. (the revenue share amount is subject to change with 30 days' prior notice), or funds may be invested in an Institutional Money Market fund from a list of providers we will supply/have supplied to you. These fund distributors may provide Citibank with Shareholder Servicing fees in addition to the fees being directly billed to you by Citibank. These fees are discussed in the fund's prospectus, which has been or will be delivered to you prior to investment.

---

The above schedule of fees does not include reasonable charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform in either an agency or fiduciary capacity. Fees are also subject to Citibank's satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this transaction is subject to internal approval of all parties depositing moneys into the accounts and able to direct the agent. Should this schedule of fees be accepted and agreed upon and work commenced on this transaction but subsequently halted and the transaction described is not consummated by February 25th, 2015, Acceptance Fee and legal fees incurred, if any, will still be payable in full. This Fee Schedule is offered for and applicable to the transaction described only, and is guaranteed for sixty days from the date on this proposal. After sixty days, this offer can be extended in writing only.

In accordance with US regulations regarding anti-money laundering and terrorist financing, Federal law requires Citibank to obtain, verify and record information that identifies each business or entity that opens an account or establishes a relationship with Citibank. What this means for you: when you open an account or establish a relationship, we will ask for your business name, a street address and a tax identification number, that Federal law requires us to obtain. In accordance with the Unlawful Internet Gambling Act (the "Act"), Citibank, N.A. accounts or other Citibank, N.A. facilities in the United States may not be used to process "restricted transactions" as such term is defined in U.S. 31 CFR Section 132.2(y). We appreciate your cooperation.

Signed:                                         Agreed and Accepted:
**CITIBANK, N.A.**                              **NEW CINGULAR WIRELESS, INC.**

_____                _____
Wayne R. Stahl                                  (Signature)
Director

Agreed and Accepted:                            _____
**NIU HOLDINGS. LLC**                           (Print Name & Title)

_____                _____
(Signature)                                     (Date)

Shana C. Smith, Manager
_____
(Print Name & Title)

1-26-15
_____
(Date)

**EXHIBIT A**

**FORM OF JOINT RELEASE NOTICE**

To:     Citibank, N.A.
as Escrow Agent
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn: Mary Ellen Connolly
Facsimile: (973) 461-7191 or (973) 461-7192

with a copy to (if sent by personal delivery, overnight courier or registered or certified mail):

Citibank, N.A.
Agency & Trust
480 Washington Blvd. 18th Floor
Jersey City, NJ 07310
Attn: Mary Ellen Connolly

This joint release notice is delivered as of the ___ day of _____, [   ], pursuant to Section [   ] of that certain Escrow Agreement dated as of [_____ __], [   ] (the "Escrow Agreement") by and among [Purchaser] ("Purchaser"), NIU Holdings LLC ("Seller") and Citibank, N.A., as Escrow Agent (the "Escrow Agent").  Capitalized terms used in this notice have the meanings ascribed to them in this Agreement.

The parties to this release notice [notify the Escrow Agent that the Closing Date occurred on [insert date]] and  jointly instruct the Escrow Agent to [release and] pay to [Purchaser/ Seller] [the Deposit Amount][an amount equal to $_____ out of the Escrow Account], by wire transfer to:

[Insert wire instructions]

Each of the undersigned hereby represents and warrants that it has been authorized to execute this notice.  This notice may be signed in counterparts.

**PURCHASER**:                                          **SELLER:**

NEW CINGULAR WIRELESS SERVICES,          NIU HOLDINGS LLC
INC.

By: _____                      By: _____
Name: _____                  Name: _____
Title: _____                     Title: _____
Test Word:                                                  Test Word:

SC1:3765128.2
NYI-524635381v5

# EXHIBIT 4

April 27, 2017

By Email and Facsimile

Citibank, N.A.,
    Agency & Trust,
        388 Greenwich Street, 14th Floor,
           New York, NY 10013,
               Facsimile: (973) 461-7191.

Attention:  Mary Ellen Connolly

          Re:       Escrow Claim Notice – Tax Claim

Dear Ms. Connolly:

          Reference is hereby made to (i) the Escrow Agreement, dated January 26, 2015 (as amended, the "Escrow Agreement"), by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("Seller") and Citibank, N.A. ("Escrow Agent"); (ii) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "Purchase Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., Seller, Nextel International (Uruguay) LLC and the Seller Guarantors identified therein; and (iii) the notice of Tax Claim, dated the date hereof, from Purchaser to Seller (the "Tax Claim Notice"), attached to this letter as Annex A. Capitalized terms not otherwise defined herein shall have the meaning given to them in the Escrow Agreement or the Purchase Agreement, as applicable.

          Certain of the Entities are subject to Tax Claims that are expected to result in Taxes and Damages for which Seller is obligated to indemnify Purchaser pursuant to Section 11.4(a) of the Purchase Agreement.  Purchaser has delivered the Tax Claim Notice to Seller pursuant to Section 11.5(a) of the Purchase Agreement, notifying Seller of the Tax Claims described in more detail therein and Purchaser's intent to seek indemnification for all Taxes and Damages related to such Tax Claims.  Purchaser's estimate as of the date hereof, and subject to amendment in the event additional information becomes available, of the aggregate amount of such Taxes and Damages, as detailed on Annex A of the Tax Claim Notice, is US$117,900,000.00 (the "Tax Claim Amount").

          This letter constitutes a Claim Notice in respect of the Tax Claims detailed in the Tax Claim Notice and a Claim against the Escrow Fund for Damages in accordance with Section 3(e)(i)(2) of the Escrow Agreement.  Purchaser hereby requests that the Escrow Agent reserve the Claimed Amount equal to the Tax Claim Amount.  Purchaser hereby expressly reserves all of its rights, claims and arguments with respect to this Claim Notice and the Taxes and Damages referenced herein and any future claims Purchaser may make.

Sincerely,

Name: Sherri Bazan
 Title: Director – Cash/Treasury

(Attachments)

cc:   NIU HOLDINGS LLC
     c/o NII Holdings, Inc.
     1875 Explorer Street
     Reston, VA 20191
     Facsimile: (703) 390-5191
     Attention: Shana C. Smith, General Counsel

     Jones Day
     222 East 41st Street
     New York, NY 10017
     Facsimile: (212) 755-7306
     Attention: Robert A. Profusek and John Kane

**Annex A**

**Tax Claim Notice**

(See attached.)

April 27, 2017

By Email and Facsimile

NIU Holdings LLC,
      c/o NII Holdings, Inc.,
          1875 Explorer Street,
            Reston, VA 20191,
               Facsimile:  (703) 390-5191.

Attention:  Shana C. Smith, General Counsel

            Re:  Tax Claim Notice

Dear Ms. Smith:

     Reference is hereby made to (i) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "Purchase Agreement"), by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., NIU Holdings LLC ("Seller"), Nextel International (Uruguay) LLC and the Seller Guarantors identified therein and (ii) the Escrow Agreement, dated January 26, 2015 (as amended, the "Escrow Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), Seller and Citibank, N.A. ("Escrow Agent").  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

     Pursuant to Section 11.4(a) of the Purchase Agreement, Seller is required to indemnify Purchaser from and against, among other things, any and all Taxes and Damages relating to any Taxes imposed on the Entities that are attributable to any Pre-Closing Period.  As of the date of this letter, certain of the Entities are the subject of certain Tax Claims concerning Taxes attributable to Pre-Closing Periods, as set forth more particularly on Annex A hereto.  As of the date hereof, and subject to amendment in the event additional information becomes available, Purchaser estimates that the aggregate amount of such Taxes and Damages indemnifiable in respect of such Tax Claims is US$117,900,000.00 (the "Tax Claim Amount").

This letter constitutes a notice in respect of such Tax Claims in accordance with Section 11.5(a) of the Purchase Agreement. Purchaser hereby expressly reserves all of its rights, claims and arguments with respect to this notice and the Tax Claims, Taxes and Damages referenced herein.

If you have any questions regarding the subject matter of this letter, please contact me at david.c.welsch@ATT.com or 214-757-3393 or Werner Ahlers at ahlersw@sullcrom.com or (212) 558-1623.

Very truly yours,

Name: David C. Welsch
Title: Vice President and Associate
General Counsel

(Attachments)

cc:     Jones Day
        222 East 41st Street
        New York, New York 10017
        Attention: Robert A. Profusek and John Kane

**Annex A**

**Tax Claims**

| Tax Claim | Entities | Estimated Taxes and Damages |
|---|---|---|
| Mexican impuesto especial sobre producción y servicios ("IEPS") audits (fiscal years 2011-2014) and related administrative appeals (fiscal years 2011-2012) and Mexican income tax/VAT audits (fiscal years 2011-2014) | Inversiones Nextel de Mexico, S. de R.L. de C.V.<br><br>NII Telecom S. de R.L. de C.V.<br><br>NII Digital S. de R.L. de C.V. | USD $37,300,000 |
| Mexican income tax, VAT, flat tax and IEPS audits (fiscal years 2010-2013) | Comunicaciones Nextel de Mexico S.A. de C.V. | USD $80,600,000 |

# EXHIBIT 5

| | |
|---|---|
| **From:** | WELSCH, DAVID C (Legal) <dw4543@att.com> |
| **Sent:** | Friday, April 28, 2017 5:05 PM |
| **To:** | Shana Smith; John K Kane |
| **Cc:** | 'Ahlers, Werner F.'; Fidler, Benjamin D.; SUMMERFORD, AUSTIN |
| **Subject:** | RE: [EXT] RE: Escrow Claim Letter |
| **Attachments:** | Tax Claim - Chart of Audits.docx |

Shana – attached is additional detail regarding the tax years and entities included in our Escrow Claim letter. My understanding is that your tax folks are working with us on most if not all of these matters. After you review this information with them, let us know if you would like to discuss this further.

**From:** Shana Smith [mailto:shana.smith@nii.com]
**Sent:** Friday, April 28, 2017 2:42 PM
**To:** WELSCH, DAVID C (Legal)
**Subject:** Re: [EXT] RE: Escrow Claim Letter

Ok, but there must be a schedule underlying the letter you put together. Can we start with that?

Shana

On Fri, Apr 28, 2017 at 3:37 PM, WELSCH, DAVID C (Legal) <dw4543@att.com> wrote:

I have been in touch with Ben and we are working on pulling together the information that you've requested. It may be a few days before we have it though, since we need to coordinate with the tax team in Mexico.

**From:** Shana Smith [mailto:shana.smith@nii.com]
**Sent:** Friday, April 28, 2017 2:34 PM
**To:** WELSCH, DAVID C (Legal) <dw4543@att.com>
**Subject:** Escrow Claim Letter

David,

We would like to understand what comprises the claim amount included in the letter yesterday. We have asked Ben at Sullivan to follow up on this, but in the interest of time, I thought I would reach out to you as well. As provided, we do not understand the issues or related amounts, and I want to reconcile the claims with the information we have on open tax matters. Specifically, we are looking for detail by tax year and entity, including a description of the issue and the related amount, and an explanation for how the amount was calculated.

Can you provide a schedule on the claims today?

Thank you,

Shana

--

**Shana C. Smith | General Counsel |** ><  **nii**

**NII Holdings, Inc.**
1875 Explorer Street | Suite 800 | Reston, Virginia 20190
desk: <u>703.390.7286</u> | mobile: <u>202.491.7060</u> | <u>shana.smith@nii.com</u>
<span style="color:green">Antes de imprimir, piensa en tu responsabilidad con el MEDIO AMBIENTE | Please consider the environment before printing this message.</span>

--

**Shana C. Smith | General Counsel |** ><  **nii**

**NII Holdings, Inc.**
1875 Explorer Street | Suite 800 | Reston, Virginia 20190
desk: 703.390.7286 | mobile: 202.491.7060 | <u>shana.smith@nii.com</u>
<span style="color:green">Antes de imprimir, piensa en tu responsabilidad con el MEDIO AMBIENTE | Please consider the environment before printing this message.</span>

**AT&T Mexico / NII**
**Breakdown of Estimated Taxes and Damages in Dispute under the Audit Proceedings Referenced in Tax Claim Notice Dated April 27, 2017[1]**

| Audit | Entity | Estimated Taxes and Damages (USD) |
|---|---|---|
| Fiscal Year 2010 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $38,600,000 |
| Fiscal Year 2011 – Mexican income tax, VAT and flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $37,100,000 |
| Fiscal Year 2011 – Mexican impuesto especial sobre producción y servicios ("**IEPS**") audit and related administrative appeal filed October 26, 2015 | Inversiones Nextel de Mexico, S de R.L. de C.V. | $9,900,000 |
| Fiscal Year 2012 – Mexican IEPS audit and related administrative appeal filed January 28, 2016 | NII Telecom S. de R.L. de C.V. | $3,000,000 |
| Fiscal Year 2012 – Mexican flat tax audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $3,800,000 |
| Fiscal Year 2013 – Mexican income tax, VAT, flat tax and IEPS audit | Comunicaciones Nextel de Mexico S.A. de C.V. | $1,100,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $12,900,000 |
| Fiscal Year 2013 – Mexican income tax, VAT and IEPS audit | NII Digital, S de R.L. de C.V. | $7,700,000 |
| Fiscal Year 2014 – Mexican income tax, Vat and IEPS audit | Inversiones Nextel de Mexico, S de R.L. de C.V. | $3,800,000 |

---

[1] **Note:** The above represents AT&T's current estimate of the breakdown of the Tax Claim Amount set forth in the above-referenced notice of Tax Claim and is subject to AT&T's ongoing review and revision based on developments in the various audit proceedings. Nothing herein is intended to or shall be deemed to limit or modify any statement or claim in the above-referenced notice of Tax Claim referenced above, and AT&T expressly reserves all of its rights, claims and arguments with respect to the Tax Claim Notice and the Taxes and Damages referenced therein.

# EXHIBIT 6

May 25, 2017

Citibank, N.A.
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn: Mary Ellen Connolly
Facsimile (973) 461-7191 or (973) 461-7192
E-mail: mary.e.connolly@citi.com

Re: <u>Objection to Escrow Claim Notice</u>

Dear Ms. Connolly:

Reference is hereby made to (i) the Escrow Agreement, dated January 26, 2015 (as amended, the "<u>Escrow Agreement</u>"), by and among AT&T Mobility Holdings B.V. ("<u>Purchaser</u>") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("<u>Seller</u>") and Citibank, N.A. ("<u>Escrow Agent</u>"); (ii) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "<u>Purchase Agreement</u>"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., Seller, Nextel International (Uruguay) LLC and the Seller Guarantors identified therein; and (iii) the Escrow Claim Notice - Tax Claim, dated April 27, 2017, from Purchaser to the Escrow Agent, and the Adjustment to Claimed Amount, dated May 18, 2017, from Purchaser to the Escrow Agent (collectively, the "<u>Escrow Claim Notice</u>"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Escrow Agreement.

Under the Tax Claim Notice attached as Annex A to the Escrow Claim Notice, Purchaser asserted claims for indemnification pursuant to Section 11.4(a) of the Purchase Agreement in the aggregate amount of $113.8 million (the "<u>Claimed Amount</u>"). Under the Escrow Claim Notice, Purchaser requested that the Escrow Agent reserve a portion of the Escrow Fund equal to the Claimed Amount. Attached hereto as <u>Annex A</u> is Seller's letter to Purchaser dated May 25, 2017 (the "<u>Objection Letter</u>"), objecting to, and disputing Purchaser's right to indemnification in respect of, the Claimed Amount

Pursuant to Section 3(e)(i)(3) of the Escrow Agreement, Seller hereby provides notice of its objection to the Escrow Claim Notice and the Claimed Amount for the reasons set forth in the Objection Letter, which is incorporated herein by reference. Pursuant to Section 3(e)(ii) of the Escrow Agreement, the Escrow Agent should release no portion of the Claimed Amount to Purchaser.

Seller hereby expressly reserves all of its rights, remedies and defenses.

Very truly yours,

NIU HOLDINGS LLC


By: *Shana C Smith*
Name: Shana C. Smith
Title: Manager

cc: AT&T
 One AT&T Plaza
 205 South Akard Street, Room 2713
 Dallas, Texas 75202
 Attention: Sherri Bazan, CPA
 Fax: (214) 746-2277
 Email: sb2038@att.com

 AT&T
 One AT&T Plaza
 205 South Akard Street, 32nd Floor
 Dallas, Texas 75202
 Attention: John O'Connor, Senior Vice President and
   Assistant General Counsel
   Bill Caldwell, General Attorney
   David C. Welsch, General Attorney
 Fax: (214) 746-2216
 Email: JO8009@att.com
   Wc2842@att.com

 Sergio J. Galvis
 Werner F. Ahlers
 Sullivan & Cromwell LLP
 125 Broad Street
 New York, New York 10004
 fax: (212) 757-3990
 Email: Galviss@sullcrom.com, Ahlersw@sullcrom.com

May 25, 2017

Via e-mail and facsimile

AT&T Inc.
One AT&T Plaza
208 S. Akard Street, Suite 3702
Dallas, TX 75202
Attention: John O'Connor
          David C. Welsch
E-mail:   jo8009@att.com
          Dw4543@att.com

Re:   Tax Claim Notice dated April 27, 2017 (the "Claim Notice")

Ladies and Gentlemen:

     With respect to your communications purporting to assert an aggregate of $117.9 million of Tax Claims, which has since been revised to $113.8 million, please be advised that:

- We disagree that you or any of your affiliates are entitled to indemnity for the alleged Tax Claims; and

- We elect to assume the defense of any such Tax Claims.

Terms used that are defined in the agreements we entered into on January 26, 2015 are used in this letter as so defined. We object to the claims asserted in the Claim Notice for the following reasons:

1. Your claims include claims for $35,462,965 in respect of 2010 income taxes, inflation and surcharges. As these claims have not been resolved with the SAT and the amount of the tax liability, if any, is undetermined, we object to this portion of your claims.

2. Your claims include claims for $46,017,777 in respect of 2011 income taxes, telecom taxes, VAT, inflation, surcharges and penalty fees. As these claims have not been resolved with the SAT and the amount of the tax liability, if any, is undetermined, we object to this portion of your claims.

3. Your claims include claims for $6,821,501 in respect of 2012 income taxes, telecom taxes, inflation, surcharges and penalty fees. Your claim assumes income tax of $3,816,390 will be assessed for 2012. These claims are not based on any "written notice of deficiency, proposed adjustment, adjustment,

assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim" by a Governmental Authority, as required by Section 11.5(a) of the Purchase Agreement, and are therefore not valid claims for indemnification. Accordingly, we object to this portion of your claims as invalid, and the $3,816,390 reserved in respect of such invalid claims should be released immediately. We expect that you will join us in a joint notice releasing all funds reserved in respect of this portion of these claims. As the balance of your claims in respect of 2012 has not been resolved with the SAT and the amount of the tax liability, if any, is undetermined, we also object to the balance of these claims.

4. Your claims include claims for $21,619,899 and $3,836,219 in respect of 2013 and 2014 IEPS and related VAT taxes, respectively. We understand that these claims are based on your assumption that the SAT will assert the same claims in respect of 2013 and 2014 IEPS taxes as it has asserted in respect of 2011 and 2012. These claims are not, however, based on any "written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim" by a Governmental Authority, as required by Section 11.5(a) of the Purchase Agreement, that references or asserts any claims or deficiencies in respect of those years, and are therefore not currently valid claims for indemnification. While the Entities have received requests for information from a Governmental Authority for 2013 and 2014, these requests included over 200 questions relating to a variety of matters and did not include any information on which to determine the specific deductions or amounts that could eventually be the subject of review if the SAT determines in the future that there is a specific allegation or claim. While we understand that claims for Taxes due in respect of 2013 and 2014 are indemnifiable under the Purchase Agreement, the amounts included in your alleged Tax Claims as reserved for IEPS and related VAT taxes in 2013 and 2014 are not based on information from a Governmental Authority. Without that information or any other specific allegation or claim, it is not possible to provide a "reasonable estimate" of the Taxes for which indemnification is being sought, as required by the Escrow Agreement, and submitting such a speculative claim as a "placeholder" just before the claim period under the escrow ends is not consistent with the good faith requirements of the Escrow Agreement. Accordingly, we object to this portion of your claims as invalid, and the $25,456,118 reserved in respect of such invalid claims should be released immediately. We expect that you will join us in a joint notice releasing all funds reserved in respect of these claims.

5. Your claims for 2010-2014 noted above include interest calculated at a 1.13% interest rate, as opposed to the .75% reduced rate (the "Reduced Rate") that is provided for by Article 70-A of the Mexican Federal Fiscal Code (*Codigo Fiscal de la Federacion*) and Article 8 of the Income Law of the Federation for 2017 (*Ley de Ingresos de la Federación para el 2017*) (translation attached hereto as <u>Annex I</u>). We meet the requirements of Article 70-A to receive the reduced rate for each of the years included in your claims and have a statutory

right to the reduced rate. By using this higher interest rate, you substantially overstate these claims, and we object to the portions of the claims attributable to the use of the higher interest rate. Accordingly, we believe the $13,909,689 related to the difference between 1.13% and .75% should be released immediately. We expect that you will join us in a joint notice releasing these funds.

In summary, we object to the alleged Tax Claims included in the Claim Notice based on the reasons set forth above, and will send a notice to the Escrow Agent to that effect. Please confirm that you will join us in a joint notice to the Escrow Agent releasing $40,458,280 of the reserved Escrow Fund, which is the portion attributable to claims that are invalid under the Escrow Agreement or, in the case of the interest claims, contrary to applicable law, as follows:

- 2010: Applying the Reduced Rate, this claim needs to be decreased by $4,818,568.

- 2011: Applying the Reduced Rate, this claim needs to be decreased by $5,995,825.

- 2012: We expect the release of $3,816,390 of income tax, which includes $314,929 of interest reduction relating to the application of the Reduced Rate and, after correctly applying the Reduced Rate to the remaining claimed balance, such balance needs to be decreased by $371,379. Therefore, the total amount to be released for 2012 is $4,187,769.

- 2013: We expect the release of $21,619,899, which includes $2,076,586 of interest reduction relating to the application of the Reduced Rate.

- 2014: We expect the release of $3,836,219, which includes $332,402 of interest reduction relating to the application of the Reduced Rate.

In addition, to the extent that any Tax Claims become due and payable, we note that pursuant to Section 11.4(d) of the Purchase Agreement, we intend to first reduce any amounts due through the utilization of available net operating losses and tax credits.

We reserve all of our rights, remedies and defenses.

Very truly yours,

NIU HOLDINGS LLC

By: *Shana C Smith*
Name: Shana C. Smith
Title: Manager

cc: Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention: Sergio J. Galvis and Werner F. Ahlers
Fax: (212) 558-3588
Email: galviss@sullcrom.com
ahlersw@sullcrom.com

## Mexican Federal Fiscal Code
### (*Codigo Fiscal de la Federacion*)(the "Code")

**Article 70-A.** – If while carrying out its audit responsibilities the tax authorities determine that the taxpayer totally or partially omitted to pay its tax contributions, not including those retained, collected or transferred, the taxpayer may request the benefits that this Article provides, only if it declares under oath that it meets all of the following requirements:

I.  To have presented for its last three fiscal years all notices, declarations and other information required by fiscal regulations.

II.  If the tax authorities have audited any of its last three fiscal years, that the amount of any assessment did not exceed 10% of the amounts of taxes and accessories declared by the taxpayer or of the amount of tax losses declared by the taxpayer.

III.  (Repealed).

IV.  To have complied with all of the requirements made by the tax authorities in the last three fiscal years, if any.

V.  Not having incurred in any of the aggravating factors referred to in Article 75 of this Code at the time the tax authorities impose the fine.

VI.  Not being subject to the exercise of one or more criminal actions contemplated in the tax legislation or not having been convicted for fiscal crimes.

VII.  Have not requested in the last three years to pay in installments its withheld, collected or transferred contributions.

To verify the above, the tax authorities may request the taxpayer, within no more than twenty days from the date in which it submitted the request referred to in this Article, the data, reports or documents that it deems necessary. The taxpayer shall be required to provide the information within no more than fifteen days, noting that if it fails to do so within this time period, the reduction requested shall not be granted. It shall not be deemed that the tax authorities have initiated an audit when they request the data, reports and documents mentioned in this paragraph, being that they may exercise their audit responsibilities at any time.

<u>Once the tax authorities determine that the taxpayer meets all of the requirements referred to in this Article, the amount of the fines for violation of the tax provisions will be reduced by 100% and the surcharge rate for extension, as determined by the Income Law of the Federation for the corresponding period, will be applied.</u>

The reduction of the fine and the application of the surcharge rate will be conditioned to the payment of the amounts due, within fifteen days of the date when the taxpayer is notified with the corresponding resolution.

The reduction will only be applicable with respect to fines that are final or that the taxpayer has consented to, provided that a related administrative act is not under challenge, as well as with respect to fines determined by the taxpayer himself. The infraction or, where applicable, the resolution determining the assessment shall be deemed accepted when the taxpayer requests the reduction of fines referred to in this article or the application of the surcharge rate for extension.

The provisions of this Article do not constitute an instance and the resolutions issued by the tax authority cannot be challenged by individuals.

## Income Law of the Federation for 2017
### (*Ley de Ingresos de la Federación para el 2017*)

**Article 8 -** In the cases of extensions for the payment of fiscal credits, the following surcharge rate will be applied:

I.      At 0.75 percent per month on outstanding balances.

# EXHIBIT 7

May 25, 2017

Via e-mail and facsimile

AT&T Inc.
One AT&T Plaza
208 S. Akard Street, Suite 3702
Dallas, TX 75202
Attention: John O'Connor
           David C. Welsch
E-mail:   jo8009@att.com
          Dw4543@att.com


Re:   Tax Claim Notice dated April 27, 2017 (the "Claim Notice")

Ladies and Gentlemen:

      With respect to your communications purporting to assert an aggregate of $117.9 million of Tax Claims, which has since been revised to $113.8 million, please be advised that:

- We disagree that you or any of your affiliates are entitled to indemnity for the alleged Tax Claims; and

- We elect to assume the defense of any such Tax Claims.

Terms used that are defined in the agreements we entered into on January 26, 2015 are used in this letter as so defined. We object to the claims asserted in the Claim Notice for the following reasons:

1. Your claims include claims for $35,462,965 in respect of 2010 income taxes, inflation and surcharges. As these claims have not been resolved with the SAT and the amount of the tax liability, if any, is undetermined, we object to this portion of your claims.

2. Your claims include claims for $46,017,777 in respect of 2011 income taxes, telecom taxes, VAT, inflation, surcharges and penalty fees. As these claims have not been resolved with the SAT and the amount of the tax liability, if any, is undetermined, we object to this portion of your claims.

3. Your claims include claims for $6,821,501 in respect of 2012 income taxes, telecom taxes, inflation, surcharges and penalty fees. Your claim assumes income tax of $3,816,390 will be assessed for 2012. These claims are not based on any "written notice of deficiency, proposed adjustment, adjustment,

assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim" by a Governmental Authority, as required by Section 11.5(a) of the Purchase Agreement, and are therefore not valid claims for indemnification. Accordingly, we object to this portion of your claims as invalid, and the $3,816,390 reserved in respect of such invalid claims should be released immediately. We expect that you will join us in a joint notice releasing all funds reserved in respect of this portion of these claims. As the balance of your claims in respect of 2012 has not been resolved with the SAT and the amount of the tax liability, if any, is undetermined, we also object to the balance of these claims.

4. Your claims include claims for $21,619,899 and $3,836,219 in respect of 2013 and 2014 IEPS and related VAT taxes, respectively. We understand that these claims are based on your assumption that the SAT will assert the same claims in respect of 2013 and 2014 IEPS taxes as it has asserted in respect of 2011 and 2012. These claims are not, however, based on any "written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other administrative or court proceeding, suit, dispute or other claim" by a Governmental Authority, as required by Section 11.5(a) of the Purchase Agreement, that references or asserts any claims or deficiencies in respect of those years, and are therefore not currently valid claims for indemnification. While the Entities have received requests for information from a Governmental Authority for 2013 and 2014, these requests included over 200 questions relating to a variety of matters and did not include any information on which to determine the specific deductions or amounts that could eventually be the subject of review if the SAT determines in the future that there is a specific allegation or claim. While we understand that claims for Taxes due in respect of 2013 and 2014 are indemnifiable under the Purchase Agreement, the amounts included in your alleged Tax Claims as reserved for IEPS and related VAT taxes in 2013 and 2014 are not based on information from a Governmental Authority. Without that information or any other specific allegation or claim, it is not possible to provide a "reasonable estimate" of the Taxes for which indemnification is being sought, as required by the Escrow Agreement, and submitting such a speculative claim as a "placeholder" just before the claim period under the escrow ends is not consistent with the good faith requirements of the Escrow Agreement. Accordingly, we object to this portion of your claims as invalid, and the $25,456,118 reserved in respect of such invalid claims should be released immediately. We expect that you will join us in a joint notice releasing all funds reserved in respect of these claims.

5. Your claims for 2010-2014 noted above include interest calculated at a 1.13% interest rate, as opposed to the .75% reduced rate (the "Reduced Rate") that is provided for by Article 70-A of the Mexican Federal Fiscal Code (*Codigo Fiscal de la Federacion*) and Article 8 of the Income Law of the Federation for 2017 (*Ley de Ingresos de la Federación para el 2017*) (translation attached hereto as <u>Annex I</u>). We meet the requirements of Article 70-A to receive the reduced rate for each of the years included in your claims and have a statutory

right to the reduced rate. By using this higher interest rate, you substantially overstate these claims, and we object to the portions of the claims attributable to the use of the higher interest rate. Accordingly, we believe the $13,909,689 related to the difference between 1.13% and .75% should be released immediately. We expect that you will join us in a joint notice releasing these funds.

In summary, we object to the alleged Tax Claims included in the Claim Notice based on the reasons set forth above, and will send a notice to the Escrow Agent to that effect. Please confirm that you will join us in a joint notice to the Escrow Agent releasing $40,458,280 of the reserved Escrow Fund, which is the portion attributable to claims that are invalid under the Escrow Agreement or, in the case of the interest claims, contrary to applicable law, as follows:

- 2010: Applying the Reduced Rate, this claim needs to be decreased by $4,818,568.

- 2011: Applying the Reduced Rate, this claim needs to be decreased by $5,995,825.

- 2012: We expect the release of $3,816,390 of income tax, which includes $314,929 of interest reduction relating to the application of the Reduced Rate and, after correctly applying the Reduced Rate to the remaining claimed balance, such balance needs to be decreased by $371,379. Therefore, the total amount to be released for 2012 is $4,187,769.

- 2013: We expect the release of $21,619,899, which includes $2,076,586 of interest reduction relating to the application of the Reduced Rate.

- 2014: We expect the release of $3,836,219, which includes $332,402 of interest reduction relating to the application of the Reduced Rate.

In addition, to the extent that any Tax Claims become due and payable, we note that pursuant to Section 11.4(d) of the Purchase Agreement, we intend to first reduce any amounts due through the utilization of available net operating losses and tax credits.

We reserve all of our rights, remedies and defenses.

Very truly yours,

NIU HOLDINGS LLC


By: *Shana C Smith*
Name: Shana C. Smith
Title: Manager

cc: Sullivan & Cromwell LLP
   125 Broad Street
   New York, NY 10004
   Attention: Sergio J. Galvis and Werner F. Ahlers
   Fax: (212) 558-3588
   Email: galviss@sullcrom.com
           ahlersw@sullcrom.com

<center>**Annex I**</center>

<center>**Mexican Federal Fiscal Code**
*(Codigo Fiscal de la Federacion)*(the "Code")</center>

**Article 70-A.** – If while carrying out its audit responsibilities the tax authorities determine that the taxpayer totally or partially omitted to pay its tax contributions, not including those retained, collected or transferred, the taxpayer may request the benefits that this Article provides, only if it declares under oath that it meets all of the following requirements:

| | |
|---|---|
| I. | To have presented for its last three fiscal years all notices, declarations and other information required by fiscal regulations. |
| II. | If the tax authorities have audited any of its last three fiscal years, that the amount of any assessment did not exceed 10% of the amounts of taxes and accessories declared by the taxpayer or of the amount of tax losses declared by the taxpayer. |
| III. | (Repealed). |
| IV. | To have complied with all of the requirements made by the tax authorities in the last three fiscal years, if any. |
| V. | Not having incurred in any of the aggravating factors referred to in Article 75 of this Code at the time the tax authorities impose the fine. |
| VI. | Not being subject to the exercise of one or more criminal actions contemplated in the tax legislation or not having been convicted for fiscal crimes. |
| VII. | Have not requested in the last three years to pay in installments its withheld, collected or transferred contributions. |

To verify the above, the tax authorities may request the taxpayer, within no more than twenty days from the date in which it submitted the request referred to in this Article, the data, reports or documents that it deems necessary. The taxpayer shall be required to provide the information within no more than fifteen days, noting that if it fails to do so within this time period, the reduction requested shall not be granted. It shall not be deemed that the tax authorities have initiated an audit when they request the data, reports and documents mentioned in this paragraph, being that they may exercise their audit responsibilities at any time.

Once the tax authorities determine that the taxpayer meets all of the requirements referred to in this Article, the amount of the fines for violation of the tax provisions will be reduced by 100% and the surcharge rate for extension, as determined by the Income Law of the Federation for the corresponding period, will be applied.

The reduction of the fine and the application of the surcharge rate will be conditioned to the payment of the amounts due, within fifteen days of the date when the taxpayer is notified with the corresponding resolution.

The reduction will only be applicable with respect to fines that are final or that the taxpayer has consented to, provided that a related administrative act is not under challenge, as well as with respect to fines determined by the taxpayer himself. The infraction or, where applicable, the resolution determining the assessment shall be deemed accepted when the taxpayer requests the reduction of fines referred to in this article or the application of the surcharge rate for extension.

The provisions of this Article do not constitute an instance and the resolutions issued by the tax authority cannot be challenged by individuals.

## Income Law of the Federation for 2017
### (*Ley de Ingresos de la Federación para el 2017*)

**Article 8 -** In the cases of extensions for the payment of fiscal credits, the following surcharge rate will be applied:

    I.      At 0.75 percent per month on outstanding balances.

# EXHIBIT 8

May 18, 2017

By Email and Facsimile

Citibank, N.A.,
    Agency & Trust,
        388 Greenwich Street, 14th Floor,
            New York, NY 10013,
                Facsimile: (973) 461-7191
                    Email:   mary.e.connolly@citi.com; cts.spag@citi.com;
                                  catherine.m.hughes@citi.com

Attention:  Mary Ellen Connolly

            Re:        Adjustment to Claimed Amount

Dear Ms. Connolly:

        Reference is hereby made to (i) the Escrow Agreement, dated January 26, 2015 (as amended, the "Escrow Agreement"), by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("Seller") and Citibank, N.A. ("Escrow Agent"); (ii) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "Purchase Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., Seller, Nextel International (Uruguay) LLC and the Seller Guarantors identified therein; and (iii) the Claim Notice, dated April 27, 2017, from Purchaser to the Escrow Agent (including all annexes thereto, the "Tax Claim Notice"). Capitalized terms not otherwise defined herein shall have the meaning given to them in the Escrow Agreement or the Purchase Agreement, as applicable.

        As set forth in the Tax Claim Notice, Purchaser's estimate as of the date thereof of the aggregate amount of Taxes and Damages indemnifiable in respect of the Tax Claims referenced in the Tax Claim Notice (the "Specified Tax Claims") was equal to US$117,900,000.00 (the "Original Claimed Amount"). Purchaser has revised its estimate based on calculations of certain interest payments that comprised a portion of the Original Claimed Amount. As a result of such calculations, Purchaser's revised estimate, as of the date hereof and subject to further revision in the event additional information becomes available, of the aggregate amount of Taxes and Damages indemnifiable in respect of the Specified Tax Claims is equal to US$113,800,000.00 (the "Revised Claimed Amount").

Citibank, N.A. -2-

Attached hereto as <u>Annex A</u> is a Joint Release Notice directing the release to Seller of US$4,100,000.00, which represents the excess of the Original Claimed Amount over the Revised Claimed Amount. Purchaser hereby requests that the Escrow Agent continue to reserve a Claimed Amount in respect of the Tax Claim Notice equal to the Revised Claimed Amount. Purchaser hereby expressly reserves all of its rights, claims and arguments with respect to this letter, the Tax Claim Notice and the Taxes and Damages referenced herein and therein and any future claims Purchaser may make.

[*Signature Page Follows*]

Sincerely,

Name: Andrew B. Keiser
Title: AVP Treasury

(Attachments)

cc:     NIU Holdings LLC
        c/o NII Holdings, Inc.
        1875 Explorer Street
        Reston, VA 20191
        Facsimile: (703) 390-5191
        Attention: Shana C. Smith, General Counsel

        Jones Day
        222 East 41st Street
        New York, NY 10017
        Facsimile: (212) 755-7306
        Attention: Robert A. Profusek and John Kane

**Annex A**

**Joint Release Notice**

(See attached.)

**JOINT RELEASE NOTICE**

To: Citibank, N.A.
as Escrow Agent
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn:  Mary Ellen Connolly
Facsimile: (973) 461-7191
Email:  mary.e.connolly@citi.com; cts.spag@citi.com; catherine.m.hughes@citi.com

        This joint release notice is being executed and delivered as of the 18th day of May, 2017, pursuant to Section 3(e)(i)(1) of that certain Escrow Agreement dated as of January 26, 2015 (the "Escrow Agreement") by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("Seller") and Citibank, N.A., as Escrow Agent (the "Escrow Agent").  Capitalized terms used and not otherwise defined in this notice have the meanings ascribed to them in the Escrow Agreement.

        The parties to this Joint Release Notice hereby jointly instruct the Escrow Agent to release and pay to Seller an amount equal to $4,100,000.00 out of the Escrow Account, by wire transfer of immediately available funds to:

|  |  |
|---|---|
| Bank: | Signature Bank |
| ABA: | 026013576 |
| SWIFT: | SIGNUS33 |
| Account: | NIU Holdings LLC |
| Acct#: | 150215-7074 |
| Ref: | Escrow Release |

*[Signature Page Follows]*

Each of the undersigned hereby represents and warrants that it has been authorized to exercise this notice. This notice may be signed in counterparts. All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.

**PURCHASER:**                                      **SELLER:**

NEW CINGULAR WIRELESS SERVICES, INC.    NIU HOLDINGS LLC

By: _____         By: _____
Name: ANDREW G KEIGER                        Name:
Title: VP-TREASURY                           Title:
Test Word: ATT                               Test Word:

*[Signature Page to Joint Release Notice – Adjusted Claimed Amount]*

Each of the undersigned hereby represents and warrants that it has been authorized to exercise this notice. This notice may be signed in counterparts. All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.

**PURCHASER:**                                          **SELLER:**

NEW CINGULAR WIRELESS SERVICES, INC.    NIU HOLDINGS LLC

By:_____          By: _Shana C Smith_____
Name:                                              Name: Shana C Smith
Title:                                               Title: Manager
Test Word: ATT                               Test Word: PIZZA

*[Signature Page to Joint Release Notice – Adjusted Claimed Amount]*

# EXHIBIT 9

# JOINT RELEASE NOTICE

To: Citibank, N.A.
as Escrow Agent
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn: Mary Ellen Connolly
Facsimile: (973) 461-7191 or (973) 461-7192
Email: mary.e.connolly@citi.com

This joint release notice is being executed and delivered as of the 18th day of July, 2017, pursuant to Section 3(e)(i) of that certain Escrow Agreement dated as of January 26, 2015 (the "Escrow Agreement") by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("Seller") and Citibank, N.A., as Escrow Agent (the "Escrow Agent"). Reference is hereby made to (i) the Claim Notice, dated April 27, 2017, from Purchaser to the Escrow Agent (including all annexes thereto, the "Tax Claim Notice") and (ii) the letter from Purchaser to the Escrow Agent, dated May 18, 2017 (including all annexes thereto, the "Tax Claim Adjustment Letter"). Capitalized terms used and not otherwise defined in this notice have the meanings ascribed to them in the Escrow Agreement.

Following discussions between Purchaser and Seller regarding the Tax Claim Notice, Purchaser and Seller hereby acknowledge that, as agreed in and subject to the terms of the letter agreement between them dated as of the date hereof, (i) the Claimed Amount set forth in the Tax Claim Notice, as adjusted by the Tax Claim Adjustment Letter, shall be reduced by $3,816,390.00 (the "Release Amount") and (ii) notwithstanding the foregoing, Purchaser may, by notice to Seller and the Escrow Agent at any time after the date hereof, adjust the Claimed Amount set forth in the Tax Claim Notice to include any Taxes and Damages attributable or otherwise related to the 2012 fiscal year (not to exceed the Release Amount).

As a result of clause (i) of the foregoing paragraph, pursuant to Section 3(e)(i)(1) of the Escrow Agreement, Purchaser and Seller hereby jointly instruct the Escrow Agent to release and pay to Seller an amount equal to $3,816,390.00 out of the Escrow Account by wire transfer of immediately available funds to:

Bank: Signature Bank
ABA: 026013576
SWIFT: SIGNUS33
Account: NIU Holdings LLC
Acct#: 150215-7074
Ref: Escrow Release

Notwithstanding the foregoing release, Purchaser hereby expressly reserves all of its rights, claims and arguments with respect to this notice, the Tax Claim Notice and the Taxes and Damages referenced herein and therein and any future claims Purchaser may make.

Each of the undersigned hereby represents and warrants that it has been authorized to execute this notice. This notice may be signed in counterparts. All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.

**PURCHASER**:

AT&T MOBILITY HOLDINGS B.V.

By: _Sherri Bazan_
Name: Sherri Bazan
Title: Director Cash / Treasury
Test Word: ATT

**SELLER:**

NIU HOLDINGS LLC

By: _____
Name: Shana C. Smith
Title: Manager
Test Word: Pizza

*[Signature Page to Joint Release Notice]*

Each of the undersigned hereby represents and warrants that it has been authorized to execute this notice.  This notice may be signed in counterparts.  All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.


**PURCHASER**:

AT&T MOBILITY HOLDINGS B.V.




By: _____
Name: Sherri Bazan
Title: Director Cash / Treasury
Test Word: ATT

**SELLER:**

NIU HOLDINGS LLC

*Shana C Smith*


By: _____
Name: Shana C. Smith
Title: Manager
Test Word: Pizza

SC1:4441197.3

# EXHIBIT 10

AT&T Mobility Holdings B.V.
One AT&T Plaza
205 South Akard Street, 32nd Floor
Dallas, TX 75202

April 5, 2018

By Email and Facsimile

NIU Holdings LLC,
c/o NII Holdings, Inc.,
1875 Explorer Street,
Reston, VA 20191
Facsimile: (703) 390-5191
Attn: Shana C. Smith, General Counsel

Re: Tax Claim and Request for Joint Release Notice

Dear Ms. Smith:

Reference is hereby made to (i) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "Purchase Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., Seller, Nextel International (Uruguay) LLC and the Seller Guarantors identified therein, (ii) the Escrow Agreement, dated January 26, 2015 (as amended, the "Escrow Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), Seller and Citibank, N.A. ("Escrow Agent"), (iii) the Claim Notice, dated April 27, 2017, from Purchaser to the Escrow Agent (including all annexes thereto, the "Tax Claim Notice"), (iv) the letter from Purchaser to the Escrow Agent, dated May 18, 2017 (including all annexes thereto, the "Tax Claim Adjustment Letter"), regarding certain adjustments to the Claimed Amount set forth in the Tax Claim Notice and the resulting release of such funds to Seller, (v) the letters from Seller to Purchaser and to the Escrow Agent, each dated May 25, 2017 (together, the "Objection Letters"), regarding Seller's objections to the Tax Claim Notice and (vi) the letter agreement and joint release notice to the Escrow Agent, each dated July 18, 2017 (together, the "2012 Tax Letter Agreement"), by and between Purchaser and Seller, setting forth the parties' agreement with respect to the 2012 Tax Claim Amount (as defined therein) and certain other agreements with respect to Taxes and Damages related to the 2012 fiscal year. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Purchase Agreement or the Escrow Agreement, as applicable.

We write in regard to your request that Purchaser execute a Joint Release Notice in connection with a potential settlement that may be reached with SAT regarding the amount of Taxes and Damages imposed on certain of the Entities for fiscal years 2010 and 2011. Purchaser does not agree to execute such a Joint Release Notice.

Under the Tax Claim Notice (as revised by the Tax Claim Adjustment Letter), Purchaser delivered a Claim under the Escrow Agreement and Purchase Agreement for indemnifiable Taxes and Damages for a single, aggregate Claimed Amount of $113,800,000. As set forth in the Objection Letters, Seller disputed the entirety of the Claimed Amount, thereby creating a single Disputed Claimed Amount of $113,800,000. As adjusted by the 2012 Tax Letter Agreement, the Claimed Amount, and therefore the Disputed Claim Amount in respect thereof, is now equal to $109,983,610 (the "<u>Disputed Tax Claim Amount</u>"). Pursuant to Section 3(e)(ii) of the Escrow Agreement, other than pursuant to an agreement of the parties to the Escrow Agreement, the Disputed Tax Claim Amount is only required to be released in the event of a Final Judgment with respect to the entirety of such Disputed Tax Claim Amount.

Furthermore, even if the Escrow Agreement were not otherwise clear with respect to the requirements for release of the Disputed Tax Claim Amount, it would be particularly inappropriate to agree to a Joint Release Notice regarding all or any portion of the Disputed Tax Claim Amount at this time because our current estimate of indemnifiable Taxes and Damages in connection with the Claim set forth in the Tax Claim Notice (the "Tax Claim") exceeds the Disputed Tax Claim Amount. As I am sure that you are aware, recent correspondence from Prodecon (the *Procuraduria de la Defensa del Contribuyente*) and SAT increased by almost $70,000,000 the aggregate amount of indemnifiable Taxes and Damages in respect of the Tax Claim that had previously been estimated by Purchaser based on information available at the time of its delivery of the Tax Claim Notice. Even taking into account the proposed resolutions of the 2010 and 2011 tax years, the current estimate of the aggregate amount of indemnifiable Taxes and Damages in respect of the Tax Claim far exceeds the Disputed Tax Claim Amount.

Purchaser notes that the foregoing is without prejudice to any other arguments or claims Purchaser may have under the Purchase Agreement or the Escrow Agreement regarding these matters and hereby expressly reserves all of its rights, claims and arguments with respect to this letter and the Tax Claims, Taxes, Damages and other correspondence referenced herein.

If you have any questions regarding the subject matter of this letter, please contact me at david.c.welsch@att.com or (214) 757-3393 or Werner Ahlers at ahlersw@sullcrom.com or (212) 558-1623.

*[remainder of page left intentionally blank]*

Very truly yours,

Name:  David C. Welsch
Title:  Vice President and Associate
         General Counsel


(Attachments)

Cc:     Jones Day
        222 East 41st Street
        New York, New York 10017
        Attn: Robert A. Profusek and John Kane

# EXHIBIT 11

# JOINT RELEASE NOTICE

To: Citibank, N.A.
as Escrow Agent
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn: Mary Ellen Connolly
Facsimile: (973) 461-7191 or (973) 461-7192
Email: mary.e.connolly@citi.com

   This joint release notice is being executed and delivered as of the 4th day of May, 2017, pursuant to Section 3(e)(iii)(1) of that certain Escrow Agreement dated as of January 26, 2015 (the "Escrow Agreement") by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("Seller") and Citibank, N.A., as Escrow Agent (the "Escrow Agent"). Capitalized terms used and not otherwise defined in this notice have the meanings ascribed to them in the Escrow Agreement.

   The parties to this Joint Release Notice hereby instruct the Escrow Agent to release and pay to Seller the entire balance remaining in the Escrow Account *less* (A) the aggregate Claimed Amount in respect of all pending or disputed Disputed Claim Amounts and (B) the aggregate Claimed Amount in respect of Claims for which the Objection Period has not yet expired, in each case pursuant to Claim Notices received by the Escrow Agent prior to the Final Release Date, which the parties hereto agree is equal to $45,562,279.58, by wire transfer of immediately available funds to:

|  |  |
|---|---|
| Bank: | Signature Bank |
| ABA: | 026013576 |
| SWIFT: | SIGNUS33 |
| Account: | NIU Holdings LLC |
| Acct#: | 150215-7074 |
| Ref: | Escrow Release |

   This Joint Release Notice will not be considered an admission by either party as to the validity or invalidity of any Claim asserted prior to the date hereof against the funds remaining in escrow under the Escrow Agreement. The parties to this Joint Release Notice reserve their rights under the Purchase and Sale Agreement and under the Escrow Agreement.

*[Signature Page Follows]*

Each of the undersigned hereby represents and warrants that it has been authorized to exercise this notice. This notice may be signed in counterparts. All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.

**PURCHASER:**

**SELLER:**

NEW CINGULAR WIRELESS SERVICES, INC.

NIU HOLDINGS LLC

By: _Sherri Bazan_

Name: Sherri Bazan
Title: Director Cash/Treasury
Test Word: ATT

By: _Shana C Smith_

Name: Shana C Smith
Title: Manager
Test Word: Pizza

*[Signature Page to Joint Release Notice – Final Release Date]*

# EXHIBIT 12

AT&T Mobility Holdings B.V.                NIU Holdings LLC,
One AT&T Plaza                             c/o NII Holdings, Inc.,
205 South Akard Street, 32nd Floor         12110 Sunset Hills Road
Dallas, TX 75202                           Suite 600
                                           Reston, Virginia 20190

July 9, 2018

   This letter agreement (this "<u>Agreement</u>") is entered into by and between AT&T Mobility Holdings B.V. ("<u>Purchaser</u>") and NIU Holdings LLC ("<u>Seller</u>").

   Reference is hereby made to (i) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "<u>Purchase Agreement</u>"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., Seller, Nextel International (Uruguay) LLC and the Seller Guarantors identified therein, (ii) the Escrow Agreement, dated January 26, 2015 (as amended, the "<u>Escrow Agreement</u>"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), Seller and Citibank, N.A. ("<u>Escrow Agent</u>"), (iii) the Claim Notice, dated April 27, 2017, from Purchaser to the Escrow Agent (including all annexes thereto, the "<u>Tax Claim Notice</u>"), (iv) the letter from Purchaser to the Escrow Agent, dated May 18, 2017 (including all annexes thereto, the "<u>Tax Claim Adjustment Letter</u>"), regarding certain adjustments to the Claimed Amount set forth in the Tax Claim Notice and the resulting release of such funds to Seller, (v) the letter from Seller to Purchaser, dated May 25, 2017 (the "<u>Objection Letter</u>"), regarding Seller's objections to the Tax Claim Notice, (vi) the letter agreement between Purchaser and Seller, dated July 18, 2017 (including all annexes thereto, the "<u>July 2017 Letter Agreement</u>"; together with the documents set forth in the foregoing clauses (iii)-(v) and subsequent related correspondence, the "<u>Tax Claim Documents</u>"), regarding the release of funds from the Escrow Account and certain related agreements with respect to claims in respect of the 2012 fiscal year. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Purchase Agreement or the Escrow Agreement, as applicable.

   This Agreement reflects certain agreements of Purchaser and Seller regarding Purchaser's consent, including for purposes of Section 11.5(b) of the Purchase Agreement, to the terms of the settlement with SAT of the 2011 Comunicaciones Nextel de Mexico S.A. de C.V. ("<u>Com Nextel</u>") income tax audit (the "<u>SAT Settlement</u>"), pursuant to which Com Nextel would make payments in the aggregate amount of MXN$76,903,557 (the "<u>SAT Settlement Amount</u>"), which SAT Settlement Amount is

indemnifiable by Seller pursuant to Section 11.5(a) of the Purchase Agreement, and the related release to Purchaser from the Escrow Account of an amount equal to the aggregate amount of the SAT Settlement Amount.  For good and valuable consideration, and intending to be legally bound hereby, each of Purchaser and Seller hereby agrees as follows:

       1.      Purchaser here by grants its consent to the SAT Settlement in accordance with Section 11.5(b) of the Purchase Agreement.

       2.      Simultaneously with the execution and delivery of this Agreement, Purchaser and Seller shall execute and deliver to the Escrow Agent a Joint Release Notice, in the form attached hereto as <u>Annex A</u>, to provide for the release of $3,994,720.20  (the "<u>Release Amount</u>"), which represents the U.S. Dollar equivalent of the SAT Settlement Amount calculated at the July 5, 2018, exchange rate, from the Escrow Account to Purchaser in respect of the SAT Settlement Amount, which release shall satisfy Seller's obligation to indemnify Purchaser for such SAT Settlement Amount.

       3.      Notwithstanding the delivery of the Joint Release Notice pursuant to the foregoing paragraph 2 or anything herein or in the Purchase Agreement or the Escrow Agreement to the contrary, each of Purchaser and Seller hereby acknowledges and agrees that, except for the satisfaction of Seller's obligation to indemnify Purchaser for the SAT Settlement Amount as provided in the foregoing paragraph 2, neither the execution and delivery of this Agreement nor the execution and delivery of such Joint Release Notice shall constitute any waiver by Purchaser or Seller of any of its rights, claims or arguments set forth in the Purchase Agreement, the Escrow Agreement, or any of the Tax Claim Documents in respect of the Taxes and Damages set forth in the Tax Claim Notice.

       This Agreement constitutes the entire agreement and understanding of Purchaser and Seller and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof.  For the avoidance of doubt, except as expressly set forth in this Agreement, nothing contained in this Agreement is intended to or shall be deemed to limit, restrict, modify, alter, amend or otherwise change in any manner the rights and obligations of Purchaser and Seller under the Purchase Agreement or Escrow Agreement.  Except as expressly provided in paragraphs 1 and 2 above, this Agreement shall in no event be construed or deemed to be evidence of, or an admission or concession on the part of Purchaser or Seller as to, any fault, liability, wrongdoing of any kind, breach or damage whatsoever; or the validity or invalidity of any claim or defense. Neither this Agreement nor any drafts, negotiations, or proceedings related to this Agreement shall be offered or received against any party for any purpose in any action or proceeding, except that this Agreement may be offered or received to enforce the terms of this Agreement.

SC1:4693699.1
NAI-1503994615v2

Purchaser and Seller further agree that Sections 1.2, 12.2, 12.3, 12.4, 12.5(b)-(c), 12.6, 12.7, 12.8, 12.9, 12.10 and 12.12 of the Purchase Agreement shall be incorporated herein by reference and made applicable, *mutatis mutandis*, to this Agreement as if set forth in their entirety herein.

[*signature page follows*]

SC1:4693699.1
NAI-1503994615v2

ACKNOWLEDGED AND AGREED:


**AT&T MOBILITY HOLDINGS B.V.**

By: _____
Name:   David C. Welsch
Title: Vice President and Associate General Counsel


**NIU HOLDINGS LLC**


By:_____
Name:
Title:


*[Signature Page to Letter Agreement re: SAT Settlement Amount]*

ACKNOWLEDGED AND AGREED:


**AT&T MOBILITY HOLDINGS B.V.**


By:_____
Name:   David C. Welsch
Title:  Vice President and Associate General Counsel


**NIU HOLDINGS LLC**


By: _Shana C Smith_
Name: Shana C Smith
Title: Manager

**Annex A**

**Form of Joint Release Notice**

(*Attached*)

# JOINT RELEASE NOTICE

To: Citibank, N.A.
as Escrow Agent
Agency & Trust
388 Greenwich Street, 14th Floor
New York, NY 10013
Attn: Mary Ellen Connolly
Facsimile: (973) 461-7191
Email: mary.e.connolly@citi.com; cts.spag@citi.com; catherine.m.hughes@citi.com

      This joint release notice is being executed and delivered as of the 9th day of July, 2018, pursuant to Section 3(e)(i) of that certain Escrow Agreement dated as of January 26, 2015 (the "Escrow Agreement") by and among AT&T Mobility Holdings B.V. ("Purchaser") (as permitted assign of New Cingular Wireless Services, Inc.), NIU Holdings LLC ("Seller") and Citibank, N.A., as Escrow Agent (the "Escrow Agent"). Reference is hereby made to (i) the Claim Notice, dated April 27, 2017, from Purchaser to the Escrow Agent (including all annexes thereto, the "Tax Claim Notice"), (ii) the letter from Purchaser to the Escrow Agent, dated May 18, 2017 (including all annexes thereto, the "Tax Claim Adjustment Letter"), and (iii) the Joint Release Notice dated July 18, 2017 (the "Joint Release Adjustment"). Capitalized terms used and not otherwise defined in this notice have the meanings ascribed to them in the Escrow Agreement.

      Pursuant to Section 3(e)(i)(1) of the Escrow Agreement, Purchaser and Seller hereby jointly instruct the Escrow Agent to release and pay to Purchaser an amount equal to $3,994,720.20 out of the Escrow Account by wire transfer of immediately available funds to:

      Bank: Citibank
      ABA: 021000089
      SWIFT: CITIUS33
      Account: AT&T Mobility Holdings B.V.
      Acct#: 30981022
      Ref: Escrow Release

      Notwithstanding the foregoing release, each of Seller and Purchaser hereby expressly reserve all of their respective rights, claims and arguments with respect to this notice, the Tax Claim Notice and the Taxes and Damages referenced herein and therein and any future claims Purchaser may make.

*[signature page follows]*

Each of the undersigned hereby represents and warrants that it has been authorized to execute this notice. This notice may be signed in counterparts. All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.


**PURCHASER**:

AT&T MOBILITY HOLDINGS B.V.

By: _Sherri Bazan_
Name: Sherri Bazan
Title: Director Cash / Treasury
Test Word: ATT

**SELLER**:

NIU HOLDINGS LLC

By: _____
Name: Shana C. Smith
Title: Manager
Test Word: Pizza

*[Signature Page to Joint Release Notice]*

Each of the undersigned hereby represents and warrants that it has been authorized to execute this notice. This notice may be signed in counterparts. All signatures of the parties to this Joint Release Notice may be transmitted by facsimile, and such facsimile will, for all purposes, be deemed to be an original signature of such party whose signature it reproduces, and will be binding upon such party.

**PURCHASER**:

AT&T MOBILITY HOLDINGS B.V.

By: _____
Name: Sherri Bazan
Title: Director Cash / Treasury
Test Word: ATT

**SELLER:**

NIU HOLDINGS LLC

By: *Shana C Smith*
Name: Shana C. Smith
Title: Manager
Test Word: Pizza

*[Signature Page to Joint Release Notice]*

# EXHIBIT 13

# JONES DAY

250 VESEY STREET • NEW YORK, NEW YORK 10281-1047

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

JP604315                                                April 24, 2018

AT&T Mobility Holdings B.V.
One AT&T Plaza
205 South Akard Street, 32nd Floor
Dallas, TX 75202
Attn: David C. Welsch, Vice President and Associate General Counsel

<div align="center">

Re:     Pending Tax Claims Against Escrow Deposit

</div>

Dear Mr. Welsch:

Reference is hereby made to (i) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "Purchase Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), NIHD Telecom Holdings B.V., Seller, Nextel International (Uruguay) LLC and the Seller Guarantors identified therein, and (ii) the Escrow Agreement, dated January 26, 2015 (as amended, the "Escrow Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), Seller and Citibank, N.A. ("Escrow Agent"). Capitalized terms not otherwise defined herein shall have the meanings given to them in the Purchase Agreement or the Escrow Agreement, as applicable.

We write in response to Purchaser's letter dated April 5, 2018 (the "April 5 Letter"), in which Purchaser rejected Seller's request that Purchaser execute a Joint Release Notice in connection with the anticipated settlement of several of the Tax Claims as to which Purchaser has asserted Claims against the Escrow Fund. Purchaser's position, as stated in the April 5 Letter, is based on two fundamentally incorrect characterizations of the terms of the Purchase Agreement and the Escrow Agreement.

First, Purchaser's letter characterizes the amounts claimed in its April 27, 2017 Tax Claim Notice (the "4/27/17 Letter") as being for a "single aggregate Claimed Amount." In fact, the 4/27/17 Letter sought indemnification for multiple "Tax Claims," which are defined in Section 11.5(a) of the Purchase Agreement to be claims based on "a written notice of deficiency, proposed adjustment, adjustment, assessment, audit, examination or other claim . . . ." The 4/27/17 Letter aggregated these Tax Claims into two (not one single) aggregated amounts, each of which consists of multiple Tax Claims relating to different entities, different tax years and different types of taxes.

NAI-1503617107v4

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

AT&T Mobility Holidays B.V.
April 24, 2018
Page 2

Seller repeatedly advised Purchaser in the days following the delivery of the 4/27/17 Letter that such letter was deficient as a notice under the Escrow Agreement because it failed to provide reasonable detail as to the nature, source and estimated amounts of the Tax Claims at issue, as required by Section 3(e)(i)(3) of the Escrow Agreement. Purchaser gradually gathered and provided the required information regarding the individual Tax Claims aggregated in the 4/27/17 Letter and, after several discussions, the parties identified the individual Tax Claims and their respective estimated amounts. This detail is memorialized in Seller's objection letter, dated May 25, 2017, in which Seller addresses the merits of each Tax Claim and objects to those amounts as to which it disputes Purchaser's entitlement to indemnification. Pursuant to the clear terms of the Escrow Agreement, each such Disputed Claim Amount is to be resolved on a case-by-case basis and, once resolved, a portion of the Escrowed Funds equal to the Disputed Claim Amount is to be released accordingly.

Second, the April 5 Letter suggests that Purchaser intends to assert claims for an additional $70 million in Tax Claims. If Purchaser wishes to seek such indemnification for such additional Tax Claims, it should make a proper indemnification claim under the Purchase Agreement. Such new claims may not be asserted against the Escrow Funds, even if characterized as an increase in one or more Claims asserted in the 4/27/17 Letter, because the Final Release Date has passed.

In sum, the amounts currently held under the Escrow Agreement consist of multiple Disputed Claim Amounts, each of which relates to a specific Tax Claim as to which Purchaser has demanded indemnification. As each such Tax Claim is resolved, the corresponding Disputed Claim Amount must be released accordingly. For the reasons outlined above and on the conference call held on April 23, 2018, Seller reiterates its request that Purchaser execute the following Joint Release Notices:

1. Immediate release to Seller of $35,192,709 in respect of the reduction in exposure related to Comunicaciones Nextel's 2010 and 2011 income tax audits, as well as a reduction in exposure related to NII Digital's 2013 audits;

2. Release to Seller of $15,940,435 when Comunicaciones Nextel files its 2010 amended return; and

3. Release to Seller of $21,869,326 and release to Purchaser of approximately $1,500,000 when Comunicaciones Nextel files its 2011 amended return.

AT&T Mobility Holidays B.V.
April 24, 2018
Page 3


Please confirm that Purchaser will comply with this request.

Very truly yours,

John K. Kane

cc: NIU Holdings LLC,
c/o NII Holdings, Inc.
1875 Explorer Street,
Reston, VA 20191
Attn: Shana C. Smith, General Counsel

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attn: Werner F. Ahlers

# EXHIBIT 14

# SULLIVAN & CROMWELL LLP

125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

☐ FAX NUMBER
☎ VOICE NUMBER

Date: August 3, 2018

| FROM: | SENDER'S NUMBER(S) | |
|---|---|---|
| **Werner F. Ahlers** | ☎ (212) 558-1623 | |
| | ☐ 212-291-9201 | |

| TO: | COMPANY | NUMBER(S) |
|---|---|---|
| 1.  **John K. Kane** | **Jones Day** | ☐ (212) 755-7306 |
| | | ☎ |

*Message:*

Number of pages sent
(including cover sheet[s])    **6**

**If there are any problems with this facsimile, please call Fax Department at this number:  (212) 558-3586.**

**Confidentiality Note:** The information in this facsimile message ("fax") is sent by an attorney or his/her Agent, is intended to be confidential and for the use of only the individual or entity named above. The information may be protected by attorney/client privilege, work product immunity or other legal rules. If the reader of this message is not the intended recipient, you are notified that retention, dissemination, distribution or copying of this fax is strictly prohibited. If you receive this fax in error, please notify us immediately by telephone and return it to the address above. Thank you.

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

August 3, 2018

By Email and Facsimile

Jones Day
250 Vesey Street
New York, NY 10281
Attn: John K. Kane

Re:     Tax Claim and Request for Joint Release Notice

Dear Mr. Kane:

Reference is hereby made to (i) the Purchase and Sale Agreement, dated January 26, 2015 (as amended, the "Purchase Agreement"), by and among AT&T Mobility Holdings, B.V. ("Purchaser" (as permitted assign of New Cingular Wireless Services, Inc.)), NIHD Telecom Holdings B.V., NIU Holdings LLC ("Seller"), Nextel International (Uruguay) LLC and the Seller Guarantors identified therein, (ii) the Escrow Agreement, dated January 26, 2015 (as amended, the "Escrow Agreement"), by and among Purchaser (as permitted assign of New Cingular Wireless Services, Inc.), Seller and Citibank, N.A. ("Escrow Agent"), (iii) the Tax Claim Notice from Purchaser to Seller and Claim Notice from Purchaser to the Escrow Agent, each dated April 27, 2017 (including all annexes thereto, the "Tax Claim Notice"), (iv) the letter from Purchaser to the Escrow Agent, dated May 18, 2017 (including all annexes thereto, the "Tax Claim Adjustment Letter"), regarding adjustments to the Claimed Amount set forth in the Tax Claim Notice and the resulting release of such funds to Seller, (v) the letters from Seller to Purchaser and the Escrow Agent, each dated May 25, 2017 (together, the "Objection Letters"), regarding Seller's objections to the Tax Claim Notice, (vi) the letter agreement and joint release notice to the Escrow Agent, each dated July 18, 2017 (together, the "2012 Tax Letter Agreement"), by and between Purchaser and Seller, setting forth the parties' agreement with respect to the 2012 Tax Claim (as defined therein) and certain other agreements with respect to Taxes and Damages related to the 2012 Fiscal Year, (vii) Purchaser's letter to Seller dated April 5, 2018 (the "April 5 Purchaser Letter"), in which Purchaser rejected Seller's request that that Purchaser execute a Joint Release Notice in connection with a settlement regarding the amount of Taxes and Damages imposed on certain of the Entities for fiscal years 2010 and 2011, (viii) Seller's response to the April 5 Purchaser Letter, dated April 24, 2018 (the "April 24 Seller

Letter"), (ix) the Escrow Release Agreement, dated July 9, 2018 (the "Escrow Release Agreement"), pursuant to which Purchaser consented to the SAT Settlement (as defined therein) and an amount equal to the amount paid by Purchaser pursuant to the SAT Settlement was released from the Escrow Account to Purchaser and (x) Seller's email to Purchaser, dated July 18, 2018 (the "2010/11 Release Request"), requesting that Purchaser execute a Joint Release Notice in connection with the SAT Settlement and a further settlement reached with SAT regarding the amount of certain Taxes and Damages imposed on the Company for fiscal year 2010 (the "2010 SAT Settlement" and together with the SAT Settlement, the "2010/11 SAT Settlements"). Capitalized terms not otherwise defined herein shall have the meanings given to them in the Purchase Agreement or the Escrow Agreement, as applicable.

We write in response to the April 24 Seller Letter and Seller's renewed request in the 2010/11 Release Request that Purchaser execute a Joint Release Notice in connection with the 2010/11 SAT Settlements. For at least six reasons, Purchaser does not agree to execute such a Joint Release Notice at this time.

*First*, although amended returns have been filed, the 2010/11 SAT Settlements will not be final until the execution of a definitive settlement agreement (*acuerdo conclusivo*) among SAT, Prodecon and the Company with respect to each amended return and the related proceedings. As a result, the April 24 Seller Letter and Seller's renewed request in the 2010/11 Release Request are, at best, premature.

*Second*, contrary to the assertion in the April 24 Seller Letter, Purchaser's Tax Claim Notice sought indemnification for a single "Tax Claim Amount." The Tax Claim Notice described the Tax Claim Amount as "Purchaser's estimate as of the date hereof, and subject to amendment in the event additional information becomes available, *of the aggregate amount*" of taxes and damages in respect of "any Taxes imposed on the Entities that are attributable to any Pre-Closing Period." Purchaser thus made a single Claim, as that term is defined under Section 3(e) of the Escrow Agreement, and the Tax Claim Amount was a single "Claimed Amount" as defined under Section 3(e) of the Escrow Agreement, *i.e.*, a "reasonable estimate of the amount of the Escrow Fund to be reserved with respect to such Claim prepared in good faith based on information then available."

In its Objection Letter, Seller itself indicated that it was "disputing Purchaser's right to indemnification in respect of[] the Claimed Amount" and refused to authorize the release of the entire Claimed Amount to Purchaser. This created a single Disputed Claim Amount, as that term is defined in the Escrow Agreement (that is, "the difference between the Claimed Amount and the amount agreed to be paid"). Neither the Purchase Agreement nor the Escrow Agreement

Jones Day                                                                    -3-

support Seller's contention that the individual objections Seller raised in the Objection Letter unilaterally created multiple, distinct Disputed Claim Amounts.[1]

*Third,* Purchaser disagrees with the assertion in the April 24 Seller Letter that Purchaser's communication to Seller of Purchaser's updated estimate of its aggregate exposure related to the Claim set forth in the Tax Claim Notice constituted additional Claims for purposes of the Escrow Agreement. Between July 18, 2017 (*i.e.,* Purchaser's adjustment of the amount of the Claimed Amount set forth in the Tax Claim Notice pursuant to the 2012 Tax Letter Agreement) and the date of the April 5 Purchaser Letter, Purchaser's estimate of the aggregate amount of indemnifiable Taxes and Damages in respect of the Tax Claim Notice increased by almost $70,000,000. This was not "an additional $70 million" in "new claims," as Seller asserts, but instead an updated estimate of the aggregate amount of indemnifiable Taxes and Damages that made up the original Tax Claim Amount in light of ongoing negotiations with Prodecon and SAT. Specifically, the preliminary findings issued by the tax authorities with respect to Comunicaciones Digitales 2013, Inversiones Nextel 2013, NII Digital 2013 and Inversiones Nextel 2014 reflected significantly higher potential Taxes and Damages for those years than the information available to Purchaser at the time of Purchaser's original estimate of the Tax Claim Amount.[2] Moreover, some of the increase in the estimate of the aggregate indemnifiable amount is attributable to inflation and various surcharges, including monthly interest and penalties, applicable to the various proceedings.

Further, the revised estimate described in the April 5 Purchaser Letter is consistent with the text of the Escrow Agreement. That the aggregate Tax Claim Amount would be subject to future revisions is embedded in the text of the Escrow Agreement, which requires only that a Claim Notice (and the Claimed Amount specified therein) be prepared "in good faith *based on information then available.*" This language supports the conclusion that such estimates are subject to later revision based on information that was *not* then available, and that doing so would not create a new "Claim". Consistent with this principle, the Tax Claim Notice clearly stated that the original Tax Claim Amount was an estimate as of the date of the Tax Claim Notice but was "subject to amendment in the event additional information becomes available"; such an amendment is precisely what the April 5 Purchaser Letter communicates. Simply stated, there is no support in the Escrow Agreement for the proposition that the good faith estimate required to be made at the time the Claim Notice is delivered was intended by the parties to act

[1] Although Purchaser provided Seller with a chart presenting in more detail its estimate of the Claimed Amount in good faith, Purchaser did so only in response to Seller's request for more information, and in any event, such additional detail did not, and Purchaser explicitly disclaimed any intent to, limit the single, aggregate Claim set forth in the Tax Claim Notice.

[2] As of the date of the Tax Claim Notice, the tax authorities had made an examination request but had not yet issued preliminary findings with respect to the eventual tax assessments regarding the applicable Taxes and Damages. The April 5 Purchaser Letter, on the other hand, is based on more accurate and recent information not available at the time of the Tax Claim Notice with respect to the assessment of the Taxes and Damages covered by the Tax Claim Notice.

Jones Day                                                                    -4-

as a cap on the maximum amount of indemnifiable Taxes and Damages that could be paid from the Escrow Account in respect of such Claim Notice.

*Fourth*, Seller's insistence that amounts be released from Escrow on a "case-by-case" basis, as various settlements with SAT are reached, fundamentally ignores the interrelated nature of the ongoing negotiations with SAT. Although individual inspections with respect to particular claims are formally independent from each other, it is only natural and commonplace for discussions and negotiations with the tax authorities to consider any open claims together.

We believe that negotiations with regard to the Tax Claim Amount would demonstrate that the same is true in this case. In particular, Seller's and Purchaser's ability to discuss potential settlements with SAT in the context of SAT's inquiries covering multiple fiscal years and related entities may increase the taxpayer's leverage and enable it to obtain better terms with regard to the settlement of the aggregate amount Taxes and Damages payable in respect of all of those inquiries. This further underscores the importance of Purchaser's delivery of a Tax Claim Notice for a single, aggregate Tax Claim Amount for Taxes and Damages expected to be imposed on the Entities for the Pre-Closing Period.

*Fifth*, even if Purchaser's estimate of the aggregate Tax Claim Amount had not increased, Seller still would not be entitled to any partial distribution from the Escrow Fund until the entirety of the Disputed Claim Amount is resolved. Under Seller's position, the Escrow Agreement would function as a one-way ratchet, whereby any reduction in any part of the Claimed Amount would require an immediate release of escrow funds to the Seller, even if the aggregate amount that may be indemnifiable in respect of the Taxes and Damages covered by the previously submitted Claim Notice (as re-estimated based on current available information) already meets or exceeds the amount then held in escrow. However, the Escrow Agreement sets forth the requirements for release of the Disputed Claim Amount, and provides that the Disputed Claim Amount shall be held in escrow until the execution of a Joint Release Notice or the entry of a Final Judgment with respect to the Disputed Claim Amount. The Escrow Agreement does not require that, while the Disputed Claim Amount remains in dispute, portions of the Disputed Claim Amount be released without taking into account to the total amount of the remaining Taxes and Damages that may be indemnifiable in respect of the original Claim.

*Finally*, Seller's argument that it is entitled to a partial distribution from the Escrow Fund is particularly inappropriate in the current context, *i.e.*, after the Final Release Date has passed. Pursuant to Section 3(e)(iii)(2), the resolution of one Disputed Claim Amount would entitle Seller to only the release of "the excess of the entire balance then available in the Escrow Account (if any) over the aggregate Disputed Claim Amounts still pending or disputed." As noted in the April 5 Purchaser Letter, Purchaser's current estimate of the aggregate amount of indemnifiable Taxes and Damages in respect of the Tax Claim Notice exceeds the remaining

Jones Day                                                                    -5-

balance of the Escrow Fund, and as such Seller would not be entitled to any partial release even if multiple Disputed Claim Amounts existed.

Purchaser notes that the foregoing is without any prejudice to any other arguments or claims Purchaser may have under the Purchase Agreement or the Escrow Agreement regarding these matters and expressly reserves all of its rights, claims and arguments with respect to this letter and the Tax Claims, Taxes, Damages, and other correspondence referenced herein.

If you have any questions regarding the subject matter of this letter, please contact me at ahlersw@sullcrom.com or (212) 558-1623.

Very truly yours,

Werner F. Ahlers